## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| NEW MEXICO CATTLE GROWERS' ASSOCIATION, SPUR LAKE CATTLE COMPANY, NELSON SHIRLEY, individually, ALLEN CAMPBELL, individually, and HUMANE FARMING ASSOCIATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES FOREST SERVICE; ANIMAL AND PLANT HEALTH INSPECTION SERVICE; CAMILLE HOWES, in her official capacity as Supervisor of the Gila National Forest, TOM VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service, MICHIKO MARTIN, in her official capacity as Southwestern Regional Forester, HENRY PROVENCIO, in his official capacity as District Ranger for the Wilderness Ranger District, Gila National Forest, JANET BUCKNALL, in her official capacity as Deputy Administrator of the Animal and Plant Health Inspection Service, KEITH WEHNER, in his official capacity as Western Regional Director, Animal and Plant Health Inspection Service, <br><br> *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§   CASE NO. _____<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs New Mexico Cattle Growers' Association ("NMCGA"), Spur Lake Cattle Co. ("Spur Lake"), Nelson Shirley, individually, Allen Campbell, individually, and the Humane Farming Association (together, "Plaintiffs") hereby file this Complaint against the United States Forest Service ("USFS"), the Animal and Plant Health Inspection Service ("APHIS"), Camille Howes, in her official capacity as Supervisor of the Gila National Forest**,** Tom Vilsack, in his official capacity as Secretary of the United States Department of Agriculture, Randy Moore, in his official capacity as Chief of the U.S. Forest Service, Michiko Martin, in her official capacity as Southwestern Regional Forester, Henry Provencio, in his official capacity as District Ranger for the Wilderness Ranger District, Gila National Forest, Janet Bucknall, in her official capacity as Deputy Administrator of the Animal and Plant Health Inspection Service, Keith Wehner, in his official capacity as Western Regional Director, Animal and Plant Health Inspection Service, and would respectfully show the Court the following:

## I.  INTRODUCTION

1.      This lawsuit is necessary to avert the mass slaughter of as many as 150 "unauthorized" cattle in the Gila National Forest. USFS has approved a project that would authorize APHIS to shoot as many these cattle with high-powered rifles from a helicopter, leaving their carcasses strewn throughout New Mexico's Gila Wilderness ("the Aerial Shooting"). This Court's intervention is necessary to put an immediate stop to this unlawful, cruel, and environmentally harmful action, both now and in the future.

2.      The USFS must cease this action for several reasons. First, it violates a June 30, 2022 Stipulation (the "Stipulation") that concluded a prior lawsuit among federal agencies (including USFS), NMCGA, Spur Lake, and other parties. That Stipulation states that USFS will provide NMCGA, Spur Lake, and the public with at least 75 days' notice of its decision to shoot

cattle from a helicopter before conducting such operations. Here, the USFS issued a final decision on February 16, 2023, announcing that cattle will be shot from a helicopter one week later starting on Thursday, February 23, 2023. This clearly violates the Stipulation, and the Court should require USFS to abide by the 75-day notice period it agreed it would provide.

3.     Second, USFS has no legal authority to carry out the Aerial Shooting, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). USFS intends to aerially gun down cattle in the complete absence of any federal statutory or regulatory authority to do so.

4.     Although the United States Department of Agriculture and the USFS have *generalized* authority to protect national forests (which does not include aerial shooting of animals), the USFS has promulgated *specific* regulations by which unauthorized livestock on federally managed lands must be impounded, sold, and potentially destroyed. *See* 36 C.F.R. § 262.10. Yet, the USFS has no intention of following its own regulation, despite expressly acknowledging its applicability in its original proposal/scoping notice, in its February 1, 2023 Notice of Intent to Impound Unauthorized Livestock, and in other publications and materials related to the removal of unauthorized livestock from such federally-managed lands. It is well-established that "an agency must abide by its own regulations," a maxim the USFS clearly intends to disregard when it begins shooting cattle from a helicopter mere days from now. *Ft. Stewart Schools v. FLRA*, 495 U.S. 641, 654 (1990). Simply put, the Aerial Shooting violates the APA because it is not authorized by statute or regulation, exceeds USFS's authority, and fails to follow the existing regulations for the removal of unauthorized cattle. This action must be set aside by the Court.

5.      Third, USFS has violated both the APA and the National Environmental Policy Act ("NEPA") by failing to prepare an Environmental Impact Statement ("EIS"), and/or by failing to fully consider all significant environmental impacts of the Aerial Shooting, including the risks of contamination of protected waters and sensitive resources associated with decomposing carcasses. USFS has cited no "categorical exclusions" that would allow it to skirt its obligations under NEPA. And, even if a categorical exclusion applied, extraordinary circumstances in the form of substantial environmental impacts exist and require full NEPA review.

6.      For these reasons, the Court should grant the declaratory and injunctive relief sought by Plaintiffs in this lawsuit.

## II.    PARTIES

7.      Plaintiff New Mexico Cattle Growers Association ("NMCGA") is a membership-driven association formed in 1914. The primary mission of NMCGA is to advance and protect the cattle industry of New Mexico, solve problems facing the cattle industry, promote the well-being of the industry, provide an official and united voice on issues of importance to cattle ranchers, producers, and feeders, and to create and maintain a legal and regulatory environment that allows ranchers, producers, and feeders to prosper economically. NMCGA strongly supports environmental policies that protect the environment and the wise use of natural resources, including national forest areas such as the Gila Wilderness and the Gila River, which serves as a water source to many NMCGA members either on their ranches or while they enjoy recreational use of the Gila National Forest and the Gila Wilderness.

8.      Plaintiff Spur Lake Cattle Co. ("Spur Lake") is a Missouri non-profit corporation with its principal place of business in Luna, New Mexico. Spur Lake owns and/or operates several ranches along the New Mexico and Arizona border.

