# EXHIBIT 1



| United States Department of Agriculture | Forest Service | Gila National Forest Voice: 575.388.8201 Fax:   575.388.8204 TTD:  575.388.8489 | 3005 E. Camino del Bosque Silver City, NM  88061-7863 Internet: www.fs.fed.us/r3/gila/ |
|---|---|---|---|

**File Code:** 1950
**Date:** February 16, 2023

Dear Interested Party

I have signed the Decision Memo for the Gila Wilderness Feral Cattle Removal. The project is in the southern portion of the Gila Wilderness on the Wilderness Ranger District, Gila National Forest. This decision authorizes the lethal and non-lethal removal of feral cattle from the Gila Wilderness to comply with various federal laws, regulations, and policies, including but not limited to the Wilderness Act, Clean Water Act, Endangered Species Act. and the Gila National Forest Land and Resource Management Plan (Forest Plan).

In authorizing the Gila Wilderness Feral Cattle Removal project, I have determined the action falls within categorical exclusions (CE) under Forest Service regulations. I further determined that there are no extraordinary circumstances that would preclude the use of the CE, and therefore, no further analysis under an environmental assessment or environmental impact statement is required.

Documents related to our analysis and the signed decision memo can be found on the project webpage: https://www.fs.usda.gov/project/?project=63204

If you have questions, you may contact Henry Provencio, District Ranger, at 575-536-2250 at the Wilderness Ranger District. For media inquiries please contact Maribeth Pecotte at 575-388-8211 or by email at Maribeth.Pecotte@usda.gov

Sincerely,

CAMILLE HOWES

Digitally signed by
CAMILLE HOWES
Date: 2023.02.16 10:36:39
-07'00'

CAMILLE HOWES
Forest Supervisor



**Caring for the Land and Serving People**

Printed on Recycled Paper






# Decision Memo
# Gila Wilderness Feral Cattle Removal
# USDA Forest Service

## Gila National Forest
### Wilderness Ranger District
### Catron and Grant Counties, New Mexico

## Background

Since the mid-1970s the Gila National Forest (Forest) has dealt with continuous issues caused by feral cattle in the Gila Wilderness. Unlike domesticated cattle, which are adapted for life in close association with and to the benefit of humans, feral cattle are wild. For the purposes of this project and document, feral cattle are defined as those cattle that are not authorized to graze on National Forest System lands through a term grazing permit and that do not have a brand, ear tag, or other identifying mark that denotes ownership by an individual or entity. The use of the term feral denotes the non-domesticated nature of these cattle that has developed over the last several decades. These cattle have not been husbanded, cared for by private owners, or kept or raised on a ranch for several generations, and are thus not domesticated. The issue started when a former grazing permittee abandoned cattle on the Redstone Allotment within the Wilderness. In the 1990s, the Forest issued a new term grazing permit for that allotment to another permittee to manage the cattle with the goal of addressing the feral cattle situation.

Despite several years of attempts to remove or manage the feral cattle, the situation had not improved and many cattle remained unconfined, roaming freely in the Wilderness beyond the boundaries of the original Redstone Allotment. Due to non-compliance, the term grazing permit was suspended in 1996 and later canceled in 1998. During those two years, 1996 to 1998, the permittee removed several hundred cattle, however, even after those efforts, a population of cattle remained and were left unclaimed, roaming freely in the Wilderness. From 1998 to the present, the Forest has issued nine gather contracts that resulted in the removal of an additional 211 cattle. In February 2022, Animal and Plant Health Inspection Service Wildlife Services (APHIS) conducted an aerial operation where 65 feral cattle were lethally removed.

The remote location and rugged topography of the Gila Wilderness combined with the wild nature of the cattle have resulted in mixed success during past live removal/gathering efforts. The work of removing them by capturing and herding them out of the wilderness is hazardous to the feral cattle, as well as to the contractor's employees due to the wild, uncooperative nature of the animals and the remote and difficult terrain. Additionally, due to the stress of capture efforts or injury during capture efforts, a percentage (approximately 50%) of captured cattle have perished or had to be euthanized before they could be herded or led out of the wilderness.

 

Members of the public hiking in the Gila Wilderness report being charged by feral bulls. These animals are a threat to public safety. Despite numerous efforts over the past 26 years, a large population of feral cattle remains in the Gila Wilderness. Based on observations provided by APHIS and the most recent gather contractor, the Forest estimates that 50 to 150 feral cattle remain. Because both cows and bulls exist within the population, the herd is capable of reproducing. No grazing has been authorized within parts of the project area since the last grazing permit was canceled in 1998, while other parts of the project area have not had authorized grazing since the 1950s.

The feral cattle within the Gila Wilderness are not authorized to graze within the national forest. The cattle are descendants of those cattle that were abandoned on the Redstone Allotment. The presence of feral cattle within the Gila Wilderness has resulted in resource damage, especially to riparian areas where cattle congregate during warmer, drier months. As a feral, reproducing population, these animals now constitute an invasive, exotic species in the Gila Wilderness. In recent years, Forest staff have documented occurrences of resource impacts from feral cattle, such as severe over-grazing (Figures 1 and 2). The feral cattle have negatively impacted fish and wildlife habitats including habitats for several federally threatened and endangered species. Critical habitat for the following federally endangered or threatened species is found within the project area: southwest willow flycatcher, narrow-headed garter snake, Gila chub, loach minnow, spikedace, and Mexican spotted owl. Except for the Mexican spotted owl, critical habitat for all other federally listed species within the Gila Wilderness is found within or adjacent to aquatic or riparian areas. Additionally, occupied Gila trout habitat is found within the project area. The 1986 Gila National Forest Land Management Plan (Forest Plan) has the following forest-wide standard, "manage threatened, endangered, and sensitive animal, fish, and plant habitat to achieve delisting in a manner consistent with the goals established with the U.S. Fish and Wildlife Service and the New Mexico Department of Game and Fish in compliance with approved recovery plans." The habitat impacts from feral cattle impede the recovery of threatened and endangered species within the Gila Wilderness.

   



Figure 1. Photo showing severe over-grazing, including riparian vegetation, along Gila River within Gila Wilderness. Photo taken June 2, 2020.



Figure 2. Photo showing severe over-grazing, including riparian vegetation, along Gila River within Gila Wilderness. Photo taken June 2, 2020.

In addition to wildlife habitat impacts, impacts to riparian areas, such as stream bank trampling and erosion (Figure 3), have degraded water quality. Amendment 10 to the Forest Plan establishes the riparian standards and guidelines to, "improve riparian ecosystems in unsatisfactory condition to satisfactory condition. Maintain riparian ecosystems currently in satisfactory condition. And to develop action plans on a site-specific basis that identify strategies for achieving satisfactory riparian conditions." Both the Gila River and Turkey Creek, the two primary waterways within the project area, are listed as being in a state of non-attainment, with water temperature listed as the probable cause for impairment (2022-2024 State of New Mexico Clean Water Act §303(d)/§305(b) Integrated Report). Water temperature is directly influenced by a riparian area's ability to shade adjacent waters. Riparian grazing and stream bank trampling by feral cattle have a direct negative impact on a riparian area's vegetative health and subsequent ability to provide for stream shading. Given the existing conditions, the Forest has determined it must take steps to address feral cattle impacts to be consistent with the Forest Plan.





Figure 3. Photo showing bank trampling and riparian
damage along Gila River within Gila Wilderness.
Photo taken May 2022.

Beyond the resource impacts, the presence of feral cattle (Figure 4) and their activities (Figure 5) in the project area is an unauthorized activity. There are no active grazing allotments and no grazing is authorized within the project area. Allowing or placing unauthorized livestock on National Forest System lands is prohibited under Forest Service regulations at 36 C.F.R. § 261.7.

Furthermore, the feral cattle are within a designated Wilderness area. Section 4(b) of the 1964 Wilderness Act states, "Except as otherwise provided in this Act, each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character. Except as otherwise provided in this Act, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use." Forest Service regulations further direct that Wilderness areas "be managed to promote, perpetuate, and, where necessary, restore the wilderness character of the land and its specific values of solitude, physical and mental challenge, scientific study, inspiration, and primitive recreation." 36 C.F.R. § 293.2. "In resolving conflicts in resource use, wilderness values will be dominant." § 293.2(c). While grazing of livestock was considered a historical use when the Gila Wilderness was designated, and grazing may be permitted to continue in Wilderness where such historical use is noted, the livestock grazing may only occur "under the general regulations covering grazing of livestock on the National Forests." § 293.7(a). As already explained, the feral cattle at issue here are not associated with a grazing permit and are not authorized to graze on the Gila National Forest under Forest Service regulations. The presence of feral cattle and their associated impacts to




resources are detrimental to the wilderness character that the U.S. Forest Service has the responsibility to protect.



Figure 4. Photo showing feral cattle in Gila Wilderness. Note presence of bulls, cows, and calves. Photo taken June 2, 2020.



Figure 5. Photo showing severe over-grazing and ground disturbance (i.e. dirt wallow) in Gila Wilderness. Photo taken June 2, 2020.

As such, there is a need to remove this population of feral cattle to:

1. Meet the intent of 36 CFR 261.7 which prohibits placing or allowing unauthorized livestock to enter or be in the National Forest System or other lands under Forest Service control.

2. Protect the habitat of aquatic and terrestrial wildlife, especially within riparian areas where resource degradation is occurring, to be consistent with the Endangered Species Act and the 1986 Forest Plan standards related to threatened and endangered wildlife habitat.

3. Protect stream banks and spring areas from further trampling, erosion, and sedimentation to be consistent with the Clean Water Act and the 1986 Forest Plan standards related to riparian areas.

4. Restore the wilderness character of the Gila Wilderness by removing non-native species and alleviating the damage caused by over-grazing to be consistent with the Wilderness Act.

5. Ensure invasive and exotic species capable of reproducing in native habitats are not allowed to invade National Forest System lands to be consistent with the 1986 Forest Plan standards related to wildlife.

# Decision

I have decided to allow for the treatment of unauthorized, feral cattle utilizing a combination of lethal and non-lethal methods to remove the remaining population of feral cattle from the Gila Wilderness (Appendix A-Map). During lethal removal efforts, the Forest would work with

 

USDA APHIS-Wildlife Services to conduct lethal removal through aerial and ground-based operations. Aerial removal efforts are expected to take place over one or more 7-day periods annually until objectives are met. Other follow-up efforts may be needed later. The first operation period is expected to begin on or around February 22, 2023. All lethally removed or euthanized cattle would be left on site to naturally decompose, unless within or adjacent to a waterbody, designated hiking trail, or culturally sensitive location. A wilderness minimum requirements analysis has been completed and approved allowing for the treatments including the low-level helicopter flights.

For non-lethal methods, the Forest may work with private contractors or individuals to gather cattle, primarily along the mainstem Gila River, and herd those cattle to a corral located outside of the wilderness. Once removed from the wilderness, the cattle would be inspected by a livestock brand inspector, and any unbranded cattle delivered to the auction facility, as appropriate. Forest Service regulations provide that unauthorized livestock "may be impounded and disposed of by a forest officer" (36 CFR 262.10). The procedures under 36 CFR 262.10 apply only to impoundments, and 36 CFR 262.10 does not preclude the agency from making other lethal and non-lethal efforts to remove feral cattle from the project area within the scope of the U.S. Government's authority. While the agency intends to follow the procedures set forth in 36 CFR 262.10 for animals successfully gathered as part of this proposed action, it is not required to follow those procedures in this instance because the feral cattle are not "livestock" as "animals of any kind kept or raised for use or pleasure," because they are no longer domesticated animals being "kept or raised" by any individual.

The Forest Service Manual, FSM 2901.02, explains the agency's authority for managing invasive and exotic species:

> The authority to manage for invasive species on National Forest System lands and other lands under Forest Service control is delegated from the Secretary of Agriculture to the Under Secretary for Natural Resources and Environment at Title 7, Code of Federal Regulations (CFR), section 2.20 (7 CFR 2.20). This authority has been delegated in turn from the Under Secretary for Natural Resources and Environment to the Chief of the Forest Service at Title 7, Code of Federal Regulations, section 2.60 (7 CFR 2.60). Title 36, Code of Federal Regulations (including Parts 221, 222, 228, 241, 251, 261, 290, 292, 293, 296, and 297) provides additional authorities to manage and regulate invasive species across the National Forest System, including establishing requirements and prohibitions to prevent and control aquatic and terrestrial invasive species.

The 1986 Forest Plan, as amended, directs the agency to "[m]aintain existing species present and avoid invasion of exotic, non-indigenous species," and notes that non-native species capable of reproducing in the wild "will not be introduced or allowed to invade National Forest System Lands." Moreover, Executive Order 13112 – Invasive Species (1999) directs federal agencies "to prevent the introduction of invasive species and provide for their control and to minimize the economic, ecological, and human health impacts that invasive species cause." Pursuant to the

 

Executive Order, "[e]ach Federal agency whose actions may affect the status of invasive species shall," among other actions "use relevant programs and authorities to: (i) prevent the introduction of invasive species; [and] (ii) detect and respond rapidly to and control populations of such species in a cost-effective and environmentally sound manner."

Based on experience, it should be noted that during attempts to remove cattle alive, a number of cattle often perish or need to be humanely euthanized during removal due to stress and injury sustained during gathering efforts. Cattle are herded using riders on horseback with dogs. Some aggressive animals may be partially sedated.

Before any lethal removal or live gathering operations, several measures would be implemented to address issues identified during public scoping and based on previous experience.

## Public Safety:

- An area closure order would be issued to prohibit the public from entering the area immediately before and during aerial removal efforts, the order would remain in effect during operations until all associated removal efforts are complete.

- Aerial shooting would take place in winter or early spring, a time of year of relatively low visitor activity within the Gila Wilderness.

## Notification to Term Grazing Permittees and Other Livestock Owners:

- A public impound notice was signed on February 1, 2023 per Forest Service regulations (36 C.F.R. 262.10) alerting the public and permittees to remove their livestock from the project area. Again, no grazing is authorized in the area and no claimed or branded cattle are expected to have accidentally wandered into the area based on proximity to the nearest active grazing allotments. Owned livestock gathered and removed by the Forest Service may be redeemed by submitting proof of ownership and paying for all expenses incurred by the United States in gathering, impounding, and feeding the livestock. However, when the impoundment cost exceeds fair market value a minimum acceptable redemption price at fair market value may be established for each head of livestock. A copy of the signed impound notice and impound area map was mailed to all term grazing permittees on the Gila National Forest, a display advertisement was posted in the Silver City Daily Press, and copies of the impound notice were posted at the Mimbres, Gila, and Cliff post offices, Grant County courthouse, and Gila National Forest public website. Future actions would follow the same regulatory process.

- Location coordinates (latitude and longitude) will be recorded for all cattle lethally removed by APHIS to allow for follow-up inspection if needed.

- If branded cattle are lethally removed during gathering or aerial operations, the owner may request compensation by contacting the U.S. Forest Service, Southwestern Region and/or Gila National Forest. The agency will provide information and forms to request compensation. Owners may also file a claim under the Federal Torts Claims Act. Evidence of ownership and loss will be needed to receive compensation.

 

**Protection of Water Resources, Cultural Locations, and Trails:**

- Cattle would not be intentionally killed within or immediately adjacent to any waterbody, designated hiking trail, or known culturally sensitive area. If a carcass is identified within or immediately adjacent to one of these areas, Forest staff will move the carcass away from that location to a great enough distance that the carcass is no longer a concern. During any aerial removal operations, APHIS will aerially survey the waterways at the end of each day to inspect for carcasses in the water.

## Protection for Federally Listed Species, Flood Plains and Wilderness Character:

- For non-lethal removal efforts, no corrals or other temporary gather structures will be placed within designated wilderness, flood plains or designated critical habitat.

- Aerial operations would not take place within ½ mile of known Mexican spotted owl protected activity centers between March 1st and September 30th.

- If ground operations are deemed necessary during the Mexican gray wolf denning season, personnel implementing the operation, including any herding dogs, will be required to observe a minimum of a one-mile buffer around any known denning or rendezvous site for shooting operations and camping.

## Protection of Scavengers from Lead Contamination:

- To mitigate possible lead contamination to scavengers feeding on cattle carcasses, non-toxic ammunition (e.g., copper) will be required for all lethal removal activities.

