**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

NEW MEXICO CATTLE GROWERS'
ASSOCIATION; SPUR LAKE CATTLE
COMPANY; NELSON SHIRLEY,
individually; ALLEN CAMPBELL,
individually and HUMANE FARMING
ASSOCIATION,

        Plaintiffs,

vs.                                                                  No. CIV 23-0150 JB/GBW

UNITED STATES FOREST SERVICE;
ANIMAL AND PLANT HEALTH
INSPECTION SERVICE; CAMILLE
HOWES, in her official capacity as Supervisor
of the Gila National Forest; TOM VILSACK,
in his official capacity as Secretary of the
United States Department of Agriculture;
RANDY MOORE, in his official capacity as
Chief of the U.S. Forest Service; MICHIKO
MARTIN, in her official capacity as
Southwestern Regional Forester; HENRY
PROVENCIO, in his official capacity as
District Ranger for the Wilderness Ranger
District, Gila National Forest; JANET
BUCKNALL, in her official capacity as
Deputy Administrator of the Animal and Plant
Health Inspection Service and KEITH
WEHNER, in his official capacity as Western
Regional Director, and Animal and Planet
Health Inspection Service,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

    **THIS MATTER** comes before the Court on (i) the Plaintiffs' Application for Temporary

Restraining Order and Preliminary Injunction, filed February 21, 2023 (Doc. 6)("Plaintiffs'

TRO"). The Court held a hearing on February 22, 2023. The primary issue is whether, pursuant

to rule 65 of the Federal Rules of Civil Procedure, the Court should grant the Plaintiffs' request

for a temporary restraining order ("TRO") enjoining the Defendants from conducting an operation planned to start on February 23, 2023 in which the United States Forest Service and United States Animal Plant and Health Inspection Service ("APHIS") will shoot up to 150 cattle in New Mexico's Gila Wilderness from helicopters (the "Operation").  Because the Plaintiffs do not demonstrate (i) that they have a substantial likelihood of success on the merits in connection with their claims, because the cattle in the Gila Wilderness are not "livestock" as the Forest Service defines that term; (ii) that, in the absence of preliminary relief, the Plaintiffs are likely to suffer irreparable harm for which damages would be an inadequate remedy; (iii) that the balance of equities falls in the Plaintiffs' favor; or (iv) that an injunction is in the public interest, the Court denies the Plaintiffs' request for a TRO.

## FACTUAL AND PROCEDURAL BACKGROUND

The events underlying the parties' dispute stem from the discovery, in the late 1990s, of 200-250 cattle in New Mexico's Gila Wilderness that are the descendants of cattle abandoned following a ranch bankruptcy in the area in the 1970s (the "Gila Cattle").  See Declaration of Camille Howes ¶ 3, at 1 (dated February 22, 2023), filed February 22, 2023 (Doc. 17)("Howes Decl.").  The parties differ in their characterization of the Gila Cattle: the Plaintiffs call them "unauthorized[,]" and the Defendants classify them as "feral" and "not domesticated."  Compare Howes Decl. ¶ 4, at 2, with Plaintiffs' Complaint for Declaratory and Injunctive Relief ¶ 1, at 2, filed February 21, 2023 (Doc. 1)("Complaint").  In any case, there are now cattle roaming the Gila Wilderness outside the permitted grazing allotments.  See Complaint at ¶ 30, at 8-9; Howes Decl. ¶¶ 3-4, at 1-2.

The key question in this dispute is how the Gila Cattle are classified under Title 36 of the C.F.R., which governs "Parks, Forests, and Public Property."  36 CFR §§ 200-299.  The Plaintiffs

argue that the Gila Cattle are appropriately classified as "Unauthorized livestock" as appears in 36 CFR § 261.2: "any cattle . . . which is not authorized by permit to be upon the land on which the livestock is located and which is not related to use authorized by a grazing permit . . . ."  36 CFR § 261.2.  By contrast, the Defendants argue that the Gila Cattle are not appropriately classified as livestock at all, and point to the definition of "livestock" in 36 CFR § 222.1 -- "animals of any kind kept or raised for use or pleasure" -- to indicate that the Gila Cattle are not livestock because they are feral and not "kept" for any purpose.  36 CFR § 222.1.

