# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **NEW MEXICO CATTLE GROWERS'** **ASSOCIATION,** *et al.* | § § § | |
| *Petitioners,* | § § | |
| **v.** | § § | |
| **UNITED STATES FOREST SERVICE,** *et al.* | § § § | **CASE NO. 1:23-cv-150-JB-GBW** |
| *Respondents, and* | § § | |
| **CENTER FOR BIOLOGICAL** **DIVERSITY,** | § § § | |
| *Intervenor Respondent.* | § | |

## PETITIONERS' OPENING BRIEF ON THE MERITS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iv

GLOSSARY ....................................................................................................................... x

I.   INTRODUCTION .......................................................................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND.................................................2

III. STANDARD OF REVIEW AND APPLICABLE LEGAL STANDARDS ...........6

     A.  Administrative Procedure Act..........................................................................6

     B.  National Environmental Policy Act. ...............................................................8

IV. ARGUMENTS AND AUTHORITIES........................................................................8

     A.  The Aerial Shooting should be declared unlawful because USFS failed to follow
         its own regulations concerning the impoundment of the Gila Cattle in the Gila
         Wilderness................................................................................................................8

         i.    The Gila Cattle in the Gila Wilderness are "Unauthorized Livestock" as
               defined in the Forest Service Regulations ...........................................10

         ii.   The definition of "livestock" in a different chapter and part of the Forest
               Service Regulations does not affect the plain and unambiguous language
               of "unauthorized livestock" ................................................................17

         iii.  USFS lacks substantial evidence that the Gila Cattle are an "invasive and
               exotic species" to justify the Aerial Shooting.....................................21

         iv.   USFS lacks sufficient evidence of environmental damage in the Gila
               Wilderness to justify the Aerial Shooting ............................................22

     B.  Respondents' decision approving the Aerial Shooting failed to comply with NEPA......25

         i.    The Aerial Shooting is a major federal action that may have significant
               adverse environmental effects requiring an environmental assessment ...............26

               a.   Biological impacts ...................................................................28

               b.   Wilderness impacts ..................................................................31

               c.   Water Quality, Air Quality, and Noise Impacts.........................33

ii.   The Aerial Shooting does not qualify for a categorical exclusion ......................... 35

iii.   Extraordinary circumstances exist that invalidate USFS's finding of a categorical exclusion ............................................................................. 39

iv.   Respondents' scoping process failed to comply with NEPA ................................ 41

C.  Petitioners have standing to challenge the Aerial Shooting ................................................. 42

V.  CONCLUSION ................................................................................................................. 46

CERTIFICATE OF COMPLIANCE ........................................................................................ 48

# TABLE OF AUTHORITIES

## Cases

*Alaniz v. Office of Personnel Mgmt.*,
    728 F.2d 1460 (Fed. Cir. 1984)........................................................................................21

*Auer v. Robbins*,
    519 U.S. 452 (1997)........................................................................................................10

*Blanca Tel. Co. v. FCC*,
    991 F.3d 1097 (10th Cir. 2021) ...................................................................................7-8

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)........................................................................................................21

*Canyon Fuel Co., LLC v. Sec'y of Labor*,
    894 F.3d 1279 (10th Cir. 2018) ....................................................................................10

*Catron Cty. Bd. of Comm'rs v. United States Fish & Wildlife Serv.*,
    75 F.3d 1429 (10th Cir. 1996) ..................................................................................26, 41

*Cherokee Nation of Okla. v. Norton*,
    389 F.3d 1074 (10th Cir. 2004) ..................................................................................9, 22

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council*,
    467 U.S. 837 (1984)........................................................................................................10

*Citizens' Comm. to Save Our Canyons v. United States Forest Serv.*,
    297 F.3d 1012 (10th Cir. 2002) ....................................................................................36

*Citizens for Constitutional Integrity v. United States*, 57 F.4th 750 (10th Cir.
    2023) ...............................................................................................................................43

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)........................................................................................................42

*Colo. Wild v. U.S. Forest Serv.*,
    435 F.3d 1204 (10th Cir. 2006) ....................................................................................20

*Conservancy of Sw. Fla. v. United States Fish & Wildlife Serv.*,
    677 F.3d 1073 (11th Cir. 2012) ......................................................................................9

*Crooks v. Mabus*,
    845 F.3d 412 (D.C. Cir. 2016) ......................................................................................20

*Ctr. for Biological Diversity v. United States DOI*,
72 F.4th 1166 (10th Cir. 2023) ..................................................................8

*Davis v. Mineta*,
302 F.3d 1104 (10th Cir. 2002) ................................................... 27-28, 34

*Dean v. United States*,
556 U.S. 568 (2009).................................................................................20

*Denver v. Bergland*,
695 F.2d 465 (10th Cir. 1982) ..................................................................8

*Dine Citizens Against Ruining Our Env't v. Bernhardt*,
923 F.3d 831 (10th Cir. 2019) ...............................................7, 8, 42, 44

*Dine Citizens Against Ruining Our Env't v. Klein*,
747 F. Supp. 2d 1234, 1254 (D. Colo. 2010).........................................28

*Florez ex rel. Wallace v. Callahan*,
156 F.3d 438 (2d Cir. 1998)....................................................................19

*High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2004) ..................................................................31

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ................................................................................27

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989).................................................................................27

*N.M. Farm & Livestock Bureau v. United States DOI*,
952 F.3d 1216 (10th Cir. 2020) ................................................................9

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994) ..............................................................7, 8

*Rocky Mt. Peace & Just. Ctr. v. United States Fish & Wildlife Serv.*,
40 F.4th 1133 (10th Cir. 2022) ..............................................................42

*Sierra Club v. United States Army Corps of Eng'rs*,
464 F. Supp. 2d 1171 (M.D. Fla. 2006)....................................................7

*Sierra Club v. United States DOE*,
255 F. Supp. 2d 1177 (D. Colo. 2002).....................................................36

*Simmons v. Block*,
　　782 F.2d 1545 (11th Cir. 1986) ........................................................................9

*State v. United States DOI*,
　　493 F. Supp. 3d 1046 (D. Wyo. 2020).........................................................19

*Suncor Energy (U.S.A.), Inc. v. United States EPA*,
　　50 F.4th 1339 (10th Cir. 2022) ...................................................................10

*TransUnion LLC v. Ramirez*,
　　594 U.S. ___, 141 S. Ct. 2190, 2203 (2021)................................................10

*United States v. Park*,
　　536 F.3d 1058 (9th Cir. 2008) ...................................................................19

*United States v. Kahn*,
　　5 F.4th 167 (2d Cir. 2021) ..........................................................................9

*Warth v. Seldin*,
　　422 U.S. 490, 511 (1975)............................................................................42

*Wilderness Watch v. U.S. Fish & Wildlife Serv.*,
　　629 F.3d 1024 (9th Cir. 2010) ...................................................................32

*Watson v. United States*,
　　552 U.S. 74 (2007)......................................................................................20

*Wyo. State Snowmobile Ass'n v. United States Fish & Wildlife Serv.*,
　　741 F. Supp. 2d 1245 (D. Wyo. 2010)........................................................27

**Statutes**

5 U.S.C. §§ 701-706 ...........................................................................................1, 6, 7

5 U.S.C. § 702.........................................................................................................6

5 U.S.C. § 706.........................................................................................................7

16 U.S.C. §§ 1131-1136 ......................................................................................2, 31

16 U.S.C. § 551........................................................................................................8

16 U.S.C. § 1133(c) ..........................................................................................31, 41

33 U.S.C. § 1313...............................................................................................33, 40

43 U.S.C. §§ 1701-1784 ..................................................................................................18

43 U.S.C. § 1752 ..............................................................................................................18

42 U.S.C. §§ 4321 *et seq.* .................................................................................................2

42 U.S.C. § 4332(C) .........................................................................................................26

42 U.S.C. § 4336(a)(2) ....................................................................................................35

42 U.S.C. § 4336(a)(3) ....................................................................................................26

42 U.S.C. § 4336(b)(2) ...............................................................................................25-26

42 U.S.C. § 4336c ............................................................................................................35

N.M. Stat. 77-13-6 ...........................................................................................................19

**Rules**

7 C.F.R. § 1b.3(a)(5) ..................................................................................................36, 37

7 C.F.R. § 372.5 ...............................................................................................................36

7 C.F.R. § 372.5(c)(1)(I) ............................................................................................37, 38

36 C.F.R. Part 261 ...........................................................................................................17

36 C.F.R. § 222.1 ......................................................................................................... 17-18

36 C.F.R. §§ 222.3 *et seq.* ................................................................................................2

36 C.F.R. § 220.6 ........................................................................................36, 37, 38, 39

36 C.F.R. § 261.2 ....................................................................................................9, 10, 17

36 C.F.R. § 261.7 .................................................................................................9, 11, 18, 37

36 C.F.R. § 262.10 .....................................................................................1, 11, 16, 17, 32, 37

40 C.F.R. § 1500.1 ............................................................................................................25

40 C.F.R. § 1501.3(b) ......................................................................................................27

40 C.F.R. § 1501.4(a) ......................................................................................................35

40 C.F.R. § 1501.4(b) ...............................................................................................35

40 C.F.R. § 1501.9 ...................................................................................................41

40 C.F.R. § 1507.3(b) ..............................................................................................36

40 C.F.R. § 1508.1(d) ..............................................................................................35

40 C.F.R. § 1508.1(g). .......................................................................................26, 27

40 C.F.R. § 1508.1(m) ..............................................................................................27

40 C.F.R. § 1508.1(q) ...............................................................................................26

**Other Sources**

42 Fed. Reg. 56,730 ..................................................................................................18

42 Fed. Reg. 2957-62 ................................................................................................18

National Park Service, Monitoring Climate and Water at Gila Cliff Dwellings National
Monument, 2017, https://www.nps.gov/articles/sodn_gicl_ch_2017...........................................23

New Mexico Environmental Dept., EPA-Approved 2022-2024 Integrated Report (April 26,
2022), https://www.env.nm.gov/surface-water-quality/303d-305b.................................................33

USFS, Helicopter Services: Hourly Flight Rates, Fuel Consumption, And Weight Reduction
Chart Effective February 16, 2019 For Contracts Awarded 2013-2017,
https://www.fs.usda.gov/sites/default/files/media_wysiwyg/flt_chrt_awarded_2013-2017_0.pdf
........................................................................................................................34

Forest Service NEPA Procedures and Guidance,
https://www.fs.usda.gov/emc/nepa/nepa_procedures ...............................................................23

# GLOSSARY

As used herein, the following terms have the following meanings:

"**Aerial Shooting**" means the action by USFS and APHIS to shoot cattle in the Gila Wilderness from a helicopter with a rifle.

"**APA**" means the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

"**APHIS**" means Animal and Plant Health Inspection Service.

"**BA**" means the USFS Biological Assessment prepared in January 2023 referenced in the Decision Memo.

"**BLM**" means the United States Bureau of Land Management.

"**CBD**" means Intervenor Center for Biological Diversity.

"**Decision Memo**" means the February 16, 2023 Decision Memo issued by USFS.

"**EA**" means an environmental assessment prepared under 42 U.S.C. § 4336(b)(2).

"**EIS**" means an environmental impact statement, which is a detailed written statement that is required by 42 U.S.C. § 4332(2)(C).