9.      Plaintiff Nelson Shirley ("Shirley") is an individual resident of New Mexico. Shirley operates Spur Lake and sues both in his capacity as Spur Lake's president and in his individual capacity. Shirley also is a member of NMCGA. As an individual, he has grazing allotments for cattle on or near the Gila National Forest and the Gila Wilderness, where many of his branded and tagged cattle legally graze on federally managed lands in the Gila National Forest and the Gila Wilderness under grazing permits authorized by the USFS.

10.     Plaintiff Allen Campbell ("Campbell") is an individual resident of New Mexico. Campbell operates a business in Grant County, New Mexico who has been irreparably harmed by the aerial shooting of cattle in the Gila Wilderness by USFS and APHIS and will suffer additional irreparable harm if the Aerial Shooting is not temporarily and permanently enjoined.

11.     Plaintiff Humane Farming Association ("HFA") is a registered, non-profit 501(c)(3) charitable organization headquartered in San Rafael, California. Founded in 1985, HFA's 270,000 members and supporters, including those living in New Mexico near the Gila National Forest, Gila Wilderness Area, and Gila River, work to protect farmed animals through their support of groundbreaking legislation, anti-cruelty investigations, legal action, and direct care for abused animals. HFA's Suwanna Ranch—the world's largest farmed animal refuge—provides more than seven square miles of land for rescued victims of animal cruelty. In advance of its organizational mission to protect animals across the country, HFA has devoted substantial organizational resources to raising awareness about animal cruelty and neglect, as it aims to inspire change in the way society views and treats animals through public education, animal rescue efforts, and advocacy.

12.    USFS is an agency of the U.S. Department of Agriculture that administers the Nation's national forests and grasslands. USFS issued the Decision Memo authorizing the aerial shooting of cattle beginning on February 23, 2023.

13.    APHIS is an agency of the U.S. Department of Agriculture that purports to, among other things, protect the health of U.S. agriculture and natural resources against invasive pests and diseases, regulates genetically engineered crops, administers the Animal Welfare Act. APHIS has been directed by the USFS to carry out the Aerial Shooting authorized by USFS's Decision Memo.

14.    Defendant Camille Howes is the Forest Supervisor for the Gila National Forest and an employee of the United States Forest Service. She is responsible for issuing the applicable agency decision at issue in this lawsuit. Defendant Howes is sued in an official capacity.

15.    Defendant Tom Vilsack is the Secretary of the USDA. In that capacity, he oversees the USFS and APHIS. As such, he is responsible for compliance with all federal laws and regulations that apply to the operations of the USDA and its affiliated agencies. Defendant Vilsack is sued in an official capacity.

16.    Defendant Michiko Martin is the USFS Regional Forester for the Southwest Region. The Southwest Region oversees the activities on the Gila National Forest, including in the Wilderness District. As such, she is responsible for compliance with all federal laws and regulations. Defendant Martin is sued in an official capacity.

17.    Defendant Henry Provencio is the District Ranger for the Wilderness Ranger District. As such is he responsible for compliance with all federal laws and regulations. Defendant Provencio is sued in his official capacity.

18.    Defendant Janet Bucknall is the Administrator of APHIS. As such she is responsible for compliance with all federal laws, rules, and regulations, including the National

Environmental Policy Act, the Wilderness Act, and the Endangered Species Act. Defendant Shea is sued in an official capacity.

19.     Defendant Keith Wehner is the Western Regional Administrator of APHIS, including the State of New Mexico. As such, he is responsible for compliance with all federal laws, rules, and regulations, including the National Environmental Policy Act, the Wilderness Act, and the Endangered Species Act. Defendant Wehner is sued in an official capacity.

20.     Unless otherwise stated, "USFS" shall mean all USFS-related Defendants, and "APHIS" shall mean all APHIS-related Defendants.

### III.     JURISDICTION AND VENUE

21.     This action arises predominantly under the APA, 5 U.S.C. §§ 701-706 and NEPA, 42 U.S.C. §§ 4321-4370h. This Court has subject-matter jurisdiction over those federal claims under 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1331 (federal question). The Court also has supplemental jurisdiction over the state-law claim  under 28 U.S.C. § 1367.

22.     This Court has the authority to grant a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202, and to set aside unlawful agency action and/or grant an injunction pursuant to 5 U.S.C. §§ 705-706 and Rule 65 of the Federal Rules of Civil Procedure.

23.     The requested relief will redress the actual, concrete injuries to Plaintiffs caused by the Defendants' failure to comply with the duties mandated by, *inter alia*, the APA, NEPA, and implementing regulations.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims stated herein occurred in, and the project area that is the subject of the action is situated in, this District.

25.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

26.     All conditions and prerequisites to the filing of this lawsuit have been satisfied or have been waived, including but not limited to, the exhaustion of administrative remedies.

## IV.   FACTS

**A.  The Gila Wilderness contains both unauthorized and excess livestock, some of which belong to NMCGA's members, Spur Lake, and/or Shirley.**

27.     The Gila National Forest is a federally designated national wilderness in New Mexico. It is the sixth-largest national forest in the continental United States. Within its boundaries lies the Gila Wilderness, a rugged and majestic area comprising approximately 560,000 acres of undeveloped land that is protected from intrusions by motorized vehicles, roads, buildings, logging, mining, or many other commercial activities.

28.     NMCGA is an association whose members seek to promote the interests of the New Mexico cattle industry. Members of NMCGA own many branded cattle that legally graze on federally managed lands in the Gila National Forest and the Gila Wilderness under grazing permits authorized by the USFS.

29.     Mr. Shirley owns many branded cattle that legally graze on federally managed lands in the Gila National Forrest and the Gila Wilderness under grazing permits authorized by the USFS.