## Required Monitoring

- To assess the effectiveness of removal activities and the need for future action, the U.S. Forest Service and partners will conduct monitoring to determine the status of the feral cattle population in the Gila Wilderness and to assess resource conditions where impacts from feral cattle have occurred. Monitoring may be conducted through a combination of aerial and on-the-ground surveys and will take place at a time of year when logistical, weather and other factors are favorable for access and monitoring success. Monitoring will be carried out for five years following the completion of removal efforts.

# Categorical Exclusion

This action is categorically excluded from documentation in an environmental impact statement (EIS) or an environmental assessment (EA). The applicable categories of actions are identified in agency procedures as:

- **Civil and criminal enforcement and investigative activities (7 CFR 1b.3(a)(5)**

In accordance with Forest Service Manual (FSM) 5330 refers to Law Violation authorities and procedures on NFS lands. FSM 5330.15 references 36 CFR 261 which describes Prohibitions on NFS lands, and 36 CFR 262.10 provides the regulations for the

 

impoundment and disposal of unauthorized livestock. This latter provision resides in 36 CFR Part 262, governing "Law Enforcement Support Activities." Further under Forest Service Handbook 5309.11-Law Enforcement Handbook, 23.12 describes the investigative procedure for livestock removal. All these regulations, manuals, and guidance provide the rationale for the applicability of 7 CFR 1b.3(a)(5) categorical exclusion for the actions necessary for the removal of feral cattle.

- **Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction (36 CFR 220.6(e)(6)).**

  I find 36 CFR 220.6(e)(6) to be pertinent for addressing the need to improve wildlife habitat and riparian conditions impacted by feral cattle. The actions for removal of feral cattle will address areas of over-grazing and over-use (i.e., trampling) in uplands and riparian areas and promote natural re-vegetation of these areas, thus assisting recovery of threatened and endangered species within the Gila Wilderness. The authorized activities through this decision do not include the use of herbicides or road construction.

- **Orders issues pursuant to 36 CFR 261 – Prohibitions to provide short-term resource protection or to protect public health and safety (36 CFR 220.6(d)(1)).**

  Use of this category would allow for the issuance of an area closure during the project activities of lethal removal and gathering operations. Additionally, use of this category would allow for issuance of an impoundment notice, which provides the regulations for the impoundment and disposal of unauthorized livestock. While this category does not require a decision memo, as under my discretion, I decided to provide documentation through this decision memo.

A project record was created to document public scoping efforts and decision supporting documents.

I find that there are no extraordinary circumstances that would warrant further analysis and documentation in an EA or EIS. I took into account the resource conditions identified in agency procedures that should be considered in determining whether extraordinary circumstances might exist, as listed below. Importantly, the mere presence of one or more of these resource conditions does not preclude the use of a categorical exclusion. It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions determines whether extraordinary circumstances exist. I considered the following resource conditions:

- **Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species.** A biological assessment was prepared for the Mexican gray wolf and concluded the proposed action is not likely to jeopardize the wolf. The U.S. Fish and Wildlife Service (USFWS) concurred with this finding (Concurrence #2023-0036459).

 

Scoping comments raised concern over the proposed action having a detrimental effect on Mexican wolf behavior and potentially increasing future wolf/livestock depredation conflicts. However, no supporting evidence or documentation was provided for the Forest to consider. Further, the Mexican gray wolf interagency field team was asked to address this issue. The interagency field team does not have any evidence that wolf scavenging on cattle carcasses has any known effect on wolf depredation rates on livestock (see biological assessment in project record for further information).

No relationship between the presence of Mexican wolves and a change in feeding behavior from the proposed action has been established. The U.S. Forest Service has consulted with the USFWS on the proposed action, the proposed action was found to not likely jeopardize the continued existence of the Mexican wolf.

Further, the U.S. Fish and Wildlife Service has provided the following information:

*Wolves are opportunistic predators and facultative scavengers and if any wolves are within the project area or in close proximity they may discover and scavenge on the carcasses. Wolves are already exposed to livestock carcasses as well as other large ungulate carcasses throughout their entire range in New Mexico and Arizona on Forest Service lands, Bureau of Land Management lands, Fish and Wildlife Service Lands, and State game agency lands. In a USFWS 2014 Environmental Impact Statement (EIS) and 2022 Supplemental EIS, the USFWS note that Mexican wolves are attracted to livestock carcasses, and if there are live livestock in the area, it could lead to conflicts. However, there is no evidence, scientific research, or observational data from the Mexican wolf reintroduction program to suggest that once wolves scavenge on a livestock carcass, they become habituated to cattle leading to increased depredations. Last year, after the Forest Service lethally removed feral cattle in the Gila Wilderness Area, two wolves were attracted to the carcasses, stayed in the area for several months, then moved back into their normal areas without preying on live cattle.*

*Because wolves are scavengers, they will be attracted to the carcasses. But because there is no livestock grazing permitted in the Gila Wilderness Area where the Forest Service will remove cattle, any wolves attracted to and scavenging on the dead livestock will not conflict with livestock. Therefore, the increase in livestock carcasses to the wilderness area will be temporary based on what we observed last time and is not expected to lead to an increase in wolf-livestock conflicts in the surrounding area.*

This concern is further mitigated by the short duration carcasses will be on the landscape. We anticipate carcasses to last for several weeks before they are consumed by scavengers and have decomposed. Since aerial operations to lethally remove feral cattle would occur over two 7-day periods annually, carcasses would not be available as a reliable, year-round food source.

A determination of no effect was made for all other federally endangered and threatened species found within the project area. Either the proposed action would have no impact

 

on the species or its habitat, or the proposed action would not overlap spatially or temporally with known habitat. One Mexican spotted owl protected activity center is located within the project area (PAC). Aerial operations will not occur within ½ mile of Mexican spotted owl PAC from March 1st through September 30th (breeding season).

The analysis and projected effects on all sensitive species and management indicator species listed as occurring or possibly occurring on the Gila National Forest are documented in the Biological Evaluation contained in the project file (see project file: 2023-02-09_BiolEval_GilaWilderness_FeralCattleRemoval). The findings document that the authorized action will have no adverse impacts on sensitive or management indicator species.

- **Flood plains, wetlands, or municipal watersheds.** No municipal watersheds occur within or downstream of the project area. The proposed action would not result in ground disturbance to flood plains (see mitigation measure requiring all temporary gathering structures to be located outside of flood plains). The issue of potential water quality contamination from cattle carcasses was raised during public scoping. The water resources specialist report has addressed this issue and concluded the long-term benefits of removing feral cattle from riparian areas and allowing for natural vegetation recovery greatly outweigh any short-term negative impacts a cow carcass may have on water quality. Two factors were considered in reaching this conclusion: 1) the temporal scale of riparian impacts from cattle presence and grazing is much greater (months to years) than the presence of a carcass within or near a waterbody (days to weeks), and 2) the mitigation measure requiring removal of any carcass within or adjacent to a waterbody further reduces the potential for water quality impacts as a result of lethal removal operations. It should be noted, cattle and other wildlife (e.g. elk and deer) die of natural causes, sometimes in or adjacent to water sources. This occurs both within and outside of the wilderness. If an occurrence is known and a concern exists, the carcass may be removed by the landowner or U.S. Forest Service. However, in most cases, it is likely the carcass, especially wildlife, naturally decompose without any intervention. This is one reason backcountry use etiquette stresses the importance of properly treating water before consumption. Of equal concern related to the impacts of feral cattle is the repeated and concentrated use along waterways and within riparian areas as animal waste has the potential to contaminate water in the form of fecal coliform.

Both the Gila River and Turkey Creek, the two primary waterways within the project area, are listed as being in a state of non-attainment, with water temperature listed as the probable cause for impairment (2022-2024 State of New Mexico Clean Water Act §303(d)/§305(b) Integrated Report). Removing unauthorized grazing impacts from stream banks along the Gila River and Turkey Creek will contribute to long-term benefits towards achieving water temperature attainment standards (see water resource specialist report in project record for further information).




- **Congressionally designated areas such as wilderness, wilderness study areas, or national recreation areas.** The proposed action would take place within the Gila Wilderness. The background information discussed above and provided within the wilderness minimum requirements analysis outlined why the continued presence of feral cattle is detrimental to wilderness character and greatly outweighs any short-term impacts to wilderness character resulting from the proposed action. The use of helicopters in wilderness was cited in scoping comments as an extraordinary circumstance. Section 4(c) of the Wilderness Act prohibits the landing of aircraft within designated wilderness, whether helicopter or fixed wing. The proposed action does not include nor does this decision authorize the landing of helicopters in wilderness. The short-term impacts of low-level helicopter flights have been analyzed within the minimum requirements analysis, concluding that the proposed action is the minimum tool necessary to protect wilderness character and address the feral cattle issue (see minimum requirements analysis in Appendix C for further discussion).

- **Inventoried roadless areas or potential wilderness areas.** No inventoried roadless areas or potential wilderness areas are found within the project area.

- **Research natural areas.** The Turkey Creek Research Natural Area is located within the southwest corner of the project area. The proposed action would not have any negative impacts to this research natural area. Removal of feral cattle and associated grazing from this research natural area would have a positive, long-term benefit.

- **American Indians and Alaska Native religious or cultural sites.** A tribal government-to-government consultation letter was mailed to 14 different tribal governments. Responses received from tribal governments have indicated the proposed action would have no adverse effect on the tribe's cultural heritage resources and/or historic properties.

- **Archaeological sites, or historic properties or areas.** The proposed action does not involve any ground-disturbing activities. If a temporary corral is used, it will be located outside of designated wilderness and an archaeologist would be consulted on the location before implementation. A determination of no adverse effect on cultural resources was reached by the district archaeologist. Further, a mitigation measure to avoid shooting cattle near known culturally sensitive locations will be implemented.

## Public Involvement

This action was originally listed as a proposal on the Gila National Forest Schedule of Proposed Actions and updated periodically during the analysis. A public scoping letter was distributed on November 22, 2022 to a wide range of local, state, and federal agencies and partners, multiple conservation and agricultural groups, all grazing permittees on the Gila National Forest, and many members of the public who have requested to be informed of Gila National Forest projects. The scoping letter requested comments on the Forest's proposed action, alternatives to consider addressing the feral cattle issue, and concerns for the Forest to consider and mitigate. Scoping




comments were requested by January 9, 2023, however, multiple comments were received after this date and were reviewed and included in the project record as well.

The public scoping comment request generated 5,973 individual comments, of which 5,547 consisted of three different form letters. All form letters expressed support for the Forest's proposed action. Most individual comment letters expressed support for the Forest's proposed action as well. Many commenters spoke about their personal experience with feral cattle in the Gila Wilderness and their observations of resource impacts caused by cattle in general, both within the Gila Wilderness as well as on Forest Service and non-Forest Service lands. Commenters expressing concern or opposition to the Forest's proposed action identified several issues for consideration. Several concerns spoke to the potential for the Forest's proposed action to have extraordinary circumstances that would prohibit the use of a categorical exclusion. Those extraordinary circumstance concerns have been addressed above as well as within resource analyses in the project record. Other concerns alleged that the Forest lacks authority to proceed with the proposed action and has failed to comply with the National Environmental Policy Act procedures. Those concerns are addressed in Appendix B. Many comments recognized the need to remove feral cattle from the Gila Wilderness but felt alternative removal methods may be more appropriate. Those proposed alternatives are addressed individually in Appendix B as well. The proposed alternatives did not meet the purpose and need for this project as they presented longer-term efforts that did not have the same likelihood of success and that would not address the short-term need to resolve ongoing resource impacts caused by the presence of feral cattle.

The Forest has had many conversations in recent years on the issue with state and local governments, livestock producer groups, environmental groups, and the public. Correspondence between the Gila National Forest and the New Mexico Livestock Board on this issue dates to at least 1996. The Forest has received reports of resource impacts and concerns from the public since the late 1990s. Correspondence records in the project file document concern from the public and conservation groups over resource impacts by feral cattle for years, not just in recent times. Many commenters during public scoping spoke about the history of this issue and that they raised concerns in the past.

On September 12, 2022, the Forest convened a facilitated discussion with conservation groups, livestock producer groups, and the New Mexico Livestock Board to discuss the issue and strategies for moving forward. Although disagreement remained over the best methods for addressing the issue, there was consensus among the group that the feral cattle need to be removed from the Gila Wilderness. Since that September meeting, the Forest has met many times with partners and local governments to discuss the issue and listen to ideas for resolution. While there may still be disagreement over the best method for resolving the issue, given the Forest's history with this matter and technical expertise, I feel strongly that the proposed action provides the best flexibility to finally attain resolution of this long-standing problem of feral cattle in the Gila Wilderness.



Please be advised that all information provided during the public involvement process will become part of the public record and is available for public inspection. This includes names and contact information provided.

# Findings Required by Other Laws and Regulations

## National Forest Management Act (NFMA)

1. Consistency with the 1986 Gila National Forest Land Management Plan (Forest Plan): The background information provided previously addresses why the existing condition of feral cattle within the Gila Wilderness must be addressed to be consistent with the Forest Plan. With the mitigation measures listed in this decision, no activities identified in the proposed action are prohibited by the Forest Plan.

2. Sensitive Species: Federal law and direction applicable to sensitive species include the National Forest Management Act and Forest Service Manual 2670. The NFMA directs that guidelines for land management plans provide for diversity of plant and animal communities based on the suitability and capability of the specific land area to meet overall multiple-use objectives [16 USC 1604 Sec.6 (g)(3)(B)]. The Forest Plan contains standards for sensitive species. The Regional Forester has approved the sensitive species list (those plants and animals for which population viability is a concern) (FSM 2610.5). Findings for sensitive and management indicator species are discussed under the extraordinary circumstances section above.

## Endangered Species Act (ESA)

Under provisions of the ESA, Federal agencies are directed to seek to conserve endangered and threatened species and to ensure that actions are not likely to jeopardize the continued existence of any of these species. The relationship between project activities and federally threatened and endangered species found within the project area is discussed above under the extraordinary circumstances section. Section 7 consultation requirements were satisfied through informal consultation and concluded with concurrence by the USFWS, received on February 10, 2023.

## Migratory Bird Treaty Act

On January 10, 2001, President Clinton signed an Executive Order outlining the responsibilities of federal agencies to protect migratory birds. Project activities would not affect migratory birds by altering habitat or displacing birds through disturbance. The mitigation to avoid placing temporary structures within designated wilderness or critical habitat would negate any potential negative effects on habitat for the federally-listed southwest willow flycatcher. No habitat modifications are proposed, thus no effects on other migratory birds or their habitat are expected.

## New Mexico State Water Quality Standards and Clean Water Act (CWA)

The State of New Mexico's Water Quality Standards, codified at 20.6.4 NMAC, define water quality goals by designating uses for rivers, streams, lakes and other surface waters, setting criteria to protect those uses, and establishing antidegradation provisions to preserve water

 

quality. The standards are adopted by the Water Quality Control Commission through a rulemaking process, making them effective for state purposes. Then the rule is submitted to the United States Environmental Protection Agency (EPA) for approval under the federal Clean Water Act.

The CWA establishes the basic structure for regulating discharges of pollutants into the waters of the United States and regulating quality standards for surface waters. Under the CWA, the EPA has implemented pollution control programs, such as setting wastewater standards for the industry. The EPA has also set water quality standards for all contaminants in surface waters. The CWA makes it unlawful to discharge any pollutant from a point source into navigable waters unless a permit is obtained. EPA's National Pollutant Discharge Elimination System (NPDES) permit program controls discharges. The resource protection measures for water resources will protect water quality from any impacts resulting from the proposed action. Thus, the project is consistent with these regulatory requirements.

## Clean Air Act (CAA)

The CAA of 1977 (as revised 1991) requires the EPA to identify pollutants that have adverse effects on public health and welfare and to establish air quality standards for each pollutant. Each state is also required to develop an implementation plan to maintain air quality. The CAA (Section 110) requires states to develop State Implementation Plans (SIPS) which identify how the State will attain and maintain national air quality standards. Three elements of the Clean Air Act generally apply to management activities that produce emissions: (1) protection of ambient air quality standards; (2) conformity with state implementation plans; and (3) protection of visibility in Class 1 airsheds. The project area is a Class I airshed. The Watershed and Air Resources report indicates the proposed action will not have any negative impacts on air quality.