The classification of the Gila Cattle is relevant to whether the Defendants' imminent action -- the Operation scheduled to begin February 23, 2023, in which USFS and APHIS will target up to 150 of the Gila Cattle to be shot from helicopters -- is proceeding in compliance with, or in violation of, (i) a stipulation from a previous litigation (the "2022 Litigation") regarding the euthanizing of cattle in the Gila Wilderness by aerial shooting (the "June 30, 2022 Stipulation") and (ii) the Administrative Procedures Act ("APA") and the National Environmental Policy Act ("NEPA").

The Operation is not the first of its kind: on February 10 and 11, 2022, APHIS conducted an aerial shooting of cattle in the same area Gila Wilderness during which no "branded, tagged, or otherwise marked livestock" were killed.  Howes Decl. ¶¶ 6 at 3; 8 at 3.  On November 22, 2022, having begun seeking feedback from stakeholders on the issue of feral cattle in the Gila Wilderness as early as September 12, 2022, USFS distributed a Scoping Letter, including to each of the plaintiffs from the 2022 Litigation, indicating the intent to use "lethal and non-lethal methods to remove feral cattle from the Gila Wilderness" in February, 2023.  Howes Decl. ¶¶ 10-14, at 4-5. The Defendants contend that the Scoping Letter constitutes 75 days' notice of the Operation under the terms of the June 30, 2022 Stipulation.  See Howes Decl. ¶ 14, at 5.  The Plaintiffs contend

that it does not.  See Complaint ¶ 2, at 2-3.  The public scoping comment period for the Operation

closed on January 9, 2023.  See Howes Decl. ¶ 19, at 6-7.  On February 1, 2023, the USFS signed

an impoundment notice requesting removal of unauthorized livestock from the area where the

Operation is planned to occur.  See Howes Decl. ¶ 22, at 7-8.  On February 16, 2023, the USFS

signed the Decision Memo Gila Wilderness Feral Cattle Removal (dated February 16, 2023), filed

February 23, 2023 (Doc.1-7)("Decision Memo"), authorizing the Operation (the "Decision

Memo").  See Howes Decl. ¶ 26, at 8-9.

The Plaintiffs filed the Complaint and Plaintiffs' TRO on February 21, 2023, two days

before the planned start of the Operation.  See Complaint; Plaintiffs' TRO.  The next day, the

Defendants filed two declarations in opposition to Plaintiffs' TRO on February 22, 2023, the day

of the hearing.  See Howes Decl.; Declaration of Keith P. Wehner (dated February 21, 2023), filed

February 22, 2023 (Doc. 16)("Wehner Decl.").

## LAW REGARDING REQUESTS FOR A TRO

The requirements for a TRO issuance are essentially the same as those for a preliminary

injunction ("PI") order.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd.,

350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1),

at 65-83 (3d ed. 2004).  The primary differences between a TRO and a PI are that a TRO may issue

without notice to the opposing party and that TROs are limited in duration to fourteen days.  See

Fed. R. Civ. P. 65(b)(1)-(2).  In both cases, however, injunctive relief is an "extraordinary remedy,"

and the movant must demonstrate a "clear and unequivocal right" to have a request granted.

Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v.

Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court of the United States of America

has explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative

- 4 -

positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451

U.S. 390, 395 (1981). See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir.

2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power

to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission

Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to a TRO under rule 65(b), a moving party must demonstrate that

"immediate and irreparable injury, loss, or damage will result" unless a court issues the order. Fed.

R. Civ. P. 65(b). "[I]rreparable injury" is "harm that cannot be undone, such as by an award of

compensatory damages or otherwise." Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320

F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone

River Power, Inc., 805 F.2d at 355). A moving party must "establish that he is likely to succeed

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v.

Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S.

674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v.

Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the

analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving

party demonstrate that there is only a "possibility" of either success on the merits or irreparable

harm. Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir.