"**Gila Cattle**" means the approximately 200 head of unauthorized cattle in the Gila Wilderness subject to the Aerial Shooting.

"**HFA**" means Petitioner Humane Farming Association.

"**Impound Notice**" means the February 1, 2023 Notice of Intent to Impound Unauthorized Livestock.

"**MRA**" means the USFS's Minimum Requirements Analysis attached to the Decision Memo as Appendix C.

"**MSO**" means the Mexican Spotted Owl.

"**NEPA**" means the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*.

"**NMCGA**" means Petitioner New Mexico Cattle Growers' Association.

"**NMLB**" means the New Mexico Livestock Board.

"**PFC**" means a Proper Functioning Condition assessment of riparian areas as described in the Riparian Technical Reference.

"**Riparian Technical Reference**" means the document entitled "Riparian Area Management: Proper Functioning Condition Assessment for Lotic Areas."

"**Scoping Notice**" means the November 17, 2022 Scoping Notice and Proposal.

"**SWWF**" means the Southwestern Willow Flycatchers.

"**USDA**" means the United States Department of Agriculture.

"**USFS**" means the United States Forest Service.

# I.   INTRODUCTION

1.     With the stated goal of removing approximately 200 head of unauthorized cattle from the Gila Wilderness (the "Gila Cattle"), the United States Forest Service ("USFS") abandoned its explicit regulations governing the removal and impoundment of these animals. Instead, USFS authorized another agency, the Animal and Plant Health Inspection Service ("APHIS") to shoot these cattle from a helicopter, leaving their carcasses as carrion for predators or to rot throughout the Gila National Forest (the "Aerial Shooting").

2.     Plaintiffs filed suit to block this unlawful, cruel, and environmentally harmful action. Not only is the Aerial Shooting an unprecedented forest management practice on public lands, it is also a radical departure from the regulations USFS itself promulgated to deal with situations like the Gila Cattle. It is fundamental to our system of government, and well-established legal precedent, that an agency's failure to follow its own regulations violates the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701-706. Here, USFS ignored its clear regulations governing the impoundment and removal of unauthorized livestock, which requires the physical impoundment of the cattle followed by certain, specified procedures to determine their ownership and govern their sale/destruction. *See* 36 C.F.R. § 262.10. To justify the obvious departure from these regulations, USFS now argues that these regulations don't apply because the Gila Cattle are not "unauthorized livestock." Yet, even USFS's Decision Memo *cites the regulation prohibiting "unauthorized livestock" to justify the Aerial Shooting*. USFS's newfound argument also ignores years of its own internal and public-facing documents expressly describing these cattle as "unauthorized livestock."

3.     The fluctuating and inconsistent positions taken by Respondents appear to be an attempt to evade existing regulations for purposes of litigation rather than a good faith effort to

interpret and follow those regulations. The interpretations offered to justify the Aerial Shooting are plainly erroneous and inconsistent with clear and unambiguous regulatory language that USFS expressly promulgated to deal with these kinds of animals. For these reasons, Respondents must be permanently enjoined from undertaking the Aerial Shooting of these cattle in the Gila National Forest.

4.      The Aerial Shooting also violates the National Environmental Policy Act ("NEPA"). 42 U.S.C. §§ 4321 *et seq.* Respondents' evaluation of the relevant environmental factors is incomplete, and the asserted categorical exclusion findings are unsupported by substantial evidence. As such, the Court must set aside the Aerial Shooting and require Respondents to comply with NEPA by conducting the required environmental assessment ("EA") and, potentially, an environmental impact statement ("EIS").

5.      For these reasons, Plaintiffs ask the Court to declare that Respondents unlawfully authorized and conducted the Aerial Shooting of the Gila Cattle in violation of the APA and NEPA, and to block any further Aerial Shooting operations from taking place.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

6.      The Gila National Forest in New Mexico is the sixth-largest national forest in the continental United States. Within its boundaries lies the Gila Wilderness, a Congressionally designated Wilderness area, pursuant to the Wilderness Act, 16 U.S.C. §§ 1131-1136. This is a rugged and majestic area comprising approximately 560,000 acres of undeveloped land that is protected from intrusions by motorized vehicles, roads, buildings, logging, mining, or many other commercial activities. Consistent with the multiple use mandate for federal lands, federal law allows cattle grazing on public lands, including the areas in and around the Gila Wilderness, with a permit. *See* 36 C.F.R. §§ 222.3 *et seq.*

7.    The USFS has regularly noted the existence of the Gila Cattle – which it has occasionally referred to as "feral cattle" – in the Gila Wilderness. For instance, according to a November 2022 USFS Fact Sheet, these Gila Cattle originated from permitted domesticated cattle in the 1970s when the permittee declared bankruptcy and abandoned his cattle in the Wilderness. [A.R. 4262].[1] The USFS has removed hundreds of Gila Cattle from the Gila National Forest since the late-1990s, and estimated that, in early February 2023, approximately 150 unbranded cattle remain in a 100,000 acre target area in the Wilderness. [A.R. 5899, 6197].

8.    In September 2021, USFS issued a decision memo announcing its intention to undertake aerial shooting operations to kill Gila Cattle. [A.R. 5899-5915]. Those operations took place in February 2022, resulting in the cruel and inhumane deaths of at least 65 cattle. [A.R. 5899].

9.    Plaintiffs NMCGA and Spur Lake, among other parties, initiated suit against USFS and other government officials seeking to stop the February 2022 operation. The lawsuit was resolved through a stipulation of dismissal dated June 30, 2022 (the "Stipulation"), in which the Government acknowledged that "[n]o further operations are planned or shall be pursued under the September 11, 2020 Decision Memo." [A.R. 6013]. The Stipulation further provided that, although no additional operations were planned, "any such aerial lethal removal operations on or before March 1, 2025 would be preceded by at least 75 days' notice to the Petitioners and also to the public." [*Id.*].

10.   Subsequently, in January 2023, the New Mexico Livestock Board ("NMLB"), a state board empowered under New Mexico law to regulate livestock health and identification in New Mexico, unanimously concluded that the February 2022 aerial shooting operation was "NOT

---

[1] All references to the Administrative Record in this matter will be note as "A.R."

in accordance with commonly accepted agricultural animal husbandry practices," and "constitutes acts of animal cruelty." [A.R. 4892]. This conclusion was based on findings of fact such as (i) the observance of multiple dead cattle in the Gila Wilderness, including two dead bulls found in the Gila River, one with a broken back leg; (ii) the dead cattle had multiple gunshot wounds in the head, neck, back, and sides of the animals, and did not "die a good death." [A.R. 4893]. The following photograph reflects the findings of the NMLB that at least two dead cattle were found in the Gila River following the February 2022 aerial shooting operation:



[A.R. 5320].

11.     On November 17, 2022, USFS issued a Scoping Notice and Proposal (the "Scoping Notice") to "address the presence of unbranded and unauthorized cattle" in the Gila Wilderness. [A.R. 4288]. The Scoping Notice stated that it was "intended to cover any ongoing live gather and removal efforts, as well as any lethal removal efforts through either aerial shooting from a helicopter or shooting on the ground." [*Id.*]. USFS requested comments from the public related to

the proposed Aerial Shooting that "should be considered in helping us develop a final proposal . . ." [*Id.* at 4290].

12.     On November 22, 2022, Gila National Forest Supervisor Camille Howes, wrote to then-counsel for NMCGA and Spur Lake, purportedly to provide the 75-days' notice required under the Stipulation. [A.R. 4350]. In that letter, Howes mischaracterized the Stipulation, describing it as follows: "future proposals by USDA involving the lethal removal of unbranded and unauthorized cattle . . . would be preceded by at least 75 days' notice . . ." [*Id.*]. This is substantively different from the Stipulation language that the operations themselves, not just proposals, would be preceded by at least 75 days' notice. [A.R. 6013 ("any such aerial lethal removal operations on or before March 1, 2025 would be preceded by at least 75 days' notice to the Petitioners and also to the public")].

13.     Plaintiffs NMCGA and Spur Lake, among others, submitted comments to the Scoping Notice opposing the proposed Aerial Shooting. [A.R. 5163; 5315]. At no point did they waive their rights under the Stipulation to 75 days' notice before "any such aerial lethal removal operations on or before March 1, 2025" would begin.

14.     On February 1, 2023, USFS issued a "Notice of Intent to Impound Unauthorized Livestock." (the "Impound Notice"). [A.R. 5590]. The Impound Notice, issued pursuant to 36 C.F.R. 262.10, gave notice to the public that "all _unauthorized livestock_ found upon National Forest System Lands . . . may be impounded by the [USFS] on or after February 15, 2023." [*Id.* (emphasis added)].

15.     On February 16, 2023, USFS issued a Decision Memo approving the Aerial Shooting (the "Decision Memo"). [A.R. 5899]. The Decision Memo was signed by Howes.

16.     Petitioners initiated this action on February 21, 2023. [Dkt. 1]. Petitioners' Petition for Review seeks declaratory and injunctive relief under the APA and NEPA. Respondents filed a response to Plaintiffs' Complaint on May 19, 2023. [Dkt. 41].

17.     Petitioners filed an application for Temporary Restraining Order and Preliminary Injunction on February 21, 2023 (the "Application"). [Dkt. 6]. The Court held a hearing on the Application on February 22, 2023 and denied the Application the same day. [Dkt. 20].

18.     On February 28, 2023, the Center for Biological Diversity ("CBD") filed an opposed Motion to Intervene. [Dkt. 26]. The Court has not yet issued an order on the Motion to Intervene, but indicated at a May 22, 2023 hearing that it was "inclined to grant [the] motion." [Dkt. 42].

19.     On July 23, 2023, the Parties filed a "Stipulation as to Briefing Materials," under which the Parties stipulated that an official document of the Bureau of Land Management and the USFS entitled "Riparian Area Management: Proper Functioning Condition and the Supporting Science for Lotic Areas" will be before the Court, without objection, for consideration on the merits. [Dkt. 47]. The Court accepted this stipulation and issued a corresponding order on August 2, 2023. [Dkt. 49].

### III.     STANDARD OF REVIEW AND APPLICABLE LEGAL STANDARDS

**A.  Administrative Procedure Act.**

20.     The APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statue, is entitled to judicial review thereof." 5 U.S.C. § 702. It empowers district courts to, in relevant part, "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in "excess of statutory

jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).

21.     Under the APA, a district court is to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The duty of a court reviewing agency action under the arbitrary or capricious standard is to determine "whether the agency considered all relevant factors and whether there has been a clear error of judgment" and evaluate "whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co*., 463 U.S. 29, 43 (1983)). Under this standard, an agency's decision must be set aside as arbitrary and capricious if the agency:

> (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

*Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 839 (10th Cir. 2019) (quoting *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2008)).

22.     Although the APA's arbitrary and capricious standard is a deferential one, a district court's review of the agency decision "must be searching and careful, ensuring that the agency decision was based on a consideration of the relevant factors and that there have been no clear errors of judgment." *Sierra Club v. United States Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1182 (M.D. Fla. 2006).

23.     Additionally, the agency's decision must be supported by substantial evidence in the record. *Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1120 (10th Cir. 2021) (citing *Olenhouse*, 42

F.3d at 1575). "For the evidence to be 'substantial,' the agency's record must contain enough facts supporting the decision that a 'reasonable mind' could accept it as 'adequate to support [the] conclusion.'" *Id.* (citing *Olenhouse*, 42 F.3d at 1581) "The evidence is inadequate if it is overwhelmed by other evidence or constitutes a mere conclusion." *Id*.