30.     Although holders of grazing permits are required to keep their cattle on their respective grazing allotments in the Gila Wilderness, it is common for gates between active allotments and vacant allotments  to be left open by hikers, hunters, or other recreational users of the Wilderness, or for fences or gates to be knocked down or broken by other occurrences out of the ranchers' control, such as by wildlife (particularly elk in the Gila Wilderness), the cattle

themselves, or because of falling trees, fires, or floods. For instance, at least 30 miles of fencing in the Gila National Forest was burned by USFS backfires in and around May 2022 between active grazing allotments and vacant allotments that are in the area where the Aerial Shooting is scheduled to occur. This significant absence of fencing in this area allows many branded, privately-owned cattle to wander into vacant allotments in the area where the Aerial Shooting is scheduled to occur.

31.     According to Title 36 of the Code of Federal Regulations (the "Forest Service Regulations"), "unauthorized livestock" are prohibited in the Gila National Forest. 36 C.F.R. § 261.7. As defined in the Forest Service Regulations, "unauthorized livestock" means:

> any cattle, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro by 222.20(13), which is not authorized by permit to be upon the land on which the livestock is located and which is not related to use authorized by a grazing permit; provided, that noncommercial pack and saddle stock used by recreationists, travelers, other Forest visitors for occasional trips, as well as livestock to be trailed over an established driveway when there is no overnight stop on Forest Service administered land do not fall under this definition.

36 C.F.R. § 261.2.

32.     Cattle were introduced to the region now known as New Mexico by the late 16th century. Cattle have been present and have grazed on land that became the Gila National Forest and the Gila Wilderness for well over a hundred years, and long before it became federally managed land. Cattle are neither exotic, invasive, nor non-indigenous to the area.

33.     USFS claims that a certain number of cattle previously grazing in the Gila Wilderness according to a legal permit in the 1970s were abandoned by the permittee. Although subsequent owners/permittees attempted to gather these cattle, they were unsuccessful. USFS claims, with no evidence or scientific support, that these cattle developed into undomesticated, "feral" cattle today, despite the fact that the genetic markers in the DNA of any cattle that were the progeny of legal livestock permitted in the Gila National Forest would match or be within the

scientifically accepted parameters of domesticated livestock. The temperament or degree of docility of cattle does not make them cease to be domesticated livestock. USFS estimated that, as of 2020, these "undomesticated" cattle numbered approximately 150-200 head.

**B. USFS conducts aerial shooting of unauthorized livestock in February 2022, resulting in a lawsuit and stipulation that USFS would provide 75 days' notice before conducting further lethal aerial operations.**

34. In February 2022, USFS initiated the aerial shooting of "unauthorized livestock," during which 65 head of cattle were shot at and killed from a helicopter. NMCGA and Spur Lake, among other parties, initiated suit against the same defendants in this lawsuit seeking relief to stop this barbarous practice.

35. That lawsuit resulted in a stipulation of dismissal dated June 30, 2022 (the "Stipulation"), in which the parties agreed to dismiss the lawsuit without prejudice. The Stipulation further provided:

> APHIS Wildlife Service's operations for aerial shooting to lethally remove unbranded and unauthorized cattle in the Gila Wilderness Area began on February 10, 2022 and concluded on February 11, 2022. On May 11, 2022, the Forest Service issued a memorandum entitled "Completion of Action Authorized by Decision Memo Gila Feral Cow Mitigation" stating that the February, 2022 Operation was complete and that "[n]o further operations are planned or shall be pursued under the September 11, 2020 Decision Memo." *In any event, any such aerial lethal removal operations on or before March 1, 2025 would be preceded by at least 75 days' notice to the Petitioners and also to the public.*

[Exhibit 1 (emphasis added)].

36. USFS and APHIS's aerial gunning of cattle was also soundly criticized by the New Mexico Livestock Board ("NMLB"), a New Mexico state agency charged with the regulation and protection of New Mexico's livestock industry. In a January 3, 2023 Decision and Findings of Fact, the NMLB concluded that the aerial gunning of cattle in February 2022 was "NOT in accordance with commonly accepted agricultural animal husbandry practices," and that such

shooting "constitutes acts of animal cruelty" in violation of New Mexico law. [Exhibit 2].

The NMLB Decision further found:

- Three dead bulls (male cattle) were observed by NMLB employees following the aerial gunning operations in February 2022 [Ex. 3 at p.2];

- Two of the dead bulls were found in the Gila River, one with a broken hind leg. Both bulls were found with multiple gunshot wounds in the head, neck, back, and sides, and "did not die a good death" [*Id.* at p. 2].

**C. USFS issues a "Scoping Notice and Proposal" to conduct both live gather and removal efforts and lethal removal efforts of unauthorized livestock.**

37.     Despite the horrific suffering caused to cattle during the February 2022 operations, on November 17, 2022, USFS issued what it described as a "scoping notice and proposal" to further "address the presence of unbranded and unauthorized cattle" (the "Scoping Notice") [Exhibit 3 at 1]. The Scoping Notice stated that it was "intended to cover any ongoing live gather and removal efforts, as well as any lethal removal efforts through either aerial shooting from a helicopter or shooting on the ground." [*Id.*].

38.     The Scoping Notice expressly acknowledged that both the proposed "live gather" and "lethal removal operations" would be subject to the impoundment regulations set forth in 36 C.F.R. § 262.10:

Before any live gather or lethal removal operations, several measures would be implemented to address public safety and other considerations. No grazing is authorized within the area identified for the proposed action. *A public notice would be posted in accordance with Forest Service regulations (36 C.F.R. § 262.10) alerting the public that unauthorized livestock will be removed and requesting that anyone that may own livestock that have wandered into the area collect their livestock and remove them from the Forest.*

[Exhibit 3 at p.2 (emphasis added)].

39.     USFS expressly sought "comments and ideas on this proposal" from the public in the Scoping Notice, including "ideas that you believe should be considered in helping us develop

a final proposal that meets the need described above." [*Id.* at p. 3]. The language of the Scoping Notice is clear that this was not a "final proposal," but an initial proposal subject to comment from the public.