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA directs all Federal agencies to consider the effects of their undertakings (actions, financial support, and authorizations) on properties included in or eligible for the National Register. Heritage resource surveys will be completed for any areas where activities that will result in ground disturbance may occur. The only ground-disturbing activity associated with the proposed action is the use of temporary corrals to assist with live gather efforts. Prior to using any temporary corrals, a district archaeologist and the State Historic Preservation Office will be consulted. A corral placement location will be selected where no culturally sensitive resources will be impacted. Additionally, cattle carcasses will be removed from all known culturally sensitive locations.

## Environmental Justice Executive Order

On February 11, 1994, President Clinton signed Executive Order 12898 requiring each Federal agency to achieve environmental justice as part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority and low-income populations. The transparent, nonexclusive process used to develop this project and seek public input, as well as consultation





with tribes, ensured fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income concerning the development, implementation, and enforcement of environmental laws, regulations, and policies. No environmental justice issues were identified for this project as it is not expected to lead to disproportionately high and adverse impacts on minority or low-income populations.

## Administrative Review Opportunities

This project is categorically excluded under NEPA and the decision is not subject to legal notice and opportunity to comment under 36 CFR 218.23 (a).

## Implementation Date

We anticipate conducting the first lethal removal efforts through aerial operations in February 2023. As previously noted, follow-up efforts may be needed. Prior to any efforts, an area closure and public notification may be implemented.

## Contact

For additional information concerning this decision, contact: Henry Provencio, District Ranger, at (575) 536-2250.

CAMILLE
HOWES

Digitally signed by CAMILLE
HOWES
Date: 2023.02.16 10:33:13
-07'00'

Camille Howes                                                                                    Date
Forest Supervisor

We make every effort to create documents that are accessible to individuals of all abilities; however, limitations with our word processing programs may prevent some parts of this document from being readable by computer-assisted reading devices. If you need assistance with any part of this document, please contact the Gila National Forest at 575-388-8201.

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).  Remedies and complaint filing deadlines vary by program or incident

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html  and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the

 

complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email:  program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.



**Appendix A. Map of project area in Gila Wilderness.**

# Appendix B.
# Response to Comments and Issues Raised during Gila Wilderness Feral Cattle Removal Project Public Scoping.

This appendix documents the Gila National Forest responses to comments received during public scoping for the Gila Wilderness Feral Cattle Removal Project. The public scoping letter was mailed on November 22, 2022 and requested comments by January 9, 2023. Several comments were received after January 9th and have been included in the project file as well.

In some cases, the Forest Service response to a comment refers to analysis and supporting documents, which are included in the project record. Detailed reports of all resources analyzed and other supporting documents are part of the project record and available upon request. Numbers listed in parentheses "(2, 91, 210)" after each alternative or issue reference an individual commenter who raised a concern related to that issue. A full list of all commenters and their commenter reference number is included in the project file.

Comment text is generally summarized or paraphrased to identify the issue and concern being addressed. Detailed responses were only prepared for substantive comments. Substantive comments include comments that address new scientific information or data that would have a bearing on the analysis; comments that identify errors in the analysis, assumptions, methodology, or conclusions; comments that address misinformation that could affect the outcome of analysis; comments that request clarification; or comments that identify a new alternative with a mix of allocations that differ from those under any of the proposed actions. Comments that were in general favor or against a proposed action, agree or disagree with Forest Service policy or decisions without justification or supporting information, do not pertain to the project, or vague, open-ended questions or statements were not addressed.

## Alternatives Considered but Dismissed from Further Analysis

**Alternative 1**: The Gila National Forest should donate the edible portions of cattle that are lethally removed to a local food bank, charity, or family support services (2, 3, 5, 23, 30, 34, 44, 50, 55, 82, 118, 125, 134, 139, 145, 161, 165, 176, 186, 188, 206, 224, 235, 239, 276, 286, 333, 342, 352, 364, 371, 384, 386, 388, 391, 408, 413, 42, 6, 16, 18, 20, 26, 37, 46, 59, 80, 101, 124, 143, 157, 179, 215, 223, 247, 262, 272, 341, 353, 367, 376, 382, 383, 409).

> **Response:** While we acknowledge the potential value in making lethally removed cattle available as a food resource, there are several factors to consider that complicate this alternative and preclude it from further consideration. The logistics of removing thousands of pounds of meat from a remote wilderness location and delivering that meat to a nearby processing facility in a timely manner to ensure that safe food handling standards and time considerations are met would be daunting. This differs from logistics handled by hunters during hunting season in that hunters are dealing with one or a few animals, not one to several dozen at a time. Further, the cattle being removed are not vaccinated and the U.S. Forest Service cannot attest to their safety for human consumption. Even if the logistical considerations could be overcome, the issue of food safety and inspection cannot be satisfied

to meet legal requirements. The U.S. Department of Agriculture Food Safety and Inspection Service has legal authority to ensure food safety through administration of several laws, including the Federal Meat Inspection Act (21 U.S.C. 601). The Federal Meat Inspection Act "…requires inspection for any product intended for human consumption, wholly or in part, from the carcass or parts of any cattle, sheep, swine, and goat. These animals, defined as "livestock" in the regulations, must be slaughtered and processed under Federal inspection, and the meat food products must be inspected and passed for human consumption. Federal inspection personnel must be present at all times during livestock slaughter operations and for at least part of each shift during which there is further processing of meat products." Meat and poultry products that are safe, wholesome, and not misbranded can be donated to non-profit organizations, such as charitable institutions, food banks, and government-supported facilities if the meat has passed federal inspection (see 21 U.S.C. 673(a)(5)(A) and 21 U.S.C. 467b(a)(5)(A)). Since there is no feasible way to have a licensed meat inspector on site during aerial lethal removal operations within the Gila Wilderness, the requirements of the Federal Meat Inspection Act cannot be met.

Some commenters requested that the public be allowed to salvage edible portions of lethally removed cattle. However, to address public safety concerns, an area closure would be implemented during aerial removal efforts prohibiting public entry into the area of operations. Thus, it is not feasible to allow timely public access to cattle carcasses, given their remote location, after removal operations are complete and still ensure the meat is still safe for human consumption.

**Alternative 2**: The Gila National Forest should designate a hunt for the unauthorized cattle and allow the public to participate as a means of removing the animals (4, 9, 10, 15, 17, 19, 23, 30, 36, 44, 51, 73, 76, 80, 82, 86, 97, 103, 118, 198, 235, 276, 326, 350, 361, 362, 414, 417, 422).

**Response:** The New Mexico Department of Game and Fish – Game Commission has legal authority to designate limited seasons and harvest for wildlife classified as game animals, nongame animals, furbearers, and unprotected wildlife. Moreover, while authority to "designate a hunt" generally lies with the New Mexico Department of Game and Fish, not the U.S. Forest service, the feral cattle located in the Gila Wilderness do not meet the definition of game, nongame, furbearer, or unprotected animal.

**Alternative 3**: Vacant allotments within and adjacent to the Gila Wilderness should be restocked and fences should be maintained to allow permittees to address issues with unauthorized cattle within their respective permitted allotment (6, 8, 9, 17, 26, 81, 21, 55, 271, 337, 384, 387, 389, 400, 405, 406, 26, 145, 320, 338, 371, 386, 388, 389, 391, 397, 400, 420, 423).

**Response:** The purpose and need for this project is to address the unauthorized use by feral cattle in the Gila Wilderness and to mitigate ongoing resource impacts in the short term. The restocking of vacant allotments is a proposed long-term alternative that does not address the short-term needs. Also, it is not a guarantee that feral cattle issues will be resolved, even over the long term. Today's issue of feral cattle in the Gila Wilderness stems from a permittee abandoning an active permit on the Redstone Allotment in the 1970's. Subsequently, the

Redstone Allotment permit was re-issued in the 1990s and the issue was not resolved (see project file document Ref01).

Today, the issue of feral cattle in the Gila Wilderness extends well beyond the historic boundaries of the Redstone Allotment (see project file document Ref02). The majority of areas where feral cattle are located today is within the historic boundaries of the Glenn Allotment, where domestic livestock grazing was eliminated in the early 1950s as part of the acquisition of the Heart Bar Ranch by the State of New Mexico (see project file document Ref03). Thus, restocking the Redstone Allotment would not resolve the current issue. Further, other management considerations must be taken into account prior to restocking allotments. For example, Brock Canyon and Watson Mountain Allotments, on the southwest corner of the Gila Wilderness, were closed in 1999 to address resource concerns (see project file document Ref04). Therefore, without an interdisciplinary analysis of each vacant allotment to assess relevant resources for a respective area, the Gila National Forest cannot determine which vacant allotments may be suitable for restocking.

Additionally, proper management of an active allotment requires routine maintenance and repair of range infrastructure, such as fences, to ensure cattle are confined to their authorized pasture. In recent years, fence damaged from natural events, such as fires and floods, have demonstrated the challenges of continually maintaining range infrastructure, even on allotments with nearby road access. Inspecting, repairing, and monitoring fences in a remote environment subject to annual fires and floods further complicates allotment management and administration in the Gila Wilderness for both a potential permittee as well as Gila National Forest staff. Currently, addressing range infrastructure repair on allotments impacted by the 2022 Black Fire is the focus of staff time and financial resources on the Gila National Forest.

While we are open to exploring restocking other vacant allotments on the Gila National Forest outside of the project area, restocking other allotments outside of the Gila Wilderness is beyond the scope of this project and does not specifically address removal of the feral cattle being addressed by this project.

**Alternative 4**: An alternative was proposed to construct corrals at the confluence of Sapillo Creek and the Gila River and at Fall River Canyon, then to use contractors to herd cattle to those corrals. The proposed alternative recommended holding cattle at those corrals for a period of time until the cattle are acclimated to human presence, reducing their stress and injury during handling. The cattle would then be herded to a corral outside of the wilderness, inspected, and removed from the Forest. It was recommended that live gather efforts take place over the course of several years during dry months when feral cattle are located along the Gila River (3, 5, 6, 16, 18, 20, 26, 37, 44, 46, 55, 59, 80, 101, 124, 139, 143, 145, 157, 179, 188, 215, 223, 247, 262, 272, 341, 353, 367, 376, 382, 383, 409, 6, 8, 9, 17, 26, 81, 21, 55, 271, 320, 337, 384, 387, 389, 400, 405, 406).

**Response:** As proposed, this alternative would require analysis of potential resource effects through an environmental impact statement as the corrals would represent permanent installations in designated wilderness. Historically, corrals may have been located at these

areas. However, the analysis and decision authorizing the construction and presence of those corrals is decades old (prior to the 1970's). Thus, their construction cannot be approved as basic range infrastructure maintenance, and a new environmental analysis would be required. Nonetheless, this proposal was analyzed as an alternative in the minimum requirements analysis for wilderness. This alternative had a larger negative impact compared to the proposed action, indicating this alternative would be more impactful to wilderness character. The greater impacts to wilderness character of this alternative were primarily due to the corrals representing a permanent installation in wilderness.

A less impactful alternative would be to use temporary corrals at these locations that are removed following each gather effort, thus eliminating the permanent installation concern. While this alternative may aid in removing feral cattle along the Gila River, it does not address those feral cattle located in the Miller Springs area and areas north of the Gila River. Based on information provided by APHIS and the most recent gather contractor, feral cattle were found in the Miller Springs area and areas to the west during winter, spring, summer, and fall. That is, those cattle would not be subject to gather efforts focused along the Gila River. The purpose and need for this project are to address the unauthorized use by feral cattle in the Gila Wilderness and to mitigate ongoing resource impacts in the short term. This alternative does not propose a short-term solution, especially in light of the environmental compliance needs to authorize this activity prior to any on-the-ground implementation.

**Alternative 5:** A recommendation to consider sterilizing bulls or cows or both through injection of drugs was proposed.

> **Response:** Although sterilization may prevent further reproduction within the population of feral cattle, it would not result in the removal of cattle currently in the wilderness and thus, would not prevent ongoing resource impacts from those cattle or meet the need for this project.

## Issues and Concerns Raised During Public Scoping

### Legal Authority

**Issue:** The U.S. Forest Service does not have legal authority to carry out lethal removal of cattle. The Forest Service's sole authority, under 36 C.F.R. 262.10, is to impound and dispose of unauthorized livestock. Nowhere does this regulation authorize the Forest Service to undertake its proposed aerial or on-the-ground gunning of cattle. Section 262.10 outlines the only options available to the Forest Service-"Unauthorized livestock may be impounded and disposed of by a forest officer as provided herein." (320, 328, 338, 377, 383, 386, 387, 388, 391, 396, 397, 398, 400, 404, 406, 409, 423).

> **Response:** Forest Service regulations provide that unauthorized livestock "may be impounded and disposed of by a forest officer." (36 CFR 262.10). Even if the feral cattle at issue here could be considered "unauthorized livestock," that regulation does not limit what the Forest Service may do with unauthorized livestock exclusively to impoundment. The procedures under 36 CFR 262.10 apply only to impoundments, not lethal control of feral cattle, and 36 CFR 262.10 does not preclude the agency from taking other lethal and non-

lethal efforts to remove feral cattle from the project area within the scope of the U.S. Government's authority. While the agency intends to follow the procedures set forth in 36 CFR 262.10 for animals successfully gathered as part of this proposed action, it is not required to follow those procedures in this instance because the feral cattle are not "livestock" as defined in the agency regulations at 36 CFR 222.1(b)(8) (defining "livestock" as "animals of any kind kept or raised for use or pleasure"), because they are no longer domesticated animals being "kept or raised" by any individual. Also, the regulations at 36 CFR 262 apply to the "impoundment of property," 79 Federal Register 44, 293 (July 31, 2014), and because feral cattle are not owned by anyone, they are not subject to the impoundment procedures for 36 CFR 262.10.

New Mexico Statutes Chapter 77 - Animals and Livestock Article 2 - Livestock Board Section 77-2-1.1 defines "estray" as "*livestock* found running at large upon public or private lands, either fenced or unfenced, whose owner is unknown, or that is branded with a brand that is not on record in the office of the board or is a freshly branded or marked offspring not with its branded or marked mother, unless other proof of ownership is produced." NM ST § 77-2-1.1(N) (emphasis added). This section defines "livestock" as "all domestic or domesticated animals that are used or raised on a farm or ranch, including the carcasses thereof, and exotic animals in captivity and includes horses, asses, mules, cattle, sheep, goats, swine, bison, poultry, ostriches, emus, rheas, camelids and farmed cervidae upon any land in New Mexico. 'Animals' or 'livestock' does not include canine or feline animals." NM ST § 77-2-1.1(A).

The feral cattle in the Gila Wilderness that are proposed for removal under this project do not include "domestic or domesticated animals that are used or raised on a farm or ranch." *Id.* Rather, they are non-domesticated cattle that have not been husbanded, cared for by private owners, or kept or raised on a ranch for over more than four decades since an original group of domesticated cattle were abandoned by their owner in the Gila Wilderness and began reproducing naturally. As a feral, reproducing population, these animals now constitute an invasive, exotic species in the Gila Wilderness. Cattle live up to 10-15 years and can reproduce once a year (approximate nine-month gestation period), so the Forest Service estimates that at least four generations of cattle have succeeded the group originally abandoned in the Gila Wilderness in the 1970s. Over those years and generations, the cattle have become feral and display different behavior than domestic cattle. Gather contractors and Forest Service staff who have encountered these cattle over the years have commented on their wild, elusive behavior similar to deer or elk. The cattle proposed for removal under this decision do not have brands, ear tags, or other identifying marks that denote ownership by an individual or entity and have not been "used or raised on a farm or ranch." *See id.* Indeed, brand inspection reports and photo documentation confirm of the several hundred cattle removed by private gather contractors and APHIS since 1998, only one animal had a brand (captured in 1998 and returned alive to its registered owner). As such, even under New Mexico law, the feral cattle proposed for removal as part of this project do not meet the definition of "livestock" and would thus not qualify as "estray livestock" under the jurisdiction of the New Mexico Livestock Board.

Moreover, even if these cattle could qualify as estrays under New Mexico Law, Federal law, including the U.S. Constitution, various statutes, and federal agency regulations, grant authority to the Forest Service to take the proposed action regardless of how these animals may be classified or regulated under state law.