2016)("Diné"). In Diné, the United States Court of Appeals for the Tenth Circuit holds that a

relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in

Winter v. Natural Resources Defense Council," which "overruled the Ninth Circuit's application

of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22).  The Tenth Circuit concludes that, although the standard that the Supreme Court found wrong in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor.  Diné, 839 F.3d at 1282.  Accordingly, the Tenth Circuit holds that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The United States, and its officers and agencies, are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable.").  See also Flood v. ClearOne Comm'ns, 618 F.3 1100, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d at 1215 (quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Court has written several times on the topic of TROs and PIs.  In O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239 (D.N.M. 2017), the Court issued a PI requiring the United States Citizen and Immigration Services ("USCIS") to reconsider the I-129 nonimmigrant R-1 petition to a religious minister to the O Centro Espirita Beneficiente Uniao

Do De Vegetal Christian spiritualist religious organization ("O Centro").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1269.  The Court issued that relief, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1263-64.  USCIS had denied the petition, because the minister made no money and because the minister was not part of an established missionary program.  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1264.  O Centro theology precluded its ministers from making money, and an established missionary program requires that at least one religious worker, at some point, be compensated.  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1264.  The Court reasoned, accordingly, that DHS had burdened substantially the minister's right to exercise his religion, because, in effect, the R-1 petition review required the minister to make money to preach his liturgy in the United States, even though his religion forbade him from making money.  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1264. The minister also met a PI's other three prongs, so the Court granted the relief requested.  See 286 F. Supp. 3d at 1265-66.  The Court has also issued a TRO, prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation.  See Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1200.  It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies," including "cupping and shaking girls' breasts," are unreasonably and unconstitutionally intrusive, even if those searches likely are effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighs the TRO's damage; and (iv) the

TRO is not adverse to the public interest, because it would protect other students' constitutional rights who attend prom and graduation.  Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1194-98.  The Court denied a request for injunctive relief in Salazar v. San Juan County Detention Center, No. CIV 15-0417 JB/LF, 2016 WL 335447 (D.N.M. Jan. 15, 2016)(Browning, J.), after concluding that, although the plaintiffs faced irreparable harm, the balance of equities favored them, and an injunction was not adverse to the public interest, the plaintiffs were unlikely to succeed on the merits.  See Salazar v. San Juan Cty. Detention Ctr., 2016 WL 335447, at *43-52.

## LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION

Under the APA,

[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.  Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (emphasis in original).  The APA states that district courts can:

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be --

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)     contrary to constitutional right, power, privilege, or immunity;

> (C)      in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D)      without observance of procedure required by law;
>
> (E)      unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F)      unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

Under Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed *as appeals*.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." 42 F.3d 1560, 1580 (10th Cir. 1994)(emphasis in original).  See WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d 1314, 1323 (D.N.M. 2009)(Browning, J.).  "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant."  N. New Mexicans Protecting Land & Water Rights v. United States, No. CIV 15-0559, 2015 WL 8329509, at *9 (D.N.M. 2015)(Browning, J.).

**1.      Reviewing Agency Factual Determinations.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).  The APA's two linguistic formulations amount to a single substantive standard of review.  Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed.

Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984)(Scalia, J.)(explaining that, as to factual findings, "there is no *substantive* difference between what [the arbitrary or capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original));  See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys., 745 F.2d at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness.  The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found *within the record of closed-record proceedings* to which it exclusively applies." (emphasis in original)).  See also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d at 1167-68 (discussing this fact).

In reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record.  See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party . . . ."); Fed. R. App. P. 16(a) ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted . . . .").  See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the

administrative record and, in most instances, no de novo proceedings may be had." (footnote omitted)).   Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action.   See New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.21 (10th Cir. 2009)("We take judicial notice of this document, which is included in the record before us in [another case]." (citing Fed. R. Evid. 201(b))); New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.22 ("We conclude that the occurrence of Falcon releases is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned, and we take judicial notice thereof.").   In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits have held that taking judicial notice is inappropriate in APA reviews absent extraordinary circumstances or inadvertent omission from the administrative record.   See Compassion Over Killing v. U.S. Food & Drug Admin., 849 F.3d 849, 852 n.1 (9th Cir. 2017); Nat'l Mining Ass'n v. Sec'y U.S. Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the record before it when determining whether an agency's decision survives arbitrary-or-capricious review.   Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation and internal quotation marks omitted).   The Tenth Circuit explains:

> "[I]n determining whether the agency acted in an 'arbitrary and capricious manner,' we must ensure that the agency 'decision was based on a consideration of the relevant factors' and examine 'whether there has been a clear error of judgment.'" We consider an agency decision arbitrary and capricious if "the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999)(quoting Friends of the Bow

v. Thompson, 124 F.3d 1210, 1215 (10th Cir. 1997)).  Arbitrary-or-capricious review requires a

district court "to engage in a substantive review of the record to determine if the agency considered

relevant factors and articulated a reasoned basis for its conclusions," Olenhouse, 42 F.3d at 1580,

but it is not to assess the wisdom or merits of the agency's decision, see Colo. Envtl. Coal. v.