24.     The court's review is "generally based on the full administrative record that was before all decision makers," which is assumed to be complete "absent clear evidence to the contrary." *Id*. (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993)).

**B.  National Environmental Policy Act.**

25.     NEPA does not provide a private cause of action. Therefore, "courts review an agency's compliance with NEPA under the Administrative Procedure Act." *Ctr. for Biological Diversity v. United States DOI*, 72 F.4th 1166, 1177 (10th Cir. 2023); *accord Bernhardt*, 923 F.3d at 839. Agency action that violates NEPA must be set aside under the APA if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Olenhouse*, 42 F.3d at 1573-74.

### IV.     ARGUMENTS AND AUTHORITIES

**A.  The Aerial Shooting should be declared unlawful because USFS failed to follow its own regulations concerning the impoundment of the Gila Cattle in the Gila Wilderness.**

26.     The Organic Act of 1897 empowers the Secretary of Agriculture, through the USFS, to "make provisions for the protection against destruction by fire and depredations upon the public forests and national forests," and to "make sure rules and regulations . . . to regulate [the national forests'] occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. As the Tenth Circuit observed, the Organic Act "confers upon the forest service the duty to protect the forests from injury and trespass, and the power to condition their use and prohibit unauthorized use." *Denver v. Bergland*, 695 F.2d 465, 476 (10th Cir. 1982).

27.     In accordance with the Organic Act, the USFS promulgated various regulations, including 36 C.F.R. § 261.7, which prohibits "placing or allowing unauthorized livestock to enter or be in the National Forest System or other lands under Forest Service control." As defined in Title 36 of the Code of Federal Regulations (the "Forest Service Regulations"), "unauthorized livestock" means:

> **_any cattle_**, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro by 222.20(13), which is not authorized by permit to be upon the land on which the livestock is located and which is not related to use authorized by a grazing permit; provided, that noncommercial pack and saddle stock used by recreationists, travelers, other Forest visitors for occasional trips, as well as livestock to be trailed over an established driveway when there is no overnight stop on Forest Service administered land do not fall under this definition.

36 C.F.R. § 261.2 (emphasis added).

28.     "When an agency does not comply with its own regulations, it acts arbitrarily and capriciously." *Cherokee Nation of Okla. v. Norton*, 389 F.3d 1074, 1078 (10th Cir. 2004); *see also Conservancy of Sw. Fla. v. United States Fish & Wildlife Serv.*, 677 F.3d 1073, 1078 n.10 (11th Cir. 2012) ("An agency's failure to follow its own regulations is arbitrary and capricious."). It is well-established that "[a]gencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure." *N.M. Farm & Livestock Bureau v. United States DOI*, 952 F.3d 1216, 1230-31 (10th Cir. 2020); *see also Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986) ("The courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself") (citing *U.S. v. Heffner*, 420 F.2d 809 (4th Cir. 1969)).

29.     "[P]roperly promulgated, substantive agency regulations have the force and effect of law." *United States v. Kahn*, 5 F.4th 167, 178 (2d Cir. 2021) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979)). Thus, if an agency chooses to impose upon itself "substantive and

procedural standards . . . it may not, so long as the regulations remain unchanged, proceed without regard to them." *Id.* (quoting *Service v. Dulles,* 354 U.S. 363, 372 (1957)) (internal quotations omitted).

      **i.**    **The Gila Cattle in the Gila Wilderness are "Unauthorized Livestock" as defined in the Forest Service Regulations.**

30.     The Gila Cattle in the Gila Wilderness clearly fall within the definition of "unauthorized livestock" under 36 C.F.R. § 261.2 and as employed in § 262.10. When interpreting a regulation, courts are to "apply the same rules we use to interpret statutes." *Canyon Fuel Co., LLC v. Sec'y of Labor*, 894 F.3d 1279, 1287-88 (10th Cir. 2018). The district court must "examine the plain language of the regulation and give each word its ordinary and customary meaning." *Id.* The court must not consider "the regulatory history or anything outside the text." *Id.* "If the language of the regulation is clear, we enforce the regulation in accordance with its plain meaning, giving no deference to a contrary interpretation by the [government]." *Id.*

31.     The definition of "unauthorized livestock" in § 261.2 is not ambiguous. The definition includes "*any cattle,*" with the only qualification that such cattle or other animals are "not authorized by permit" to be in their location, and are "not related to use authorized by a grazing permit." 36 C.F.R. § 261.2. There is no dispute that the Gila Cattle are "not authorized by permit" and are not "related to use authorized by a grazing permit." Accordingly, because these animals clearly fall within the plain language, "any cattle," they are unauthorized livestock.[2]

---

[2] Respondents may argue they are entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997) or *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984). To the extent these cases continue to represent correct statements of the law, which Petitioners dispute, the deference owed under these doctrines applies only when the regulation or statute, as applicable, is ambiguous. *Suncor Energy (U.S.A.), Inc. v. United States EPA*, 50 F. 4th 1339, 1353-54 (10th Cir. 2022) ("When an agency reasonably interprets a genuinely ambiguous regulation that it has promulgated, federal courts generally defer to that interpretation" under *Auer*); *Chevron*, 467 U.S. at 843 n. 9, 843-44 (courts will defer to an agency's reasonable interpretation when "Congress has explicitly left a gap for the agency to fill," or if the statute is ambiguous after application of

32.     Importantly, the unambiguous nature of this definition is evidenced by the USFS's consistent use of the term "unauthorized livestock" referring to the Gila Cattle for years prior to the Decision Memo. USFS's decision to undertake the Aerial Shooting in the first place is premised on its authority to remove "unauthorized livestock" under § 261.7. [A.R. 5903 (stating that the need to remove the Gila Cattle is intended to "[m]eet the intent of 36 CFR 261.7, which prohibits placing or allowing *unauthorized livestock* to enter or be in the National Forest System . . ." ) (emphasis added)]. This direct admission in the document authorizing the Aerial Shooting fatally undercuts the Respondents' primary argument that the Gila Cattle are not "unauthorized livestock" as used in § 261.7 and § 262.10.

33.     Additionally, USFS has continually and repeatedly over the years referred to the Gila Cattle as "unauthorized livestock." In November 2022, around the time the Scoping Notice was issued, USFS issued a public fact sheet concerning the Gila Cattle in the Gila Wilderness, entitled "Gila Wilderness Livestock Removal," [A.R. 4262]. In that document, USFS addressed "Frequently Asked Questions," including the following admission that the Gila Cattle are "unauthorized livestock":

> Are the cattle in the Gila Wilderness trespass cattle? There are no active allotments in the Gila Wilderness on the Wilderness Ranger District where these cattle are located. Any cattle, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro by 36 C.F.R. § 222.20(b)(13), which is not authorized by permit (or Bill for Collection) to be upon the land on which the livestock is located, and which is not related to use authorized by a grazing permit (livestock owned by other than a national forest grazing permit holder) are defined as unauthorized livestock. *The cattle in the wilderness fit this definition.*

---

"traditional tools of statutory construction"). Here, there is nothing ambiguous about the definition of "unauthorized livestock" or the impoundment process in § 262.10.

[A.R. 4262 (emphasis added)].  This answer, quoting the exact language of § 261.7 defining "unauthorized livestock," is the most clear-cut admission USFS could make regarding this issue.

34.     The Administrative Record is replete with instances of the Respondents and Intervenor referring to the Gila Cattle as "unauthorized livestock" or "livestock." In fact, Respondents were referring to these cattle as "unauthorized livestock" as recently as mere weeks prior to issuing the Decision Memo. For instance, a United States Department of Agriculture ("USDA") internal briefing paper dated January 9, 2023 identified its topic as "Gila Wilderness Unauthorized Livestock in Gila National Forest":


**United States Department of Agriculture**

**Topic:**  Briefing Paper – Gila National Forest, <u>Unauthorized Livestock</u> in Gila Wilderness

**Date:**  January 9, 2023

**Contact:**     Robert Trujillo, Director, WFRPRGM, Southwestern Region, 505-280-8283, <u>robert.trujillo@usda.gov</u>
Anthony Madrid, Deputy Director, WFRPRGM, Southwestern Region, 505-634-6695, <u>anthony.madrid@usda.gov</u>

**Issue Summary:**  Unbranded and unauthorized cattle are causing increased damage to riparian areas, water quality, and threatened and endangered species habitat in the Gila Wilderness on the Gila National Forest (Forest). The current situation has placed the Forest in violation of the National Forest Management Act, the Wilderness Act, and the Endangered Species Act. There is strong social interest in this topic from both the livestock industry as well as the environmental community.

Issued less than six weeks before the Decision Memo, this briefing paper also expressly refers to the alleged problems with the Gila Cattle as the "unauthorized livestock issue," [A.R. 5138], and stated that many comments received by USFS were "in favor of unauthorized livestock removal from the Gila Wilderness." [A.R. 5138-39].

35.     Another USFS document entitled "Talking Points," dated January 17, 2023, less than a month before the Decision Memo was issued, was prepared to address the "Gila Wilderness Unauthorized Livestock Concerns Letter – Congressional Western Caucus":

 

|  | **Forest Service** | |
|--|**National Forest System**| |
|  | **Talking Points** | |

**Topic:** Gila Wilderness Unauthorized Livestock Concerns Letter - Congressional Western Caucus.
**Date:** January 17, 2023

[A.R. 5527]. These "Talking Points" also include eight other references to "unauthorized livestock" or "livestock" when expressly referring to the Gila Cattle and the proposed Aerial Shooting. This document includes the following explicit acknowledgments that the Gila Cattle are "unauthorized livestock":

- "For nearly 30 years, the Forest Service has been removing *unauthorized livestock* from the Gila Wilderness. Each time a gather is conducted the Forest Service posts an impoundment notice in the newspaper." [A.R. 5527 (emphasis added)].

- "[T]he overwhelming majority of stakeholders support the removal of the *unauthorized livestock* in the Gila Wilderness through aerial shooting." [A.R. 5526 (emphasis added)].

- "Once cattle are removed from the Gila Wilderness, they are inspected by the NM Livestock Board and our contractor hauls them to the closest sale barn to be sold for slaughter. The NM Livestock Board keeps the proceeds from the sale of the *unauthorized livestock*." [A.R. 5526 (emphasis added)].

36.     The Administrative Record includes numerous other examples of the Respondents using the term "unauthorized livestock" to refer to the Gila Cattle:

- April 2015 USFS Briefing Paper. Describes a summary of the "past and present activities that have been implemented on the Gila NF to deal with feral cattle." The document includes a "Fact Sheet" describing the history and origin of these cattle and efforts to remove them:

- o "When the Wild Cow Contract ended in 2006, over 200 head of *unauthorized livestock* had been removed by the FS from the Redstone Allotment and surrounding area." [A.R. 2634 (emphasis added)].

- o "The [Gila National Forest] in cooperation with the [New Mexico Livestock Board] would develop, award, and administered a contract to gather *livestock* that were determined to be *unauthorized* on National Forest System lands and located within an area defined in a Notice of Intent to Impound *Unauthorized Livestock*." [A.R. 2635 (emphasis added)].

- ▪ Sept. 12, 2022 Draft Meeting Notes.