40.     NMCGA and Mr. Shirley, on behalf of himself and Spur Lake, submitted comments in response to the Scoping Notice, objecting to the proposed action and describing both the factual and legal deficiencies in the Scoping Notice and the proposed action. [Exhibits 4, 5].

41.     On February 1, 2023, USFS issued a "Notice of Intent to Impound Unauthorized Livestock" (the "Impoundment Notice"). [Exhibit 6]. The Impoundment Notice was given "pursuant to Regulation of the Secretary of Agriculture, 36 C.F.R. 262.10." [*Id.*]. It further states:

> all unauthorized livestock found upon National Forest System Lands or other lands under Forest Service control within the following area may be impounded by the United States Forest Service on or after February 15, 2023, unless said livestock are removed permanently from the described lands.

[*Id.*].

**D. USFS issues a Decision Memo announcing that it will begin to shoot cattle from a helicopter on and after February 23, 2023.**

42.     On February 16, 2023, USFS issued a "Decision Memo, Gila Wilderness Feral Cattle Removal" (the "Decision Memo"). [Exhibit 7]. In the Decision Memo, Defendant Howes stated she has "decided to allow for the treatment of unauthorized, feral cattle utilizing a combination of lethal and non-lethal methods to remove the remaining population of feral cattle from the Gila Wilderness." [*Id.* at p. 5].

43.     Specifically, the Decision Memo states that it will "work with USDA APHIS-Wildlife Services to conduct lethal removal through aerial and ground-based operations." [*Id.* at p. 5-6]. Such "aerial removal efforts are expected to take place over one or more 7-day periods annually until" all unauthorized cattle are removed from the Gila Wilderness. [*Id.*]. The first aerial

lethal operations "are expected to begin on or around February 22, 2023." Later communications from USFS confirmed that the Aerial Shooting would begin on Thursday, February 23, 2023.

44.     The Decision Memo further states, "All lethally removed or euthanized cattle would be left on site to naturally decompose, unless within or adjacent to a waterbody, designated hiking trail, or culturally sensitive location." [*Id.*].

45.     According to the Decision Memo, the procedures set forth in 36 C.F.R. § 262.10 "apply only to impoundments," and do "not preclude the agency from making other lethal and non-lethal efforts to remove feral cattle from the project area within the scope of the U.S. Government's authority." [*Id.*]. To justify its position, USFS stated:

> While the agency intends to follow the procedures set forth in 36 CFR 262.10 for animals successfully gathered as part of this proposed action, it is not required to follow those procedures in this instance because the feral cattle are not "livestock" as "animals of any kind kept or raised for use or pleasure," because they are no longer domesticated animals being "kept or raised" by any individual.

[*Id.*].

**E.  USFS decision to authorize APHIS to shoot cattle from a helicopter will result in cattle owned by NMCGA members, Shirley, and/or Spur Lake to be shot and killed in the Gila Wilderness.**

46.     NMCGA members, Spur Lake, and Shirley maintain grazing permits adjacent to and/or partially in the Gila Wilderness.

47.     Branded, privately owned cattle have inadvertently and unintentionally wandered into the Gila Wilderness in the area where USFS intends to conduct the aerial shooting of cattle. Although not authorized to be grazing in these areas, they remain private property of their respective owners.

48.     Although cattle owned by NMCGA members, Spur Lake, and/or Shirley are branded or otherwise tagged, such brands/tags are difficult to identify unless the animal is

physically inspected. This is particularly difficult during the colder months in the Gila Wilderness (November – April) when cattle grow thicker winter coats.

49.     Identifying properly branded/tagged cattle can be difficult for trained brand inspectors in physical contact with cattle on the ground.

50.     It is nearly impossible for untrained individuals, including APHIS shooters, to identify branded/tagged cattle while chasing running cattle from a flying helicopter.

51.     Upon information and belief, APHIS shooters who will be engaged in the Aerial Shooting will make little or no effort to identify whether a particular cow is branded/tagged, or "feral" as described in the Decision Memo.

52.     Instead, USFS claims that "no claimed or branded cattle are expected to have accidentally wandered into the area based on proximity to the nearest active grazing allotments." [Ex. 7 at p.7]. That is demonstrably untrue in light of the fact that numerous branded cattle are very likely in the areas of the Gila Wilderness in which these lethal aerial operations will take place.

53.     Because privately owned, branded cattle are in the subject areas of the Gila Wilderness, and because neither USFS nor APHIS has taken or intends to take any action to distinguish between these branded cattle and the unauthorized and unbranded livestock APHIS intends to kill, the aerial shooting of cattle announced by USFS will undoubtedly result in the killing of branded cattle.

54.     It will also be nearly impossible for private owners of branded cattle illegally shot by USFS/APHIS to even discover that their cows have been killed. Irrespective of where the cattle are actually shot, many such cattle are wounded, but not immediately killed. These wounded cattle then continue moving, wandering off to bleed out and die. Many such cattle ultimately die far from

where they were shot. For instance, NMLB's investigation of USFS/APHIS's aerial shooting operations in February 2022 found that cattle with multiple gunshot wounds did not die at the location they were shot but instead traveled to water sources such as the Gila River before perishing. [Ex. 3].

55.     Further, the target area for these operations is approximately 102,000 acres. [Ex. 6]. USFS/APHIS do not intend to remove cattle shot and killed during these operations, leaving these carcasses exposed in the Gila Wilderness to rot or be scavenged by various animals and insects. It will be nearly impossible for Plaintiffs to search this vast area to find and identify their branded cattle before these cattle carcasses have been eaten or naturally decomposed to the point where they cannot be identified.

56.     As such, Plaintiffs will be unable to determine – even after such operations have already occurred – whether their cattle were unlawfully shot by USFS and APHIS. In this way, unless USFS's plan to shoot cattle from a helicopter is enjoined, Plaintiffs will suffer irreparable harm.