Under the Property Clause of the U.S. Constitution, the Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.  U.S. Const. art. IV. sec. 3, cl. 2; *see also e.g., Kleppe v. New Mexico,* 426 U.S. 529 (1976) (holding authority of Congress to regulate use of federal land is broad and derives from the Property Clause). Congress directed the Forest Service through the Secretary of Agriculture to "make provisions for the protection against destruction by fire and depredations" upon the national forests, and the Secretary "may make such rules and regulations and establish such service as will insure the [national forests], namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." Organic Administration Act of 1897, 16 U.S.C. 551. Congress has also passed numerous other statutes directing the management, protection, and uses of National Forest System (NFS) lands. For example, Congress granted authority to the Secretary of Agriculture to regulate livestock grazing on NFS lands under the Granger-Thye Act of 1950 (16 U.S.C. 580l) and the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1751-1752).

The Forest Service Manual, FSM 2901.02, explains the agency's authority for managing invasive and exotic species:

> The authority to manage for invasive species on National Forest System lands and other lands under Forest Service control is delegated from the Secretary of Agriculture to the Under Secretary for Natural Resources and Environment at Title 7, Code of Federal Regulations (CFR), section 2.20 (7 CFR 2.20).  This authority has been delegated in turn from the Under Secretary for Natural Resources and Environment to the Chief of the Forest Service at Title 7, Code of Federal Regulations, section 2.60 (7 CFR 2.60).  Title 36, Code of Federal Regulations (including Parts 221, 222, 228, 241, 251, 261, 290, 292, 293, 296, and 297) provides additional authorities to manage and regulate invasive species across the National Forest System, including establishing requirements and prohibitions to prevent and control aquatic and terrestrial invasive species.

The 1986 Forest Plan, as amended, directs the agency to "[m]aintain existing species present and avoid invasion of exotic, non-indigenous species," and notes that non-native species capable of reproducing in the wild "will not be introduced or allowed to invade National Forest System Lands." [Cite Wildlife Standard and Guideline 8A C01].  Moreover, Executive Order 13112 – Invasive Species (1999) directs federal agencies "to prevent the introduction of invasive species and provide for their control and to minimize the economic, ecological, and human health impacts that invasive species cause."  Pursuant to the Executive Order, "[e]ach Federal agency whose actions may affect the status of invasive species shall," among other actions "use relevant programs and authorities to: (i) prevent the

introduction of invasive species; [and] (ii) detect and respond rapidly to and control populations of such species in a cost-effective and environmentally sound manner."

Conflicting state laws are preempted by federal law under the Supremacy Clause of the U.S. Constitution, U.S. Const. art. VI. cl. 2. State law may be preempted by federal law in three ways: (1) express preemption by Congress; (2) implied field preemption where Congress intends for federal law to occupy a field exclusively; and (3) implied conflict preemption where state law is an obstacle to accomplishment of the objectives of federal law or it is impossible to meet the requirement of both federal and state law. *See, e.g., English v. Gen. Elec. Co.,* 496 U.S. 72, 78-80 (1990). Here, application of New Mexico state laws that give the New Mexico Livestock Board authority over these animals at least to the extent they require the Forest Service to take or to not take certain actions would directly conflict with applicable federal laws and regulations. The Forest Service will accommodate state livestock laws when doing so will not frustrate or hinder the Forest Service's ability to implement the federal laws and protects the NFS lands from destruction. Among other responsibilities as the delegated federal land manager, the Forest Service has the responsibility for addressing issues where grazing (whether authorized or unauthorized) is impacting other resources.

Forest Service range management regulations define "livestock" as "animals of any kind kept or raised for use or pleasure," 36 CFR 222.1(b)(8), and subsequent regulations prohibiting certain actions on National Forest System lands define "unauthorized livestock" as "any cattle, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro by 222.20(b)(13), which is not authorized by permit to be upon the land on which the livestock is located and which is not related to use authorized by a grazing permit." 36 C.F.R. 261.2. No grazing is authorized within the area where the feral cattle are located. Placing or allowing unauthorized livestock to enter or be on NFS lands is prohibited (36 CFR 261.7).

## Notification of Upcoming Aerial Lethal Removals

**Issue:** As part of the 2022 litigation, the Forest Service agreed to provide 75-days advance notice before killing cattle. Because the scoping notice is legally insufficient, the scoping notice does not meet the 75-day notice period. As a result, the Forest Service is precluded from proceeding with the lethal cattle removal in February 2023; instead, legally sufficient notice must be given with a new 75-day notice period (320).

**Response:** The 75-day notice requirement was not a settlement agreement or any other type of court-ordered, legally enforceable agreement, but rather a statement the U.S. Forest Service made to Plaintiffs during the conferral process for the stipulated dismissal motion. The stipulation for dismissal for case number 2:22-cv-00086-JB-CG states: "In any event, any such aerial lethal removal operations on or before March 1, 2025 would be preceded by at least 75 days' notice to the Petitioners and also to the public." (see project file document Ref05). The stipulation for dismissal does not refer to or rely upon NEPA processes as part of that notice nor does it state that a signed decision would be completed at the time such notice is given. The U.S. Forest Service provided the notice on November 22, 2022, the

same date the public was notified of an opportunity to comment (see project file document Ref06). No removal efforts have been or will be implemented within 75 days of that date.

**Alleged Violations of NEPA**

**Issue 1:** The scoping notice does not identify the categorical exclusion (CE) that the Forest Service contends authorizes it to (1) avoid its regulatory duty first to impound the cattle, endeavor to find their owner or, failing that, sell them and (2) that authorizes APHIS, on the Forest Service's behalf, to intentionally shoot and kill unbranded cattle from a helicopter. The Forest Service, like other agencies, may categorically exclude actions from further NEPA review under only limited circumstances. Under the Forest Service's regulations, it may only categorically exclude an action if: "(1) The proposed action is within one of the categories established by the Secretary at 7 CFR part lb.3; or (2) The proposed action is within a category listed in § 220.6(d) and (e)." *See* 36 C.F.R. 220.6(a). (320, 371, 387, 391, 398, 400, 404).

**Response:** U.S. Forest Service regulations in 36 CFR 220.6 do not require that the scoping notice identify the categorical exclusion category or categories that might be used to authorize the final decision. Rather, the decision memo authorizing an action that is categorically excluded from analysis under an environmental assessment or environmental impact statement must identify the categorical exclusion category being used and justification for use of that category (see 36 CFR 220.6(f)(2)). Forest Service Handbook 1909.15 Chapter 31.3 provides further direction on scoping: "Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded (sec. 11). Scoping is important to discover information that could point to the need for an EA or EIS versus a CE. Scoping is the means to identify the presence or absence of any extraordinary circumstances that would warrant further documentation in an EA or EIS. Scoping should also reveal any past, present, or reasonably foreseeable future actions with the potential to create uncertainty over the significance of cumulative effects. Scoping complexity should be commensurate with project complexity."

The scoping letter stated, "We would appreciate your comments and ideas on this proposal. If you have ideas that you believe should be considered in helping us develop a final proposal that meets the need described above, please respond with written comments. The information you provide during this scoping period will also help determine extraordinary circumstances that would preclude categorically excluding the project from documentation in an environmental assessment or environmental impact statement." As such, the U.S. Forest Service was not pre-decisional in its determination that a categorical exclusion might be used and was not required to identify a categorical exclusion category in the scoping letter. The scoping letter requested information from the public to incorporate in its analysis and determine the correct level of environmental documentation based on information related to the proposed action and alternatives (see project file document Ref07). Further, the information obtained from public input during the scoping period may also serve to inform which type of categorical exclusion category might be used.

**Issue 2:** The scoping notice does not provide any information on APHIS' decision-making process. APHIS' actions are connected to and inextricably linked with the Forest Service's

actions and the public needs the information on APHIS' decision-making process and the ability to participate in it to fully evaluate the project (320, 371, 387, 391, 398, 400, 404).

**Response:** APHIS-WS will determine the appropriate level of NEPA analysis for the proposed action based the APHIS Implementing NEPA Procedures after all of the required documentation and authorization from the U.S. Forest Service and other Cooperating Agencies has been received.

https://www.aphis.usda.gov/aphis/resources/lawsandregs/Environmental_Compliance/Statut es/CT_APHIS_Implementing_NEPA_Procedures

**Issue 3:** The scoping notice lacks detailed information, such as how population estimates were reached or the extent and location of resource damage. The public cannot meaningfully evaluate the extent of the purported damage to the riparian areas or the cost (economic and otherwise) of removing the cattle because of the lack of information in the Scoping Notice (320, 371, 387, 391, 398, 400, 404).

**Response:** The scoping notice provides a history of the issue, the need to address the issue, a proposed action, and mitigation measures to address concerns. Information related to resource damage is available in the project record (see project file documents Ref08 and Ref09). Examples of resource impacts documented by U.S. Forest Service staff include severe over-grazing and stream bank trampling. Some commenters have suggested wildlife, such as elk, or natural disturbances, such as floods, have contributed to disturbances within riparian areas of the Gila Wilderness. The monitoring and site conditions documenting impacts from feral cattle were made by range management and other resource specialists and clearly demonstrate the actual presence of feral cattle as well as sign left by cattle (e.g. tracks, manure, wallows with tracks, and vegetation grazing). Physical evidence has been documented in both the riparian areas and uplands, outside of any areas that would be influenced by flooding. Aside from the documented resource impacts, the cattle are not authorized to be within the Gila Wilderness. Some commenters have stated feral cattle are not having an impact on Gila Wilderness resources. To date, no documentation has been provided to the U.S. Forest Service to support this statement.

Information on the current population estimate of feral cattle was provided by aerial reconnaissance information from February 2022 by APHIS as well as by the private gather contractor who operated within the removal area from October 2021 through December 2022. Some commenters have requested financial information on past gather and aerial removal efforts to conduct a cost benefit analysis. The 2021/2022 gather contract was awarded for $337,840. That contract included work for the Gila Wilderness feral cattle and for feral horse gathering on the Apache-Sitgreaves National Forest. The gather contract obligated $216,000 specifically for Gila Wilderness feral cattle gathering in addition to $65,000 for Gila Wilderness mobilization and demobilization. As a comparison, the 2021/2022 APHIS interagency agreement was $38,996. Over the course of two days of aerial removal efforts, APHIS removed nearly as many feral cattle (65) than the 2021/2022 gather contractor did over 15 months (70 cattle). Over half of the cattle removed by the

gather contractor were euthanized before they could be herded out alive from the Gila Wilderness.

**Issue 4:** The timelines the scoping notice outlines presuppose that the Forest Service (and APHIS) will proceed under a CE regardless of public comment and that lethal disposal methods will be used. The scoping notice does not allow adequate time for the Forest Service to meaningfully consider public comments before taking action in February 2023.

> **Response:** As stated previously, the U.S. Forest Service was not pre-decisional in its determination that a categorical exclusion would likely be used. The proposed February 2023 timeline was a goal. However, having a signed decision and supporting documentation of the NEPA and other compliance steps is a precondition before any action can be implemented.

## Alleged Violation of Freedom of Information Act Request

**Issue:** The Forest Service has seriously undermined the public's ability to provide a substantive response to its scoping notice by failing to respond to prior Freedom of Information Act (FOIA) requests served by NMCGA. Specifically on February 22, 2022, NMCGA filed a FOIA request with both the APHIS and the Forest Service for all documentation related to the decision memo authorizing the 2022 aerial livestock gunning. Although the Forest Service/Department of Agriculture formally accepted the request on April 5, 2022, the agency has provided no responsive documents. Through counsel, numerous follow-up requests have been made as to the status of the response of that FOIA request. None of the follow requests has received a response. Without this information, it is not possible for the public to adequately analyze the claims and assumptions in the Scoping Notice. thus, to provide the public with adequate information upon which to comment, a draft EA must be completed and released for public review and comment (320, 400, 404).

> **Response:** Correspondence to counsel was provided on April 5, 2022 (see project file document Ref10) that the request was in the queue awaiting processing. An option was provided to reduce the scope of the request to shorten the processing time, that request was not responded to.

## Impacts to Mexican wolves

**Issue:** The presence of cattle carcasses will impact Mexican wolf behavior and potentially increase future carnivore-livestock conflicts. Not only is leaving the carcasses inconsistent with the Forest Service's goals of protecting wildlife, including endangered species, it is also inconsistent with the Forest Service's asserted goal of protecting waterways and riparian areas (13, 81, 108 151, 320, 383, 386, 388, 391, 397, 398, 400, 406, 292, 307, 322, 351, 356, 360, 387, 398, 400, 404).

> **Response:** No relationship between presence of Mexican wolves and a change in feeding behavior from the proposed action has been established. The U.S. Forest Service has consulted with the U.S. Fish and Wildlife Service on the proposed action, the proposed action was found to not likely jeopardize the continued existence of the Mexican wolf. Further, the U.S. Fish and Wildlife Service has provided the following information:

*Wolves are opportunistic predators and facultative scavengers and if any wolves are within the project area or in close proximity they may discover and scavenge on the carcasses. Wolves are already exposed to livestock carcasses as well as other large ungulate carcasses throughout their entire range in New Mexico and Arizona on Forest Service lands, Bureau of Land Management lands, Fish and Wildlife Service Lands, and State game agency lands. In our 2014 Environmental Impact Statement (EIS) and 2022 Supplemental EIS, we note that Mexican wolves are attracted to livestock carcasses, and if there are live livestock in the area, it could lead to conflicts. However, there is no evidence, scientific research, or observational data from the Mexican wolf reintroduction program to suggest that once wolves scavenge on a livestock carcass they become habituated to cattle leading to increased depredations. Last year, after the Forest Service lethally removed feral cattle in the Gila Wilderness Area, two wolves were attracted to the carcasses, stayed in the area for several months, then moved back into their normal areas without preying on live cattle.*

*Because wolves are scavengers, they will be attracted to the carcasses. But because there is no livestock grazing permitted in the Gila Wilderness Area where the Forest Service will remove cattle, any wolves attracted to and scavenge on the dead livestock will not be in conflict with livestock. Therefore, the increase in livestock carcasses to the wilderness area will be temporary based on what we observed last time and is not expected to lead to an increase in wolf-livestock conflicts in the surrounding area."*

This concern is further mitigated by the short duration carcasses will be on the landscape. We anticipate carcasses to last for several weeks before they are consumed by scavengers and have decomposed. Since aerial operations to lethally remove feral cattle would occur over two 7-day periods annually, carcasses would not be available as a reliable, year-round food source. Field reports following the February 2022 aerial removal efforts found no evidence of cattle carcasses several months later.

## Impacts to Water Quality

**Issue:** The presence of cattle carcasses in or near waters has the potential to contaminate water quality (15, 126, 145, 151, 320, 328, 353, 397, 398, 404, 405, 414).

**Response:** The specialist report addressing water quality and riparian resources has indicated the long-term detrimental impacts of feral cattle to the riparian areas of the Gila Wilderness greatly outweighs any short-term potential concerns over carcasses contaminating water quality (see project file document Ref11). This statement is based on the temporal scale of the impacts being compared. Ongoing impacts to riparian areas and stream banks have been continual since the 1970s and will continue until feral cattle are removed. Potential concerns over water quality impacts from a carcass are much shorter (days to a few weeks) and will not have the same lasting impact as continual, concentrated use of riparian areas. However, to address water quality concerns from carcasses, a requirement to report and remove any carcass in or adjacent to a water source, trail, or known heritage site will be implemented. Aerial reconnaissance will be conducted at the end of each day to check these locations and any need for carcass removal will be reported

to U.S. Forest Service staff that same day. It should be noted, cattle and other wildlife (e.g. elk and deer) die of natural causes, sometimes in or adjacent to water sources. This occurs both within and outside of the wilderness. If an occurrence is known and a concern exists, the carcass may be removed by the landowner or U.S. Forest Service. However, in most cases, it is likely the carcass, especially wildlife, naturally decompose without any intervention. This is one reason backcountry use etiquette stresses the importance of properly treating water before consumption. Of equal concern related to the impacts of feral cattle is the repeated and concentrated use along waterways and within riparian areas as animal waste has the potential to contaminate water in the form of fecal coliform.