Dombeck, 185 F.3d at 1172.  The agency must articulate the same rationale for its findings and

conclusions on appeal upon which it relied in its internal proceedings.  See SEC v. Chenery Corp.,

318 U.S. 80, 92-95 (1943).  While the court may not supply a reasoned basis for the agency's

action that the agency does not give itself, the court should "uphold a decision of less than ideal

clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-

Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(citation omitted).

2.      **Reviewing Agency Legal Interpretations.**

        In promulgating and enforcing regulations, agencies must interpret federal statutes, their

own regulations, and the Constitution of the United States of America, and Courts reviewing those

interpretations apply three different deference standards, depending on the kind of law at issue.

First, the federal judiciary accords considerable deference to an agency's interpretation of a statute

that Congress has tasked it with enforcing.  See United States v. Undetermined Quantities of

Bottles of an Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994).  This is known as

Chevron deference, named after the supposedly seminal case, Chevron, U.S.A., Inc. v. Natural

Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron").[1]  Chevron deference is a two-

---

[1]The case itself is unremarkable, uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all.  Its author, the Honorable John Paul Stevens, former Associate Justice of the Supreme Court, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years.  See generally Charles Evans Hughes, Justice Stevens and the Chevron Puzzle,

step process[2] that first asks whether the statutory provision in question is clear and, if it is not, then asks whether the agency's interpretation of the unclear statute is reasonable.  As the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative agency interpretations of their organic statutes laid down by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 . . . (1984).  Those directives require that we first determine whether Congress has directly spoken to the precise question at issue.  If the congressional intent is clear, we must give effect to that intent.  If the statute is silent or ambiguous on that specific issue, we must determine whether the agency's answer is based on a permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d at 238 (citing Chevron, 467 U.S. at 842-43).

Chevron's second step is all but toothless, because if the agency's decision makes it to step two, it is upheld almost without exception.  See Ronald M. Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent L. Rev. 1253, 1261 (1997)("[T]he Court has never once struck down an agency's interpretation by relying squarely on the second *Chevron* step."); Jason J.

---

106 Nw. U. L. Rev. 551 (2012).

[2]There is, additionally, a threshold step -- the so-called step zero -- which asks whether Chevron deference applies to the agency decision at all.  See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006).  Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by the agency, for example, do not speak with the force of law and are thus not entitled to Chevron deference, see Christensen v. Harris Cty., 529 U.S. 576 (2000).  An affirmative answer to all three inquiries results in the agency's decision passing step zero.

Czarnezki, An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law, 79 U. Colo. L. Rev. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice.").  Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

Chevron's first step, in contrast, has bite, but there is substantial disagreement about what it means.  In an earlier case, the Court noted the varying approaches that different Supreme Court Justices have taken in applying Chevron deference:

> The Court notices a parallel between the doctrine of constitutional avoidance and the Chevron doctrine.  Those Justices, such as Justice Scalia, who are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible interpretations from the first step.  These Justices are also the most likely to find that the statute is unambiguous, thus obviating the need to apply the second step of each doctrine.  Those Justices more likely to find ambiguity in statutes are more likely to eschew applying the doctrines in the first place, out of their distaste for their second steps -- showing heavy deference to agencies for Chevron doctrine, and upholding facially overbroad statutes, for constitutional avoidance.

Griffin v. Bryant, 30 F. Supp. 3d 1139, 1192 n.23 (D.N.M. 2014)(Browning, J.).  A number of policy considerations animate Chevron deference, among them: (i) statutory interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, grants discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency, i.e., that agencies are more competent than the courts at filling out the substantive law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately headed by the President of the United States of America, can be held politically accountable for their interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory

state -- found in the C.F.R. and other places -- than a unified but Circuit-fragmented federal judiciary can.