  - o Title: "Gila Wilderness – Management of *Unauthorized Livestock*" [A.R. 4212 (emphasis added)].

  - o "Eager to hear the challenge and understand why it may take years to accomplish this task of getting *livestock* out of the wilderness." [A.R. 4213 (emphasis added)].

  - o "Current condition – number of *unauthorized livestock*" [A.R. 4213 (emphasis added)].

  - o "Humane euthanasia would likely be the most effective elimination of *unauthorized livestock*." [A.R. 4214].

  - o "*Unauthorized livestock* must be removed from the Gila National Wilderness" [A.R. 4216 (emphasis added)].

- ▪ Sept. 2022 "Gila Wilderness Unauthorized Livestock Management – Background Information."

  - o Title describes the cattle as "unauthorized livestock" and lays out the history, background, and prior aerial shooting operations with respect to the Gila Cattle. [A.R. 4186].

- ▪ Nov. 8, 2022 Briefing Paper on "Unauthorized Livestock in Gila Wilderness."

  - o "Though opinions still differ on which methods of removal are most appropriate to resolve the issue, the group collectively agreed it is in the best interest of all involved that the *unauthorized livestock* be removed from the Gila Wilderness." [A.R. 4267 (emphasis added)].

- <u>Nov. 18, 2022 – Internal USFS Memorandum by Camille Howes</u>.

  - "On Friday, 18 November 2022, Henry Provencio and I met with [Grant County Officials] to discuss *unauthorized livestock* in the Gila Wilderness" [A.R. 4292 (emphasis added)].

  - "I informed both gentlemen that any help, support, or assistance they would offer to our short-term concerns of aggressive *unauthorized livestock* prior to the upcoming 100th Anniversary celebration of the Gila Wilderness would be thoroughly heard and evaluated." [A.R. 4292 (emphasis added)].

- <u>Nov. 22, 2022 USFS News Release</u>. Announcing the proposed lethal removal of the Gila Cattle and describing the title of the project as "Gila Wilderness *Livestock* Removal" [A.R. 4356 (emphasis added)].

- <u>Dec. 6, 2022 USFS Email</u>

  - "The following is a summary of my brief update to the Grant County Board of Supervisors on the *unauthorized livestock* removal and our Scoping Letter, for the record." [A.R. 4523 (emphasis added)].

- <u>Feb. 8, 2023 Website Screenshot</u>. Shows the USFS "Notice of Intent to Impound Unauthorized Livestock" added under "Project Documents" for the "Gila Wilderness Feral Cattle Removal." [A.R. 5679].

- <u>Nov. 5, 2021 Photographs</u>. Includes a caption describing "temporary corral location to herd unauthorized livestock that were being removed from the Gila Wilderness." [A.R. 3753].

- <u>June 2, 2022 Photographs</u>. Includes a caption describing photographs taken by Gila National Forest Staff, and stating, "The photos document the presence of unauthorized livestock along the Gila River within the Gila Wilderness." [A.R. 3515].

- <u>CBD Sept. 10, 2022 Email from Todd Shulke to USFS</u>. Includes photographs with captions describing "bank trampling by unauthorized livestock along the Gila River." [A.R. 4189].

- <u>CBD Sept. 10, 2022 Email from Todd Shulke to USFS</u>. Includes prior photographs with captions describing "vegetation grazing and cattle presence by unauthorized livestock at Miller Springs tank within the Gila Wilderness." [A.R. 4195].

- ▪ <u>July 21, 2015 Emails between USFS Regional Director and USFS Range Specialist.</u>

  - o Emails about the procedure for publishing an impoundment notice under § 262.10 (related to removal of "unauthorized livestock") for the removal of "feral cattle." [A.R. 2622-24].

- ▪ <u>USFS-APHIS 2020-2021 Agreement</u>: Describing "feral cattle and feral swine" as "feral livestock." [A.R. 3535].

37.    The Impound Notice issued by the USFS further proves the point. The Impound Notice is required pursuant to § 262.10 in connection with the physical impoundment of "unauthorized livestock." By issuing the Impound Notice with respect to the removal of the Gila Cattle, USFS tacitly acknowledged that (1) the Gila Cattle are "unauthorized livestock"; and (2) the impoundment procedure set forth in § 262.10 applies to the Gila Cattle. [A.R. 5590]. The USFS cannot simultaneously follow the physical impoundment procedures in § 262.10 with respect to the Gila Cattle, while also arguing that they are not "unauthorized livestock." Respondents' position on this is a clear departure from the unambiguous regulations that govern the removal of "unauthorized livestock" and protect the private property rights for owners of cattle who may be caught up in the impoundment operations.[3]

38.    As these examples make obvious, the USFS has for years referred to the Gila Cattle as "unauthorized livestock" in both internal and external official documents. It is beyond dispute that the consistent position of the USFS and the other Respondents has been that the Gila Cattle constitute "unauthorized livestock" subject to removal through the physical impoundment process

---

[3] This is precisely why the impoundment regulation for "unauthorized livestock" accounts for the possibility that cattle gathered in such operations may be owned, and may be redeemed by their owners prior to being subject to public sale. *See* 36 C.F.R. § 262.10(d). The Aerial Shooting deprives owners of cattle in the target area of the right to redeem their cattle in accordance with this procedure.

under § 262.10 the Forest Service Regulations. Now, USFS has changed its position for the purpose of litigation rather than a good faith interpretation of the regulations.

      **ii.**      **The definition of "livestock" in a different chapter and part of the Forest Service Regulations does not affect the plain and unambiguous language of "unauthorized livestock."**

39.     Contrary to the plain language of the regulations, and despite the overwhelming evidence in the Administrative Record to the contrary, the Respondents have argued that the Gila Cattle are not "unauthorized livestock" because a different regulation defines "livestock" as "animals of any kind kept or raised for use or pleasure." *See* 36 C.F.R. § 222.1.[4] This argument fails for multiple, independent reasons.

40.     *First*, the plain language of the definition of "unauthorized livestock" is not limited to "animals of any kind kept or raised for use or pleasure." To the contrary, the definition applies to "any cattle," which is much broader than the limited definition the Respondents propose.

41.     *Second*, the prohibition against "unauthorized livestock" is found in Part 261 of the Forest Service Regulations. Injecting the definition of "livestock" into the definition of "unauthorized livestock" is misplaced where, by its own terms, § 261.2 states, "The following definitions *apply to this part*." 36 C.F.R. § 261.2 (emphasis added). Thus, the regulations themselves provide that a unique definition of "unauthorized livestock" applies to the regulations prohibiting unauthorized livestock on USFS lands. Using a definition of "livestock" from a

---

[4] Although the Decision Memo contains numerous references to "unauthorized livestock" in relation to the Gila Cattle at issue here, it also contends that it is not required to follow the physical impoundment procedure set forth in § 262.10 because "the feral cattle are not 'livestock' as 'animals of any kind kept or raised for use or pleasure,' because they are no longer domesticated animals being 'kept or raised' by any individual." This fundamentally inconsistent explanation demonstrates the arbitrary and capricious nature of the Decision Memo.

different part of the Forest Service Regulations is inconsistent with the clear intent for "unauthorized livestock" to have a standalone meaning for purposes of that specific part.

42.     Moreover, the definition of "livestock" Respondents propose has no relationship to the prohibition on "unauthorized livestock" found in § 261.7. Part 222 of the Forest Service Regulations includes a definition of "livestock" for purposes of issuing and managing grazing permits in accordance with the Federal Land Policy and Management Act of 1976, codified at 43 U.S.C. §§ 1701-1784 (the "FLPMA"). This statute authorized USFS to promulgate regulations concerning cattle grazing. For instance, § 1752 of the FLPMA uses phrases such as "domestic livestock" in the context of establishing policies and procedures for issuing grazing permits on federal lands. *See* 43 U.S.C. § 1752 ("All permits and leases for domestic livestock grazing issued pursuant to this section may incorporate an allotment management plan . . ."). Consistent with that purpose, USFS promulgated Part 222 of Title 36 in October 1977, defining livestock, for purposes of establishing grazing policy, to require that such animals be "kept or raised for use or pleasure." *See* 42 Fed. Reg. 56,730; 36 C.F.R. § 222.1.

43.     By contrast, regulations defining the term "unauthorized livestock" and the prohibition against unauthorized livestock on forest service lands were promulgated and became effective January 14, 1977, more than 10 months before Part 222 and under completely separate statutory authority. *See* 42 Fed. Reg. 2957-62. It is plainly erroneous to blend the definition of "unauthorized livestock," a standalone definition limited to the regulations in its specific part, with the definition of "livestock" because the latter (i) was promulgated after the definition of "unauthorized livestock," (ii) is contained in a distinct and separate part of the Forest Service Regulations; (iii) concerns different subject matter; and (iv) lacks any reference to, or an express intent to affect, the definition of "unauthorized livestock" in Part 261. Respondents' attempt to

entangle these definitions is plainly erroneous and must be rejected. *See Florez ex rel. Wallace v. Callahan*, 156 F.3d 438, 442 (2d Cir. 1998) (an interpretation is plainly erroneous "where the plain language of the regulation itself or some other indication of the agency's intent *at the time of promulgation* compels a different result.") (emphasis added).

44.     *Third*, as discussed above, Respondents' position conflicts with the numerous instances – including in the USFS's own Decision Memo – referring to the Gila Cattle as "unauthorized livestock." It is well-established that "[p]ost hoc rationalizations for agency action are impermissible." *State v. United States DOI*, 493 F. Supp. 3d 1046 (D. Wyo. 2020) (*citing Dept of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020)).[5] Despite years of identifying the Gila Cattle as "unauthorized livestock," USFS's last-minute argument that these animals are not "livestock" constitutes a post hoc rationalization rather than a good faith attempt to justify its position.

45.     *Finally*, even if the definition of "livestock" were relevant to interpret the term "unauthorized livestock," it does not follow that the Gila Cattle are not "kept or raised for use or pleasure." The Ninth Circuit has recognized that the common meaning of "livestock," using the same definition as that found in § 222.1, "has been used to describe cattle, horses, and pigs." *United States v. Park*, 536 F.3d 1058, 1062 (9th Cir. 2008). Yet, USFS ignores this common understanding to argue that these specific cattle cannot be "livestock" simply because they are not currently owned by a private party.

46.     Even if the Gila Cattle are not privately owned,[6] that does not mean they are not "kept or raised for use or pleasure." The use of the passive voice in this phrase suggests it relates

---

[5] Although the Decision Memo includes a one-sentence statement asserting this position,

[6] Under New Mexico law, the Gila Cattle are likely considered to be owned by the State of New Mexico. *See, e.g.,* N.M. Stat. 77-13-6. It is also unknown whether the cattle USFS has killed,

to the nature of the animal rather than any requirement of active private ownership, "keeping," or "raising." *See Dean v. United States*, 556 U.S. 568, 572 (2009) ("The passive voice focuses on an event that occurs without respect to a specific actor . . . . It is whether something happened – not how or why it happened – that matters."); *cf. Watson v. United States*, 552 U.S. 74, 81 (2007) (use of passive voice in statutory phrase "to be used" reflects "agnosticism . . . about who does the using"). Indeed, the Gila Cattle are – with the exception of private ownership – substantively no different from cattle that legally graze in the Gila National Forest under a grazing permit. Moreover, these Gila Cattle are indistinguishable from other "domesticated" cattle as evidenced by their ability to be sold and used by private parties as part of the impoundment process set forth in § 262.10. In this way, the Gila Cattle can be used, and would otherwise be used if the USFS complied with its own physical impoundment regulations.