57.     Alternatively, even if NMCGA members, Shirley, and/or Spur Lake are able to identify their branded cattle unlawfully shot and killed by USFS/APHIS, there is no meaningful statutory or regulatory mechanism for Plaintiffs to seek compensation from USDA, USFS, and/or APHIS for compensation. No adequate legal remedy exists under these circumstances.

**F.  Allen Campbell and his business will be imminently and irreparably harmed by the Aerial Shooting.**

58.     Campbell owns a business in Grant County, New Mexico known as the Gila Hot Springs Campground (the "Campground"). The Campground provides tourists, hikers, campers, and many other people who enjoy nature and the outdoors with a place to sleep, eat, and rest before, during, and after their recreational activities in the Gila Wilderness.

59.     After the February 2022 aerial shooting operation, hikers and campers staying at the Campground observed dead cattle throughout the forest at various places, including in or near the Gila River. Other hikers and campers noted that the forest "smelled like hell" and described a putrid and rancid smell caused by the decomposing carcasses of cattle in the forest. Other individuals noted a fear of drinking the water in the Gila River.

60.     The Campground experienced a decline in the number of hikers and campers who visited after the February 2022 aerial shooting operations by the USFS and APHIS. The Campground experienced a loss of customers and a loss of goodwill caused by the dead cattle in the Gila Wilderness during that timeframe. The harm caused to the Campground cannot be calculated because it cannot be known how many customers would have visited the Campground but chose not to because of the dead cattle in the Gila Wilderness. If the Aerial Shooting is not enjoined, the Campground will additionally suffer a loss of customers and goodwill. These damages will also be unable to be calculated because it cannot be known how many customers would have visited the Campground but chose not to because of the dead cattle in the Gila Wilderness.

**G.  HFA's members and supporters will be adversely impacted by the Aerial Shooting.**

61.     HFA's members and supporters are adversely impacted by Defendants' plans to kill more than 150 cows and calves in the Gila Wilderness as part of the Aerial Shooting. HFA's members and supporters are particularly distraught by the intense suffering these animals face given the inhumane, stressful, indiscriminate, imprecise nature of the killing methods that will be employed in the Aerial Shooting. Many of these cows and calves that are shot will languish in the wilderness, injured and dying, but not dead, sometimes for days. There is no justification for the use of helicopters in the management of these mammals, as helicopters frighten them, causing

them to run, trip, and fall, often into or onto each other. There can be no doubt that the Aerial Shooting plan is a plan for animal cruelty.

62.    HFA's members and supporters have an interest in the health and humane treatment of the cows and calves in the Gila Wilderness, as they could be called to rehabilitate sick and injured cows and calves that are injured, but not killed by Defendants' shooters. HFA's members, staff, volunteers, and supporters have engaged in these activities in the past and intend to do so again soon.

63.    HFA as well as its members, supporters, and staff, are dedicated to ensuring the humane treatment of cows and calves throughout the contiguous United States and specifically in the Gila Wilderness and to ensuring that Defendants comply with all applicable state and federal laws related to the humane treatment of animals.

64.    In addition to its animal protection mission and activities, many of HFA's members, supporters, and staff live in or near the Gila National Forest, Gila Wilderness, and Gila River or they visit these areas for hiking, camping, photography, birdwatching, observing wildlife, and other recreational and professional pursuits. HFA's members, supporters, and staff gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild animals, including observing signs of endangered species in these areas, and observing ecosystems enhanced by these animals. The opportunity to possibly view wolves, or signs of wolves, in these areas is of particular interest and value to HFA's members, supporters, and staff, and increases their use and enjoyment of the forest and wilderness areas. HFA's members, supporters, and staff have engaged in these activities in the past and have specific plans to continue to do so in the future.

65.     Defendants' plans to kill more than 150 cows and calves in the Gila Wilderness will adversely impact native wildlife, the natural ecosystem, and waterways. Indeed, Defendants' plan to kill 150 of these large prey mammals will introduce unnatural sources of carrion to native wildlife, including threatened and endangered carnivores. Native predators do not stay inside the Gila Wilderness because they do not recognize borders, so HFA anticipates that these habituated predators will move outside the forest boundaries to adjacent livestock allotments where they will hunt and kill branded cows and calves.

66.     The interests of HFA's members, supporters, and staff have been, and will continue to be, injured by Defendants' killing of cows and calves by aerial gunning in the Gila Wilderness. The interests of HFA's members, supporters, and staff have been, and will continue to be, injured by Defendants' failure to comply with their obligations under NEPA and the APA in authorizing the inhumane killing of cows and calves in the Gila Wilderness.

67.     The relief requested by Plaintiffs, if granted, would redress, or at least lessen, the injuries of HFA's members, supporters, volunteers, and staff. The relief requested by Plaintiffs, if granted, would require Defendants to comply with the requirements NEPA and the APA by at a minimum, requiring the humane removal of cows and calves from the Gila Wilderness without causing intense animal suffering, interfering with the natural behaviors of threatened and endangered species, forcing unnatural wildlife conflicts, and illegally dumping a catastrophic source of water pollution in this pristine wilderness area.

## V.     LEGAL FRAMEWORK

### A.     Administrative Procedure Act.

68.     The Administrative Procedure Act ("APA") provides for judicial review of final agency actions. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion or

otherwise not in accordance with law," in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).

**B.     National Environmental Policy Act.**

69.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, is the nation's basic national charter for the protection of the environment and it contains action-forcing provisions to make sure that federal agencies comply with the Act. 40 C.F.R. § 1500.1. NEPA's purpose is to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. 40 C.F.R. § 1500.1(c).

70.     NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA, which are binding on all federal agencies. 40 C.F.R. § 1507.1. CEQ's regulations specify the factors an agency must consider in determining whether an action may significantly affect the environment, thus warranting preparation of an EIS. *Id*. § 1508.27.