## Alleged Violation of the Wilderness Act

**Issue:** The Forest Service's proposed action violates the Wilderness Act. The Wilderness Act presumptively prohibits the Forest Service from using motorized equipment, including helicopters, in the Wilderness. *See* 16 U.S.C. 1133(d)(l); 36 C.F.R. 293.6(b). The Forest Service may only overcome the presumption against use of motorized equipment in the Wilderness if the Forest Service undertakes a "Minimum Requirements Analysis", *see* Section 4 of the Wilderness Act, which is generally documented in a "Minimum Requirements Decision Guide. The scoping notice does not specifically address this Forest Service requirement, but instead, only obliquely states that "[a] wilderness minimum requirements decision guide would be completed and approved before using any methods otherwise prohibited under the 1964 Wilderness Act." Given that use of motorized equipment is prohibited, an MRA/MRDG is required (292, 307, 322, 351, 356, 360, 387, 398, 400, 404, 320, 52, 104, 266, 340, 394).

**Response:** Use: Section 4(c) of the Wilderness Act states, "Except as specifically provided for in this Act, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this Act and except as necessary to meet minimum requirements for the administration of the area for the purpose of this Act (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area." The landing of aircraft (helicopter or fixed wing) is prohibited by the Wilderness Act, not the use of low flying helicopters. The proposed action would not authorize the landing of a helicopter unless needed for emergency purposes. Regardless, the minimum requirements analysis (MRA) has analyzed the impacts to wilderness character of the proposed action (including low flying helicopter use), no action alternative (i.e. not removing cattle), and recommended alternative as a comparison of the least impactful option for addressing the issue while minimizing impacts to the Gila Wilderness. The short-term impacts of low-level helicopter flying were determined not to rise to the level of an extraordinary circumstance, especially in relation to the long-term negative impacts of feral cattle occurring in the Gila Wilderness.

## Use of Categorical Exclusion

**Issue:** The Forest Service cannot proceed under a CE because extraordinary circumstances exist. First, it is undisputed that Mexican Wolves inhabit this area, as confirmed by the USFWS'

collared wolf-location map of January 3, 2023; by leaving between 50 and 150 cattle carcasses in the forest, Mexican wolves will be encouraged to utilize this unnatural occurrence as a food source. In addition, the wolves will become preconditioned to relying on cattle as a primary food source, which will increase conflicts between the endangered predator and local cattle growers. Second, flood plains and wetlands will also be impacted when cattle die in waterways and riparian areas, which happened the last time the Forest Service shot cattle from a helicopter. Dead animals can contaminate water sources for other animals and people and increase undesirable bacterial populations. Finally, Congress has already determined that use of motorized or mechanical equipment negatively impact wilderness areas and has prohibited their use. *See* 16 U.S.C. 1133(c). As a result, it cannot be disputed that using helicopters to facilitate killing cattle in the Gila Wilderness will affect the Wilderness and its wilderness character. In addition, the Forest Service's proposal to use a CE, a limited NEPA review, to overcome Congress' prohibition on use of motorized equipment in the Wilderness is inappropriate (320, 39, 371, 387, 391, 398, 400, 404).

> **Response:** Regarding extraordinary circumstances, 36 CFR 220.6(b)(2) states, "The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." Resource analysis in the project record and decision memo documents why the no action alternative (i.e. not removing feral cattle) has a greater impact on water quality and wilderness character than the proposed action and why no cause-effect relationship exists.

## Animal Cruelty

**Issue:** The proposed action constitutes animal cruelty. Testimony provided at the NMLB hearing demonstrated "two of the dead bulls were found in the Gila River, one with a broken hind leg," "both bulls in the river appeared to have been shot multiple times," and bulls "did not die a good death". As a result, the NMLB concluded that "aerial gunning of cattle in the Gila Wilderness and Gila National Forest during February 1, 2022, through March 1, 2022, by the USFS and APHIS, was contrary to commonly accepted agricultural animal husbandry practices and thus in violation of§ 30-18-1 (J), constituting cruelty to animals (178, 179, 184, 186, 192, 219, 234, 247, 291, 407).

> **Response:** The finding by the New Mexico Livestock Board pertains to commonly accepted agricultural animal husbandry practices. The proposed action is not an animal husbandry practice. The proposed action is a land management action carried out to address resource impacts.
>
> Animal and Plant Health Inspection Service – Wildlife Services (APHIS-WS) policy and operations comply with the guidelines of the American Veterinary Medical Association (AVMA 2020), which states "... euthanasia is the act of inducing humane death in an animal" and that "...that if an animal's life is to be taken, it is done with the highest degree

of respect, and with an emphasis on making the death as painless and distress free as possible" (see project file document Ref12).

AVMA (2020) recognizes that there is "an inherent lack of control over free-ranging wildlife, accepting that firearms may be the most appropriate approach to their euthanasia, and acknowledging that the quickest and most humane means of terminating the life of free-ranging wildlife in a given situation may not always meet all criteria established for euthanasia." In other words, the AVMA distinguishes between euthanasia, typically conducted on a restrained animal, and methods that are more accurately characterized as humane killing of unrestrained animals under field conditions.

Furthermore, classification of a given method as a means of euthanasia or humane killing may vary by circumstances and species. These acknowledgments are not intended to condone a lower standard for the humane euthanasia of wildlife. The best methods possible under the circumstances must be applied, and new technology and methods demonstrated to be superior to previously used methods must be embraced. The AVMA (2020) states that personnel should be proficient and should use the proper firearm, ammunition, and trap for the species.

APHIS-WS personnel are trained and certified to use firearms to ensure operations are conducted in a safe and effective manner (WS Directive 2.615 WS Firearms Use and Safety). Aerial shooting from a helicopter is conducted by trained and certified USDA-APHIS-WS crew members. This method is commonly used in Predator Damage Management operations in New Mexico and has been identified as an effective means to efficiently remove target animals. The WS program aircraft-use policy (WS Directive 2.620 Aviation Safety and Operations) ensures that aerial shooting is conducted in a safe and environmentally sound manner, in accordance with applicable laws and regulations. Pilots and aircraft must be certified under established USDA-APHIS-WS program procedures and only properly trained employees are approved to shoot from aircraft.

AVMA (2020) notes, "…it may still be an act of euthanasia to kill an animal in a manner that is not perfectly humane or that would not be considered appropriate in other contexts. For example, due to lack of control over free-ranging wildlife and the stress associated with close human contact, use of a firearm may be the most appropriate means of euthanasia.

As described by the AVMA, there may be a distinction between clinical euthanasia and field practices for humane killing, but field practices are still considered an acceptable form of euthanasia. APHIS-WS policy and operating procedures fully comply with these guidelines, and APHIS-WS recognizes the importance of careful decision making in the field regarding all use of lethal methods.

**Concern over Shooting of Branded Cattle**

**Issue:** If the cattle at issue are branded or marked, the cattle belong to the registered owner but the owner will not be able to receive compensation because the cattle will not be found and the Forest Service has never cited any authority that authorizes the Forest Service to pay compensation. New Mexico law presents an independent barrier to the Forest Service's plan to

kill cattle in the Wilderness. New Mexico's requirement of impoundment and sale of cattle (which is entirely consistent with the Forest Service's implementing regulations) reinforces the fact that the Forest Service's proposal to kill cattle is arbitrary and capricious and contrary to law (320, 338, 377, 387, 391, 392, 397, 398, 400, 404, 405, 406, 414).

> **Response:** An impound notice will be issued in accordance with 36 CFR 262.10 at least 15 days prior to any removal activities. This notice will be provided directly to all term grazing permittees on the Gila National Forest as well as posted in a local newspaper, post offices, courthouse, and at Forest Service District Offices. Of the hundreds of cattle removed from the Gila Wilderness since the 1990s, one individual cow was branded (captured in 1998). If branded cattle are lethally removed during gathering or aerial operations, the owner may request compensation by contacting the U.S. Forest Service, Southwestern Region and/or Gila National Forest. The agency will provide information and forms to request compensation. Owners may also file a claim under the Federal Torts Claims Act. Evidence of ownership and loss will be needed to receive compensation. A requirement of any lethal removal activity will be documenting kill locations so interested parties can inspect the animals.

## Concern that Cattle were Historically Present
**Issue:** There were questions that if these feral cattle were present when the Gila Wilderness was managed by indigenous people, they should not be eliminated. Rather their population should be reduced to the proximate number who lived there 1,000 (say) years ago and a study project to identify why the previous population controls are no longer sufficient (136, 143).

> **Response:** The history of feral cattle in the Gila Wilderness is well-known and well-documented. The feral cattle at issue are descendants of cattle originating from the Redstone Allotment during the 1970s.

## Inclusion of Feral Horses in the Proposed Action
**Issue:** There was a request to include feral horses into the proposed action.

> **Response:** Feral horses do not occur within the project area and including feral horses is outside the scope and scale of this project.

## Concern over Potential Disturbance to Cultural Resources
**Issue:** If there is a need for any off-road staging areas that could possibly result in disturbance to cultural resources, the SHPO recommends that consultation regarding such be initiated by the USFS per the terms outlined in the Region 3 Programmatic Agreement.

> **Response:** Before any on-the-ground activities are implemented that may result in ground disturbance, an archaeologist from the Forest will be consulted and consultation with the State Historic Preservation Office will be completed as needed.

## Concern over the Status of the Cattle being Removed from the Gila Wilderness
**Issue:** There is concern that the cattle being removed from the Gila Wilderness for this project meet the definition of estray livestock and thus fall under the jurisdiction of the New Mexico Livestock Board.

**Response:** New Mexico Statutes Chapter 77 - Animals and Livestock Article 2 - Livestock Board Section 77-2-1.1 defines "estray" as "*livestock* found running at large upon public or private lands, either fenced or unfenced, whose owner is unknown, or that is branded with a brand that is not on record in the office of the board or is a freshly branded or marked offspring not with its branded or marked mother, unless other proof of ownership is produced." NM ST § 77-2-1.1(N) (emphasis added). This section defines "livestock" as "all domestic or domesticated animals that are used or raised on a farm or ranch, including the carcasses thereof, and exotic animals in captivity and includes horses, asses, mules, cattle, sheep, goats, swine, bison, poultry, ostriches, emus, rheas, camelids and farmed cervidae upon any land in New Mexico. 'Animals' or 'livestock' does not include canine or feline animals." NM ST § 77-2-1.1(A).

The feral cattle in the Gila Wilderness that are proposed for removal under this project do not include "domestic or domesticated animals that are used or raised on a farm or ranch." *Id.* Rather, they are non-domesticated cattle that have not been husbanded, cared for by private owners, or kept or raised on a ranch for over more than four decades since an original group of domesticated cattle were abandoned by their owner in the Gila Wilderness and began reproducing naturally. Cattle live up to 10-15 years and can reproduce once a year (approximate nine-month gestation period), so the Forest Service estimates that at least four generations of cattle have succeeded the group originally abandoned in the Gila Wilderness in the 1970s. Over those years and generations, the cattle have become feral and display different behavior than domestic cattle. Gather contractors and Forest Service staff who have encountered these cattle over the years have commented on their wild, elusive behavior similar to deer or elk. The cattle proposed for removal under this decision do not have brands, ear tags, or other identifying marks that denote ownership by an individual or entity and have not been "used or raised on a farm or ranch." *See id.* Indeed, brand inspection reports and photo documentation confirm of the several hundred cattle removed by private gather contractors and APHIS since 1998, only one animal had a brand (captured in 1998 and returned alive to its registered owner). As such, even under New Mexico law, the feral cattle proposed for removal as part of this project do not meet the definition of "livestock" and would thus not qualify as "estray livestock" under the jurisdiction of the New Mexico Livestock Board.

Moreover, even if these cattle could qualify as estrays under New Mexico Law, Federal law, including the U.S. Constitution, various statutes, and federal agency regulations, grant authority to the Forest Service to take the proposed action regardless of how these animals may be classified or regulated under state law.

Under the Property Clause of the U.S. Constitution, the Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. U.S. Const. art. IV. sec. 3, cl. 2; *see also e.g., Kleppe v. New Mexico,* 426 U.S. 529 (1976) (holding authority of Congress to regulate use of federal land derives from Property Clause). Congress directed the Secretary of Agriculture through the Forest Service to "make provisions for the protection against destruction by fire and depredations" upon the national forests, and the Secretary "may

make such rules and regulations and establish such service as will insure the [national forests], namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." Organic Administration Act of 1897, 16 U.S.C. § 551. Congress has also passed numerous other statutes directing the management, protection, and uses of National Forest System (NFS) lands. For example, Congress granted authority to the Secretary of Agriculture to regulate livestock grazing on NFS lands under the Granger-Thye Act of 1950 (16 U.S.C. § 580l) and the Federal Land Policy and Management Act of 1976 (43 U.S.C. §§ 1751-1752).

Conflicting state laws are preempted by federal law under the Supremacy Clause of the U.S. Constitution, U.S. Const. art. VI. cl. 2. State law may be preempted by federal law in three ways: (1) express preemption by Congress; (2) implied field preemption where Congress intends for federal law to occupy a field exclusively; and (3) implied conflict preemption where state law is an obstacle to accomplishment of the objectives of federal law or it is impossible to meet the requirement of both federal and state law. *See, e.g., English v. Gen. Elec. Co.,* 496 U.S. 72, 78-80 (1990). Here, application of New Mexico state laws that give the New Mexico Livestock Board authority over these animals—at least to the extent they require the Forest Service to take or to not take certain actions— would directly conflict with applicable federal laws and regulations. The Forest Service will accommodate state livestock laws when doing so will not frustrate or hinder the Forest Service's ability to implement the federal laws and protects the NFS lands from destruction. Among other responsibilities as the delegated federal land manager, the Forest Service has the responsibility for addressing issues where grazing (whether authorized or unauthorized) is impacting other resources.

Forest Service regulations define "livestock" as "animals of any kind kept or raised for use or pleasure," 36 C.F.R. § 221.1, and define "unauthorized livestock" as "any cattle, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro by § 222.20(b)(13), which is not authorized by permit to be upon the land on which the livestock is located and which is not related to use authorized by a grazing permit." 36 C.F.R. § 261.2. No grazing is authorized within the area where the subject cattle are located. Therefore, any domestic cattle discovered within the Project area are unauthorized livestock in accordance with Forest Service regulations and placing or allowing unauthorized livestock to enter or be on NFS lands is prohibited. § 261.7. A public impound notice was signed on February 1, 2023 in accordance with Forest Service regulations (36 C.F.R. § 262.10) alerting the public that unauthorized livestock will be removed and requesting that anyone that may own livestock that have wandered into the area collect their livestock and remove them from NFS land. Even so, unauthorized cattle that are determined to have an ear tag, brand, or other signs of private ownership will not be targeted for lethal removal during aerial operations.

**Gila Wilderness – Unauthorized Cattle Removal**



ARTHUR CARHART NATIONAL WILDERNESS TRAINING CENTER

# MINIMUM REQUIREMENTS ANALYSIS FRAMEWORK Workbook

*"…except as necessary to meet minimum requirements for the administration of the area for the purpose of this Act…"*

— Section 4(c), Wilderness Act of 1964

***NOTE:*** *Blue underlined text in this document contains instructions (screen tips) that can be accessed by hovering the cursor over the hyperlinked word or phrase. These screen tips were added using hyperlinks, and the "Control + Click to follow link" prompt is a function of how the screen tips work. Clicking on the screen tip does not lead to a different site. Please read the full instructions before proceeding. Delete this note before finalizing the document.*

## Introduction

The Minimum Requirements Analysis (MRA) is designed to examine whether a project truly needs to occur in wilderness, and if so, how to accomplish it with the least impact to the wilderness resource. The framework below is intended to help managers: 1) evaluate actions proposed in wilderness involving a use otherwise prohibited by the Wilderness Act; and 2) consider appropriate choices about administrative actions they might take. Like the previous version of this document (the Minimum Requirements Decision Guide (MRDG)), the MRA Framework (MRAF) is based on the Wilderness Act and is consistent with agency policy. The MRAF incorporates lessons learned by agency employees as they used the MRDG over the years. The goal of the MRAF is to help provide consistency in the way wilderness-managing agencies consider actions to address threats to wilderness, and to ensure that agencies strive to preserve wilderness character through their on-the-ground decisions.

This document is intended for uses prohibited by Section 4(c) of the Wilderness Act in designated wilderness, but it can be used to analyze all projects in wilderness. Check agency policy to determine if this workbook may be appropriate for other proposals in wilderness.