Second, when agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party was in compliance with them -- courts accord agencies what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452 (1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945)("Seminole Rock").  This deference is applied in the same manner as Chevron deference and is substantively identical.  There would be little reason to have a separate name for this doctrine, except that its logical underpinnings are much shakier, and its future is, accordingly, more uncertain.  Justice Scalia, after years of applying the doctrine followed by years of questioning its soundness, finally denounced Auer deference in 2013 in his dissent in Decker v. Northwest Environmental Defense Center, 568 U.S. 597 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice himself:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations."  This is generally called *Seminole Rock* or *Auer* deference.
>
> . . . .
>
> The canonical formulation of *Auer* deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for *Auer* to do.  In practice, *Auer* deference is *Chevron* deference applied to regulations rather than statutes.  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.
>
> Our cases have not put forward a persuasive justification for *Auer* deference. The first case to apply it, *Seminole Rock,* offered no justification

whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Our later cases provide two principal explanations, neither of which has much to be said for it.  First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it.  The implied premise of this argument -- that what we are looking for is the agency's *intent* in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means."  Whether governing rules are made by the national legislature or an administrative agency, we are bound *by what they say*, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" That is true enough, and it leads to the conclusion that agencies and not courts should make regulations.  But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective.  Making regulatory programs effective is the purpose of *rulemaking*, in which the agency uses its "special expertise" to formulate the best rule.  But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is."  Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation *will be given effect* if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors.  If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for *Auer* deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that *Congress* enacted, as we do per *Chevron*, it is *a fortiori* reasonable to defer to them regarding the meaning of *regulations that they themselves crafted*.  To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all.  The theory of *Chevron* (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve

- 16 -

ambiguities in its own regulations.  For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands.  "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."  Congress cannot enlarge its *own* power through *Chevron* -- whatever it leaves vague in the statute will be worked out *by someone else*.  *Chevron* represents a presumption about who, as between the Executive and the Judiciary, that someone else will be.  (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.)  So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else.  Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect.   "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power."  Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it."  And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation.  *Auer* deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures."  *Auer* is not a logical corollary to *Chevron* but a dangerous permission slip for the arrogation of power.

It is true enough that *Auer* deference has the same beneficial pragmatic effect as *Chevron* deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court.  The agency's view can be relied upon, unless it is, so to speak, beyond the pale.  But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute.  For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear.   The circumstances of this case demonstrate the point.  While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing.  It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here.  And there is another respect in which a lack of *Chevron*-type deference has less severe pragmatic consequences

for rules than for statutes.  In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute.  That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from *Auer* deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 568 U.S. at 616-21 (Scalia, J., dissenting)(alterations and emphasis in original)(citations omitted).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution.  See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content.  The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

## <u>LAW REGARDING NEPA</u>

NEPA requires federal agencies to examine the environmental effects of proposed federal actions, and to inform the public of the environmental concerns that went into the agency's decision-making.  See <u>Baltimore Gas and Elec. Co. v. Natural Res. Def. Council</u>, 462 U.S. 87, 97 (1983).  NEPA's purpose is to "'focus[] the agency's attention on the environmental consequences of a proposed project,' to 'guarantee[] that the relevant information will be made available to the larger audience that may also play a role' in forming and implementing the agency's decision," and to give other potentially affected governmental bodies sufficient notice of the expected consequences so that they may be able to implement corrective measures.  <u>Davis v. Mineta</u>, 302 F.3d 1104, 1114 n.5 (10th Cir. 2002)(quoting <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349-350 (1989)).  NEPA's purpose is not to encourage a particular substantive decision, but rather to "insure a fully informed and well-considered decision."  <u>Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council</u>, 435 U.S. 519, 558 (1978).  Given its purpose, NEPA imposes only procedural requirements and does not mandate results.  <u>See</u> <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. at 350-51 (1989).  NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(2)(C).  An EIS must describe the "environmental impact of the action; unavoidable adverse environmental effects; alternatives to the action; relationship between the short-term uses and long-term productivity of the affected environment; and irretrievable and irreversible commitments of resources should the action be implemented."  <u>Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.</u>, 75 F.3d 1429, 1434 (10th Cir. 1996)(citing 42 U.S.C. § 4332(2)(C)(i)-(v)).