47.     In the Decision Memo, USFS for the first time sought to distinguish these animals on the grounds that they "are no longer domesticated animals being 'kept or raised' by any individual." [A.R. 5904]. However, nothing about the definition of "livestock" under § 222.1 requires ownership or "domestication." Nor does USFS have any evidence in the Administrative Record to support these conclusions, much less the substantial evidence required for the Court's APA analysis. *See, e.g., Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213-14 (10th Cir. 2006) (holding that "agency action will be set aside as arbitrary unless it is supported by substantial evidence in the administrative record"); *Crooks v. Mabus*, 845 F.3d 412, 423 (D.C. Cir. 2016) ("[An] informal adjudication[] . . . must be supported by substantial evidence – otherwise it would

---

and intends to kill in subsequent Aerial Shootings, were branded. Respondents did not confirm whether the cattle that were shot were branded before killing them and did not inspect the carcasses after being shot to confirm whether any such cattle were privately-owned. What's more, USFS imposed a ban on third-party travel into the Wilderness during and after its shooting operation in February 2023.

be arbitrary and capricious."). Here, there is no evidence in the Administrative Record of any substantive differences between the Gila Cattle and the cattle that graze legally in the Gila National Forest under a grazing permit.

48.     It is apparent that this most recent interpretation by USFS – expressly contradicted by its own prior interpretation, positions, and practice – has been purposely contrived to justify its decision to undertake the Aerial Shooting in this lawsuit. As such, this interpretation must be rejected. *See, e.g., Alaniz v. Office of Personnel Mgmt.*, 728 F.2d 1460, 1465 (Fed. Cir. 1984) ("It is clear that no deference is due to an agency interpretation fashioned for the purposes of litigation."); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

### iii.   USFS lacks substantial evidence that the Gila Cattle are an "invasive and exotic species" to justify the Aerial Shooting.

49.     USFS asserts it may conduct the Aerial Shooting and abandon its impoundment procedure because it has the authority "for managing invasive and exotic species." [Decision Memo, A.R. 5904]. There is no question that the Gila Cattle are descended from traditional cattle used for agricultural purposes, are not invasive or exotic species. [A.R. 5899]. The Administrative Record contains no evidence from which USFS could reasonably conclude these cattle are different in nature from cattle present in the Gila National Forest under a grazing permit.

50.     Even if the Gila Cattle could be categorized as "invasive or exotic species," that does not provide USFS with *carte blanche* authority, let alone the power to conduct the Aerial Shooting. That is particularly true where the Forest Service Regulations already provide a specific mechanism for removing unauthorized livestock, whether or not they qualify as invasive or exotic

species. *See* 36 C.F.R. § 262.10. USFS's failure to follow those specific procedures is arbitrary and capricious. *Cherokee Nation of Okla.*, 389 F.3d at 1078.

> ### iv.   USFS lacks sufficient evidence of environmental damage in the Gila Wilderness to justify the Aerial Shooting.

51.   USFS has claimed that the presence of Gila Cattle in the Gila Wilderness "has resulted in resource damage, especially to riparian areas," and that "habitat impacts from feral cattle impede the recovery of threatened and endangered species within the Gila Wilderness." [Decision Memo, A.R. 5900]. Notwithstanding these repeated statements over the year, USFS lacks sufficient evidence to support these conclusions.

52.   USFS employed no scientific procedures or deliberative principles to evaluate any alleged environmental harm caused by the Gila Cattle. In the Decision Memo, USFS included only five photographs that allegedly document overgrazing and damage to riparian areas. [A.R. 5901-5903]. Additional photographs are found in the Administrative Record, including some photographs taken by CBD, an environmental organization devoted to removing all cattle from National Forest lands. [*See, e.g.,* A.R. 4126, 3516-17, 4189, 4128)]. In all, there are approximately 50 photographs in the Administrative Record that purport to reflect the environmental harm allegedly caused by the Gila Cattle.

53.   These photographs do not provide reliable evidence to support the environmental claims made by USFS. The Gila Wilderness is hundreds of thousands of acres of land, and 50 photographs is undoubtedly too few to adequately reflect, much less to prove, the significant environmental harm alleged by USFS. USFS and CBD also did not record/chart where the photographs were taken, making it impossible for USFS or anyone else to monitor the same locations and observe changes over time.

54.     For instance, USFS has concluded that certain dusty or barren areas reflected in some of the photographs must necessarily have been caused by the Gila Cattle. USFS made no attempt to identify potential alternative causes of these conditions, such as flooding, the presence of animals other than the Gila Cattle, or even dry conditions caused by a drought that has been observed in the Gila National Forest since at least 2001.[7]

55.     For instance, the Decision Memo cites the following photograph taken by CBD in May 2022 as evidence of "bank trampling and riparian damage along the Gila River":



[A.R. 5902; A.R. 4189]. USFS used this photograph to improperly (i) assume that this particular bank was damaged by the Gila Cattle, as opposed to elk, deer, or various other large animals in the Gila Forest that rely upon the Gila River for water; and (ii) exaggerate the extent and frequency of these allegedly damaged areas in the Gila Wilderness.

---

[7] The U.S. Park Service has recognized the impact of the current drought in the Gila Wilderness. *See* National Park Service, Monitoring Climate and Water at Gila Cliff Dwellings National Monument, 2017 https://www.nps.gov/articles/sodn_gicl_ch_2017.htm.

56.     USFS's reliance on these photographs, without additional evidence, violates its own standards for managing riparian areas and evaluating environmental harm. A document issued by the USFS, USDA, and the Bureau of Land Management ("BLM") entitled "Riparian Area Management: Proper Functioning Condition Assessment for Lotic Areas," describes methods for "addressing the physical functioning of perennial or intermittent lotic (flowing water) riparian systems, such as rivers or streams." [Exhibit G at p. 3 (the "Riparian Technical Reference")]. The Riparian Technical Reference recommends conducting a Proper Functioning Condition ("PFC") assessment of riparian areas. Critical to this assessment is the fact that "different disciplines must work together to accurately interpret existing information about the dynamic nature of riparian areas and how riparian attributes and processes change over time in response to management, climate, and watershed conditions." [*Id.* at p. 15].

57.     USFS and the Respondents performed no controlled assessment, particularly over time to evaluate the actual impact, if any, the Gila Cattle have had on riparian areas throughout the Gila Wilderness. As the Riparian Technical Reference directs, "To document actions and to help establish cause and effect relationships when evaluating trend, some level of implementation monitoring should be done periodically for ongoing activities such as grazing by livestock or wildlife." [*Id.* at p. 11]. It further acknowledges that, with respect to livestock grazing, reference areas for PFC assessments should be carefully identified:

> Livestock grazing varies greatly in intensity, duration, and opportunities for recovery and, consequently, its influence on riparian functions. Therefore, the ID team should select and use reference areas with care. The reference conditions for potential can be based on data or professional judgment and should be documented.

[*Id.* at p. 30]. In other words, a single photograph of an unidentified river bank at one point in time is inadequate to properly assess the condition of that river bank over time, let alone the overall health of riparian areas along the Gila River more broadly.

58.     Fundamentally, USFS's claims of environmental harm are founded on a sparse set of random photographs and the mostly-anecdotal reports of persons associated with CBD and others with interests adverse to the multiple use mandate with respect to federal lands. USFS failed to follow the recommendations in the Riparian Technical Reference. Nor did it employ any consistent and reliable scientific methods or procedures to properly assess any alleged harm to riparian areas over time as claimed in the Decision Memo. These failures demonstrate a gross deviation from the scientific method and USFS's own materials. Accordingly, the Administrative Record lacks sufficient credible evidence to conclude the Gila Cattle pose a serious environmental threat to the Gila Wilderness or its riparian areas, and USFS has acted arbitrarily and capriciously in violation of the APA.

**B.  Respondents' decision approving the Aerial Shooting failed to comply with NEPA.**

59.     NEPA is a "procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decisionmaking process." 40 C.F.R. § 1500.1. It requires federal agencies to examine and disclose the potential impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332 (C). This requires the responsible agency to issue "a detailed statement" addressing the action's (i) reasonably foreseeable environmental effects, (ii) unavoidable adverse impacts, (iii) a reasonable range of feasible alternatives, (iv) the relationship between short-term uses and maintaining long-term productivity, and (v) any irreversible commitment of resources that would result from the action's implementation. *Id*.

60.     If the proposed action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," the agency "shall prepare an environmental assessment" to "set forth the basis of the agency's finding of no significant impact or determination that an environmental impact statement is necessary."

42 U.S.C. § 4336 (b)(2). The agency is not required to prepare an EA or an EIS only if the proposed

action is subject to a "categorical exclusion." *Id.*, § 4336 (a)(3). As the Tenth Circuit has held,

> Partial fulfillment of NEPA's requirements, however, is not enough. The
> plain language of NEPA makes clear that "to the fullest extent possible"
> federal agencies must comply with the act and prepare an impact statement
> for all major federal actions significantly affecting the environment."

*Catron Cty. Bd. of Comm'rs v. United States Fish & Wildlife Serv.*, 75 F.3d 1429, 1437 (10th Cir.

1996) (quoting 42 U.S.C. § 4332(C)).

      **i.**   **The Aerial Shooting is a major federal action that may have significant
adverse environmental effects requiring an environmental assessment.**

61.    A "major federal action" is "an activity or decision subject to Federal control and

responsibility," which includes "approval of specific projects, such as . . . management activities

located in a defined geographic area." 40 C.F.R. 1508.1(q)(3)(iv). Such projects may be "new and

continuing activities, including projects and programs entirely or partly financed, assisted,

conducted, regulated, or approved by Federal agencies." *Id.* at § 1508(q)(2).

62.    The Aerial Shooting is a major federal action because Respondents are federal

agencies and the Aerial Shooting consists of specific management activities located in a defined

geographic area. The Decision Memo describes it as a management activity to control an invasive

species and protect endangered species habitat. [A.R. 5899]. The activity is also limited to a

defined target area within the Gila Wilderness. [*Id.*]. USFS has funded the Aerial Shooting and

contracted with APHIS to perform the shooting. [A.R. 5903-04]. Accordingly, the decision to

approve and conduct the Aerial Shooting is a major federal action subject to NEPA.

63.    Under NEPA, the phrase "effects or impacts" is defined as "changes to the human

environment . . . that are reasonably foreseeable" to result from the proposed action or alternatives.

40 CFR § 1508.1(g). "Human Environment" means "comprehensively the natural and physical

environment and the relationship of present and future generations of Americans with that environment." *Id.* at §1508.1(m). Accordingly:

> Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, *even if on balance the agency believes that the effects will be beneficial*.

*Id.* at § 1508.1(g)(4) (emphasis added).

64.     In evaluating whether an effect or impact is "significant," an agency must consider both the context and intensity of the action. That is, the agency "shall analyze the potentially affected environment and degree of the effects of the action," including whether the affected area contains threatened and endangered species. *Id.* at § 1501.3(b), (b)(1). In evaluating the "degree of the effects", the agency should consider "(i) Both short- and long-term effects; (ii) Both beneficial and adverse effects, (iii) Effects on public health and safety; and (iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment." *Id.* at § 1501.3(b)(2).