71.     To determine whether an action's effects are "significant," agencies must consider both context and intensity. 40 C.F.R. § 1508.27. "Context" means the significance of the project "must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id*. § 1508.27(a).

72.     The "intensity" of the action is determined by considering the ten "significance factors" enumerated in the regulations, which include the degree to which the proposed action affects public health or safety; the degree to which the effects on the environment are likely highly

controversial; the degree to which the possible effects involve unique or unknown risks; whether the action has cumulatively significant impacts; and the degree to which the action may adversely affect a species listed under the Endangered Species Act, among others. *Id.* §§ 1508.27(b)(1)-(10).

73.     NEPA's regulations provide that an agency may first prepare an Environmental Assessment ("EA") aimed at determining whether the environmental impact of a proposed action is "significant," warranting an EIS. 40 C.F.R. § 1501.3. If, pursuant to the EA, an agency determines that an EIS is not required, it must issue a "finding of no significant impact" that briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment. *Id*. §§ 1501.4(e), 1508.13.

74.     The regulations contain a narrow exception. Specifically, a federal agency may adopt a "categorical exclusion" through rulemaking for "a category of actions that do not individually or cumulatively have a significant effect on the human environment." *Id.* § 1501.4(e), 1508.4. If a federal action falls within an agency's categorical exclusion, the agency is not required to prepare an EIS or an EA. *Id.* However, an agency invoking a categorical exclusion must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.* In such circumstances, a typically excluded action would nevertheless trigger preparation of an EIS or an EA.

75.     The USFS and APHIS have cited certain categorical exclusions that purport to excuse them from serious review of the Aerial Shooting's environmental impacts, but none of them applies here as explained in greater detail below.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION FOR VIOLATION OF COURT STIPULATION

76.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

77.     The Stipulation is a valid and enforceable agreement between NMCGA, Spur Lake, and several of the Defendants, including Tom Vilsack (Secretary of the USDA), Randy Moore (Chief of USFS), Michiko Martin (USFS), Henry Provencio (USFS), and Keith Wehner (APHIS).

78.     USFS and APHIS and their respective officials breached that Stipulation by issuing the Decision Memo only one week before the Aerial Shooting is scheduled to begin. Pursuant to the Stipulation, Defendants agreed to provide 75 days' notice before further aerial shooting operations would occur. Such notice was not provided and could not be provided until after the Decision Memo was published.

79.     Plaintiffs have been harmed as a proximate cause of the breach of the Stipulation.

80.     Alternatively, to the extent the Stipulation does not constitute an enforceable agreement, USFS, APHIS, and their respective officials promised that they would provide Plaintiffs and the public with 75 days' notice before further aerial shooting operations would occur. Defendants failed to provide sufficient notice consistent with the Stipulation between issuing the Decision and when the Aerial Shooting is scheduled to begin.

81.     Plaintiffs relied on this promise to provide notice and have been harmed as a proximate cause of the failure to comply with its promise.

82.     Accordingly, Plaintiffs ask the Court to enforce the Stipulation, and the current Aerial Shooting should, at a minimum, be stayed to provide Plaintiffs with the 75 days' notice Defendants agreed to provide.

### SECOND CAUSE OF ACTION FOR ACTING IN EXCESS OF STATUTORY AUTHORITY (APA VIOLATION)

83.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

84.     A court must "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(a)(2)(C). An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv.*, 476 U.S. at 374.

85.     The Aerial Shooting of unauthorized livestock in the Gila Wilderness exceeds USFS's and APHIS's statutory authority, in violation of the APA. 5 U.S.C § 706(a)(2).

86.     There is no statute that authorizes the destruction of cattle on wilderness lands. This is evidenced, in part, by USFS's own admission, in its latest Draft Revised Forest Plan for Gila National Forest (2019) that "[u]nclaimed, unauthorized, and unmanaged cattle . . . are the property of the state [of New Mexico]" and cannot be eradicated without the "formal, written permission" of the New Mexico's "livestock board." The New Mexico Livestock Board has *provided no such permission.* Further, the Wilderness Act, presumptively *prohibits* the use of "motorized equipment" and "mechanical transport," such as the aircraft intended to be used for shooting cattle here. 16 USCS § 1133(c).

87.     The absence of statutory authority is further evidenced by the specific regulation to control for and manage unauthorized livestock, 36 C.F.R. § 262.10. That regulation sets forth the procedures that USFS must follow when removing unauthorized livestock – including the cattle targeted in the Aerial Shooting – from the wilderness. This regulation is consistent with the legal principle that unclaimed, unauthorized, and unmanaged cattle are the property of New Mexico. The regulation makes no allowance for the on-site destruction of such cattle. USFS cannot skirt

this regulatory limitation on how it removes unauthorized cattle on wilderness lands by deputizing

another agency (APHIS) to unlawfully remove cattle by Aerial Shooting.

88.     The Court should hold unlawful and set aside approval of the Aerial Shooting as

being in excess of USFS's and APHIS's statutory authority.

### THIRD CAUSE OF ACTION FOR ACTING IN VIOLATION OF REGULATION
### (APA VIOLATION)

89.     Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs.

90.     A court must "hold unlawful and set aside agency action . . . found to be . . .

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without

observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).

91.     The Aerial Shooting of unauthorized livestock in the Gila Wilderness exceeds

USFS's and APHIS's regulatory authority in violation of the APA. 5 U.S.C § 706(a)(2).

92.     The cattle that USFS/APHIS intend to shoot from a helicopter in the Gila

Wilderness are "unauthorized livestock" as defined by USFS's Regulations. *See* 36 C.F.R. § 261.2.

93.     USFS is required to follow its own regulations. USFS has the discretion whether to

remove unauthorized livestock from the Gila National Forest and the Gila Wilderness. But if and

when it decides to do so, it is required to follow 36 C.F.R. § 262.10. That provision prescribes a

specific process of notice of impoundment, gathering and impoundment, notice of sale, and sale,

all of which must be followed *before* the cattle may be destroyed or otherwise disposed of.