If applicable, per agency policies, collaborate and coordinate with associated Tribe(s) and/or Tribe(s) with historical, treaty, or related ties to the area.

**Title:**

**Gila Wilderness – Feral Cattle Removal**

## Step 1: Determine If Administrative Action May Be <u>Necessary</u>

**Issue Statement**

*Describe the issue.*

Since the mid-1970s unbranded/unauthorized cattle, referred to in this document as feral cattle, have been known to roam in a general area bounded by the confluence of the Gila River and Turkey Creek, upstream along the Gila River to Alum Mountain, north to the Little Creek drainage, west to Miller Spring Cabin, and continuing west down the Turkey Creek drainage to the confluence with the Gila River.  Originally part of the abandoned Redstone Cattle Allotment, currently there are no open grazing pastures within the area.  The area encompasses over 100,000 of the 559,000-acre Gila Wilderness. The topography of the country includes portions of the Diablo Mountain, the sharply divided canyons, high ridges and talus slopes of the Gila River and Turkey Creek watersheds, and the gentler broad open country between them.

The issue started when a permittee abandoned his cattle on the grazing allotment within the wilderness. Attempts to remove the cattle, including issuing term grazing permits, and issuing nine gather contracts have resulted in the removal (alive or through lethal means) of 691 feral cattle since 1996.  However, the situation has not improved, and many feral cattle remain, roaming freely within the wilderness, beyond the boundaries of the original Redstone Allotment.  The remote and rugged topography combined with the wild nature of the cattle has resulted in the mixed success of the past gathering efforts. In February 2022, Animal and Plant Health Inspection Service Wildlife Services (APHIS) conducted an aerial operation where 65 cattle were lethally removed through aerial operations. The Forest currently estimates that 50 to 150 unauthorized cattle remain in the area. Because both cows and bulls exist within the population, the herd is capable of reproducing.  The current situation is out of compliance with FSM2320 and FSM2900.

The presence of unauthorized cattle within the Gila Wilderness has resulted in resource damage, especially to riparian areas where cattle congregate during warmer, drier months. In recent years, Forest staff have documented occurrences of over-grazing and stream bank trampling (and subsequent erosion). On an invasive plant inventory survey, a forest partner organization documented bank trampling within the perimeter of an invasive plant infestation. The unauthorized cattle have negatively impacted fish and wildlife habitats including habitats for several federally threatened and endangered species, including the narrow-headed garter snake, Gila trout, Mexican spotted owl, and Mexican wolf.

Due to the confined topography of the Gila River canyon, feral cow trailing's braid with existing Forest Service trails creating a spider web of pathways within the riparian corridor of the Gila River. Unsustainable erosion, braided trail systems, and hiker and feral cattle interactions leads to a trail system that is out of compliance with the Critical National Quality Standard for Forest Service Trails. (FSH 2309.18, section 15)

## Options Outside of Wilderness
*Can the issue be resolved or addressed outside of wilderness?*

☐ YES   **STOP – EXPLAIN BELOW AND DO NOT TAKE ACTION**

☒ NO     **EXPLAIN BELOW AND PROCEED TO THE NEXT SECTION**

Explain:

> The feral cattle are known to occur within the Gila Wilderness. Operations must occur within the congressionally designated wilderness.

## Criteria for Determining Necessity
*Do any of the criteria below apply?*

### A. Wilderness Character
*Based on the Issue Statement, are any of the qualities of wilderness character degraded, impaired, or threatened to a degree that it is necessary to analyze potential action otherwise prohibited by Section 4(c) to address the issue?*

#### UNTRAMMELED

☐ YES     ☒ NO

Explain:

> The Untrammeled Quality of Wilderness Character monitors authorized actions that intentionally manipulate or control ecological systems. The feral cattle are descendants of permitted livestock from the 1970's and have become a human-caused threat to wilderness character. Although the existence of cattle in wildernesses is a result of their introduction by humans, it is not an intentional manipulation or control of ecological systems. To allow feral cattle to continue to exist and alter the landscape around them could be considered a sign of human influence on the biophysical environment of the affected wilderness areas, but action in wilderness to manage them is not necessary to preserve the untrammeled quality of wilderness character.

#### UNDEVELOPED

☐ YES     ☒ NO

Explain:

Undeveloped means wilderness retains its primeval character and influence and is essentially without permanent improvement or modern human occupation, such as structures and installations, as well as the use of motor vehicles, motorized equipment, and mechanical transport. Action is not necessary to preserve the undeveloped quality.

## NATURAL

☒ YES    ☐ NO

Explain:

The Natural Quality of wilderness character encompasses all naturally occurring biological and physical elements of wilderness: plant and animal species and communities, soil, air, and water. This quality also includes the interactions among these elements and the resulting ecological processes or functions that occur in wilderness. The presence of feral cattle has and will continue to degrade the natural quality of the Gila Wilderness. Cattle grazing and trampling, especially within riparian areas, has resulted in over-grazing and the spread of noxious weeds, stream bank degradation, water quality impacts, and habitat damage for sensitive plants and animals including federally listed species, specifically narrow-headed garter snake, Gila trout, Mexican spotted owl, and Mexican wolf The successful removal of feral cattle within the riparian areas will contribute to the continued effort to delist these species. Action is necessary to preserve this quality.

## SOLITUDE OR PRIMITIVE and UNCONFINED RECREATION

☒ YES    ☐ NO

Explain:

The outstanding opportunities for solitude and primitive and unconfined recreation quality means that visitors are free from encountering other visitors, and free from the sights and sounds of modern civilization, and that visitors require self-reliance, and skills in wilderness travel. It encompasses the sense of discovery, adventure, and mental challenge where one can travel and explore unique and unknown environments on one's own. Feral cattle presence in wilderness affects visitors experience by their mere existence. A reminder for modern civilization, feral cattle hinder the visitors sense of discovery.   In addition, where cattle are present, they produce trails in and out of riparian zones creating multiple trail braiding along system trails, and piles of manure.  Action is necessary to preserve this quality.

## OTHER FEATURES OF VALUE

☐ YES    ☒ NO

Explain:

This quality centers on unique and tangible features of a wilderness that are integral to the wilderness character of that place. These features may include cultural resource sites, paleontological sites, or any other features not included under the other four qualities that have ecological, geological, scientific, educational, scenic, or historical value (Section 2(c) of the Wilderness Act).

There are no known features of value currently effected by feral cattle. However, feral cattle could have a negative impact on unknown cultural resources and historical sites. The Gila Wilderness is home to the Mimbres people and has significant historic sites, lithic scatters, ruins, and is of important cultural significance to multiple tribes. These sites are often near riparian zones where cattle are often found.

## B. **Valid Existing Rights**
*Is action necessary to satisfy a valid existing right? If so, cite the specific right, terms and conditions, and source.*

☐ YES    ☒ NO

Explain:

Currently, there are no valid existing grazing rights in this area of the wilderness.

## C. Special Provisions of Wilderness Legislation
*Is action necessary to satisfy a special provision in wilderness legislation (i.e., Section 4(d) of the Wilderness Act of 1964 or subsequent wilderness-enabling laws) that requires action? Cite law and section.*

☐ YES    ☒ NO

Explain:

Neither the Wilderness Act of 1964 nor subsequent legislation establishing this wilderness contain special provisions or existing rights for the proposed action.

## D. Requirements of Other Federal Laws or Legal Directives

*Not including special provisions found in wilderness-enabling laws, does another Federal law, by itself or as implemented or interpreted through EO, court order, policy, etc., <u>require</u> action? Cite law and section.*

☒ YES    ☐ NO

<u>Explain</u>:

Endangered Species Act: The Endangered Species Act states "Federal agencies shall…utilize their authorities… by carrying out programs for the conservation of endangered species and threatened species." Conservation, as defined in the Act, means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measure provided pursuant to the [Endangered Species] Act are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management." The affirmative direction from the Endangered Species Act requires the agency to take actions necessary to conserve threatened and endangered species. This requirement is consistent with requirements of the Wilderness Act to preserve wilderness character, specifically, preservation of natural conditions (Section 2(c)). The feral cattle within the wilderness are causing resource impacts to the habitats of narrow-headed garter snake, Gila Trout, Gila chub, loach minnow, spikedace and southwest willow flycatcher, which are species listed under the Endangered Species Act.  Specifically, feral cattle impacts to riparian areas and streambanks have reduced habitat quality, reducing vegetative cover impacting water temperature and streambank stability, resulting in water quality concerns.

## Step 1: Determination – Is Administrative Action <u>Necessary</u> in Wilderness?

*Based on the responses and detailed explanations in A through D above, is there a need to proceed to Step 2? If at least one criterion in B through D in Step 1 has been met, or at least one quality of wilderness character is threatened, check the "Yes" box and provide a thorough explanation of the rationale described in A through D. It may also be helpful to describe in this determination how action would be consistent with the public purposes of wilderness or satisfy a specific agency obligation. If none of the criteria have been met, action is NOT necessary. Check the "No" box, explain why the proposed project does not meet the criteria, and stop your analysis.*

☒ YES    **EXPLAIN BELOW AND COMPLETE STEP 2 OF THE MRAF**

☐ NO    **STOP – EXPLAIN BELOW AND DO NOT TAKE ACTION**

<u>Explain</u>:

The management of feral cattle in the Gila Wilderness upholds the Wilderness Act's mandate to maintain wilderness character by limiting natural resource damage, especially to ESA-listed species and their habitat, reducing public interaction with feral cattle and the evidence of feral cattle, reducing a potential vector of invasive species, and limiting the possible collateral damage to cultural heritage sites.  Feral cattle management complies with the Endangered Species Act while providing for the protection of public health and safety.

# Step 2: Determine the <u>Minimum</u> Activity

**Other Direction**

*Is there "special provisions" language in legislation or other congressional direction that explicitly allows consideration of (but does not require) a prohibited use? (Step 1 has a similar question in Section C, but that question is specific to other legislation <u>requiring action</u> in wilderness; this question is specific to other legislation addressing <u>consideration of prohibited uses</u>).*

***AND/OR***

*Has the issue been addressed or prescribed in agency policy, management plans, or legal directive (e.g., treaty, EO, court order, or other binding agreement with federal, state, or local agencies or authorities)?*



☒ YES        **DESCRIBE OTHER DIRECTION**

☐ NO         **SKIP TO "UNCONTROLLABLE TIMING REQUIREMENTS" BELOW**

<u>Describe Other Direction</u>:

**Forest Service Manual- 2320 - Wilderness Management**

**2320.2 - Objectives**

2. Maintain wilderness in such a manner that ecosystems are unaffected by human manipulation and influences so that plants and animals develop and respond to natural forces.

3. Minimize the impact of those kinds of uses and activities generally prohibited by the Wilderness Act, but specifically excepted by the Act or subsequent legislation.

**2320.3 - Policy**

1. Where there are alternatives among management decisions, wilderness values shall dominate over all other considerations except where limited by the Wilderness Act, subsequent legislation, or regulations. Manage the use of other resources in wilderness in a manner compatible with wilderness resource management objectives.

**2320.5 - Definitions**

10. Indigenous Species. Any species of flora or fauna that naturally occurs in a wilderness area and that was not introduced by man.

11. Native Species. Any species of flora or fauna that naturally occurs in the United States and that was not introduced by man.

12. Naturalized Species. Any non-indigenous species of flora or fauna that is close genetically or resembles an indigenous species and that has become established in the ecosystem as if it were an indigenous species.

13. Exotic Species. Any species that is not indigenous, native, or naturalized.


**2323.04 – Responsibilities**

2326.04b - Regional Forester. The Regional Forester is responsible for approving:

1. Transport and supply by aircraft, air drop, motorboat, or mechanical transport for situations that meet the conditions under items 2, 4, or 5, in FSM 2326.1


**2323.3 - Management of Wildlife and Fish**

**2323.31 - Objectives**

1. Provide an environment where the forces of natural selection and survival rather than human actions determine which and what numbers of wildlife species will exist.

2. Consistent with objective 1, protect wildlife and fish indigenous to the area from human caused conditions that could lead to Federal listing as threatened or endangered

3. Provide protection for known populations and aid recovery in areas of previous habitation, of federally listed threatened or endangered species and their habitats.


**2323.32 – Policy**

2. Wildlife and fish management programs shall be consistent with wilderness values.

4. Manage wilderness to protect known populations of federally listed threatened or endangered species where necessary for their perpetuation and aid in their recovery in areas of previous habitation. When alternative areas outside of wilderness offer equal or better protection, take actions to recover threatened or endangered species outside of wilderness areas first.


**Forest Service Policy on Invasive Species Management – FSM 2900**

**2902 - Objectives**

1. Early Detection and Rapid Response (EDRR). Inventory and survey susceptible aquatic and terrestrial areas of the National Forest System so as to quickly detect invasive species infestations, and subsequently implement immediate and specific actions to eradicate those infestations before they become established and/or spread.

2. Control and Management. Conducting integrated invasive species management activities on priority aquatic and terrestrial areas of the National Forest System will be consistent with guidance from the National Invasive Species Council, such as the 'Control and Management Guidelines', to contain, reduce, and remove established infestations of aquatic and terrestrial invasive species, and to limit the adverse effects of those infestations on native species, human health, and other National Forest System resources.

**2903 – Policy**

1. Initiate, coordinate, and sustain actions to prevent, control, and eliminate priority infestations of invasive species in aquatic and terrestrial areas of the National Forest System.

5. Ensure that all Forest Service management activities are designed to minimize or eliminate the possibility of establishment or spread of invasive species on the National Forest System, or to adjacent areas.

**2905 – Definitions**

Rapid Response. With respect to invasive species (plant, pathogen, vertebrate, or invertebrate species), rapid responses are defined as the quick and immediate actions taken to eradicate, control, or contain infestations that must be completed within a relatively short time to maximize the biological and economic effectiveness against the targeted invasive species.

Forest Service National Strategic Framework for Invasive Species Management (2013) – prioritizes and guides the prevention, detection, and control of invasive wildlife that threaten terrestrial and aquatic ecosystems.

**2600-Wildlife, Fish, and Sensitive Plant Habitat Management**

Policy: National Forest System resources must be adequately protected during animal damage management activities authorized by the states and conducted by the states or Animal and Plant Health Inspection Service (APHIS) - Animal Damage Control program. This policy in no way defines or limits the authority of States to regulate the taking of predators according to State and other applicable Federal laws. When the Forest Service conducts animal damage

management activities, such as controlling small mammal populations on plantations, the agency must comply fully with state and federal laws.

In carrying out animal damage management activities, Forest Service employees shall --

1. Rely upon APHIS or the state agencies to provide the expertise and conduct predator control on National Forest System lands, to determine livestock losses, and to determine methodology for animal damage management.

4. Use an integrated approach to the prevention of animal damage and management of animal damage control programs. Consider a full range of methods, including physical barriers, repellents, habitat manipulation, biological controls, silvicultural methods (for example, fertilizing to improve soil fertility), pesticides, and hunting and trapping. Use licensed hunting, fishing, and trapping as a control technique where practicable.

**FSM 2353.15 - National Quality Standards for Trails**

Apply the National Quality Standards for Trails in the planning, construction, maintenance, condition assessment, and management of NFS trails, in accordance with FSH 2309.18, section 15.

**FSH 2309.18 - TRAILS MANAGEMENT HANDBOOK CHAPTER 10 - TRAIL PLANNING**

15 - NATIONAL QUALITY STANDARDS FOR TRAILS

1. The National Quality Standards for Trails establish desired outcomes for NFS trails managed at a full-service level. These standards also form the baseline for estimating the cost of managing NFS trails. The National Quality Standards for Trails consist of five key measures: health and cleanliness, safety and security, condition of facilities, responsiveness, and resource setting.
2. The complete set of National Quality Standards for Trails is contained in exhibit 01 of this section.
3. Critical National Quality Standards for Trails are identified with an asterisk. If any of these standards is not met, the resulting conditions pose a high probability of immediate and permanent injury to persons or property. If any of the critical standards cannot be met due to budget or other constraints, take action as soon as practicable to correct or mitigate the problem. Corrective or mitigating measures may include closing the trail, portions of the trail, or associated trail structures to public use.
4. Take mitigating steps if conditions, facilities, or services addressed by noncritical standards decline to the point where visitor's health or safety is threatened. Examples include repairing the trail, portions of the trail, or associated trail structure or removing trail structures that are in disrepair and no longer needed.