Under NEPA's implementing regulations, an agency must first prepare a draft EIS in which it evaluates the proposed action, and its direct, indirect, and cumulative impact on the environment. See 40 C.F.R. § 1508.25(c).  Specifically, NEPA requires that an EIS provide "cumulative effects" analysis based on actual data.   NEPA defines "cumulative effects" as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ."  40 C.F.R. § 1508.7.  The agency must also study three categories of actions in its EIS: those that are "connected," "cumulative," and "similar."  40 C.F.R. § 1508.25(a)(1)-(3).  In the draft stage, the agency must compare the proposed action to other reasonable alternatives, including taking no action at all.  See 40 C.F.R. § 1502.14.  After a period of public comment and review, the agency responds to any comments, makes appropriate changes, and circulates a final draft of the EIS.  40 C.F.R. § 1503.4.  The agency ultimately adopts a course of action by issuing an ROD.

NEPA does not require that an agency discuss every potential impact in great detail; it requires only a reasoned evaluation of the relevant factors.  See Utah Shared Access Alliance v. U.S. Forest Serv., 288 F.3d 1205, 1213 (10th Cir. 2002).  Moreover, NEPA does not require that an agency elevate environmental concerns over other appropriate considerations.  See Baltimore Gas and Elec., 462 U.S. at 97.  Instead, the statute "merely prohibits uninformed-rather than unwise-agency action."  Robertson v. Methow Valley Citizens Council, 490 U.S. at 351.  Thus, judicial review of an RMP/EIS is narrow, and the court must not substitute its judgment for the agency's.  In undertaking its review, a court should employ a "rule of reason" test to determine whether the EIS contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences."  Hells Canyon Alliance v. U.S. Forest Serv., 227 F.3d 1170, 1177 (9th Cir. 2000).  In reviewing an EIS' adequacy, a court should determine whether "there is a

reasonable, good faith, objective presentation of the topics," such that it "foster[s] both informed

decision-making and informed public participation."  Custer Cnty. Action Ass'n v. Garvey, 256

F.3d 1024, 1035 (10th Cir. 2001)(citations omitted)(internal quotation marks omitted).

## ANALYSIS

A TRO is an "extraordinary remedy," for which a movant must demonstrate a "clear and

unequivocal right" to have its request granted.  Greater Yellowstone Coalition v. Flowers, 321

F.3d at 1256.  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  Before a district court

may issue a TRO pursuant to rule 65, the movant must make the same four showings as for a PI:

(i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the

threatened injury" to the movant if the court does not issue the PI "outweighs whatever damage

the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would

not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success]

on the merits."  Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992).  See

People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138

(D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.

Nken v. Holder, 556 U.S. at 434.

## I.   THE PLAINTIFFS DO NOT HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

The Plaintiffs' inability to show a substantial likelihood of success on the merits is fatal to

their application for a TRO.  See Nken v. Holder, 556 U.S. at 434; Diné Citizens Against Ruining

Our Env't v. Jewell, 839 F.3d at 1281.  The Plaintiffs make two claims.  First, the Plaintiffs contend

that the Defendants' Operation violates the June 30, 2022 Stipulation.  See Complaint, Count I.

Second, the Plaintiffs contend that the Defendants' Operation violates the APA and NEPA.  See

Complaint, Counts II, III, and IV.

A.   **THE PLAINTIFFS DO NOT HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS IN ESTABLISHING THAT THE DEFENDANTS VIOLATED THE JUNE 30, 2022 STIPULATION.**

The Plaintiffs' argue that the Defendants violated the terms of a June 30, 2022 Stipulation,

requiring seventy-five days of notice before the commencement of the Operation.  The Court

concludes that the Plaintiffs do not have a substantial likelihood of success on Count I of their

Complaint.  See Nken v. Holder, 556 U.S. at 434; Diné Citizens Against Ruining Our Env't v.