65.     Agencies are entitled to a high degree of deference when the evaluation of facts implicates the agency's scientific or technical expertise. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989); *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). However, "[t]he deference a court must accord an agency's decision-making is not unlimited." *Wyo. State Snowmobile Ass'n v. United States Fish & Wildlife Serv.*, 741 F. Supp. 2d 1245, 1251 (D. Wyo. 2010). "Where the agency fails to articulate a rational connection between the facts found and the choice made," no such deference is warranted. *Id*. (citing *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 88 (1983)).

66.     For example, in *Davis v. Mineta*, the Tenth Circuit concluded an EA/Finding of No Significant Impact for a highway project was inadequate because it failed to consider reasonable alternatives, failed to examine impacts from noise, induced growth, phasing, and cumulative

impacts, and was too vague and incomplete to enable an informed decision. 302 F.3d 1104, 1118, 1121-26 (10th Cir. 2002). Because the agency's finding of no significant impact had no rational connection to the factual evidence in the record, it was held to be arbitrary and capricious. *Id.*; *see also Dine Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234, 1254 (D. Colo. 2010) (finding an environmental assessment inadequate because it failed to consider effects of relocating a road).

67.    Here, the factual evidence contained in the Decision Memo and supporting documents clearly shows that the Aerial Shooting may impact endangered species, impair wilderness resources, and violate the Forest Service Regulations. Although USFS took limited steps to examine potential environmental impacts, its analysis is vague, incomplete, and thus inadequate to support a finding of no significant impact under NEPA.

### a.    Biological impacts.

68.    USFS's Biological Assessment prepared in January 2023 (the "BA") asserts that the Aerial Shooting will have no effect on threatened and endangered species or critical habitats. [A.R. 5680-5736]. However, the document identifies seventeen federally protected species, including several "Threatened, Endangered, Proposed, and Candidate species . . . that occur within the action area." [A.R. 5682-84].[8] Nevertheless, USFS provided no analysis concerning six of these species: the Mexican Long-nose Bat, Northern Mexican Garter Snake, Northern Aplomado Falcon, Gila Topminnow, Zuni Flebane, and Monarch Butterfly. [A.R. 005682]. Of these, five are identified by the table as not occurring within the action area, but no information is provided to explain or support this determination. The sixth omitted species, the Monarch Butterfly, is

---

[8] The table at A.R. 5683 identifies sixteen species, but omits the endangered New Mexico Meadow Jumping Mouse, which is discussed on the next page. The Mexican Wolf is listed in the table but considered in a separate document.

identified as *possibly* occurring in the area, but again, USFS provided no analysis whatsoever to support its "no effect" determination. [*Id.*; A.R. 5680-5736]. Of the species that were analyzed, eight of these were found to occur in the area and to require some form of mitigation to prevent adverse impacts from occurring. [A.R. 5680-5736].

69.     Importantly, Mexican Spotted Owls ("MSO") are known to nest within the project area, which overlaps with a "critically important" Recovery Unit and the largest known population of MSOs in the Southwest. [A.R. 5687]. "[T]he Action Area contains approximately 36% of the MSO [Protected Activity Centers, or] PACs, 35% of the PAC acres, and 41% of the total habitat (inside and/or outside of PACs) according to figures assembled for continued implementation of the Forest Plans (USDA Forest Service, 2004)." [*Id.*]. Later, the BA states that only one PAC is located within the project area, raising questions as to the distinction between the "action Area" and the "project area." [A.R. 5689].

70.     Notably, the BA contains no analysis of the potential impacts of low-flying helicopters, such as intense noise and wind, on the MSO. Instead, USFS simply asserts, "the pilot will remain a minimum of ¼ mile away from the one MSO PAC during the breeding season March-August." [A.R. 5691]. Ground operations must also avoid this area. [*Id.*]. USFS's BA lacks any analysis of MSO sensitivity to the noise and disruption generated by helicopters or whether this activity could discourage MSOs from selecting the area for nesting. [*Id.*]. USFS's assumption that a seasonal buffer zone will be sufficient to mitigate any potentially significant impacts is unsupported by any substantial evidence in the Administrative Record.

71.     Two other protected avian species, Southwestern Willow Flycatchers ("SWWF") and Yellow-billed Cuckoos, also occur within the area, but seasonally. [A.R. 5682, 5692, 5700]. The Gila National Forest and Gila Wilderness are home to the largest documented populations of

endangered SWWFs and threatened Yellow-billed Cuckoos in the Southwest. [A.R. 5692-93, 5701-02]. While both species are migratory and not expected to be present in February or March when helicopters are used, the BA indicates that nonlethal cattle removal operations could impair critical or important habitats for these species. [A.R. 5692, 5700].  SWWFs utilize riparian areas along the Gila River, including two sites "that have been consistently occupied for over 25 years" and some critical habitat is located within the project area. [A.R. 5696, 5698]. USFS concluded that no SWWFs are known to be in the project area but acknowledged that nesting habitat varies from year to year, and the most recent survey data cited is from 2019. [A.R. 5693, 5699, 5700]. The BA recommended that no temporary cattle holding facilities that would impair riparian vegetation should be placed in these areas. [A.R. 5699]. Similar mitigation is identified for Yellow-billed Cuckoos. [A.R. 5705]. The BA contains no analysis of whether low-flying helicopters will drive cattle into riparian areas for cover, potentially intensifying habitat impacts.

72.    In addition, the BA identifies several protected aquatic species known to occur within the project area, including Gila Chub, Gila Trout, Loach Minnow, Spikedace, and Narrow-headed Garter Snakes. [A.R. 5707, 5711, 5715, 5719, 5733]. The BA states that, for each of these species, no temporary holding facilities should be placed within critical habitat areas. [A.R. 5709, 5713, 5717, 5721]. The analyses for Loach Minnow, Spikedace, and Narrow-headed Garter Snakes also admit that aerial shooting may cause cattle carcasses to end up within or near the river or stream reaches utilized by these species, but concludes that this will have no impact on these species. [A.R. 5717, 5721, 5736]. The sole support for this finding is the "personal observation" of Jerry Monzingo, the Gila National Forest Biologist who compiled the BA. [A.R. 5717, 5721, 5736]. The Garter Snake analysis states that these carcasses would be no different from carcasses of large animals that die naturally, such as elk and deer. [A.R. 5736]. However, no analysis or data

is provided to support this assertion. *Id*. Indeed, the BA lacks any information or analysis concerning the frequency and distribution of large animals perishing naturally within the Gila River or other nearby watercourses compared to the mass slaughter posed by the Aerial Shooting.

73.    Likewise, the BA ignores the potential for disease and pollution from rotting carcasses that may impact fish and wildlife. According to a Watershed and Air Specialist Report prepared by USFS, decomposing carcasses can increase nutrient loads, decrease dissolved oxygen, and increase exposure to parasites like cryptosporidium. [A.R. 6041]. Because these impacts were not considered in the BA, the finding of "no effect" is not supported by substantial evidence.

### b.    Wilderness impacts.

74.    The Gila Wilderness is a Congressionally designated Wilderness area under the Wilderness Act, 16 U.S.C. §§1131-1136. As such, it is subject to special rules and regulations intended to preserve the "untrammeled" or "natural" condition of such areas. "A wilderness, in contrast with those areas where man and his own works dominate the landscape, is … an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." *Id*. §1131(c). "The agency charged with administering a designated wilderness area is responsible for preserving its wilderness character." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 646 (9th Cir. 2004) (citing 16 U.S.C. §1133(b)).

75.    To protect the natural condition of these areas, Congress expressly prohibited certain activities that are antithetical to the wilderness character—including any "landing of aircraft" and "use of motor vehicles, motorized equipment or motorboats"—unless "*necessary* to meet minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." 16 U.S.C. § 1133(c) (emphasis added).

76.    Here, the Aerial Shooting would have significant adverse impacts on the wilderness character of the project area. This action, which involves shooting cattle with rifles from low-

flying helicopters, is antithetical to the Congressional mandate to preserve the wilderness character of the Gila Wilderness. The use of helicopters over these pristine areas has, and will continue to, disrupt the forest's peaceful nature and cause the landscape to be dominated by extremely loud equipment meant to interfere with, rather than preserve, the natural environment of the Gila Wilderness.

77.     While helicopters have been allowed in limited cases where their use is deemed necessary, they are not necessary under these circumstances. *See e.g., Wilderness Watch v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1037 (9th Cir. 2010) (an agency authorizing activity generally prohibited by the Wilderness Act must find the action is necessary and implemented only to the extent necessary). The use of helicopters here is not "necessary," particularly where USFS's own regulations provide that the cattle must be physically impounded rather than shot from a flying helicopter. 36 C.F.R. § 262.10. This non-lethal method is not only effective – USFS admits that it has been able to remove hundreds of the Gila Cattle using this method – it does not violate the Wilderness Act. [A.R. 5899-5900].

78.     Nor is the Aerial Shooting necessary to prevent any alleged danger to hikers or campers. There is inadequate evidence in the Administrative Record to support this conclusion. And even if there were some danger posed by the Gila Cattle, USFS failed to evaluate alternatives used to address similar dangers. For example, risks posed by large, dangerous animals such as grizzly bears or wild bison are typically addressed through targeted outreach and education, as well as improved signage to alert wilderness visitors to these risks. The Gila Wilderness is home to many animals that may be considered dangerous to humans, but that alone does not necessitate the Aerial Shooting.

79.     The USFS's Minimum Requirements Analysis (MRA) further demonstrates that the Aerial Shooting will have significant adverse effects on the wilderness character of the area. According to the MRA, removal of the Gila Cattle is not necessary to preserve the "untrammeled" or "undeveloped" qualities of the wilderness. [A.R. 5809-10].[9] The MRA also notes that helicopter use could disrupt elk or deer behavior. [A.R. 5824, 5829]. It further acknowledges that "[s]ights and sounds of the low flying helicopters would diminish a person's sense of solitude" and "these impacts would be severe," though short in duration. [*Id.*]. And, "[f]iring bullets from a helicopter . . . further diminishes the undeveloped character of wilderness." [A.R. 5828]. These impacts, which must be considered under NEPA, demonstrate that the Aerial Shooting has had, and will have, significant effects on the human environment.

### c.     Water Quality, Air Quality, and Noise Impacts.

80.     The Aerial Shooting has had, and may also have, significant adverse impacts on water quality, air quality, and noise that have not been adequately evaluated. As noted above, the Watershed and Air Specialist Report acknowledges that decomposing carcasses in the water may cause pollutants impacting the water quality of the Gila River. [A.R. 6041]. The Decision Memo acknowledges that the Upper Gila River, including Turkey Creek and Little Creek, is already listed by the State of New Mexico as "impaired water" pursuant to section 303(d) of the Clean Water Act.[10] *See* 33 U.S.C. § 1313. [A.R. 5901]. The primary pollutant is temperature. [A.R. 5901]. Because the Upper Gila River is already impaired, further pollution from carcasses will add an additional impact to an already stressed watershed, which could make the adverse impacts more significant. The Decision Memo identifies the presence of cattle as a factor on stream impairment

---

[9] The MRA was attached to the Decision Memo as Appendix C. [A.R. 5934-5969].