The regulation contains no provision for pre-impoundment destruction of unauthorized cattle. Nor

is there any other regulation that authorizes such a drastic—and inhumane—course of action.

94.     USFS has no regulatory authority to conduct the aerial shooting of cattle in the Gila

Wilderness to remove unauthorized livestock. The Aerial Shooting *violates* 36 C.F.R. § 262.10

because it seeks to circumvent the orderly, humane, and environmentally-sound procedures provided therein by pursuing the pre-impoundment destruction of unauthorized cattle.

95.     Moreover, USFS cannot delegate power or authority it does not have to take actions that plainly violate its own regulation. Thus, USFS cannot contract with APHIS, and thereby deputize that agency, to shoot cattle from helicopters when (a) such action violates USFS's specific procedures for removal of unauthorized cattle from the Wilderness; and (b) APHIS has no independent authority to conduct the Aerial Shooting.

96.     The Court should hold unlawful and set aside approval of the Aerial Shooting as being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and/or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).

### FOURTH CAUSE OF ACTION FOR FAILURE TO PREPARE EA OR EIS (APA AND NEPA VIOLATION)

97.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

98.     NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). To determine whether an action's effects are "significant," agencies must consider both context and intensity. 40 C.F.R. § 1508.27. Agencies may not rely on unproven mitigation measures to avoid finding significant effects and dodge the requirement to prepare an EIS.

99.     An agency may choose to first prepare an EA to determine whether the environmental impact of a proposed action is "significant" such that the action warrants preparation of an EIS. 40 C.F.R. § 1501.3. If, pursuant to the EA, an agency determines that an EIS is not required, it must issue a "finding of no significant impact" that presents the reasons why

the proposed agency action will not have a significant impact on the human environment. *Id.* at §§ 1501.4(e), 1508.13.

100.     The Aerial Shooting constitutes a major federal action significantly affecting the quality of the human environment under NEPA. At a minimum, USFS/APHIS were required to prepare an EA to evaluate whether dozens, if not hundreds of cattle carcasses throughout the Gila Wilderness would constitute a significant effect.

101.     Cattle carcasses may carry or create pathogens that spread to humans and wildlife, as well as contaminants that leach into the environment. Carcasses can therefore have devastating impacts on scavengers and other species, as well as waters and other natural resources as the carcasses rot and decompose. Indeed, last year, when USFS/APHIS carried out the same project, wounded cattle traveled distances from the location where they were shot into waterways, including the Gila River, where they died. USFS/APHIS have failed to conduct sufficient analysis as to the impacts of such inevitable consequences of their Aerial Shooting on the wilderness environment, particularly given the evidence from the February 2022 aerial shooting project.

102.     Nor do USFS's unproven promises to purportedly address significant impacts excuse its failure to prepare an EA or an EIS. For example, the Decision Memo claims that there will be no shooting of cattle "adjacent" to certain important natural resources, including waterways.  That term is left undefined. Further, in contradicts the historic record, in which there is credible evidence that wounded cattle shot by APHIS wandered into waterways, including the Gila River, and died. Not all cattle carcasses were timely removed. The Decision Memo failed to take into account these facts and the risks entailed with dead and dying cattle throughout the Gila Wilderness and in the Gila River.

103.     APHIS's aerial gunning of cattle—as approved by USFS—was also soundly criticized by the NMLB as an act of animal cruelty. In a January 3, 2023 Decision and Findings of Fact, the NMLB concluded that the aerial gunning of cattle in February 2022 was "NOT in accordance with commonly accepted agricultural animal husbandry practices," and that such shooting "constitutes acts of animal cruelty" in violation of New Mexico law. [Exhibit 2]. The NMLB Decision further cited dead cows observed by NMLB employees, including two dead bulls found in the Gila River that had wandered wounded into the river to die.

104.     None of the categorical exclusions cited by USFS or APHIS to avoid an EA or EIS take these facts into account, and USFS/APHIS acted arbitrarily and capriciously in applying purported categorical exclusions to this Aerial Shooting. USFS may not use a categorical exclusion unless it is "certain" that the project will not cause significant effects to the environment. 36 C.F.R. § 220.6(c) ("If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA."). No such "certainty" exists here, and the cited exclusions do not apply.

105.     First, USFS cites 7 C.F.R. § 1b.3(a)(5), which excludes "civil and criminal law enforcement and investigative activities" from further environmental review under NEPA. But the Aerial Shooting is not a civil or criminal law enforcement proceeding. In its Decision, USFS relies on 36 CFR Part 262 ("Law Enforcement Support Activities") generally, and § 262.10 of that part specifically. That is the "impoundment" regulation that elsewhere in its Decision Memo USFS asserts is *irrelevant* to this Aerial Shooting. Thus, the Aerial Shooting is either a law enforcement proceeding, subject to the impoundment and removal process set forth in 36 CFR § 262.10, or it is not a law enforcement process, and thus cannot support a categorial exclusion to justify USFS's failure to prepare an EIS or even an EA.

106.    Second, USFS cites 36 C.F.R. § 220.6(e)(6), which excludes "timber stand" and "wildlife habitat improvement" activities. But this Aerial Shooting does not concern either activity. It is not a "timber stand" project. And it does not fit within USFS's own examples of wildlife habitat improvement, which involves activities such as "girdling trees to create snags," "thinning or brush control," and "prescribed burning." Rather, this Aerial Shooting entails the inhumane killing of animals from a helicopter and leaving their carcasses to decompose throughout the Gila Wilderness, including in and around waterways, which does not improve wildlife habitat. The categorical exclusion does not apply.

107.    The last categorical exclusion cited by USFS is 36 C.F.R. § 261, which excludes orders "to provide short-term resource protection or to protect public health and safety." But USFS uses this exclusion to justify, not the Aerial Shooting, but the issuance of an area closure (to allow for aerial shooting), as well as issuance of impoundment notices. The categorical exclusion does not allow USFS to avoid its EIS obligations with respect to the Aerial Shooting.