**NATIONAL QUALITY STANDARDS FOR TRAILS**

Key Measure: RESOURCE SETTING

1. Effects from trail use do not conflict with environmental laws (such as the Endangered Species Act, National Historic Preservation Act, and Clean Water Act). *

2. Resource management adjacent to and along the trail corridor is consistent with ROS objectives and desired conditions of adjacent management areas.

Key Measure: SAFETY & SECURITY

1. Hazards do not exist on or along the trail. *

*Indicates a Critical National Quality Standard. If it cannot be met, action must be taken as soon as practicable to correct or mitigate the problem. Refer to FSH 2309.18, section 15.

**Uncontrollable Timing Requirements**
*What, if any, are the considerations that would dictate timing of the action?*

| |
|---|
| Operations would likely take place during spring, fall or winter when cattle are generally at locations away from the Gila River corridor and foliage cover is minimal. During summer months prior to the monsoon season, cattle are often found closer to water sources (Gila River and tributaries) which may lead to greater likelihood of management operations conflicting with recreational use of the wilderness. |

**Workflow Components**
*What are the distinct components or phases of the action?*

| Example: | Transportation of personnel to the project site |
|---|---|
| Component 1: | Necessary actions for ensuring public safely |
| Component 2: | Scout locations within the wilderness to determine numbers of feral cattle |
| Component 3: | Dispose of feral cattle |
| Component 4: | Monitor for continued feral cattle |

**Feasibility of Alternatives**

Only include feasible alternatives in this section. Some alternatives that are not feasible may warrant documentation in the "Alternatives Considered but Dismissed" section to provide a brief description and explanation of why it was dismissed and not considered in detail.

Possible reasons for dismissal include alternatives that are impossible, have unacceptable impacts, are unsafe, are proven ineffective, have excessive costs, or whose timing would cause degradation to wilderness character.

The alternatives should also be reasonable. For example, there is no need to include helicopters in an alternative for equipment transport when that equipment can be easily carried by people or pack stock along a maintained trail.

Refer to the **MRAF instructions** regarding alternatives and the effects to each of the comparison criteria.

# Step 2: Alternatives

**Alternative 1:**

| Wrangling/Herding Feral Cattle with Euthanasia of Cattle as necessary |
|---|

## Component Methods

*How will each of the components of the action be performed under this alternative?*

| Comp # | Workflow Components | Component Methods for this Alternative |
|---|---|---|
| | *Example: Transportation of personnel to the project site.* | *Example: Workers walk to work site.* |
| #1 | Necessary actions for ensuring public safely | Post information at trailheads and through social media |
| #2 | Scout Locations | Riders on horseback and personnel in helicopter will scout for feral cattle |
| #3 | Disposition of feral cattle | Riders on horseback will herd cattle out of the wilderness.  Euthanize injured cattle as needed. |
| #4 | Monitor for continued feral cattle | Riders on horseback and on foot will monitor riparian areas for evidence of cattle |
| #5 | | |

## Description of the Alternative

*What are the details of this alternative? When, where, and how will the action occur? What mitigation measures will be taken? Provide a complete narrative description of the Component Methods identified above.*

Under this alternative, contracted groups of 3-4 horse mounted livestock handlers will scout canyons, river corridors, springs and other know areas looking for the presence of feral cattle. The livestock handlers may spend 3-4 nights camping out in the wilderness during the scouting trip. The contractor will use helicopters to scout potential locations for feral cattle. Helicopter flights will take place during the winter season when leaves are off the trees providing for better visibility. This is also a time of reduced visitor use.  Total helicopter flight will be less than six hours over the wilderness per year. When feral cattle are spotted from the air that information will be relayed to the livestock handlers on the ground who will then travel by horseback to the location.  There are Forest Service trail systems within the area. The livestock handlers may use the existing trails, but most travel of the livestock handlers is expected to be cross country and off trail.  Once the livestock handlers are engaged with feral cattle, either through on the ground scouting or through ariel scouting, the livestock handlers will use traditional wrangling techniques to herd the feral cattle out of the wilderness to corrals constructed outside of the wilderness.  The livestock handlers will attempt to herd the cattle out in one day, if they need to overnight, a temporary corral will need to be constructed to hold the feral cattle.  It is estimated that the livestock handlers will need to make 10 trips with a total of up to 50 days in the wilderness per year. Communications with the public would be facilitated prior to all operations through the Forest Public Affairs Officer, and information will be posted at trailheads and on the Forest social media.

Experience proves that herding feral cattle out of the wilderness is difficult to accomplish. Having been born in the wild and never domesticated, the cattle are extremely hard to catch. The steep sided canyons and talus slopes are hard to navigate off trail on horseback. Some of the area has seen wildfire that has left the area covered in downfall and standing snags, and floods have deposited large debris piles to navigate through and around within the riparian areas.  In addition, the farther away from the wilderness border feral cattle are found, and hence a longer herding distance to corrals, the more complicated and time intensive the operation becomes.

Historically, about half of the feral cattle sustain an injury requiring euthanasia of the feral cattle. Cattle would only be shot when away from water sources, trails, cultural sites, and all other locations identified by Gila National Forest staff. Non-toxic (e.g., copper) bullets would be used to minimize risk of lead toxicity to wildlife scavenging on the carcasses.  Multiple years of herding trips would be necessary to accomplish the goal of no feral cattle in the wilderness.  It is expected up to three additional low level flights per year would be needed for after action monitoring. Annual monitoring of riparian areas within the project area for evidence of feral cattle will be conducted using horse back and foot travel. The Forest will continue to use public and agency sightings of feral cattle and evidence of feral cattle as part of the monitoring protocol.

**Wilderness Character**

| Component # | For each component number, indicate the impact the **method for this alternative** will have on each of the five qualities of Wilderness:<br><br>Positive = P, Negative = N, No Effect = 0<br><br>**Describe in detail the impacts to each of the five qualities in the narrative section below** | Untrammeled | Undeveloped | Natural | Solitude or Primitive and Unconfined Recreation | Other Features of Value |
|---|---|---|---|---|---|---|
| | *Example:* Workers walk to work site. | 0 | 0 | 0 | 0 | 0 |
| #1 | Post information at trailheads and through social media | 0 | 0 | 0 | O | 0 |
| #2 | Riders on horseback and personnel in helicopter will scout the area. | O | N | N | N | 0 |
| #3 | Riders on horseback will wrangle and herd cattle out of the wilderness.  Euthanize injured cattle as needed. | N | N | P | P | 0 |
| #4 | Personnel in helicopter, riders on horseback and on foot will monitor for feral cattle | 0 | N | N | N | 0 |
| #5 | | 0 | 0 | 0 | 0 | 0 |

*What is the effect of each Component Method on the qualities of wilderness character? What mitigation measures will be taken? Include cumulative impacts in the explanation.*

UNTRAMMELED: Explain the intensity of the action that would intentionally control, manipulate, or hinder the conditions or processes of ecological systems:

> The untrammeled character of wilderness is most intensely affected by the agency decision to remove the feral cattle from the wilderness by herding or euthanasia of injured cattle.  This intentional action controls the components of ecological systems in the wilderness.

UNDEVELOPED: Explain the effects to this quality in terms of how "the imprint of man's work [would] remain substantially unnoticeable," and how wilderness will continue to be in contrast to other areas of "growing mechanization":

The undeveloped character of the wilderness could be impacted by low level helicopter flights, especially if the helicopter needs to land for some unforeseen issue within the wilderness. As the livestock handlers explore deeper into the wilderness requiring multiday herding, temporary installations would be needed to contain feral cattle.  The impacts should be short in duration.

NATURAL: Explain the effects to this quality in terms of protection, degradation, or restoration of natural conditions:

Low level helicopter flights under this alternative could negatively affect behavior of elk, deer, or other wildlife due to disturbance but are short term in duration. Livestock handlers on horseback scouting or monitoring could have a negative effect on animal behavior, but to a much lesser degree. The effect would be comparable to hunters on horseback. The herding of feral cattle could have a negative effect on the behavior of wildlife due to the disturbance, but the impacts would be minimal and short in duration.  The removal of the feral cattle either by euthanasia or herding would be a positive impact to the natural character.  It would be a step towards the restoration of critical habitat for multiple federally listed species foundational to the character of the Gila Wilderness.

SOLITUDE OR PRIMITIVE and UNCONFINED RECREATION: Explain how opportunities for visitors to experience solitude or a primitive and unconfined type of recreation will be protected or degraded. As appropriate, describe solitude, primitive recreation, and unconfined recreation separately:

Components of this action will negatively affect the solitude and unconfined recreation character of this wilderness. Sights and sounds of the low flying helicopters would diminish a person's sense of solitude. Witnessing livestock handlers just scouting on horseback may diminish a person's sense of unconfined recreation if they travel to avoid them. Witnessing livestock handlers herding cattle could diminish a person's sense of self-reliance and unconfined recreation. While some of these impacts would be considered severe, all are limited in duration and will be mitigated by the winter timing of the actions. In contrast, removing the cattle either through herding or euthanasia would have a positive long-term effect to solitude and unconfined recreation. It would reduce the sights and sounds of modern civilization represented by the feral cattle, and the impact of potential future actions associated with the cattle.

OTHER FEATURES OF VALUE: Explain any effects to features of scientific, educational, scenic, or historical value that are not accounted for in the above qualities, including cultural and paleontological resources that are integral to wilderness character:

No known features of value would be affected by this alternative. However, it is possible that the feral cattle could be damaging unknown cultural features.  The Gila Wilderness is home to the Mimbres people and has significant historic sites, lithic scatters, ruins, and is of important cultural significance to multiple tribes. These sites are often near riparian zones where cattle are often found.  The removal of the feral cattle would have a positive impact on this character in this instance.

# Step 2: Alternatives

**Alternative 2:**

Lethally Removal of Feral Cattle Through Aerial Operations.

## Component Methods

*How will each of the components of the action be performed under this alternative?*

| Comp # | Workflow Components | Component Methods for this Alternative |
|---|---|---|
| | *Example: Transportation of personnel to the project site.* | *Example: Workers walk to work site.* |
| 1 | Necessary actions for ensuring public safety | Institute area closure order during operations. Post information at trailheads and through social media |
| 2 | Scout locations within the wilderness to determine numbers of feral cattle | Wildlife Services specialists would conduct helicopter flights to determine numbers and locations of feral cattle |
| 3 | Disposition of feral cattle | Wildlife Services specialists would euthanize feral cattle through aerial shooting from a helicopter |
| 4 | Monitor for continued feral cattle | Personnel in helicopter, riders on horseback and on foot will monitor for feral cattle |
| 5 | | |

## Description of the Alternative

*What are the details of this alternative? When, where, and how will the action occur? What mitigation measures will be taken? Provide a complete narrative description of the Component Methods identified above.*

Under this alternative, Animal and Plant Health Inspection Service Wildlife Services (APHIS) would cooperate with the Gila National Forest to oversee removal of feral cattle from the Gila Wilderness. First, Wildlife Services specialists would use aerial reconnaissance through helicopter flights to determine cattle distribution and estimated population size. Up to three helicopter reconnaissance flights would be conducted within one week of beginning removal efforts to assist in determining cattle locations. Based on reconnaissance information gathered, Wildlife Services specialists would meet with Gila National Forest staff to develop a plan of operation for removal of the feral cattle. Removal operations would primarily involve shooting by Wildlife Services specialists from a helicopter. Any ground-based personnel would use horses for travel within the wilderness. Cattle would only be shot when away from water sources, trails, cultural sites, and all other locations identified by Gila National Forest staff. Cattle would be left onsite to naturally decompose. If a cow dies within or next to a waterbody or trail, U.S. Forest Service staff will travel to the location on horseback and drag the carcass away from the location. Traditional tools will be used to assist in dragging the carcass due to weight considerations. Non-toxic (e.g., copper) bullets would be used to minimize risk of lead toxicity to wildlife scavenging on the carcasses. Communications with the public would be facilitated prior to all operations through the Forest Public Affairs Officer, and information will be posted at trailheads and on the Forest social media. Area closures will be implemented to address public safety considerations. Total aerial operations to lethally remove feral cattle are expected to take up to two weeks, this includes aerial reconnaissance. It is possible two separate 7-day operations may be needed depending on weather, helicopter, and staffing availability. The helicopter will not land in wilderness unless it is an emergency.  There is an interagency agreement in place with APHIS to conduct aerial monitoring as needed. It is expected no more than three additional flights per year would be needed to monitor post action. Annual monitoring of riparian areas within the project area for evidence of feral cattle will be conducted using horse back and foot travel. The Forest will continue to use public and agency sightings of feral cattle and evidence of feral cattle as part of the monitoring protocol. Follow-up operations to include all listed actions in subsequent years may be needed until the entire feral cattle population has been removed.

**Wilderness Character**

*What is the effect of each Component Method on the qualities of wilderness character? What mitigation measures will be taken?*

| Component # | For each component number, indicate the impact the **method for this alternative** will have on each of the five qualities of Wilderness:<br><br>Positive = P, Negative = N, No Effect = 0<br><br>**Describe in detail the impacts to each of the five qualities in the narrative section below** | Untrammeled | Undeveloped | Natural | Solitude or Primitive and Unconfined Recreation | Other Features of Value |
|---|---|---|---|---|---|---|
| | *Example:* Workers walk to work site. | 0 | 0 | 0 | 0 | 0 |
| 1 | Institute area closure order during operations. Post information at trailheads and through social media | 0 | 0 | 0 | N | 0 |
| 2 | Wildlife Services specialists would conduct helicopter flights to determine numbers of feral cattle | 0 | N | N | N | 0 |
| 3 | Wildlife Services specialists would conduct aerial shooting from a helicopter | N | N | P | P | 0 |
| 4 | Personnel in helicopter, riders on horseback and on foot will monitor for feral cattle | 0 | N | 0 | N | 0 |
| 5 | | 0 | 0 | 0 | 0 | 0 |

*What is the effect of each Component Method on the qualities of wilderness character? What mitigation measures will be taken? Include cumulative impacts in the explanation.*

UNTRAMMELED: Explain the intensity of the action that would intentionally control, manipulate, or hinder the conditions or processes of ecological systems:

The untrammeled character of wilderness is most intensely affected by the agency decision to lethally remove feral cattle through aerial operations within the wilderness. This intentional action controls the components of ecological systems in the wilderness.

UNDEVELOPED: Explain the effects to this quality in terms of how "the imprint of man's work [would] remain substantially unnoticeable," and how wilderness will continue to be in contrast to other areas of "growing mechanization":

Under this alternative, the undeveloped character of the wilderness could be impacted by low level helicopter flights, especially if the helicopter needs to land for some unforeseen issue within the wilderness. Firing bullets from a helicopter are considered a transport and supply by aircraft and require Regional Forester approval (FSM 2326.04b), and further diminishes the undeveloped character of wilderness

NATURAL: Explain the effects to this quality in terms of protection, degradation, or restoration of natural conditions:

> Low level helicopter flights under this alternative could negatively affect behavior of elk, deer, or other wildlife due to disturbance but are short term in duration. The effects are expected to be short-lived in duration during the flights and would not have a permanent effect on the natural wilderness character. Reduction of cattle by shooting would reduce the damage caused by the nonnative animal and help restore riparian habitat damaged by feral cattle. It would be a step towards the restoration of critical habitat for multiple federally listed species foundational to the character of the Gila Wilderness. Cattle are planned to be shot away from water sources, trails, cultural sites, etc. and thus carcasses should not pose impacts (e.g., water quality contamination) to the natural character of the wilderness. In the event cattle die near a water source moving euthanized feral cattle will mitigate negative impact.