Jewell, 839 F.3d at 1281.  The Plaintiffs argue that the Defendants violated the June 30, 2022

stipulation by failing to provide seventy-five days of notice in advance of commencing the

Operation, and, specifically, that the Plaintiffs did not provide notice until they sent the Decision

Memo on February 16, 2023, one week before the planned start of the Operation.  See Complaint

¶ 2, at 2-3.  The Court concludes that the Defendants have provided seventy-five-days notice of

the Operation when the Defendants disseminated the Scoping Letter on November 22, 2022.  See

Howes Decl. ¶¶ 13-14, at 4-5.  Further, the Forest Service sent the Scoping Letter directly to the

Plaintiffs' counsel on November 22, 2022, noting that the Plaintiffs of the 2022 Litigation were

"being sent the scoping notice along with nearby permittees, neighbors, other stakeholders, and

members of the general public that have expressed interest in receiving such notices."  Letter from

Camille Howes to Karen Budd-Falen (dated November 22, 2022), filed February 22, 2023 (Doc.

17-4)("Howes Letter").  The Scoping Letter, sent more than seventy-five days before February 23,

2023, served as sufficient notice to the Plaintiffs of the planned commencement of the Operation.

See Howes Decl. ¶¶ 13-14, at 4-5; Howes Letter.  Accordingly, the Plaintiffs' focus on the

- 22 -

February 16, 2023 date of the Decision Memo as proof of the Defendants' failure to provide notice under the June 30, 2022 stipulation is misplaced.

> **B.   THE PLAINTIFFS DO NOT HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS IN ESTABLISHING THEIR CLAIMS THAT THE DEFENDANTS VIOLATED THE APA AND NEPA.**

The Defendants' Operation does not violate the APA or NEPA, and, accordingly, the Plaintiffs do not have a substantial likelihood of success on Count II, Count III, or Count IV or their Complaint.  See Nken v. Holder, 556 U.S. at 434; Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d at 1281.  The key question bearing on the Plaintiffs' likelihood of success on Count II, Count III, and Count IV is whether the Gila Cattle should be classified as "[u]nauthorized livestock" under 36 CFR § 261.2, i.e., "any cattle . . . which is not authorized by permit to be upon the land on which the livestock is located and which is not related to use authorized by a graving permit . . . . [,]" or not as livestock at all, as the Defendants contend is appropriate because 36 CFR § 222.1 defines "livestock" as "animals of any kind kept or raised for use or pleasure[,]" and feral cattle are, by definition, not "kept or raised for use or pleasure."  Compare 36 CFR § 261.2, with 36 CFR § 222.1.  If the Plaintiffs are correct that the Gila Cattle are "unauthorized livestock" under the C.F.R., they argue, then the only permissible way to remove them from the Gila Wilderness is via "[i]mpoundment and disposal of unauthorized livestock" procedures, 36 CFR § 262.10, which would prohibit the Operation's planned euthanizing of the Gila Cattle.  Accordingly, the question is whether the Gila Cattle are "unauthorized livestock" or not livestock as the C.F.R. specifically defines that term.

The Court concludes that, because the C.F.R.'s definition of "livestock" includes only "animals . . . kept or raised for use or pleasure[,]"  36 C.F.R. § 222.1, the Gila Cattle are not "unauthorized livestock" because, as feral animals, they are not "kept or raised for use or pleasure,"

36 CFR § 261.2.  The Plaintiffs have not argued that the Gila Cattle fit the definition of "livestock" in § 222.1; rather, they say the Court should not use that definition.  Also, no one has presented evidence that the Gila Cattle are "kept or raised for pleasure."  Accordingly, because the Gila Cattle are not considered livestock under the C.F.R., it follows that they cannot be considered "unauthorized livestock."  36 CFR §§ 222.1, 261.2.  The Plaintiffs argue that, because the definitions of "unauthorized livestock" and "livestock" at issue here are included in different sections of Title 36 of the C.F.R. -- Part 222 (Range Management) and Part 261 (Prohibitions), respectively -- the definition of "livestock" should not be incorporated into the definition of "unauthorized livestock."  36 CFR §§ 222.1, 261.2.  While Range Management deals with allotments, there is not a principle of statutory construction that suggests the Court should not use the definition in § 222.1 to define livestock later in Title 36.  Moreover, reading "livestock" as meaning the same in both sections provides consistency, whereas giving "livestock" different meanings in the two sections would mean that feral animals are included in § 261.2, but not § 222.1.  The Court does not think the Forest Service was imprecise and unaware of how it defined "livestock" in § 222.1 when it wrote § 261.2.  Accordingly, the Court concludes that the Plaintiffs have not established a substantial likelihood of success on their APA claim.