[10] *See* New Mexico Environmental Dept., EPA-Approved 2022-2024 Integrated Report (April 26, 2022), https://www.env.nm.gov/surface-water-quality/303d-305b/.

but fails to consider pollutants caused by the Aerial Shooting. Nor do the supporting documents consider these potential impacts. *Id*.

81.     The Decision Memo and supporting documentation also fail to provide any analysis of air pollution associated with the use of helicopters. The Decision Memo includes one short paragraph on air quality concluding, "[t]he Watershed and Air Resources Report indicates that the proposed action will not have negative impacts on air quality." [A.R. 5913]. However, the only potential air impact considered in that report is the potential for dust to be generated by cattle movements. [A.R. 6041]. The report, written by a hydrologist, provides some baseline information on existing sources of air pollution in the area, but it does not consider the impact of exhaust fumes or greenhouse gases associated with helicopter use. [A.R. 6033-43]. Helicopters use a significant amount of fuel, ranging from 20 gallons per hour to more than 500 gallons per hour.[11] The engine exhaust may also contain harmful air pollutants such as particulate matter and nitrogen oxides. Yet, these impacts are altogether unexamined in the Decision Memo and supporting documents, demonstrating that the decision was not fully evaluated as required under NEPA.

82.     In addition, helicopters generate significant noise, which may have significant impacts on wildlife. This noise can also impact human health and undermine the aesthetic experience of the wilderness. The potentially significant noise impacts of the proposed action were not examined.

83.     As these failures show, Respondents' decision to undertake the Aerial Shooting falls well short of the analysis required under NEPA. The Aerial Shooting may disrupt endangered

---

[11] *See* USFS, Helicopter Services: Hourly Flight Rates, Fuel Consumption, And Weight Reduction Chart Effective February 16, 2019 For Contracts Awarded 2013-2017, available online at: https://www.fs.usda.gov/sites/default/files/media_wysiwyg/flt_chrt_awarded_2013-2017_0.pdf.

species and other wildlife, pollute the landscape and watercourses with rotting carcasses, impair the wilderness character of the project area and the aesthetic experience of wilderness values, generate emissions that contribute to climate change and air pollution, and generate noise pollution. These issues were insufficiently considered by USFS.

84.     Like the agency review in *Davis v. Mineta*, USFS's reliance on the incomplete or vague information in the Administrative Record is inadequate to support its conclusion that the Aerial Shooting will have no significant effects on the environment. 302 F.3d at 1118. Further, record evidence indicates that foreseeable impacts of the Aerial Shooting would be significant. Compliance with NEPA therefore requires Respondents to complete at least an EA to examine whether an EIS is necessary. Accordingly, Respondents violated NEPA and should be prohibited from undertaking any further Aerial Shootings until these requirements have been met.

**ii.     The Aerial Shooting does not qualify for a categorical exclusion.**

85.     NEPA provides that agencies may exclude certain categories of actions from environmental review or apply exclusions defined by other agencies. 42 U.S.C. §§ 4336(a)(2), 4336c. These are "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement." 40 C.F.R. §§ 1501.4(a), 1508.1(d). If an agency determines a categorical exclusion applies to a proposed action, it must also determine whether extraordinary circumstances are present that would cause a normally excluded action to have a significant effect. 40 C.F.R. § 1501.4 (b). "If an extraordinary circumstance is present, the agency nevertheless may categorically exclude the proposed action if the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects." *Id*. If an action cannot be excluded, "the agency shall prepare an environmental assessment or environmental impact statement, as appropriate." *Id*.

86.     The USFS has issued NEPA guidance adopting categorical exclusions established by the USDA. *See* 7 C.F.R. § 1b.3; 36 C.F.R. § 220.6(d), (e); Forest Service Handbook 1909-15, Chapter 30 (Jan. 16, 2020).[12] APHIS has also established categorical exclusions. 7 C.F.R. § 372.5. [A.R. 5895].

87.     In evaluating whether an agency has properly applied a categorical exclusion, courts afford the agency some measure of deference. *Citizens' Comm. to Save Our Canyons v. United States Forest Serv.*, 297 F.3d 1012, 1024 (10th Cir. 2002). "Courts have treated categorical exclusions . . . as agency regulations because the categorical exclusions 'are published in the Federal Register, and [are] subject to public comment and review.'" *Id.* at 1023, n. 8; *see also* 40 C.F.R. § 1507.3(b). However, "[a]n agency's interpretation of its own regulations must be rejected when plainly erroneous or inconsistent with the regulation." *Sierra Club v. United States DOE*, 255 F. Supp. 2d 1177, 1183 (D. Colo. 2002) (quoting *Mission Group Kan. v. Riley*, 146 F.3d 775, 780 (10th Cir. 1998)) (internal quotations omitted).

88.     Here, the Decision Memo asserts that the Aerial Shooting may be excluded from NEPA review under the categorical exclusions for (1) civil and criminal enforcement and investigative activities under 7 C.F.R. § 1b.3(a)(5); (2) timber stand and/or wildlife habitat improvement activities that do use herbicides or require more than 1 mile of road construction under 36 C.F.R. § 220.6(e)(6); and (3) orders issued pursuant to 36 CFR § 261 related to "[p]rohibitions to provide short-term resource protection or to protect public health and safety" under 36 C.F.R. § 220.6(d)(1). [A.R. 5906-07]. In addition, APHIS maintains that the action is

---

[12] This guidance document was omitted from the record but is available on the USFS website, available online at: Forest Service NEPA Procedures and Guidance, https://www.fs.usda.gov/emc/nepa/nepa_procedures/.

excluded as a "routine measure" pursuant to 7 C.F.R. § 372.5(c)(1)(I). [A.R. 5895]. None of these categorical exclusions applies to the Aerial Shooting.

89.     First, if the Court were to accept Respondents' argument that the Gila Cattle are not "unauthorized livestock" as referenced in 36 C.F.R. § 261.7, then the USDA exclusion for civil and criminal enforcement and investigative activities is inapplicable. 7 C.F.R. § 1b.3(a)(5).[13] In fact, USFS contends the Aerial Shooting is a resource management measure aimed at protecting endangered species habitat from degradation, which is not a law enforcement action. [A.R. 5903-05]. By USFS's own admission, and Respondents' position in this lawsuit, this categorical exclusion does not apply.

90.     Second, the exclusion for "timber stand and/or wildlife habitat improvement activities" is inapplicable because the Aerial Shooting is nothing like the activities covered by this category. This category applies to timber and forest management activities, including prescribed burning, thinning and brush control, and "girdling trees to create snags."[14] 36 C.F.R. § 220.6(e)(6).

91.     Unlike these activities, the Aerial Shooting is not an established vegetation treatment or forestry practice. Each of the listed examples, while not exhaustive, is a well-vetted, standard forestry practices for reducing fire risk and/or maintaining forest lands. As such, the methods and risks are well-known and foreseeable. By contrast, the Aerial Shooting is a novel practice, used only once before in 2022 prior to the Decision Memo, with no supporting research and largely unknown impacts and risks. It stretches reason to equate shooting cattle from a

---

[13] By contrast, if the Gila Cattle are "unauthorized livestock," then USFS should be required to follow the impoundment procedure set forth in 36 C.F.R. § 262.10.

[14] Girdling is the process of removing inner and outer tree bark to kill a tree.  The dead tree is known as a "snag."

helicopter with activities such as prescribed burning, thinning underbrush, or strategically killing certain trees. This exception is also misapplied.

92.     The third exclusion USFS improperly relies upon concerns orders issued pursuant to 36 CFR § 261, which addresses prohibitions to provide short-term resource protection or to protect public health and safety. 36 C.F.R. § 220.6(d)(1). It does not apply. Although this exception would likely apply to an impoundment notice or the closure order to protect public safety during the Aerial Shooting, it would not apply to the Aerial Shooting itself. The Aerial Shooting is not itself an "order," and it is not issued to provide "short-term resource protection" or protect public health and safety. This exclusion clearly does not apply.

93.     Finally, APHIS's proposal to apply the categorical exclusion for "routine measures" to the Aerial Shooting is baffling. [A.R. 5895]. The Aerial Shooting of cattle under these circumstances is anything but "routine." While this exception applies to "removals" and "target-specific devices," it is also expressly limited to actions that are "localized" and "limited in terms of quantity," that "will not cause contaminants to enter water bodies [or] wetlands," or adversely impact protected species. 7 C.F.R. § 372.5(c)(1)(I).

94.     Here, the Aerial Shooting has occurred twice – once in 2022 and once in 2023 – and may have to be repeated year after year to eliminate a non-specific number of Gila Cattle that are estimated to live in the Gila Wilderness. [A.R. 5904]. The Aerial Shooting is also likely to cause cattle carcasses to contaminate water bodies and wetlands. In addition, as discussed above, it is highly probable that low-flying helicopters and impacts of carcasses will disturb and adversely impact endangered species. As such, the action does not meet the criteria for this exception.

95.     Moreover, APHIS's assertion that the proposed action "does not have unknown or uncertain risks, or uncertain effects and the effects are not highly controversial" is plainly wrong.

[A.R. 5895]. The Administrative Record lacks any studies that have examined the risks and impacts of aerial shooting cattle from helicopters. The Record does show, however, that prior efforts to use helicopters to manage cattle have led to unexpected stampedes, scattering cattle deeper into the forest, and caused rotting carcasses to end up in streams. [A.R. 5836, 5320]. It is also unreasonable to claim that the effects of the Aerial Shooting are not highly controversial when, among other things, the NMLB has publicly declared that the Aerial Shooting constitutes animal cruelty in violation of New Mexico law. The controversy surrounding the Aerial Shooting is also evinced by the multiple lawsuits filed, as well as letters from Members of Congress, cattle growers, and state officials such as the Governor of New Mexico. [*See e.g*., A.R. 5142-43, 5592-93, 5805]. USFS even created a specified "talking points" memo to guide its discussions with Members of Congress. [A.R. 5527]. Accordingly, the "routine measure" exception is also inapplicable.

96.      Because none of the cited categorical exclusions applies, the Decision should be set aside and Respondents should be ordered to comply with NEPA.

### iii.      Extraordinary circumstances exist that invalidate USFS's finding of a categorical exclusion.

97.      Forest Service Regulations enumerate seven "[r]esource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS." 36 C.F.R. § 220.6(b)(1). These include the presence of (1) federally protected species or habitat, (2) flood plains and wetlands, (3) designated wilderness, (4) roadless area or potential wilderness, (5) Research natural areas, (6) Native American cultural sites, and (7) archaeological sites or historic areas. *Id*. at § 220.6(b)(1)(i)-(vii). The regulation further provides:

> The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed

action on these resource conditions that determines whether extraordinary circumstances exist.

*Id*.

98.     The Decision Memo asserts that no extraordinary circumstances exist. [A.R. 5907-10]. This finding ignores several of the impacts discussed above. In particular, the Aerial Shooting is likely to impact each of the first three resource conditions identified by the regulation. (1) federally protected species or habitat, (2) flood plains and wetlands, (3) designated wilderness.

99.     The Aerial shooting would impact federally protected species or habitats. Specifically, as discussed above, the Aerial Shooting may disturb Mexican Spotted Owls and multiple aquatic species. The use of loud, low-flying helicopters may deter owls and other protected species from using the project area, while the possibility that cattle carcasses will be left within or near watercourses may cause pollution that adversely impacts aquatic species. Despite the Decision Memo's claim that there will be no adverse effects, the ultimate impacts of the Aerial Shooting are largely unstudied and unknown. Respondents' position is conjecture.