108.    As for APHIS, it claims one categorical exclusion from further NEPA review: 7 C.F.R. § 372.5(c)(1), which categorically excludes "routine measures." The regulation defines the kinds of measures deemed to be "routine": "identifications, inspections, surveys, sampling that does not cause physical alteration of the environment, testing, seizures, quarantines, removals, sanitizing, inoculations, control, and monitoring employed by agency programs to pursue their missions and functions."  Further, the regulation specifies that "such measures may include the use . . . of chemicals, pesticides, or other potentially hazardous or harmful substances, materials, and target-specific devices or remedies, provided that such use meets all of the following criteria (insofar as they may pertain to a particular action): (A) The use is localized or contained in areas where humans are not likely to be exposed, and is limited in terms of quantity, i.e., individualized

dosages and remedies; (B) The use will not cause contaminants to enter water bodies, including wetlands; (C) The use does not adversely affect any federally protected species or critical habitat; and (D) The use does not cause bioaccumulation."

109.    Shooting animals from a helicopter is nothing like the listed measures deemed to be "routine." Nothing in the definition of "routine measures" suggests that the _mass slaughter of 150 cattle by shooting them from a helicopter_ — as opposed to their "seizure" or removal"— is "routine." Further, even if it qualified as "routine," the Aerial Shooting violates, at a minimum, condition (B) because the record does not establish, beyond doubt, that the Aerial Shooting "will not cause contaminants to enter water bodies."

110.    To the contrary, carcasses were found in water bodies last year; and USFS/APHIS does not deny that the same may happen this year. The proposed protocol for addressing wounded cattle who die and decompose in a water body does not prevent contaminants from entering said water bodies. According to USFS/APHIS, at the end of every shooting day, the agencies will determine whether wounded cattle are in water bodies and, if they are, they represent that "U.S. Forest Service personnel will travel to the location on horseback and drag the carcass away . . . ." The protocol assumes immediate action. But even if that protocol were followed, it would be too late to recover carcasses that have _already_ contaminated a water body upon its entry therein and the start of decomposition.

111.    Even if one or more categorical exclusions applied, extraordinary circumstances would override them and dictate preparation of an EIS or, at a minimum, an EA. As the regulations state:

> Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are: (i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal

listing or proposed critical habitat, or Forest Service sensitive species; (ii) Flood plains, wetlands, or municipal watersheds; (iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas; (iv) Inventoried roadless area or potential wilderness area; (v) Research natural areas; (vi) American Indians and Alaska Native religious or cultural sites; and (vii) Archaeological sites, or historic properties or areas.

36 C.F.R. § 220.6(b)(1). If the proposed action "may" have a significant effect on one of these specified resources, the Forest Service may not issue a categorical exclusion and must proceed with an environmental assessment or environmental impact statement. *Id.* § 220.6(b)(2).

112.    The Aerial Shooting may impact a number of resource conditions listed in section 2206.6(b)(1). Among them are chemical and/or biological impacts to waterways, as well as disturbances to protected species and their habitats resulting from the shooting, as well as the operation of a low-flying helicopter in the Gila Wilderness. These extraordinary circumstances mandate preparation of an EIS or, at a minimum, an EA.

113.    USFS and APHIS's unjustified invocation of categorical exclusions and failure to prepare an EIS or an EA was arbitrary, capricious, not in accordance with law, an abuse of discretion, and contrary to NEPA and the APA. *See, e.g., Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 n.5 (9th Cir. 1996) ("An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the [CE] to the facts of the particular action is not arbitrary and capricious.")

## VII.    RELIEF REQUESTED

114.    For the foregoing reasons, Plaintiffs seek the following relief:

a.      A declaration, order, and judgment holding unlawful the Aerial Shooting;

b.      Temporary and permanent injunctive relief enjoining Defendants from engaging in the Aerial Shooting, specifically from engaging in the unlawful

shooting of cattle in the Gila National Forest from helicopters now or in the future.

c.       An award of attorneys' fees and costs, pursuant to 28 U.S.C. § 2412; and

d.       All other relief, in law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,

*/s/ Deana M. Bennett*
Deana M. Bennett
Spencer L. Edelman
MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
500 4th St. NW, Suite 1000
Albuquerque, NM 87102
Telephone: (505) 848-1800
Facsimile: (505) 848-9710
deana.bennett@modrall.com
spencer.edelman@modrall.com

and

Daniel D. McGuire (*pro hac vice* forthcoming)
FISHERBROYLES LLP
450 S. Denton Tap Rd.
Suite 2211
Coppell, TX 75019
Telephone: (214) 295-7272
Facsimile: (214) 295-7252
dan.mcguire@fisherbroyles.com

*Counsel for Plaintiffs New Mexico Cattle Growers'*
*Association, Spur Lake Cattle Co., and Nelson*
*Shirley*

*/s/ Steven S. Scholl*

Steven S. Scholl
DIXON, SCHOLL, CARRILLO, P.A.
6700 Jefferson NE
Building B, Suite 1
Albuquerque, NM 87109
Telephone: (505) 244-3890
Facsimile: (505) 244-3889
sscholl@dsc-law.com

*Counsel for Plaintiff Allen Campbell*

*/s/ Gretchen Elsner*

Gretchen Elsner
ELSNER LAW & POLICY, LLC
314 S. Guadalupe St., Suite 123
Santa Fe, New Mexico 87501
Telephone: (505) 303-0980
Gretchen@ElsnerLaw.org

and

Jessica L. Blome (*pro hac vice* forthcoming)
GREENFIRE LAW PC
2748 Adeline, Suite A
Berkeley, CA 94703
Telephone: (510) 900-9502, ext. 703
jblome@greenfirelaw.com

*Counsel for Plaintiff Humane Farming Association*