SOLITUDE OR PRIMITIVE and UNCONFINED RECREATION: Explain how opportunities for visitors to experience solitude or a primitive and unconfined type of recreation will be protected or degraded. As appropriate, describe solitude, primitive recreation, and unconfined recreation separately:

> Components of this action will negatively affect the solitude and unconfined recreation character of this wilderness.  An area closure will be implemented for public safety considerations. This would impact the visitor's ability to experience a high degree of freedom over their own actions and decisions. Sights and sounds of the low flying helicopters would diminish a person's sense of solitude. These impacts would be severe, but short in duration. Impacts are expected to last in duration for the time that operations are taking place (total aerial operations to lethally remove feral cattle are expected to take up to two weeks, this includes aerial reconnaissance). Additionally, up to three low level flights may be necessary for monitoring purposes.  Disposing of feral cattle would have a positive effect because their existence effects the solitude of visitor's experience. It would reduce the sights and sounds of modern civilization represented by the feral cattle.  Solitude quality has the potential for negative impacts from cattle carcasses left because of the operations. Specialists will take measures to conduct shooting operations away from high use areas, trails, water sources, etc., but this does not guarantee wilderness visitors will not observe carcasses if they travel cross-country. Following removal operations carcasses will be present until natural decomposition occurs, or scavengers eliminate them.

OTHER FEATURES OF VALUE: Explain any effects to features of scientific, educational, scenic, or historical value that are not accounted for in the above qualities, including cultural and paleontological resources that are integral to wilderness character:

No known features of value would be affected by this alternative. However, it is possible that the feral cattle could be damaging unknown cultural features.  The Gila Wilderness is home to the Mimbres people and has significant historic sites, lithic scatters, ruins, and is of important cultural significance to multiple tribes. These sites are often near riparian zones where cattle are often found.  The removal of the feral cattle would have a positive impact on this character in this instance.

# Step 2: Alternatives

**Alternative 3:**

Use of System of Corrals to Contain and Herd Cattle

## Component Methods

*How will each of the components of the action be performed under this alternative?*

| Comp # | Workflow Components | Component Methods for this Alternative |
|---|---|---|
| | *Example: Transportation of personnel to the project site.* | *Example: Workers walk to work site.* |
| 1 | Necessary actions for ensuring public safely | Post information at trailheads and through social media |
| 2 | Scout locations within the wilderness to determine numbers of feral cattle | Reconnaissance helicopter flights to determine numbers and locations of feral cattle and deliver construction material |
| 3 | Dispose of feral cattle | Livestock handlers, dogs, and horses would herd cattle out of the wilderness using a system of corrals |
| 4 | Monitor for continued feral cattle | Personnel in helicopter, riders on horseback and on foot will monitor for feral cattle |
| 5 | | |

## Description of the Alternative

*What are the details of this alternative? When, where, and how will the action occur? What mitigation measures will be taken? Provide a complete narrative description of the Component Methods identified above.*

Under this alternative, corrals and traps would be built within the Gila Wilderness to facilitate gathering cattle. The alternative proposes to construct corrals near the confluence of the Gila River and Sapillo Creek. In addition, a cattle trap will be constructed in Fall River Canyon utilizing the topography of the canyon.  The construction materials for the corrals and trap would be a sling loaded by helicopter to the locations where they would be constructed. The helicopter will not land in wilderness unless it is an emergency. The number of flights required to transport all material is unknown and dependent on several factors but a minimum of six flights is anticipated. In addition, up to three reconnaissance helicopter flights are needed to locate the feral cattle. Cattle would then be gathered to corral or trap locations by horse mounted livestock handlers. The feral cattle would be held onsite until acclimated to the corrals and people before being moved to the next corral. Hay and salt would be sling loaded by helicopter to the corral locations to feed cattle. The number of helicopter flights will be dependent on the number of cattle being fed and the number of gather efforts being conducted. A minimum of four helicopter trips per gather effort is anticipated. Certified weed free hay would be required to minimize risk of introducing non-native plants into the wilderness. Corrals would not be constructed within riparian areas. As such, water will be hauled from the nearest water source to water troughs by horse and hand for the duration of the cattle's stay in the corrals. The proposed alternative recommends that the corrals and trap be permanent to allow for future management use as needed. Eventually, the feral cattle will be herded to corrals outside of the wilderness. From this point, cattle would be inspected by a livestock brand inspector and then transported off the forest. These operations would take place each winter while the cattle are on the rivers at lower elevations. Communications with the public would be facilitated prior to all operations through the Forest Public Affairs Officer, and information will be posted at trailheads and on the Forest social media.

It is expected up to three additional flights per year would be needed to monitor for feral cattle post action. Annual monitoring of riparian areas within the project area for evidence of feral cattle will be conducted using horse back and foot travel. The Forest will continue to use public and agency sightings of feral cattle and evidence of feral cattle as part of the monitoring protocol.

**Wilderness Character**

*What is the effect of each Component Method on the qualities of wilderness character? What <u>mitigation measures</u> will be taken?*

| Component # | For each component number, indicate the impact the **method for this alternative** will have on each of the five qualities of Wilderness:<br><br>Positive = P, Negative = N, No Effect = 0<br><br>**Describe in detail the impacts to each of the five qualities in the narrative section below** | Untrammeled | Undeveloped | Natural | Solitude or Primitive and Unconfined Recreation | Other Features of Value |
|---|---|---|---|---|---|---|
| | *Example:* Workers walk to work site. | 0 | 0 | 0 | 0 | 0 |
| 1 | Post information at trailheads and through social media | 0 | 0 | 0 | O | 0 |
| 2 | Reconnaissance helicopter flights to determine numbers and locations of feral cattle and deliver construction material | N | N | N | N | 0 |
| 3 | Livestock handlers, dogs, and horses would herd cattle out of the wilderness using a system of corrals | N | N | P | N | 0 |
| 4 | Personnel in helicopter, riders on horseback and on foot will monitor for feral cattle | 0 | N | 0 | N | 0 |
| 5 | | 0 | 0 | 0 | 0 | 0 |

*What is the effect of each Component Method on the qualities of wilderness character? What <u>mitigation measures</u> will be taken? Include cumulative impacts in the explanation.*

UNTRAMMELED: <u>Explain</u> the intensity of the action that would intentionally control, manipulate, or hinder the conditions or processes of ecological systems:

> The untrammeled character of wilderness is most intensely affected by the agency decision to remove the feral cattle out of the wilderness by herding or euthanasia of injured cattle. This intentional action controls the components of ecological systems in the wilderness. In addition, the decision to bring hay and salt into the wilderness could affect the ecological systems of native animal who casually feed on them.  The installation of a permanent trap could alter native animal behavior for the duration of the life of the trap.

UNDEVELOPED: <u>Explain</u> the effects to this quality in terms of how "the imprint of man's work [would] remain substantially unnoticeable," and how wilderness will continue to be in contrast to other areas of "growing mechanization":

The installation of permanent corrals and traps will degrade the undeveloped character for the duration of the life of the installations. Wood constructed corrals are known to last over 100 years in the arid landscape. The corrals not only occupy the land, but also make it easier for people in the future to impose their will on the environment. In addition, the use of multiple helicopter sling loads for construction supplies and feed would be a short-term reminder of the growing mechanization of man and is considered a prohibited section 4(c) action in the Wilderness Act.

NATURAL: Explain the effects to this quality in terms of protection, degradation, or restoration of natural conditions:

Low level helicopter flights under this alternative could negatively affect behavior of elk, deer, or other wildlife due to disturbance but are short term in duration. Livestock handlers on horseback scouting or monitoring could have a negative effect on animal behavior, but to a much lesser degree, comparable to hunters on horseback. The herding of feral cattle could have a negative effect on the behavior of wildlife due to the disturbance, but the impacts would be minimal and short in duration. While the corrals would be built away from riparian areas, the need to water the cattle would facilitate hauling water from rivers by horse over an extended time. It would be impossible not to create a user created path to the stream.  This would lead to greater erosion and streamside trampling. The removal of the feral cattle out of the wilderness through herding would be a positive long-term impact to the natural character. It would be a step towards the restoration of critical habitat for multiple federally listed species foundational to the character of the Gila Wilderness.

SOLITUDE OR PRIMITIVE and UNCONFINED RECREATION: Explain how opportunities for visitors to experience solitude or a primitive and unconfined type of recreation will be protected or degraded. As appropriate, describe solitude, primitive recreation, and unconfined recreation separately:

Components of this action will negatively affect the solitude and unconfined recreation character of this wilderness.  Sights and sounds of the low flying helicopters would diminish a person's sense of solitude.  Witnessing livestock handlers herding cattle diminishes a person's sense of self-reliance. Witnessing livestock handlers just scouting on horseback may diminish a person's sense of unconfined recreation if they travel to avoid them. The presence of the corrals and the livestock handlers camping near the corrals would negatively impact visitor's solitude.

OTHER FEATURES OF VALUE: Explain any effects to features of scientific, educational, scenic, or historical value that are not accounted for in the above qualities, including cultural and paleontological resources that are integral to wilderness character:

No known features of value would be affected by this alternative. However, it is possible that the feral cattle could be damaging unknown cultural features.  The Gila Wilderness is home to the Mimbres people and has significant historic sites, lithic scatters, ruins, and is of important cultural significance to multiple tribes. These sites are often near riparian zones where cattle are often found.  The removal of the feral cattle would have a positive impact on this character in this instance.

**NOTE:** *To add more alternatives, copy and paste a blank alternative from above.*
*Delete this note before finalizing the document.*

# Step 2: Alternatives Considered but Dismissed

**Alternatives Considered but Dismissed**

*What alternatives were considered but dismissed? Why were they dismissed?*

Explain:

**Helicopter herding**: Attempted once during a previous gathering attempt, this alternative consists of using a helicopter, supported on the ground by horse mounted livestock handlers, to herd feral cattle down a canyon drainage into the main riparian corridor of the Gila River, and then into a temporary corral.  In this alternative, the presence and sound of the helicopter is the mechanism that drives or pushes the cattle and the horse mounted livestock handlers are on the ground to help keep the herd together. While the first attempt was successful in herding a significant number of feral cattle out of the side drainage, the horse mounted livestock handlers were unable to keep up with the speed of the helicopter. The helicopter spooked the feral cattle causing a stampede. The corral was unable to hold the agitated cattle, resulting in no significant reduction in feral cattle in the wilderness. Subsequent use of the helicopter only succeeded in spreading the cattle out across the landscape.  The alternative was not analyzed due to its infeasibility.

**Public Hunt for the Feral Cattle**: The alternative was not analyzed because Forest Service policy dictates that the state agency has jurisdiction over the implementation of public hunts on federal land.

**Sterilization of Feral Cattle**: This alternative suggests that either through helicopter trapping or on the ground wrangling, feral cows in the wilderness are injected with an immunocontraceptive to induce sterilization, or the bulls are castrated through banding. Either option requires capture of all feral cattle of one gender to be successful.  After the procedure, the feral cattle would be released while still in the wilderness. They would not be able to reproduce, but they would still be causing the impacts to wilderness character and harming habitat for federally listed species of animals.  This alternative was deemed ineffective.

## Step 2: Determination – What is the Minimum Activity?

Refer to the **MRAF instructions** before identifying the selected alternative and explaining the rationale for its selection.

**Selected Alternative**

Alternative 2- Lethally Removal of Feral Cattle Through Aerial Operations.

Explain rationale for selection, including a comparison of the selected alternative with other alternatives:

Alternative 2 is the chosen alternative because it is the minimum action necessary to accomplish the removal of feral cattle within the Gila Wilderness and best protects the wilderness character of the Gila Wilderness. This determination was drawn by comparing the impacts to the five qualities of wilderness character across the three alternatives. Analysis of both the severity and duration of the impact is imperative when determining the minimum action.

All three alternatives will negatively impact the untrammeled quality because we are intentionally taking action to remove the feral cattle.  The severity of the impact is generally equal across all three alternatives, however, the time that the untrammeled quality is impacted is considerably less using the chosen alternative.

All alternatives will negatively impact the undeveloped quality of wilderness character.  Alternative 1 would have the least negative impact to the undeveloped quality coming mostly from low level helicopter flights and utilization of temporary corrals. Both would be short duration and low in severity. Alternative 3 would have the greatest impact to the undeveloped quality both in severity and time. The permanent constructed corrals would have a high severity and long-term impact to the undeveloped quality; in addition, short-term impacts from the helicopter sling loads used to carry supplies for the operation would be acknowledged.  The chosen alternative would have similar impacts of alternative 1 both in severity and time. In addition, the bullets delivered from the helicopter would further impact the undeveloped quality, however, it would be an impact low in severity and time.

The natural quality of wilderness is positively impacted by all three alternatives because all strive to remove the feral cattle, reduce resource impact from the cattle and become a step towards the restoration of critical habitat for multiple federally listed species foundational to the character of the Gila Wilderness.  The chosen alternative will accomplish the desired outcome sooner.  In all three alternatives, the long-term positive impact is weighed against the short-term impacts that low level helicopter flights, herding operations or constructed traps may have on the natural travel patterns of other species.

Outstanding opportunities for solitude or unconfined recreation is negatively impacted by the three alternatives. The difference being severity and time.  Alternative 1 and 3 would have low severity impacts to solitude during the operations, but the time of the operations could last 3-6 months during a year, and it is believed that the operations would have to be repeated year after year for several years until fully successful.  All alternatives would utilize similar helicopter reconnaissance and monitoring that would be a severe but short duration impact. In addition, the chosen alternative would have additional helicopter flights lethally remove the feral cattle and a closure order for a two-week period during the operations, both severe and short in duration. Though additional flights may be necessary to employ the desired outcome with the chosen alternative, it is believed that the required time would be significantly less than the other alternatives.  These negative short-term impacts to the solitude and unconfined recreation qualities are weighed by the long-term positive impact the removal of the cattle would have for the visitor.

No alternative has a known impact to the other features of value quality of wilderness character. Due to this analysis, it is determined Alternative 2 is the minimum action necessary across the large expanse of project area to rid the wilderness of feral cattle.   However, due to the transitory nature of feral cattle and the complexity of terrain of the project area, it is possible that opportunities would arise in localized locations where Alternative 1 would be comparable to Alternative 2 in overall impacts to wilderness character.

Which of the prohibited uses found in Section 4(c) of the Wilderness Act are approved in the selected alternative? Describe limits on quantity, timing, frequency, or duration.

| Approved? | Prohibited Use | Quantity, Timing, Frequency, or Duration |
|---|---|---|
| ☐ | Mechanical Transport: | 5-6 low level helicopter flights for reconnaissance and monitoring per year of operation.<br>12-20 low level helicopter flights lethally removing of feral cattle per year of operation. |
| ☐ | Motorized Equipment: | |
| ☐ | Motor Vehicles: | |
| ☐ | Motorboats: | |
| ☐ | Landing of Aircraft: | While not planned, there is a potential for landing of the helicopter in case of an emergency. The number of times required is unknown. |
| ☐ | Temporary Roads: | |
| ☐ | Structures: | |
| ☐ | Installations: | |

Describe mitigation measures as well as monitoring and reporting requirements, if appropriate:

- All motorized use and landings will be reported to the identified Forest Service liaison for Infra-WILD module data entry on use of motorized equipment in wilderness per agency requirements.
- Reconnaissance flights as described in the actions are needed to determine number of remaining cattle and if further action is necessary.
- An interagency agreement is in place with APHIS to conduct arial monitoring as needed
- The Forest will conduct riparian monitoring  as required of the Upper Gila Riparian Settlement Agreement.
- Aerial operations will take place during the late winter through early spring months prior to leaf-on season.  The provides good visibility from the helicopter, but it is also a time of low visitor use in the wilderness.
- The Forest will continue to use public and agency sightings of feral cattle and evidence of feral cattle as part of the monitoring protocol.

**Approvals**

**Project Title** (from page 2)**:**

| Gila Wilderness – Feral Cattle Removal |
|---|

Refer to agency policies for the following signature authorities:

**Prepared by:**

Name | Phillip Walrod | Position | Recreation Specialist

**Reviewed by:**

Name | Camille Howes | Position | Forest Supervisor

Signature   CAMILLE HOWES   Digitally signed by CAMILLE HOWES
Date: 2023.02.09 18:50:29 -07'00'        Date _____

**Reviewed by:**

Name | | Position |

Signature   LEIGH JOHNSON   Digitally signed by LEIGH JOHNSON
Date: 2023.02.10 08:09:25 -07'00'        Date _____

Comments -

**Reviewed by:**

Name | | Position |

Signature _____        Date _____

**Approved by:**

Name _____          Position _____

Signature <u>SHERRI SCHWENKE _____</u>          Date _____

Digitally signed by SHERRI
SCHWENKE
Date: 2023.02.10 08:48:06
-07'00'