The Plaintiffs also have not shown a substantial likelihood of success on their claim that the Defendants violated NEPA by not conducting an environmental impact statement.  The evidence that the Defendants have submitted in the Howes Decl. and Wehner Decl. have shown that the Defendants have taken sufficient precautions to avoid liability under NEPA.  See Nken v. Holder, 556 U.S. at 434; Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d at 1281.  These actors are exempt of the need for an environmental impact statement.

## II.   THE PLAINTIFFS HAVE NOT SHOWN THAT THEY WILL SUFFER IRREPARABLE HARM FOR WHICH DAMAGES WOULD BE AN INADEQUATE REMEDY.

The mere possibility of irreparable harm is not enough to justify the granting of a temporary restraining order.  See Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 at 1281.  While it is possible that errant cattle belonging to the Plaintiffs could be killed during the Operation, it credits the Defendants' representations regarding the successful record of similar operations in avoiding accidental deaths of cattle that are branded and owned by others.  Of the approximately 300 cattle removed or killed over the last several decades, only one has been branded, and it was removed rather than killed.  Further, damages would be an appropriate remedy for any inadvertent killing of the Plaintiffs' cattle.  The Plaintiffs express concerns regarding the Operation's impact on goodwill and the potential loss of customers, but these potential harms are not sufficient to justify the granting of injunctive relief here.  The Plaintiffs were unable to provide evidence of how many customers they have lost, so the loss, if it exists at all, is speculative.  In short, the Court is not convinced that irreparable harm "that cannot be undone, such as by an award of compensatory damages or otherwise" will result from the Operation if the Court does not stop the Operation.  Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355).

## III.   THE BALANCE OF EQUITIES FAVORS THE DEFENDANTS.

The third factor for a Court to consider before issuing preliminary relief is whether the balance of equities favors the movant.  See Winter, 555 U.S. at 19-20.  Also referred to as the balance of hardships, this factor requires a movant to show that the threatened injury averted by the injunction "outweighs any injury to [other parties] caused by granting the injunction."  Awad

v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012).  Here, the balance of equities does not favor the Plaintiffs.  The Defendants have provided more than seventy-five days of notice to the Plaintiffs of the Operation when they disseminated the Scoping Letter on November 22, 2022.  Despite their notice of the Operation, the Plaintiffs waited until two days before the Operation to file this action. The Operation is logistically complicated and set to begin, on schedule, on February 23, 2023.  A pilot has been flown from Montana and is in New Mexico.  The Plaintiffs' delay in bringing this action contributes to the Court's conclusion that the balance of equities favors the Defendants.

## IV.    A TRO PREVENTING THE OPERATION WOULD BE ADVERSE TO THE PUBLIC INTEREST.

Enjoining the Operation from occurring would be averse to the public interest.  The Defendants are charged with managing the Gila Wilderness for the benefit of the citizens of the United States, and have determined that the Operation is in furtherance of that aim and in compliance with its powers under the C.F.R..  No one disputes that the Gila Cattle need to be removed and are doing significant damage to the Gila Wilderness.  The Court does not see a legal prohibition on the Operation.  It would be contrary to the public interest to stop the Operation from proceeding on February 23, 2023.

**IT IS ORDERED** that the Plaintiffs' request for a temporary restraining order, as set forth in Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction, filed February 21, 2023 (Doc. 6), is denied.

_____
UNITED STATES DISTRICT JUDGE

- 26 -

*Counsel:*

Deana M. Bennett
Spencer L. Edelman
Modrall, Sperling, Roehl, Harris & Sisk, PA
Albuquerque, New Mexico

-- and --

Dan McGuire
FisherBroyles, LLP
Dallas, Texas

>   *Attorneys for Plaintiffs New Mexico Cattle Growers Association,*
>   *Spur Lake Cattle Company, and Nelson Shirley*

Steven S. Scholl
Dixon Scholl & Bailey PA
Albuquerque, New Mexico

>   *Attorney for Plaintiff Allen Campbell*

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

>   *Attorneys for Plaintiff Humane Farming Association*

Sean C. Duffy
Emma L. Hamilton
Andrew A. Smith
United States Department of Justice
Albuquerque, New Mexico

>   *Attorneys for the Defendants*