100.    Similarly, the Aerial Shooting will impact flood plains and wetlands. The project area clearly includes rivers and streams, including the Gila River which is part of the Colorado River system that provides drinking water to millions of people. The project may cause decomposing cattle carcasses to impact these streams with a variety of pollutants. [A.R. 6041]. The Gila River, Turkey Creek, and Little Creek are already "impaired waters" pursuant to section 303(d) of the Clean Water Act. 33 U.S.C. § 1313. [A.R. 5901]. The Aerial Shooting may cause additional pollution that will further impair these water bodies.

101.    As discussed above, the Aerial Shooting will also impact the Gila Wilderness. To maintain the wilderness character of such lands, Congress expressly prohibited aircraft or vehicles such as the helicopter that would be used in the Aerial Shooting unless "necessary to meet

minimum requirements for the administration of the area for the purpose of [the Wilderness Act]." *Id*. at §1133(c). Respondents can show no need for the Aerial Shooting that would override the restrictions in the Wilderness Act, particularly given the predomination of wilderness values where USFS has alternative management decisions. USFS Forest Service Manual 2320, Policy 2320.3.

102.    There is no question that the proposed activity will adversely impact designated wilderness. [A.R. 5956-57]. Respondents attempt to minimize these effects by focusing almost exclusively on the expected benefit of eliminating adverse impacts of the Gila Cattle. However, NEPA requires agencies to consider the positive and negative impacts, as well as the short- and long-term benefits of the proposed action. The possibility of beneficial outcomes does not eliminate the need to examine the negative impacts as to protected species, water quality, and significantly impaired wilderness values that are likely to occur as well. These are extraordinary circumstances, which, if there were an applicable categorical exception, would nevertheless preclude its applicability to the Aerial Shooting. The Tenth Circuit has held that "[p]artial fulfillment of NEPA's requirements . . . is not enough." *Catron*, 75 F.3d at 1437. In this case, Respondents' partial evaluation of the relevant factors and issues is insufficient to satisfy the requirements of NEPA for the Aerial Shooting.

### iv.    Respondents' scoping process failed to comply with NEPA.

103.    Finally, Respondents misused the scoping process, thereby misleading the public and denying citizens, including Petitioners, the opportunity to comment at all or fully on the proposed action. The scoping process is normally the first step in preparation of an EIS: "Generally, [a]gencies shall use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying the significant issues and eliminating from further study non-significant issues." 40 C.F.R. § 1501.9.

104.    When USFS initiated the November scoping process, many people interpreted this as a first step to share information and fully expected that a proposed action, with a public notice and comment period would follow. [*See* A.R. 6017-19]. This is evident in letters from Catron County officials and the Grant County Soil and Water Conservation District, both of whom wrote to the Forest Service to initiate interagency coordination on the anticipated EIS. [A.R. 4444, 4554-55]. But this never happened. Instead of proceeding with a NEPA compliant process, Respondents reversed course and issued a unilateral decision, claiming categorical exceptions and abandoning their obligations to conduct an open public process in the interest of informed decision-making. NEPA is a procedural statute but its procedures were not followed here.

**C.  Petitioners have standing to challenge the Aerial Shooting.**

105.    Standing is an element of the case or controversy requirement under the Constitution. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Petitioners bear the burden of establishing standing. *See Rocky Mt. Peace & Just. Ctr. v. United States Fish & Wildlife Serv.*, 40 F.4th 1133, 1151 (10th Cir. 2022).

106.    It is well-established that an organization may demonstrate standing in either of two ways: (1) by establishing that it was directly injured as an organization or (2) or by establishing standing to sue on behalf of its members. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An organization has standing to sue on behalf of its members if it shows that:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Bernhardt*, 923 F.3d at 840. For a member to have standing, there must be injury-in-fact, causation, and redressability. *See TransUnion LLC v. Ramirez*, 594 U.S. ___, 141 S. Ct. 2190, 2203 (2021).

107.    In addition, "the Supreme Court and [the Tenth Circuit] have repeatedly 'held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" *Citizens for Constitutional Integrity v. United States*, 57 F.4th 750, 760 (10th Cir. 2023) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000)).

108.    Here, Petitioners NMCGA and HFA are organizations that have standing to challenge the Aerial Shooting on behalf of their members. NMCGA has standing because its members would have standing. Its members have standing because of their economic interests associated with the likelihood that their branded cattle may have wandered into the Wilderness and be shot among the Gila Cattle. [Exhibit A, Declaration of Loren Patterson at ¶¶ 6-14]. Its members also have standing because of their interests in nature, the environment, and the effects dead and decomposing cattle will have on them as they go into the Gila Wilderness. [*Id.* at ¶¶ 15-22].

109.    HFA has organizational standing for similar reasons. HFA member Jay Kinsella lives within two miles of the Gila Wilderness and frequently recreates there to enjoy open space and wilderness, and to observe animals in their natural habitat. [Exhibit D, Declaration of J. Kinsella at ¶¶ 7-8, 11, 18]. HFA member Barbara Thompson lives close to the wilderness also, with plans to return this year. [*See generally* Exhibit F, Declaration of Barbara Thompson]. As HFA members, Mr. Kinsella and Ms. Thompson support animal protection and campaigns against animal cruelty. [Ex. D at ¶ 5; Ex. F at ¶ 4]. The Aerial Shooting impairs Mr. Kinsella's aesthetic enjoyment of the wilderness and his interest in the humane treatment of animals by disrupting the wilderness solitude with helicopter noise and other manifestations of cruelty to animals, including

gunfire and rotting carcasses, and by disturbing native wildlife. [*Id.* at ¶¶ 11-20]. HFA members were also injured by Respondents' failure to comply with NEPA, which deprived them of the opportunity to comment on the proposed action and the consolation of knowing that any harm to animals was carefully evaluated. [Ex. D at ¶¶ 21-25; Ex. F at ¶¶ 19-22; Exhibit E, Declaration of Bradley Miller at ¶¶ 7-8, 15-19].

110.    Further, the interests advanced by this litigation are germane to NMCGA and HFA's organizational purposes. NMCGA has pursued its claims in furtherance of its organizational purpose to advance the interests of the New Mexico cattle industry, as well as to encourage sound environmental policies that benefit cattle ranchers and their cattle. [Ex. A at ¶ 3]. Likewise, HFA is dedicated to the organizational mission of protecting farmed animals, including cattle, which it furthers through legislation, anti-cruelty investigations, legal action, education, and direct care for abused animals. [Ex. E at ¶¶ 4-5].

111.    Additionally, the relief requested by NMCGA and HFA does not require the participation of their individual members. The Court's ability to prevent the Aerial Shooting stands to benefit numerous members of both organizations without the individual involvement of their members in this lawsuit or the proposed remedy.

112.    Individual petitioners Spur Lake, Shirley, and Campbell also have standing. An individual plaintiff has standing if:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bernhardt*, 923 F.3d at 840. Spur Lake, Shirley, and Campbell each have standing because they have suffered, and/or are likely to suffer direct harm to their personal interests as a result of the Aerial Shooting. Spur Lake operates a ranch bordering the Gila Wilderness and has cattle who

graze in the wilderness under a grazing permit. [Exhibit B, Declaration of Nelson Shirley at ¶¶ 2-7]. Its cattle may reasonably have wandered off of its grazing allotment due to conditions outside its control such as downed fences or gates left open by hunters, hikers, and campers. [*Id.* at ¶¶ 8].

113.    In addition to his interests as president of Spur Lake, Mr. Shirley individually has standing because he regularly travels into the Gila National Forest and the Gila Wilderness for recreational and aesthetic reasons. [*Id.* at ¶¶ 18-24]. In this capacity, Mr. Shirley has been, and will be harmed by the Aerial Shooting as dead cattle rot and attract various predators and scavengers. The Aerial Shooting will thus directly impact Mr. Shirley's experience in the Gila National Forest. [*Id.*].

114.    Finally, Mr. Campbell has standing because he owns a campground adjacent to the Gila National Forest. [Exhibit C, Declaration of Alan Campbell at ¶ 2]. His campground has experienced a loss of customers directly caused by the Aerial Shooting. [*Id.* at ¶¶ 3-14]. In fact, multiple campers and hikers who use his campground expressly noted the presence of dead cattle in the forest as a reason for dissatisfaction with their experience. [*Id.* at ¶¶ 7-8]. In this way, Mr. Campbell has been directly harmed by the Aerial Shooting and will continue to suffer harm if Aerial Shootings continue. [*Id.* at ¶¶ 11-12].

115.    There is no question that Respondents' actions in approving and implementing the Aerial Shooting have directly caused the alleged injuries to these Petitioners and their members. There is also no question that these injuries are redressable by means of judicial relief enjoining Respondents to cease their unlawful actions and comply with existing statutes and regulations. Therefore, Petitioners have alleged sufficient facts to establish standing to assert the claims in this case.

## V.  CONCLUSION

For the foregoing reasons, Petitioners ask the Court to set aside the Decision Memo, declare that the Aerial Shooting violates the APA and NEPA, and permanently enjoin Respondents from proceeding with the Aerial Shooting on this basis, and for any and all other relief, in law or equity, to which they are entitled.

Respectfully submitted,

/s/ Daniel D. McGuire
Deana M. Bennett
Spencer L. Edelman
MODRALL, SPERLING, ROEHL, HARRIS &
SISK, P.A.
500 4th St. NW, Suite 1000
Albuquerque, NM 87102
Telephone: (505) 848-1800
Facsimile: (505) 848-9710
deana.bennett@modrall.com
spencer.edelman@modrall.com

and

Daniel D. McGuire (admitted *pro hac vice*)
FISHERBROYLES LLP
450 S. Denton Tap Rd.
Suite 2211
Coppell, TX 75019
Telephone: (214) 295-7272
Facsimile: (214) 295-7252
dan.mcguire@fisherbroyles.com

*Counsel for Petitioners New Mexico Cattle Growers' Association, Spur Lake Cattle Co., and Nelson Shirley*

/s/ Steven S. Scholl
Steven S. Scholl
DIXON, SCHOLL, CARRILLO, P.A.
6700 Jefferson NE
Building B, Suite 1
Albuquerque, NM 87109
Telephone: (505) 244-3890
Facsimile: (505) 244-3889
sscholl@dsc-law.com

*Counsel for Petitioner Allen Campbell*

/s/ Jessica L. Blome
Gretchen Elsner
ELSNER LAW & POLICY, LLC
314 S. Guadalupe St., Suite 123
Santa Fe, New Mexico 87501
Telephone: (505) 303-0980
Gretchen@ElsnerLaw.org

and

Jessica L. Blome (admitted *pro hac vice*)
GREENFIRE LAW PC
2748 Adeline, Suite A
Berkeley, CA 94703
Telephone: (510) 900-9502, ext. 703
jblome@greenfirelaw.com

*Counsel for Petitioner Humane Farming Association*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, a true and correct copy of the foregoing document has been served on all counsel of record via the Court's CM/ECF service.

*/s/ Daniel D. McGuire*
Daniel D. McGuire

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the body of this brief from the Introduction through Conclusion, including footnotes, contains 13,811 words.

*/s/ Daniel D. McGuire*
Daniel D. McGuire