# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

NEW MEXICO CATTLE GROWERS'
ASSOCIATION; SPUR LAKE CATTLE
COMPANY; NELSON SHIRLEY,
individually; ALLEN CAMPBELL,
individually and HUMANE FARMING
ASSOCIATION,

        Petitioners,

vs.                                                                No. CIV 23-0150 JB/GBW

UNITED STATES FOREST SERVICE;
ANIMAL AND PLANT HEALTH
INSPECTION SERVICE; CAMILLE
HOWES, in her official capacity as Supervisor
of the Gila National Forest; TOM VILSACK,
in his official capacity as Secretary of the
United States Department of Agriculture;
RANDY MOORE, in his official capacity as
Chief of the U.S. Forest Service; MICHIKO
MARTIN, in her official capacity as
Southwestern Regional Forester; HENRY
PROVENCIO, in his official capacity as
District Ranger for the Wilderness Ranger
District, Gila National Forest; JANET
BUCKNALL, in her official capacity as
Deputy Administrator of the Animal and Plant
Health Inspection Service; and KEITH
WEHNER, in his official capacity as Western
Regional Director, Animal and Plant Health
Inspection Service,

        Respondents,

CENTER FOR BIOLOGICAL DIVERSITY,

        Respondent-Intervenor.

<u>**MEMORANDUM OPINION AND ORDER**</u>[1]

**THIS MATTER** comes before the Court on: (i) the proposed-intervenor's Motion to Intervene, filed February 28, 2023 (Doc. 26)("Motion to Intervene"); and (ii) the Petitioners' Opening Brief on the Merits, filed August 31, 2023 (Doc. 50)("Petitioners' Merits Brief"). The Court held hearings on May 22, 2023, <u>see</u> Clerk's Minutes at 1, filed May 22, 2023 (Doc. 42)("May 22, 2023, Hearing Minutes"), and on February 1, 2024, <u>see</u> Clerk's Minutes at 1, filed February 1, 2024 (Doc. 65)("February 1, 2024, Meeting Minutes"). The primary issues are: (i) whether the Court should allow proposed-intervenor Center for Biological Diversity ("Biological Center") to intervene in this lawsuit concerning the United States Forest Service ("Forest Service") and United States Animal Plant and Health Inspection Service's February, 2023, operations in New Mexico's Gila Wilderness involving the shooting of the forest's wild cows ("Gila Cows") from a helicopter ("Aerial Shooting"), where the Biological Center and the United States both support the Aerial Shooting; (ii) whether the Petitioners have standing to pursue their claims, where the Petitioners are a cattle ranchers association, a private ranching company, an individual cattle rancher, a campground owner, and an animal rights group; (iii) whether the Respondents violate the terms of A Stipulation of Dismissal, filed June 30, 2022 (Doc. 39 in No. CIV 22-0086-JB/CG (D.N.M.))("June, 2022, Stipulation"), which requires seventy-five days of notice before beginning the Aerial Shooting; (iv) whether the Respondents violate the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370, ("NEPA"), because the Forest Service did

---

[1]On September, 28, 2023 the Court entered an Order granting the Motion to Intervene, filed February 28, 2023 (Doc. 26). <u>See</u> Order at 1-11, filed September 28, 2023 (Doc. 57)("Order"). In the Order, the Court stated that it would "issue . . . a Memorandum Opinion at a later date more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion.

not prepare an Environmental Assessment ("EA") or an Environmental Impact Statement ("EIS") to evaluate the Aerial Shooting's environmental effects; (v) whether the Respondents violate the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), by exceeding their statutory authority in conducting the Aerial Shooting, where other statutes limit helicopter use in Congressionally designated wilderness areas, see Wilderness Act, 16 U.S.C. § 1133(c), and Forest Service regulations require the Forest Service to impound "unauthorized livestock" before killing them, 36 C.F.R. § 262.10; and (vi) whether the Respondents violate the Forest Service's impoundment procedures in 36 C.F.R. § 262.10, and thus violate the APA -- by conducting an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law, 5 U.S.C. § 706 -- where the targeted cows are not raised for human use or pleasure. The Court concludes that: (i) the Biological Center may intervene, because its interest in this case -- promotion and protection of the Gila Wilderness' biological diversity -- may be impaired if it is not allowed to intervene and the government parties -- the Forest Service and the Animal and Plant Health Inspection Service ("Animal Inspection Service") -- will not represent adequately the Biological Center's interest; (ii) Petitioners New Mexico Cattle Growers' Association ("Cattle Growers") and Spur Lake Cattle Company ("Spur Lake") have standing to pursue the First Cause of Action for Violation of Court Stipulation ("Count I"), see Plaintiffs' Complaint for Declaratory and Injunctive Relief ¶¶ 76-82, at 20-21, filed February 21, 2023 (Doc. 1)("Complaint"), because those three Petitioners are parties to the June, 2022, Stipulation; (iii) Petitioners Nelson Shirley, Humane Farming Association ("Humane Farming"), and Allen Campbell do not have standing to pursue Count I, because those two Petitioners are not parties to the June, 2022, Stipulation; (iv) Petitioners Cattle Growers, Spur Lake, Shirley, and Campbell have standing to pursue the Fourth Cause of Action for Failure to

Prepare EA or EIS (APA and NEPA Violation), <u>see</u> Complaint ¶¶ 97-113, at 24-29, because the Cattle Growers, Spur Lake, Shirley, and Campbell allege cognizable environmental injuries and the organizational Petitioners' injuries are germane to their organizational purposes; (v) Humane Farming does not have standing to pursue Count IV, because its cognizable injuries are not germane to its organizational purpose; (vi) all Petitioners have standing to pursue the Second Cause of Action for Acting in Excess of Statutory Authority (APA Violation)("Count II"), <u>see</u> Complaint ¶¶ 83-88, at 21-23, and the Third Cause of Action for Acting in Violation of Regulation (APA Violation)("Count III"), <u>see</u> Complaint ¶¶ 89-96, at 23-24, because each Petitioner alleges cognizable injuries that are within the relevant provisions' zones-of-interests; (vii) the Respondents do not violate the terms of the June, 2022, Stipulation, because they notified the Cattle Growers, Spur Lake, and Shirley about the Aerial Shooting by November 22, 2022, which is more than seventy-five days before the Aerial Shooting began; (viii) the Respondents do not violate the NEPA, because the Aerial Shooting is excluded categorically from NEPA's requirements to prepare an EA or and EIS; (ix) the Aerial Shooting does not exceed the Respondents' statutory authority, because the Respondents are authorized to make rules and regulations to preserve the Gila Wilderness; and (x) the Aerial Shooting does not violate Forest Service's impoundment regulations under 36 C.F.R. § 262.10, because the Gila Cows are not unauthorized livestock.

## FACTUAL BACKGROUND

The Court divides its factual background into three sections. First, the Court introduces the parties. Second, the Court describes how the Respondents developed the Aerial Shooting. Third, the Court discusses the Petitioners' alleged injuries.

1.    **The Parties.**

Petitioner Cattle Growers "is a member-driven organization with more than 1,200 members" that

> has several objectives, including (a) to advance and protect the interests of the New Mexico cattle industry; (b) solve problems facing the cattle industry; (c) promote the well-being of the industry; (d) provide an official and united voice on issues of importance to cattle ranchers, producers, and feeders; and (e) to create and maintain a legal and regulatory environment that allows ranchers, producers, and feeders to prosper economically.

Declaration of Loren Patterson ¶ 3, at 1 (dated February 21, 2023), filed August 31, 2023 (Doc. 50-1)("Patterson Decl."). With members in Grant and Catron Counties, the Cattle Growers "strongly supports environmental policies that protect the environment and the wise use of natural resources, including national forest areas such as the Gila Wilderness and the Gila River." Patterson Decl. ¶¶ 3-4, at 1-2. Petitioner Spur Lake "is a cow, calf, and yearling operation" that "owns and/or operates several ranches along the New Mexico and Arizona Border," and has Forest Service permits on three Ranger Districts in the Gila and Apache Sitgreaves National Forests. Declaration of Nelson Shirley ¶ 2, at 1 (dated February 20, 2023), filed August 31, 2023 (Doc. 50-2)("Shirley Decl."). Petitioner Nelson Shirley owns and operates Spur Lake, manages a ranch that shares an eleven-mile border with the Gila Wilderness, has a grazing permit in the Gila Forest, and is a Cattle Growers member. See Shirley Decl. ¶¶ 2-4, at 1. Petitioner Allen Campbell owns and operates the Gila Hot Springs Campground, which "provides tourists, hikers, campers, and many other people who enjoy nature and the outdoors, with a place to sleep, eat, and rest before, during, and after their recreational activities in the Gila Wilderness." Declaration of Allen Campbell ¶ 2, at 1 (dated February 20, 2023), filed August 31, 2023 (Doc. 50-3)("Campbell Decl."). Petitioner Humane Farming "is a registered, non-profit organization headquartered in San Rafael,

California," whose "280,000 members and supporters, including those living in New Mexico, work to protect farmed animals through their support of groundbreaking legislation, anti-cruelty investigations, legal action, and direct care for abused animals." Declaration of Bradley Miller ¶ 4, at 1 (dated August 29, 2023), filed August 31, 2023 (Doc. 50-5)("Miller Decl."). Humane Farming also owns and operates the Suwanna Ranch, which is "the world's largest farmed animal refuge [that] provides more than seven square miles of land for rescued victims of animal cruelty from various states, primarily in the Western region of the United States." Miller Decl. ¶ 4, at 1-2.

Respondent Forest Service "is an agency of the U.S. Department of Agriculture that administers the Nation's national forests and grasslands" and "issued the Decision Memo authorizing the aerial shooting of cattle beginning on February 23, 2023." Complaint ¶ 12, at 6. Respondent Animal Inspection Service "is an agency of the U.S. Department of Agriculture that purports to, among other things, protect the health of U.S. agriculture and natural resources against invasive pests and diseases, regulate[] genetically engineered crops, [and] administer[] the Animal Welfare Act[, 7 U.S.C. §§ 1231-2160]." Complaint ¶ 13, at 6. The Animal Inspection Service "has been directed by the USFS to carry out the Aerial Shooting." Complaint ¶ 13, at 6. Respondent Camille Howes "is the Forest Supervisor for the Gila National Forest and an employee of the United States Forest Service," and she "is responsible for issuing the applicable agency decision at issue in this lawsuit." Complaint ¶ 14, at 6. Respondent Tom Vilsack is the Secretary of the United States Department of Agriculture, and, "[i]n that capacity, he oversees the" Forest Service and Animal Inspection Service. Complaint ¶ 15, at 6. Respondent Michiko Martin is the Forest Service Regional Forester for the Southwest Region, who "oversees the activities on the Gila National Forest, including in the Wilderness District." Complaint ¶ 16, at 6. Respondent Henry Provencio is the District Ranger for the Wilderness Ranger District, where the Aerial

Shooting took place.  <u>See</u> Complaint ¶ 17, at 6.  Respondent Janet Bucknall is the Administrator of the Animal Inspection Service, and Respondent Keith Wehner is the Western Regional Administrator of the Animal Inspection Service.  <u>See</u> Complaint ¶¶ 18-19, at 6-7.  Respondents Howes, Vilsack, Martin, Provencio, Bucknall, and Wehner are each sued in their official capacities.  <u>See</u> Complaint ¶¶ 14-19, at 6-7.

Proposed respondent-intervenor Biological Center "is a non-profit 501(c)(3) public-interest, conservation organization with more than 1.7 million members and online activists, based in Tucson, Arizona, and dedicated to the protection of endangered species and wild places." Declaration of Todd Schulke ¶ 4, at 2 (dated February 27, 2023), filed February 28, 2023 (Doc. 26-1)("Schulke Decl.").  Founded in Silver City, New Mexico, in 1989 and originally called the Greater Gila Biodiversity Project, <u>see</u> Schulke Decl.  ¶¶ 3,5, at 2, the Biological Center "work[s] to secure a future for all species, great and small, hovering on the brink of extinction" through "science, law and creative media, with a focus on protecting the lands, waters and climate that species need to survive," Schulke Decl. ¶ 4, at 1.  "The [Biological] Center is actively involved in species and habitat protection and, as of December 2022, has 84,324 members including 1,473 members in New Mexico."  Motion to Intervene at 2-3, filed February 28, 2023 (Doc. 26)("Motion to Intervene").

### 2.    <u>The Aerial Shooting</u>.

The Court first describes the Gila Cows' history in the Gila Wilderness and the Forest Service's efforts to remove the Gila Cows over the last several decades before the Aerial Shooting. Second, the Court summarizes prior litigation related to the Forest Service's efforts to remove the Gila Cows.  Third, the Court details the Aerial Shooting's scoping process.  Fourth, the Court describes the Forest Service's final decision and supporting materials related to the Aerial

Shooting.  Fifth, the Court summarizes the Animal Inspection Service's involvement in the Aerial Shooting.

### a.    The Gila Wilderness and the Gila Cows.

Comprising approximately 560,000 acres within New Mexico's Gila National Forest, the Gila Wilderness traces its official roots back to June 3, 1924, when Aldo Leopold, a Forest Service employee, encouraged the Forest Service to make the area the nation's first designated wilderness in the National Forest System.  See U.S. Forest Service, History of the Gila Wilderness, available at https://www.fs.usda.gov/detail/gila/learning/history-culture/?cid=stelprdb5038907 (last visited October 2, 2024)("Gila Wilderness History").  In 1964, President Lyndon B. Johnson signed the Wilderness Act, 16 U.S.C. §§ 1131-36, into law and established the Gila Wilderness as a federally designated wilderness area.  See National Park Service, Gila Wilderness History: Law and Policy, available at https://www.nps.gov/subjects/wilderness/law-and-policy.htm (last visited October 2, 2024).  The Wilderness Act establishes a National Wilderness Preservation System, which:

> shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness.

16 U.S.C. § 1131(a).  Defining "wilderness," the Wilderness Act provides:

> A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this Act an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an

unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).

In the mid-1970s, a grazing permittee[2] abandoned his cattle on a plot of land -- the Redstone Allotment -- in the Gila Wilderness.  See Gila National Forest Wilderness Ranger District, U.S. Forest Service Decision Memo: Gila Wilderness Feral Cattle Removal at 1 (dated February 16, 2023)(AR[3] 005899)("Decision Memo."); Gila National Forest, U.S. Forest Service, Gila Wilderness Livestock Removal at 1 (dated November, 2022)(AR 004262)("November, 2022, Fact Sheet").  The Redstone Allotment lies at the northern edge of the Silver City Ranger District, along the border of the Wilderness Ranger District:

---

[2]"Grazing permitees [sic] are individuals or organizations who have acquired the privilege to graze livestock on National Forest or National Grasslands. The USDA Forest Service supports livestock grazing on National Forest System lands. We believe that grazing on these lands, if responsibly done, provides a valuable resource to the livestock owners, as well as the American people."  U.S. Forest Service, Resource Management, available at https://www.fs.usda.gov/resources/gila/landmanagement/resourcemanagement (last visited October 2, 2024).

[3]"AR" denotes citations to the Administrative Records, which the Respondents lodged on July 14, 2023.  See Federal Respondents' Notice of Lodging Administrative Records, filed July 14, 2023 (Doc. 44).



Gila National Forest Grazing Allotment Map, U.S. Forest Service, available at

https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5035820.pdf (last visited October

2, 2024).



Silver City Ranger District Map with Range Allotments, U.S. Forest Service, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd952855.pdf (last visited October 2, 2024).  The abandoned cows "have not been husbanded, cared for by private owners, or kept or raised on a ranch for several generations, and are thus not domesticated."  Decision Memo. at 1 (AR 005899).  In the 1990s, the Gila Forest issued a new grazing permit on the Redstone Allotment to manage the abandoned cows' progeny.  See Decision Memo. at 1 (AR 005899).  In 1996, after the Forest Service suspended his grazing permit, the new permittee removed several hundred cattle from the Gila Wilderness.  By 1998, "even after those efforts, a population of cattle remained and were left unclaimed, roaming freely in the Wilderness."  Decision Memo. at 1 (AR 005899).

### b.    Prior Relevant Litigation.

In February, 2022, the Forest Service contracted the Animal Inspection Service to remove the Gila Cows with "a sharpshooter in a hovering helicopter."  Federal Respondents' Response Brief on the Merits at 1, filed October 19, 2023 (Doc. 58)("Respondents' Merits Response").  The Cattle Growers, New Mexico Federal Lands Council, Spur Lake, and Double Spring Ranch, LLC

("2022 Litigation Petitioners") filed a lawsuit and moved for a temporary restraining order and a preliminary injunction to stop the February, 2022 shoot.  See New Mexico Cattle Growers' Association v. Vilsack, No. CIV 22-0086-JB-CG (D.N.M.), Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, filed February 9, 2022 (Doc. 7)("First TRO Motion").  The Court denied the First TRO Motion, see Order at 1, filed February 23, 2022 (Doc. 15 in No. CIV 22-0086-JB-CG (D.N.M.)), and Animal Inspection Service shot and killed sixty-five Gila Cows during several flights over the Gila Wilderness ("February, 2022, Aerial Shooting").  See Email from Kraig Glazer to Jeffrey Shearer, Re: Monday check-in at Gila NF officer at 1 (dated February 14, 2022)(AR 003985).  The June, 2022, Stipulation") agrees that "any [] aerial lethal removal operations on or before March 1, 2024 would be preceded by at least 75 days' notice to the Petitioners and also to the public."  June, 2022, Stipulation at 1.

<blockquote>c.     The February, 2023, Aerial Shooting Scoping Period.</blockquote>

After the June, 2022, Stipulation, the Forest Service begins planning another shoot in the Gila Wilderness.  During this planning process, the Forest Service notifies the public about the agency's plan and receives comments about that plan.   The Court first discusses the Forest Service's public notice process.  Next, the Court describes some of the public comments.

<blockquote>i.     The Scoping Letter.</blockquote>

Despite the June, 2022, Stipulation's indication that "[n]o further operations are planned," June, 2022, Stipulation at 1, between November 17-22, 2022, the Forest Service disseminates a scoping[4] letter to the public and to the 2022 Litigation Petitioners that details plans for a similar

---

[4]43 C.F.R. § 46.235 provides:

Scoping is a process that continues throughout the planning and early stages of preparation of an environmental impact statement. Scoping is required for an

shooting operation in February, 2023.   See Declaration of Camille Howes ¶¶ 13-14 at 4-5

(executed February 22, 2023), filed February 22, 2023 (Doc. 17)("First Howes Decl."); Letter

from Camille Howes to Karen Budd-Falen, cc'd Andrew Smith, Emma Hamilton, Sean Duffy, at

1 (dated November 22, 2022)(AR 004350)("Petitioners Notification Letter"); November 17, 2022

Scoping Letter at 1-3 (AR 004288-90)("Scoping Letter").   Providing context for the second

shooting, the Forest Service states: "From 1998 to [November, 2022], the [Gila] Forest has issued

nine gather contracts that resulted in the removal of an additional 211 cattle," Scoping Letter at 1

(AR 004288), which cost the Gila National Forest approximately $335,000 compared to the

approximately $35,000 February, 2022 aerial shooting contract with the Animal Inspection

Service. Gila National Forest, U.S. Forest Service, Gila Wilderness Livestock Removal Fact Sheet

at 1 (AR 004262)("Fact Sheet").   Only one branded cow was captured pursuant to the Forest

Service's removal efforts during the previous several decades, November, 2022, Scoping Letter at

1 (AR 004288), and, as of November, 2022, there were "no active allotments in the Gila

---

environmental impact statement; scoping may be helpful during preparation of an
environmental assessment, but is not required (see paragraph 46.305(a) Public
involvement in the environmental assessment process). For an environmental
impact statement, bureaus must use scoping to engage State, local and tribal
governments and the public in the early identification of concerns, potential
impacts, relevant effects of past actions and possible alternative actions. Scoping is
an opportunity to introduce and explain the interdisciplinary approach and solicit
information as to additional disciplines that should be included. Scoping also
provides an opportunity to bring agencies and applicants together to lay the
groundwork for setting time limits, expediting reviews where possible, integrating
other environmental reviews, and identifying any major obstacles that could delay
the process.

43 C.F.R. §46.235.

Wilderness on the Wilderness Ranger District where [the Gila Cows] are located," Fact Sheet at 1 (AR 004262).

The November, 2022, Scoping Letter describes a "proposed action" using "a combination of lethal and non-lethal methods to remove the remaining population unbranded and unauthorized cattle from the Gila Wilderness," during which the Forest Service "would work with a private contractor to gather . . . and herd [the Gila Cows] to a corral located outside the wilderness . . . [where] the cattle would be inspected by a livestock brand inspector and delivered to the livestock auction in Belen, New Mexico." Scoping Letter at 2 (AR 004289). The November, 2022, Scoping Letter further provides:

> Based on experience, it should be noted that during attempts to remove cattle alive, a number[5] of cattle often need to be humanely euthanized before removal due to stress and injury sustained during gathering efforts. Cattle are herded using helicopter and riders on horseback with dogs. Some aggressive animals may be partially sedated. During lethal removal efforts, the Forest would work with USDA APHIS to conduct aerial shooting of cattle from a helicopter and shooting from the ground, very similar to operations conducted earlier in 2022.

November, 2022, Scoping Letter at 2 (AR 004289). The Forest Service identifies "several measures [that] would be implemented to address public safety and other considerations," including posting a public notice in accordance with Forest Service regulations (36 C.F.R § 262.10) requesting that individuals should remove their livestock[6] that may have

---

[5]The Forest Service estimates that fifty percent of these captured cattle "had to be euthanized before they could be herded or led out of the wilderness." November, 2022, Scoping Letter at 1 (AR 004288).

[6]Despite requesting that individuals remove their wandering livestock, the Forest Service notes: "No grazing is authorized within the area identified for the proposed action." November, 2022, Scoping Letter at 2.

wandered into the project area,[7] closing the project area during the proposed action, removing any carcasses left "within or adjacent to any waterbody or spring," and completing and approving a "minimum requirements decision guide . . . before using any methods otherwise prohibited under the 1964 Wilderness Act" before commencing the proposed action.  November, 2022, Scoping Letter at 2 (AR 004289).

To justify the proposed action, the Forest Service asserts that the Gila Cows cause "resource damage, especially to riparian areas,"[8] that "Forest staff have documented occurrences of over-grazing and stream bank tramping (and subsequent erosion)," and that the Gila Cows "have negatively impacted fish and wildlife habitats including habitats for several federally threatened

---

[7]The Forest Service identifies the project area as "the general area bounded by the confluence of the Gila River and Turkey Creek, upstream along the Gila River to Alum Mountain, west to Miller Spring Cabin.  And continuing west down the Turkey Creek drainage to the confluence with the Gila River."  November, 2022, Scoping Letter at 1 (AR 004288).  The November 2022, Scoping Letter also provides a map that identifies the "Cattle Removal Area" with a bright red line.  November, 2022, Scoping Letter at 4 (AR 004291).

[8]The United States Fish & Wildlife Service Glossary provides:

> Riparian areas are plant communities contiguous to and affected by surface and subsurface hydrologic features of perennial or intermittent lotic and lentic water bodies (rivers, streams, lakes, or drainage ways). Riparian areas are usually transitional between wetland and upland. Riparian areas have one or both of the following characteristics:
>
> 1. distinctly different vegetative species than adjacent areas.
>
> 2. species similar to adjacent areas but exhibiting more vigorous or robust growth forms.

Riparian, U.S. Fish & Wildlife Service, available at https://www.fws.gov/glossary/riparian (last visited October 4, 2024).  While lotic systems are "[a]quatic systems that consist of flowing fresh water," lentic systems are "[s]tanding freshwater systems."  Lentic v. Lotic: Aquatic Systems in the Park, U.S. National Park Service, available at https://www.nps.gov/blri/learn/nature/lentic-lotic.htm (last visited October 4, 2024).

and endangered species." Scoping Letter at 1-2 (AR 004288-89). The Forest Service identifies

three desired outcomes for the proposed action:

1.    Protect the habitat of aquatic and terrestrial wildlife, especially within riparian areas where resource degradation is occurring, to comply with the Endangered Species Act [of 1973, 16 U.S.C. §§ 1531-44] and the 1986 Forest Plan[9] standards related to threatened and endangered wildlife habitat;

_____

[9]Pursuant to 36 C.F.R. § 219, Gila National Forest is revising the 1986 Forest Plan, and, in July 2024, it published a final draft, which describes the role of the Gila National Forest's Forest Plan and its revision process:

There are three levels of planning for National Forest System lands. The first and broadest level of planning occurs at the national level through the United Stated Department of Agriculture Forest Service Strategic Plan. This is a 5-year plan that allows public transparency of the agency's goals, objectives, and accomplishments.

The second level of planning occurs at the level of the national forest and grassland administrative units through forest plans. Every national forest and grassland is required to have a forest plan by the National Forest Management Act of 1976, consistent with the provisions in the Act, the most current planning regulations, and agency policy direction. The Regional Forester approved the original Gila National Forest Plan in 1986. The 1986 plan was written following the guidance in the 1982 forest planning regulations and was amended 11 times to adjust for situations in specific projects or to reflect changes in economic, social, and ecological conditions, scientific information, and agency and public understanding. This plan revision follows the 2012 Planning Rule (36 Code of Federal Regulations [CFR] 219) and the associated 2015 agency directives (Forest Service Manual 1920 and Forest Service Handbook 1909.12).

This forest plan contains information and guidance for the third level of planning and decision making, which occurs at the project or activity level. All projects and activities must be consistent with the forest plan. With the direction laid out in this plan, it is anticipated that management can better adapt to changing conditions and achieve the vision for the Gila National Forest. It does not compel any agency action or guarantee specific outcomes. It does not list specific projects or prioritize the program of work, although it can inform priorities based on the direction it provides. An accompanying monitoring plan provides the feedback necessary to evaluate management effectiveness and identify future needs to change plan direction.

A forest plan guides and constrains Forest Service personnel, not the public. Any constraint on the public must be imposed by law, regulation, or through an

2.     Protect stream banks and spring areas from further trampling, erosion and sedimentation to comply with the Clean Water Act[, 33 U.S.C. §§ 1151, 1251-1387,] and the 1986 Forest Plan standards related to riparian areas;

3.     Restore the wilderness character of the Gila Wilderness by removing non-native species and alleviating the damage caused by over-grazing to comply with the Wilderness Act and the 1986 Forest Plan management direction related to the wilderness.

November, 2022, Scoping Letter at 2 (AR 004289). Finally, the Forest Service requests "comments and ideas on this proposal," noting that "[t]he information you provide during this scoping period will also help determine extraordinary circumstances that would preclude excluding categorically the project from documentation in an environmental assessment or environmental impact statement." November, 2022, Scoping Letter at 3 (AR 004290).

### i.    The Scoping Comments.

Between November, 2022, and February, 2023, the public did what it was told to do: it provided "comments and ideas" on the aerial shooting proposal. November, 2022, Scoping Letter at 3 (AR 004290). The Cattle Growers and Petitioner Nelson Shirley, on behalf of himself and Spur Cattle (together, the "Commenting Petitioners"),[10] opposed the aerial shooting and submitted lengthy comments with arguments much like those that the Petitioners' Merits Brief offers. These

---

order issued under 36 CFR part 261, subpart B. In addition to forest plans, management of National Forest System lands is guided and constrained by laws, regulations, and the policies, practices, and procedures that are in the Forest Service Directive System, which are not required to be repeated in the forest plan.

Gila National Forest: Land Management Plan at 1, U.S. Forest Service, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd1194081.pdf (last visited October 9, 2024)(brackets in original).

[10]Petitioners Allen Campbell and Humane Farming Association ("HFA") did not submit any comments, nor did any of HFA's members.

scoping comments, which largely mirror each other, establish their writers' "strong opposition to shooting cattle, either from a helicopter or on the ground," and allege "that the Forest Service is not only precluded by law from engaging in such a practice, but also that doing so would be arbitrary and capricious."  Letter from Loren Patterson to Gila National Forest, cc'd Anthony Romero, Belinda Garland, Re: Gila Wilderness Feral Cattle Removal at 1 (dated January 5, 2023)(AR 005245)("Cattle Growers Comments"); Letter from Nelson Shirley to Gila National Forest, Re: Gila Wilderness Feral Cattle Removal at 1 (dated January 9, 2023)(AR 005316)("Shirley Comments").

**(1)    The Commenting Petitioners Allege That the Aerial Shooting Is Unlawful and Inhumane.**

The Commenting Petitioners assert that the aerial shooting proposal is unlawful and inhumane.  See Cattle Growers Comments at 2-3 (AR 005246-27); Shirley Comments at 2-3 (AR 005317-18).  The Commenting Petitioners allege that aerial shooting proposal is unlawful because it violates Forest Service regulations by failing to first impound the Gila Cows, identify their owners, if any, and try to sell them before killing them.  See Cattle Growers Comments at 2 (AR 005246); Shirley Comments at 2 (AR 005317).  The Commenting Petitioners also allege that the Forest Service fails to comply with NEPA because the scoping letter does not identify a categorical exclusion ("CE") on which the Forest Service intends to rely if it chooses to not produce an EA or an EIS.  See Cattle Growers Comments at 2-3 (AR 005246-27); Shirley Comments at 2-3 (AR 005317-18).  The Commenting Petitioners also allege that the Aerial Shooting violates the Clean Water Act, because the Gila Cows' rotting carcasses will contaminate the Gila Wilderness' waterways.  See Cattle Growers Comments at 8 (AR 004991); Shirley Comments at 9 (AR 005324).

- 18 -

To support their assertion regarding the aerial shooting proposal's cruelness, the Commenting Petitioners attach the New Mexico Livestock Board's Decision and Findings of Fact relating to the aerial shooting proposal. See Aerial Gunning of Cattle in the Gila National Forest: Decision and Findings of Fact at 1-3 (dated January 3, 2023)(AR 005266-68)("New Mexico Livestock Board Decision").[11]  The New Mexico Livestock Board Decision concludes that the February, 2022 Aerial Shooting is "NOT in accordance with commonly accepted agricultural animal husbandry practices and [the February, 2022, Aerial Shooting] constitutes acts of animal cruelty."  New Mexico Livestock Board Decision at 1 (AR 005266).  At a December 13, 2022, New Mexico Livestock Board open hearing -- held pursuant to N.M.S.A. § 30-18-1(J) -- Shawn Davis and Justin Gray, New Mexico Livestock Board employees and certified law enforcement officers, testified that they examined several gunned-down Gila Cow in the days after the February, 2022, Aerial Shooting and opined that the animals suffered inhumane deaths.  See New Mexico Livestock Board Decision at 2 (AR 005267).  Specifically, Gray and Davis found: (i) two dead bulls in the Gila River, one with a broken hind leg, who both appeared to have been shot multiples times; and (ii) other Gila Cows who had multiple wounds in the head, neck, back, and sides.  See New Mexico Livestock Board Decision at 2 (AR 005267).  Davis also said that "federal employees knowledgeable of the matter" told him that the two dead bulls were not shot near waterways and that, in his professional opinion, the bulls "sought low ground of the waterway," implying that the wounded animals ran to the river to escape the gunfire.  New Mexico Livestock Board Decision at 2 (AR 005267).  Both Davis and Gray testified that they believe the animals they examined "did

---

[11]While both the Cattle Growers' Comments and Shirley Comments attach the New Mexico Livestock Board Decision, the Court cites only to the Cattle Growers Comments' attachment.  The analogous Shirley Comments attachment is found at AR 005338-40.

not die a good death."  New Mexico Livestock Board Decision at 2 (AR 005267).  Dr. Alexandra

Eckhoff, DVM,[12] also testified regarding the American Veterinary Medical Association guidelines

for euthanizing livestock and advised that any approach should strive to achieve instantaneous

death and avoid negative added stress.  See New Mexico Livestock Board Decision at 2-3

(AR 005267-68).  "After hearing the testimony of the three witnesses and reviewing the evidence,

the Board of the NMLB deliberated in public and reached a unanimous decision" that the February,

2022, Aerial Shooting "was contrary to commonly accepted agricultural animal husbandry

practices and thus in violation of [N.M.S.A.] § 30-18-1 (J), constituting Cruelty to Animals."

AR 005268; AR 005340.  Citing the New Mexico Livestock Board Decision, the Commenting

Petitioners allege that Gila Cows "were found with their legs shot off and several wandered into

waterways where they died, indicating that the cattle were subject to prolonged suffering,"

although it is unclear whether the Gila Cows allegedly "found with their legs shot off" are the same

cows that Davis and Gray observed, or if Shirley or another NMCGA member observed those Gila

Cows.  Cattle Growers Comments at 4 (AR 005248); Shirley Comments at 4 (AR 005319).  The

Commenting Petitioners also provide a photograph of two dead Gila Cows -- neither of whom

appear to be missing legs -- in the Gila River, and allege: "Calves were orphaned when APHIS

shot their mothers, leaving the calves to die from predators or starvation."  Cattle Growers

Comments at 4 (AR 005248); Shirley Comments at 4-5 (AR 005319-20).

---

[12]"A Doctor of Veterinary Medicine (DVM) is a highly educated medical professional who
is licensed to practice veterinary medicine.  Doctor of Veterinary Medicine, Purdue University
College of Veterinary Medicine, available at https://www.vet.purdue.edu/dvm/ (last visited
October 9, 2024).

(2)    **The Commenting Petitioners Allege That the Aerial Shooting Injures Them.**

Regarding their alleged injuries, the Commenting Petitioners allege that the aerial shooting proposal threatens to "inadvertently kill[]" their cattle and "deprives [them] of an opportunity to purchase [] cattle" because the Forest Service must first impound stray cattle and offer them for public sale before killing them.   Cattle Growers Comments at 4-5 (AR 005248-49); Shirley Comments at 5-6 (AR 005320-21).   The Commenting Petitioners also allege that leaving the Gila Cow carcasses to rot may damage riparian areas and habituate wolves, including the endangered Mexican gray wolf,[13] to feed on livestock.   See Cattle Growers Comments at 5, 9 (AR 005249; AR 005253); Shirley Comments at 6, 10 (AR 005321; AR 005325).   Shirley asserts that: (i) he "suffered distress from viewing and learning about the dead cattle and will suffer distress if more cattle are shot and left to die"; (ii) he "personally viewed cattle that had been shot during the 2022 aerial operations -- cattle that suffered and were left to bleed out and die"; and (iii) "[g]iven the ties I have with the cattle and proximity of my allotment to the lands upon which the cattle live, this distress is distinct from that suffered by the public at large."   Shirley Comments at 5 (AR 005320).   The Cattle Growers similarly assert that their members suffer the same distress of viewing and learning about the dead Gila Cows, and that their members' ties with the animals and the lands upon which the animals live renders that distress "distinct from that suffered by the public at large."   Cattle Growers Comments at 5 (AR 005249).   To drive home their point, the

---

[13]The Mexican gray wolf is "the rarest subspecies of gray wolf in North America" that "Was all but eliminated from the wild by the 1970s."  U.S. Fish & Wildlife Service, Conserving the Mexican Wolf, available at https://www.fws.gov/program/conserving-mexican-wolf (last visited October 15, 2024)("Mexican Gray Wolf Background").  In the late 1970s, the U.S. Fish and Wildlife Service initiated a conservation effort, which is still active today.  See Mexican Gray Wolf Background.

Commenting Petitioners note that the aerial shooting proposal "would lead to more carnivore-livestock conflict." Cattle Growers Comments at 5 (AR 005249); Shirley Comments at 5 (AR 005320). Shirley alleges that, two days after the February, 2022, shooting, he spoke with a United States Fish & Wildlife Service Interagency Field Team leader, John Oakleaf, who identified one wolf within half a mile of a dead Gila Cow. See AR 005321. Shirley also asserts that Oakleaf "confirmed that the [] pack has grown substantially over the past year in this area," and that, in Shirley's opinion, the "huge amount of beef left to rot and to be scavenged" causes this increase. AR 005322.

### (3) The Commenting Petitioners Propose Alternative Ways of Removing the Gila Cows.

In addition to identifying the aerial shooting proposal's alleged legal violations and their resulting injuries, the Commenting Petitioners propose alternative solutions to the Gila Cow problem. See Cattle Growers Comments at 1 (AR 005245); Shirley Comments at 2 (AR 005316). In the short term,

> the Forest Service should repair corrals and traps it has allowed to deteriorate; authorize neighboring permittees (who may have cattle interspersed with the unbranded cattle) to gather the cattle on the vacant allotments to those corrals and traps, feed, water and salt the cattle to acclimate them to those facilities before moving them out of the Wilderness; move them slowly to a road whether they can be trailered out; and, subject to New Mexico Livestock Board ("NMLB") inspection, returned to the owner if branded or marked or otherwise sold at a fixed, pre-set price to the cowboys who gathered them.

Cattle Growers Comments at 1 (AR 005245); Shirley Comments at 2 (AR 005316). In the long term, "the Forest Service should reactivate vacant grazing allotments with sustainable stocking rates so that ranchers are on the ground managing the allotments and removing unauthorized cattle from them." Cattle Growers Comments at 1 (AR 005245); Shirley Comments at 2 (AR 005316). This proposal is similar to one raised at a November 15, 2022, meeting among Forest Service

employees (Camille Howes, Henry Provencio, Jeff Shearer, and Anthony Madrid), grazing permittees (Nelson Shirley and Tom Paterson), New Mexico Livestock Board representatives (Shawn Davis, Belinda Garland, Molly Manzanares), and Loren Patterson, the Cattle Growers' president.  See Memorandum for Record -- Meeting Notes, Gila National Forest Supervisor's Office, at 1-2 (dated November 29, 2022)(AR 004285-86)("November 15, 2022 Meeting Notes"). Based on Shearer's November 29, 2022 notes memorializing the meeting, Shirley and Paterson "felt that [their proposal] would be a long-term effort to removing cattle and would take multiple years," and Provencio asked Nelson and Paterson to "write up the details of their proposed alternative and submit it for consideration when the Gila National Forest requests public feedback during the scoping period."  November 15, 2022 Meeting Notes at 1-2 (AR 004285-86).  The Forest Service did not respond to either Commenting Petitioners when they requested feedback on their comments.  See Email from Taylor Riggins to Gila National Forest, Re: NMCGA: Inquiry regarding status of scoping comments (dated January 26, 2023)(AR 005543-45); Email from Nelson Shirley to Gila National Forest, Re: Spur Lake Cattle Co.; comments inquiry (dated January 27, 2023)(AR 005546-47).

### (4)    The Biological Center Submits Comments Supporting the Aerial Shooting.

The Biological Center, proposed intervenor in this lawsuit, also submitted comments in support of the Aerial Shooting.  See Email from Todd Schulke to FS-comments-southwestern-Gila Re: Gila Wilderness Feral Cow Removal at 1-8 (dated January 9, 2023)(AR 005304-11)("Biological Center Comments").  The Biological Center Comments urge the Forest Service to conduct the Aerial Shooting, because the Gila Cows' presence threatens the Gila Wilderness'

wilderness character and environmental integrity.  See Biological Center Comments at 1.  To

support their contention that the Gila Cows threaten the environment, the Biological Center states:

> Several years of ecological monitoring with photo documentation have
> shown significant and long-lasting damage caused by the feral cows in the Gila
> Wilderness, including trampling, denuding vegetation, and feces and urine in the
> water, particularly where cattle have concentrated near water sources such as the
> Gila River and springs. Monitoring reports, showing extreme damage, from 2017,
> '18, '19, '21, '22 have been made available to the Gila National Forest (GNF).

Biological Center Comments at 1.  The Biological Center Comments also discuss how the Aerial

Shooting is not likely to disrupt the Gila Wilderness' ecology, because: (i) "[e]xtensive surveys

were done 60-90 days after the" February, 2022, Aerial Shooting and no carcasses were found;

(ii) "the electronic wolf tracking program showed no influx of wolves into the [project] area and

post-operation ecological monitoring did not detect an unusual number of black bears or other

carnivores in the [project] area" after the February, 2022, Aerial Shooting; and (iii) the two Gila

Cows who died in the Gila River during the February, 2022, Aerial Shooting were "promptly

removed."  Biological Center Comments at 7.  On February 1, 2023, pursuant to Forest Service

regulation 36 C.F.R. § 262.10, a public impound notice alerting the public and permittees to

remove their livestock from the project area was signed and mailed to all Gila National Forest

grazing permittees, and posted in a local newspaper, at local courthouses and post offices, and on

the Gila National Forest public website.  See Decision Memo. at 7 (AR 005906).

### d.    The February, 2023, Aerial Shooting Decision Memorandum.

On February 16, 2023, the Forest Service finalizes a decision memorandum that outlines

the Aerial Shooting's substance, motivation, and legality.  See Decision Memo. at 1-17

(AR 005899-915).  The Forest Service also includes, as an appendix, detailed responses to third-

party comments raised during the scoping process.  See U.S. Forest Service, Decision Memo: Gila

Wilderness Feral Cattle Removal -- Appendix B at 1-17 (AR 00005917-33)("Scoping Responses").

### i.    The Aerial Shooting's Substance.

The Decision Memo. indicates that the Gila Cows may be removed "utilizing a combination of lethal and non-lethal methods." Decision Memo. at 5 (AR 005903). The Decision Memo. states that lethal removal includes both "aerial and ground-based operations," and the aerial operation is "expected to take place over one or more 7-day periods annually until objectives are met." Decision Memo. at 6 (AR 005904). The Decision Memo. also states: "All lethally removed or euthanized cattle would be left on site to naturally decompose, unless within or adjacent to a waterbody, designated hiking trail, or culturally sensitive location."[14] Decision Memo. at 6 (AR 005904). The Forest Service also notes that a "wilderness minimum requirements analysis has been completed and approved allowing for the treatments including the low-level helicopter flights." Decision Memo. at 6 (AR 005904). To remove the Gila Cows non-lethally, the Forest Service states that they "may work with private contractors or individuals" to gather and impound the Gila Cows as the Forest Service regulations, see 36 C.F.R. § 262.10-- i.e., the Forest Service would impound the animals, a livestock brand inspector would inspect them, and the Forest

---

[14]The Decision Memo describes this scenario:

> Cattle would not be intentionally killed within or immediately adjacent to any waterbody, designated hiking trail, or known culturally sensitive area. If a carcass is identified within or immediately adjacent to one of these areas, Forest staff will move the carcass away from that location to a great enough distance that the carcass is no longer a concern. During any aerial removal operations, APHIS will aerially survey the waterways at the end of each day to inspect for carcasses in the water.

Decision Memo. at 8 (AR 005906).

Service would deliver unbranded animals to an auction facility, Decision Memo. at 6 (AR 005904). Ahead of the Aerial Shooting, the Forest Service estimates that "50 to 150 feral cattle remain" in the Gila Wilderness.  Decision Memo. at 2 (AR 005900).

In addition to removing Gila Cow carcasses adjacent to waterways, hiking trails, or culturally sensitive areas, the Forest Service identifies several other actions intended to mitigate the Aerial Shooting's potential environmental, economic, and social impacts.  See Decision Memo. at 8 (AR 005906)  To protect wildlife, flood plains, and wilderness character: (i) the Forest Service will not construct any corrals or temporary gather structures within critical habitats, flood plains, or designated critical habitat; (ii) aerial operations will not take place within one-half mile of known Mexican spotted owl protected activity centers ("PACs")[15] between March 1st and September 30th; and (iii) ground operations will not take place within one mile of any known

---

[15]A Mexican spotted owl protected activity center (PAC) is an area where Mexican spotted owls are known to roost and nest, and disruptive activities, like timber harvesting, are limited.  See Joseph L. Ganey, James P. Ward, Jr., Jeffrey S. Jenness, William M. Block, Shaula Hedwall, Ryan S. Jonnes, Darrell L. Apprill, Todd A. Rawlinson, Sean C. Kyle, Steven L. Spangle, Use of protected activity centers by Mexican Spotted Owls in the Sacramento Mountains, New Mexico, 48 J. Raptor Rsch. 210, 211-12 (2014).  The Forest Service notes:

> Protected Activity Centers (PACs) have been established at all [Mexican spotted owl] sites located during surveys and around all management territories since 1989 . . . . These PACs are 600 acres or more in size and have been digitized using mapped vegetation polygons that are centered around nest sites, roost sites, quality nesting habitat and appropriate topographic features.

Gila National Forest Wilderness Ranger District, U.S. Forest Service, Biological Assessment for Gila National Forest Feral Cattle Removal Project: No Effect Determinations at 8 (dated January 2023), (AR 005687)("Miscellaneous Biological Assessment")(brackets and ellipses added).

Mexican gray wolf denning[16] or rendezvous[17] site.  See Decision Memo. at 8 (AR 005906).  To protect scavengers from lead contamination, Animal Inspection Service will use only non-toxic ammunition, e.g., copper, to shoot the Gila Cows.  See Decision Memo. at 8 (AR 005906).  To protect local cattle ranchers' economic interests, the Decision Memo provides that, although the Forest Service already notified grazing permittees about the Aerial Shooting through both personal mail service and public postings, any "[o]wned livestock gathered and removed by the Forest Service may be redeemed by submitting proof of ownership and paying for all expenses incurred by the United States in gathering, impounding, and feeding the livestock."  Decision Memo. at 8 (AR 005906).  Further, the Forest Service will record location coordinates for each carcass "to allow for follow-up inspection if needed," and, "[i]f branded cattle are lethally removed during gathering or aerial operations, the owner may request compensation" accordingly.  Decision Memo. at 7 (AR 005906).  Finally, to promote public safety, the Aerial Shooting will take place in winter or early spring, when there are few visitors in the Gila Wilderness, and the Forest Service

---

[16]Shortly before giving birth, a female Mexican gray wolf digs a small hole or den where she will birth and nurse her pups for approximately six weeks until they emerge from the den and begin acclimating to the wild.  See U.S. Fish & Wildlife Service, How Mexican Wolves Find and Prepare a Den for Pups (dated May 2, 2023), available at https://www.fws.gov/story/2024-05/100th-mexican-wolf-pup-fostered-wild (last visited October 15, 2024)("Denning Background").  While the mother nurses the pups, other pack members hunt and bring back food to the den, which serves as a home base for the pups until they are about three months old.  See Denning Background.  In 2023, 23 Mexican grey wolf packs exhibited denning behavior in New Mexico.  See U.S. Fish & Wildlife Service, Mexican Wolf Recovery Program Progress Report #26 at 23 (dated August 30, 2024).

[17]"In the summer, 8-20 weeks after wolf pups are born, reproductive packs localize to areas called rendezvous sites, where the pups are kept while they are too young to travel with the pack." Jennifer L. Stenglein, Lisette P. Waits, David E. Ausband, Peter Zager &Curt M. Mack, Estimating gray wolf pack size and family relationships using noninvasive genetic sampling at rendezvous sites, 92 J. Mammalogy 784, 785 (2011).

will issue a closure order to prohibit the public from entering the project area immediately before and during the operation.  See Decision Memo. at 8 (AR 005906).

### ii.    The Aerial Shooting's Motivation.

The Forest Service summarizes the Aerial Shooting's rationales:

1.    Meet the intent of 36 CFR 261.7 which prohibits placing or allowing unauthorized livestock to enter or be in the National Forest System or other lands under Forest Service control.

2.    Protect the habitat of aquatic and terrestrial wildlife, especially within riparian areas where resource degradation is occurring, to be consistent with the Endangered Species Act and the 1986 Forest Plan standards related to threatened and endangered wildlife habitat.

3.    Protect stream banks and spring areas from further trampling, erosion, and sedimentation to be consistent with the Clean Water Act and the 1986 Forest Plan standards related to riparian areas.

4.    Restore the wilderness character of the Gila Wilderness by removing non-native species and alleviating the damage caused by over-grazing to be consistent with the Wilderness Act.

5.    Ensure invasive and exotic species capable of reproducing in native habitats are not allowed to invade National Forest System lands to be consistent with the 1986 Forest Plan standards related to wildlife.

Decision Memo. at 5 (AR 005903).  Regarding (1) and (5), the Forest Service notes that the Gila Cow population can reproduce, no grazing has been authorized within the project area since 1998, and hikers "report being charged by feral bulls."  Decision Memo. at 2 (AR 005900).  Regarding (2) and(3), the Forest Service identifies several ways the Gila Cows threaten the Gila Wilderness' delicate ecology.  See Decision Memo. at 2-4, 11 (AR 005900-2; AR 005909).  First, documented over-grazing and stream-bank trampling may damage "a riparian area's vegetative health and subsequent ability to provide for stream shading."  Decision Memo. at 3 (AR 005901).  Water temperature may rise without proper stream shading, and "[b]oth the Gila River and Turkey Creek,

the two primary waterways within the project area, are listed as being in a state of non-attainment,[18] with water temperature listed as the probable cause for impairment." Decision Memo. at 3 (AR 005901)(citing New Mexico Environment Department Surface Water Quality Bureau, 2022-2024 State of New Mexico Clean Water Act § 303(d)/§305(b) Integrated Report, available at https://cloud.env.nm.gov/resources/_translator.php/MjQ5NzMxZWFkMjgyMmEzMmVlYzFlM TI4Nl82NDQwOQ~~.pdf (last visited October 9, 2024)("CWA Report")). The Forest Service provides three photographs documenting the alleged overgrazing and trampling:

---

[18]A waterway is in a state of non-attainment if it cannot support an associated use. See New Mexico Environment Department Surface Water Quality Bureau, 2022-2024 State of New Mexico Clean Water Act § 303(d)/§305(b) Integrated Report Appendix A at ii (dated April 26, 2022), available at https://www.env.nm.gov/surface-water-quality/wp-content/uploads/sites/18/2022/03/2022-2024-IR-Appendix-A-303d-305b-Integrated-List.pdf (last visited October 9, 2024)("CWA Report Appendix A"). For example, based on 2022 assessments, some Gila River and Turkey Creek segments cannot support uses like "HQColdWAL" -- high quality coldwater aquatic life -- "MCWAL" -- marginal coldwater aquatic life -- "WWAL" -- warmwater aquatic life -- "MWWL" -- marginal warmwater aquatic life -- or "PC" -- primary contact -- because of their temperatures, nutrients, or E. coli presence. CWA Report at 347, 349-50, 352, 354-55. See CWA Report Appendix A at 11.



Figure 1. Photo showing severe over-grazing, including riparian vegetation, along Gila River within Gila Wilderness. Photo taken June 2, 2020.



Figure 2. Photo showing severe over-grazing, including riparian vegetation, along Gila River within Gila Wilderness. Photo taken June 2, 2020.



Figure 3. Photo showing bank trampling and riparian damage along Gila River within Gila Wilderness. Photo taken May 2022.

Decision Memo. at 3-4 (AR 005901-02).  Second, the Forest Service contends that the Gila Cows'
concentrated presence around waterways threatens the Gila Wilderness' riparian areas, "because
animal waste has the potential to contaminate water."  Decision Memo. at 11 (AR 005909).  The
Administrative Records contain a study observing that higher fecal matter concentrations in
Chilean freshwater bodies located near urban and agricultural sites are associated with higher rates
of antibacterial-resistant and zoonotic[19] bacteria in those waterways, which poses public health
risks because those waterways are used to irrigate crops.  See Constanza Díaz-Gavidia, Carla
Barría, Daniel L. Weller, Marilia Salgado-Caxito, Erika M. Estrada, Aníbal Araya, Leonardo Vera,
Woutrina Smith, Minji Kim, Andrea I. Moreno-Switt, Jorge Olivares-Pacheco, & Aiko D. Adell,
Humans and Hoofed Livestock Are the Main Sources of Fecal Contamination of Rivers Used for
Crop Irrigation: A Microbial Source Tracking Approach, Frontiers in Microbiology June 30, 2022,
at 1-2, 13-14 (AR 004149-50, AR 004161-62).  Third, the Forest Service alleges that the Gila
Cows' over-grazing has "negatively impacted fish and wildlife habitats including habitats for
several federally threatened and endangered species," including the "southwest willow flycatcher,

---

[19]The World Health Organization provides:

> A zoonosis is an infectious disease that has jumped from a non-
> human animal to humans.  Zoonotic pathogens may be bacterial, viral or
> parasitic, or may involve unconventional agents and can spread to humans
> through direct contact or through food, water or the environment.  They
> represent a major public health problem around the world due to our close
> relationship with animals in agriculture, as companions and in the natural
> environment.  Zoonoses can also cause disruptions in the production and
> trade of animal products for food and other uses.

World Health Organization Zoonoses, available at https://www.who.int/news-room/fact-
sheets/detail/zoonoses (last visited October 9, 2024).

narrow-headed garter snake, Gila chub, loach minnow, spikedace, and Mexican spotted owl," each

of whose habitat is in the Aerial Shooting's project area.  Decision Memo. at 2 (AR 005900).

Regarding (4) -- i.e., restoring wilderness character -- the Forest Service asserts that the

Gila Cows' presence in the Gila Wilderness undermines the Forest Service's duty to preserve

wilderness character, as the Wilderness Act and Forest Service regulations mandate.  See Decision

Memo. at 4 (AR 005902).  The Wilderness Act states that

> each agency administering any area designated as wilderness shall be responsible
> for preserving the wilderness character of the area and shall so administer such area
> for such other purposes for which it may have been established as also to preserve
> its wilderness character.  Except as otherwise provided in this Act, wilderness areas
> shall be devoted to the public purposes of recreational, scenic, scientific,
> educational, conservation, and historical use.

16 U.S.C. § 1133(b).  Relevant Forest Service regulations provide:

> National Forest Wilderness shall be so administered as to meet the public purposes
> of recreational, scenic, scientific, educational, conservation, and historical uses; and
> it shall also be administered for such other purposes for which it may have been
> established in such a manner as to preserve and protect its wilderness character.  In
> carrying out such purposes, National Forest Wilderness resources shall be managed
> to promote, perpetuate, and, where necessary, restore the wilderness character of
> the land and its specific values of solitude, physical and mental challenge, scientific
> study, inspiration, and primitive recreation.  To that end:
>
> > (a)    Natural ecological succession will be allowed to operate
> > freely to the extent feasible.
> >
> > (b)    Wilderness will be made available for human use to the
> > optimum extent consistent with the maintenance of primitive
> > conditions.
> >
> > (c)    In resolving conflicts in resource use, wilderness values will
> > be dominant to the extent not limited by the Wilderness Act,
> > subsequent establishing legislation, or the regulations in this
> > part.

36 C.F.R. § 293.2.  The Forest Service acknowledges that livestock grazing "was considered a

historical use when the Gila Wilderness was designated" and permitted livestock to continue to

graze in the Gila Wilderness. Decision Memo. at 4 (AR 005902). The Forest Service maintains

that, because the Gila Cows are not permitted livestock, however, their "presence . . . and their

associated impacts to resources are detrimental to the wilderness character that the U.S. Forest

Service has the responsibility to protect." Decision Memo. at 4-5 (AR 005902-03).

### iii.    The Aerial Shooting's Legality.

The Decision Memo. details how the Aerial Shooting complies with Forest Service

regulations and the NEPA. See Decision Memo. at 6-12, 14-16 (AR 005904-10; AR 005912-

14).[20] The Court discusses each argument in turn.

> **(1)    The Forest Service Argues That the Aerial Shooting Complies With Forest Service Regulations, Because the Gila Cows Are Not Unauthorized Livestock, and the Forest Service Has the Authority to Manage Invasive Species.**

Regarding compliance with Forest Service regulations that govern impounding

unauthorized livestock,[21] the Decision Memo. states:

> While the agency intends to follow the procedures set forth in 36 CFR 262.10 for animals successfully gathered as part of this proposed action, it is not required to follow those procedures in this instance because the feral cattle are not "livestock"

---

[20]The Respondents make similar arguments in the Federal Respondents' Response Brief on the Merits at 17-51, filed October 19, 2023 (Doc. 58)("Respondents' Merits Response").

[21]36 C.F.R. § 262.10 requires the Forest Service to notify the public of its intent to impound unauthorized livestock and post a notice of sale of any impounded unauthorized livestock. See 36 C.F.R. § 262.10(a)-(d). Unauthorized livestock owners may then submit proof of ownership and redeem the livestock based on the impoundment cost. See 36 C.F.R. § 262.10(e). If the impoundment cost, including gathering, impounding, feeding, and pasturing, exceeds the livestock's fair market value, the owner may redeem their livestock for a "minimum acceptable redemption price at fair market value." 36 C.F.R. § 262.10(e). If no owner redeems the impounded unauthorized livestock, the Forest Service ten shall sell the unauthorized livestock at public sale. See 36 C.F.R. § 262.10(f). If the public sale is unsuccessful, the unauthorized livestock may then be sold at private sale, reoffered at public sale, condemned and destroyed, or otherwise disposed of. See 36 C.F.R. § 262.10(f).

as "animals of any kind kept or raised for use or pleasure," because they are no longer domesticated animals being "kept or raised" by any individual.

Decision Memo. at 6 (AR 005904)(quoting 36 C.F.R. § 221(b)). The Decision Memo. also asserts that the Forest Service has authority to manage invasive and exotic species like the Gila Cows:

> The authority to manage for invasive species on National Forest System lands and other lands under Forest Service control is delegated from the Secretary of Agriculture to the Under Secretary for Natural Resources and Environment at Title 7, Code of Federal Regulations (CFR), section 2.20 (7 CFR 2.20). This authority has been delegated in turn from the Under Secretary for Natural Resources and Environment to the Chief of the Forest Service at Title 7, Code of Federal Regulations, section 2.60 (7 CFR 2.60). Title 36, Code of Federal Regulations (including Parts 221, 222, 228, 241, 251, 261, 290, 292, 293, 296, and 297) provides additional authorities to manage and regulate invasive species across the National Forest System, including establishing requirements and prohibitions to prevent and control aquatic and terrestrial invasive species.

Decision Memo. at 6 (AR 005904)(quoting Forest Service Manual § 2901.02).[22]

---

[22]The Decision Memo also states that the 1986 Forest Plan, as amended, and Executive Order 13112, 64 Fed. Reg. 125 (February 8, 1999), grant the Forest Service similar authority to remove invasive species. The 1986 Forest Plan directs the Forest Service to "[m]anage for indigenous species," and notes that "exotic species capable of reproducing in native habitats will not be introduced or allowed to invade National Forest System lands." U.S. Forest Service, Gila National Forest Plan at 27 (dated September 1986), available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5275452.pdf (last visited October 15, 2024). Executive Order 13112 provides:

> **Sec. 2**. <u>Federal Agency Duties</u>. (a)    Each Federal agency whose actions may affect the status of invasive species shall, to the extent practicable and permitted by law,
>
>    (1)    identify such actions;
>
>    (2)    subject to the availability of appropriations, and within Administration budgetary limits, use relevant programs and authorities to: (i) prevent the introduction of invasive species; (ii) detect and respond rapidly to and control populations of such species in a cost-effective and environmentally sound manner; (iii) monitor invasive species populations accurately and reliably; (iv) provide for restoration of native species and habitat conditions in ecosystems that have been invaded; (v) conduct research on

(2)    **The Forest Service Argues That the Aerial Shooting Complies With the NEPA, Because At Least One Categorical Exclusion Applies, and There Are No Extraordinary Circumstances.**

Regarding NEPA compliance,[23] the Decision Memo. contends that the Aerial Shooting "is categorically excluded from documentation in an environmental impact statement (EIS) or an

_____

invasive species and develop technologies to prevent introduction and provide for environmentally sound control of invasive species; and (vi) promote public education on invasive species and the means to address them; and

(3)    not authorize, fund, or carry out actions that it believes are likely to cause or promote the introduction or spread of invasive species in the United States or elsewhere unless, pursuant to guidelines that it has prescribed, the agency has determined and made public its determination that the benefits of such actions clearly outweigh the potential harm caused by invasive species; and that all feasible and prudent measures to minimize risk of harm will be taken in conjunction with the actions.

Executive Order No. 13112, 64 Fed. Reg. 125 (February 8, 1999).

[23]As discussed in more detail below, see infra, at 166-70, the NEPA is a procedural statute that prevents federal agencies from making decisions without evaluating environmental ramifications. See Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric., 817 F.2d 609, 620 (10th Cir. 1987). There are three ways an agency can comply with the NEPA's requirement for a "detailed statement" regarding "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). First, an agency can prepare a detailed statement, called an EIS, that conforms to regulations regarding its format, content, and methodology. See 40 C.F.R. §§ 1502, 1508.11. Second, if an agency is unsure whether an EIS is required for a proposed action, i.e., whether the action qualifies as a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), the agency may prepare an EA, see 40 C.F.R. §§ 1503(a), 1501.4(b). An EA "provide[s] sufficient evidence and analysis for determining whether to prepare" an EIS or, alternatively, "a finding of no significant impact," 40 C.F.R. § 1508.9(a)(1), which is "a document . . . briefly presenting the reasons why an action . . . will not have a significant effect on the human environment [such that an EIS] therefore will not be prepared," 40 C.F.R. § 1508.13. See 40 C.F.R. § 1502.2. Third, an agency can determine that an EIS is not required without needing to prepare an EA when the proposed action falls within a categorical exclusion ("CE"). See 40 C.F.R. § 1508.4. A CE is "a category of actions which do not individually or cumulatively have a significant effect on the human environment and

environmental assessment (EA)."  Decision Memo. at 8 (AR 05906).  The Forest Service argues
that the Aerial Shooting is excluded categorically from EIS or EA documentation, because at least
one categorical exclusion applies, and there are no extraordinary circumstances.  The Court
discusses each argument in turn.

The Decision Memo. identifies three categorical exclusions (CEs): (i) civil and criminal
enforcement and investigative activities under 7 C.F.R. § 1b.3(a)(5); (ii) timber stand and/or
wildlife habitat improvement activities under 36 C.F.R. § 220.6(e)(6); and (iii) short-term resource
or public health and safety protection under 36 C.F.R. § 220.6(d)(1).  See Decision Memo. at 8-9
(AR 005906-07).  The Decision Memo. states that: (i) the Aerial Shooting is an enforcement or
investigative activity, because the Forest Service is authorized to investigate and remove
unauthorized cattle under 36 C.F.R. § 261, 262.10; (ii) the Aerial Shooting is a wildlife habitat
improvement activity, because it will address over-grazing and over-use in uplands and riparian
areas and promote natural re-vegetation; and (iii) the Aerial Shooting's closure order and

---

which have been found to have no such effect in [NEPA] procedures adopted by a Federal agency."
40 C.F.R. § 1508.4.  If a CE applies, the agency then evaluates whether "extraordinary
circumstances" exist such that the "normally excluded action may have a significant effect."
40 C.F.R. § 1501.4(b).

> If an extraordinary circumstance exists, the agency nevertheless may apply
> the categorical exclusion if the agency conducts an analysis and determines that the
> proposed action does not in fact have the potential to result in significant effects
> notwithstanding the extraordinary circumstance, or the agency modifies the action
> to avoid the potential to result in significant effects. In these cases, the agency shall
> document such determination and should publish it on the agency's website or
> otherwise make it publicly available.

40 C.F.R. § 1501.4(b)(1).  If an agency cannot apply a CE, the agency shall prepare an EA
or EIS, "as appropriate."  40 C.F.R. § 1501.4(b)(2).

impoundment notice is a public safety and resource protection activity.  See Decision Memo. at 8-9 (AR 005906-07).

Having identified three applicable CEs, the Forest Service contends that, although there are several resource conditions that "should be considered in determining whether extraordinary circumstances" exist, "there are no extraordinary circumstances that would warrant further analysis and documentation in an EA or EIS."  Decision Memo. at 9 (AR 005907).

> Importantly, the mere presence of one or more of these resource conditions does not preclude the use of a categorical exclusion.  It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions determines whether extraordinary circumstances exist.

Decision Memo. at 9 (AR 005907).  The Forest Service evaluates each of the seven requisite[24] resource conditions and concludes that none of them constitute extraordinary circumstances: (i) threatened, endangered, or sensitive species, and/or designated or proposed critical habitats; (ii) flood plains, wetlands, or municipal watersheds; (iii) Congressionally designated areas such as wilderness, wilderness study areas, or national recreation areas; (iv) inventoried roadless areas or potential wilderness areas; (v) research natural areas; (vi) American Indians and Alaska Native religious or cultural sites; and (vii) archaeological sites, or historic properties or areas.  See Decision Memo. at 9-12 (AR 005907-10).

---

[24]36 C.F.R. § 220.6(b)(1) provides that these seven resource conditions "should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS."  36 C.F.R. § 220.6(b)(1)

Regarding (i), the Forest Service prepares two biological assessments:[25] one for the Mexican gray wolf, and one for all other species on the Aerial Shooting's official species list.[26]

---

[25]Under the Endangered Species Act and 50 C.F.R. § 402, an agency may prepare a biological assessment while it evaluates a federal action's viability:

> A biological assessment shall evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary.

50 C.F.R. § 402.12(a). Depending on the circumstances, a biological assessment, as well as formal or informal concurrence from partner agencies like the United States Fish and Wildlife Service, may be either required or optional:



Biological Assessment Guidebook, Version 3.1 at 8, (dated September 2018), U.S. Forest Service, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd639466.pdf (last visited October 18, 2024)("Biological Assessment Guidebook"). A biological assessment's contents are "at the discretion of the Federal agency and will depend on the nature of the Federal action," although the following "may be considered for inclusion:"

(1)    The results of an on-site inspection of the area affected by the action to determine if listed or proposed species are present or occur seasonally.

(2)    The views of recognized experts on the species at issue.

See Decision Memo. at 9-11 (AR 005907-09); Gila National Forest Wilderness Ranger District, U.S. Forest Service, Biological Assessment for Gila National Forest Feral Cattle Removal Project at 1-10 (dated January 29, 2023)(AR 005548-57)("Mexican Gray Wolf Biological Assessment"); Gila National Forest Wilderness Ranger District, U.S. Forest Service Biological Assessment for Gila National Forest Feral Cattle Removal Project: No Effect Determinations at 1-57 (dated February 8, 2023)(AR 005680-736)("Miscellaneous Biological Assessment"). The Forest Service provides a table that summarizes the biological assessments' findings:

---

(3)    A review of the literature and other information.

(4)    An analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies.

(5)    An analysis of alternate actions considered by the Federal agency for the proposed action.

50 C.F.R. § 402.12(f).

[26]The Endangered Species Act requires that an agency obtain from the Fish and Wildlife Service or the National Marine Fisheries Service a current "official species list" that identifies all threatened and endangered species that may occur in the action area. Biological Assessment Guidebook at 19.

| Species Common Name | ESA Status | Occurs within Action Area | Critical Habitat within Action Area | Effects Determination for Species and CH if present |
|---|---|---|---|---|
| Mexican Gray Wolf | Experimental, Non-essential Population | Yes | No | Not Likely to Jeopardize |
| Mexican Long-nosed Bat | Endangered | No | No | No Effect |
| Mexican Spotted Owl | Threatened | Yes | Yes | No Effect |
| SW Willow Flycatcher | Endangered | Possible | Yes | No Effect |
| Yellow-Billed Cuckoo | Threatened | Possible | No | No Effect |
| Northern Aplomado Falcon | Experimental, Non-essential Population | No | No | No Effect |
| Narrow-Headed Gartersnake | Threatened | Yes | Yes | No Effect |
| Northern Mexican Gartersnake | Threatened | No | No | No Effect |
| Chiricahua Leopard Frog | Threatened | No | No | No Effect |
| Gila Chub | Endangered | Yes | Yes | No Effect |
| Gila Trout | Threatened | Yes | No | No Effect |
| Loach Minnow | Endangered | Yes | Yes | No Effect |
| Spikedace | Endangered | Yes | Yes | No Effect |
| Gila Topminnow | Endangered | No | No | No Effect |
| Zuni Flebane | Threatened | No | No | No Effect |
| Monarch Butterfly | Candidate | Possible | No | No Effect |

Miscellaneous Biological Assessment at 4 (AR 005683).[27] In addition to preparing the two

biological assessments for the Mexican gray wolf and each threatened or endangered species that

_____

[27]"ESA" refers to the Endangered Species Act, which categorizes species as either "endangered," which "means a species is in danger of extinction throughout all or a significant portion of its range," or "threatened," which "means a species is likely to become endangered within the foreseeable future." U.S. Fish and Wildlife Service, ESA Basics: 40 Years of Conserving Endangered Species at 1 (dated February 2017), available at https://www.fws.gov/sites/default/files/documents/endangered-species-act-basics.pdf (last visited October 18, 2024)("Endangered Species Act Basics"). The Endangered Species Act also provides for the categorization of species as experimental and non-essential:

> One conservation tool to help a threatened or endangered species recover is to re-introduce them into their habitat. To relieve landowner concerns that reintroductions may result in restrictions on the use of private, tribal, or public land, Congress added the provision for experimental populations under section 10(j) of the [Endangered Species Act, 16 U.S.C. § 1539(j)]. Under section 10(j) the [Fish

_____

and Wildlife Service] may designate a population of a listed species as experimental if it will be released into suitable natural habitat outside the species' current range. An experimental population is a special designation for a group of plants or animals that will be reintroduced in an area that is geographically isolated from other populations of the species. With the experimental population designation, the specified population is treated as threatened under the ESA, regardless of the species' designation elsewhere in its range. Treating the experimental population as threatened allows the FWS the discretion to devise management programs and special regulations for that population.

An experimental population may be considered essential or nonessential. An essential population is one that is considered essential to the continued existence of an endangered or threatened species. Under a 10(j) designation as "nonessential, experimental," both the take prohibitions and consultation requirements of the ESA are relaxed, easing regulatory burden associated with endangered species. For example, the 10(j) rules for black-footed ferrets makes certain incidental harm to ferrets legal when it happens as a result of otherwise lawful activities including traditional management or land use. This flexibility has allowed FWS biologists to introduce ferrets into a number of sites on public and private lands from Mexico to Canada. With the special allowances afforded under the 10(j) rule, landowners can continue to manage their lands without concern about violating the ESA by inadvertently harming a ferret.

U.S. Fish and Wildlife Service, <u>What is a (j) Rule?</u> at 1 (dated October 2018), available at https://www.fws.gov/sites/default/https://www.fws.gov/sites/default/files/documents/ESA-section10%28j%29-fact-sheet.pdf/documents/endangered-species-act-basics.pdf (last visited October 18, 2024). "Take prohibitions" refer to limitations on interactions with listed animals:

The ESA makes it unlawful for a person to take a listed animal without a permit. Take is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct." Through regulations, the term "harm" is defined as "an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."

Endangered Species Act Basics at 1-2 (first quoting 16 U.S.C. § 1532(19); and then quoting 50 C.F.R. § 17.3).

may occur in the project area, the Forest Service prepares a biological evaluation,[28] which provides a summary table indicating that "the authorized action will have no adverse impacts on sensitive[29] or management indicator[30] species." Decision Memo. at 11 (AR 005909). See Gila National Forest Wilderness Ranger District, U.S. Forest Service, Biological Evaluation, at 3-11 (dated February 9, 2023)(AR 005790-98)("Biological Evaluation"). The Biological Evaluation concludes, without providing more information, that each sensitive or management indicator

---

[28]A biological evaluation is a "documented Forest Service review of Forest Service programs or activities in sufficient detail to determine how an action or proposed action may affect any threatened, endangered, proposed, or sensitive species." Forest Service Manual § 2670.5.

[29]Sensitive species are:

> Those plant and animal species identified by a Regional Forester for which population viability is a concern, as evidenced by:
>
> a.    Significant current or predicted downward trends in population numbers or density.
>
> b.    Significant current or predicted downward trends in habitat capability that would reduce a species' existing distribution.

Forest Service Manual § 2670.5. "A regional forester oversees forest supervisors," forest supervisors "direct the work of district rangers," and a "district ranger and his or her staff is often your first point of contact with the Forest Service." Agency Organization, U.S. Forest Service, available at https://www.fs.usda.gov/about-agency/organization#:~:text=A%20regional%20forester%20oversees%20forest%20supervisors.%20Regional%20office,forest%20plans%2C%20and%20allocates%20budgets%20to%20the%20forests (last visited October 25, 2024)("Forest Service Organization"). There are nine geographic regions in the Forest Service, each with its own Regional Forester. See Forest Service Organization.

[30]Management Indicators are "plant and animal species, communities, or special habitats selected for emphasis in planning, and which are monitored during forest plan implementation in order to assess the effects of management activities on their populations and the populations of other species with similar habitat needs which they may represent." Forest Service Manual § 2620.5-1. A Management Indicator Species is a species that the Forest Service selects "because their population changes are believed to indicate the effects of management." U.S. Forest Service, Region 3 Management Indicator Species Selection Process and Criteria at 1, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5181244.pdf (last visited October 25, 2024).

species either does not occur in the project area, or, if they do, the Aerial Shooting does not alter the species' habitats.  See Biological Evaluation at 1-11 (AR 005788-98).

In sum, the Forest Service concludes Aerial Shooting will not affect the first resource condition -- threatened, endangered, or sensitive species, and/or designated or proposed critical habitats – in a way that warrants a finding of extraordinary circumstances.  See Decision Memo. at 9-11 (AR 005907-09).  To support this conclusion, the Forest Service compiles nearly seventy pages of biological assessment materials for the sixteen species identified in the Aerial Shooting's official species list.  See Mexican Gray Wolf Biological Assessment at 1-12 (AR 005548-59); Miscellaneous Biological Assessment at 1-57 (AR 005680-736).  Of the sixteen identified species, ten occur or likely occur in the project area, and, of those ten, six have critical habitat in the project area.  See Miscellaneous Biological Assessment at 4 (AR 005683).  The Forest Service determines that the Aerial Shooting will have no effect on nine of the ten occurring species.  See Miscellaneous Biological Assessment at 4 (AR 005683).  The Forest Service bases this conclusion on its detailed cataloguing of each species' presence in the Gila Wilderness.  See Mexican Gray Wolf Biological Assessment at 1-12 (AR 005548-59); Miscellaneous Biological Assessment at 1-57 (AR 005680-736).  The Forest Service concludes that the Aerial Shooting may affect only one identified species -- the Mexican gray wolf, which is an experimental, non-essential population.  See Mexican Gray Wolf Biological Assessment at 1-12 (AR 005548-59).  The Forest Service finds -- and the Fish and Wildlife Service concurs -- that the Aerial Shooting is not likely to jeopardize the Mexican gray wolf population, because there is no compelling evidence that scavenging on cattle carcasses increases wolf/livestock conflicts, and, after the February, 2022, Aerial Shooting, only two wolves lingered in the project area for a few months afterwards.  See Mexican Gray Wolf Biological Assessment at 8-10 (AR 005906-08); Fish and Wildlife Concurrence at 3 (AR 005800).

For the six species who have critical habitat in the project area, the Forest Service anticipates that the Aerial Shooting will improve and not damage habitat conditions by decreasing the Gila Cows' destructive over-grazing. See Miscellaneous Biological Assessment at 12, 19, 28, 37, 41, 57 (AR 005691; AR 005698; AR 005707; AR 005716; AR 005720; AR 005736). The Court discusses the Forest Service's conclusions related to each species in turn.

The Decision Memo. states that the Mexican Gray Wolf Biological Assessment "concluded the proposed action is not likely to jeopardize the wolf" and that the Fish and Wildlife Service "concurred with this finding." Decision Memo. at 9 (AR 005907)(citing U.S. Fish and Wildlife Service, Concurrence No. 2023-0036459 (dated February 10, 2023)(AR 005799-803)("Fish and Wildlife Service Concurrence"). The Decision Memo. says that, although "[s]coping comments raised concern over the proposed action having a detrimental effect on Mexican wolf behavior and potentially increasing future wolf/livestock depredation . . . no supporting evidence or documentation was provided for the Forest to consider." Decision Memo. at 10 (AR 005908). The Forest Service contends, instead, that "[n]o relationship between the presence of Mexican wolves and a change in feeding behavior from the proposed action has been established." Decision Memo. at 9 (AR 005908). To support its conclusion that the Aerial Shooting does not impact the Mexican gray wolves' feeding patterns, the Forest Service notes that the Mexican gray wolf interagency field team "does not have any evidence that wolf scavenging on cattle carcasses has any known effect on wolf depredation rates on livestock." Decision Memo. at 10 (AR 005908). The Decision Memo also contends that, because the carcasses will only be in the Gila Wilderness for several weeks, they will not be a "reliable, year-round food source," which mitigates the depredation concern. Decision Memo. at 10 (AR 005908).

The Mexican Gray Wolf Biological Assessment acknowledges that the Mexican gray wolves, like other scavengers such as coyotes, foxes, bobcats, raccoons, scavenging birds, and insects, may feed on the Gila Cow carcasses. See Mexican Gray Wolf Biological Assessment at 8 (AR 005555). This dynamic is not, however, a paradigm shift:

> Wolves and other predators are exposed to livestock carcasses as well as other large ungulate[31] carcasses throughout their entire range in New Mexico and Arizona on Forest Service lands, Bureau of Land Management lands, Fish and Wildlife Service Lands, and State game agency lands as none of these agencies have a policy requiring livestock carcasses to be removed or disposed of.

Mexican Gray Wolf Biological Assessment at 8 (AR 005555)(citing internal emails). The Mexican Gray Wolf Biological Assessment also contends that "the whole subject of carcass disposal as a factor predisposing cattle to wolf depredations remains open," given that "[r]eviews at the continental and global scales show that wolves tend to prefer wild over domestic ungulates where both are available." Mexican Gray Wolf Biological Assessment at 9 (AR 005556)(first citing Diane Zlatanova., Atidzhe Ahmed, Albena Valasseva, & Peter Genov, Adaptive Diet Strategy of the Wolf (Canis lupus L.) in Europe: A Review, 66 Acta Zoologica Bulgarica 439 (2014); and then citing Thomas M. Newsome, Luigi Boitani, Guillaume Chapron, Paolo Ciucci, Christopher R. Dickman, Justin A. Dellinger, José Vicente López-Bao, Rolf O. Peterson, Carolyn Shores, Aaron J. Wirsing, William J. Ripple, Food Habits of the World's Gray Wolves, 46 Mammal Rev. 255 (2016)). The Decision Memo. also quotes the Fish and Wildlife Service Concurrence at length, noting that, after the February, 2022, Aerial Shooting, "two wolves were attracted to the carcasses, stayed in the area for several months, then moved back into their normal

---

[31]An ungulate is a hoofed animal. See Ungulata, The Oxford English Dictionary Vol. 19, at 40 (2d ed. 1998).

areas without preying on live cattle."  Decision Memo. at 10 (AR 005908); Fish and Wildlife Service Concurrence at 3 (AR 005800).

The Mexican Gray Wolf Biological Assessment also acknowledges that the Aerial Shooting's helicopter use may disturb Mexican gray wolves in the project area.  <u>See</u> Mexican Gray Wolf Biological Assessment at 8 (AR 005555).  According to the Mexican Gray Wolf Biological Assessment, the Aerial Shooting's precautions are sufficient, however, because no operations are planned during denning season, and if any operations occur during denning season, the helicopter will observe a one-mile buffer around known dens and rendezvous sites.  <u>See</u> Mexican Gray Wolf Biological Assessment at 8 (AR 005555).  On this point, the Mexican Gray Wolf Biological Assessment concludes that the Aerial Shooting "will not adversely affect reproductive success, natural behavior, or survival of wolves."  Mexican Gray Wolf Biological Assessment at 8 (AR 005555).  The Mexican Gray Wolf Biological Assessment separately notes that, because the Mexican gray wolves are a nonessential population, which is "not essential to the continued existence of the species," no proposed action "could lead to a jeopardy determination for the entire species." Mexican Gray Wolf Biological Assessment at 10 (AR 005557).  Overall, the Mexican Gray Wolf Biological Assessment concludes that the Aerial Shooting Project is "Not Likely to Jeopardize" the Mexican gray wolf.  Mexican Gray Wolf Biological Assessment at 10 (AR 005555)(emphasis and capitalization in original).

The Decision Memo. states that "a determination of no effect was made for all other federally endangered and threatened species found within the project area," because: (i): the Aerial Shooting "would have no impact on the species or its habitat"; or (ii) the Aerial Shooting would not "overlap spatially or temporally with known habitat."  Decision Memo. at 10-11 (AR 005908-09).  The Forest Service identifies one concerning area: there is one Mexican spotted owl PAC

within the project area.  See Decision Memo. at 11 (AR 005909).  The Decision Memo. notes, however, that the Aerial Shooting will not occur within one-half mile of that PAC during breeding season -- March 1st through September 30th.  See Decision Memo. at 11 (AR 005909).  The fifty-seven page Miscellaneous Biological Assessment provides more detail[32] on the no effect determinations: only the Mexican spotted owl, Southwestern willow flycatcher, narrow-headed gartersnake, Gila chub, loach minnow, and spikedace have critical habitats[33] within the project area.  See Miscellaneous Biological Assessment at 4 (AR 005683).  The Miscellaneous Biological Assessment also determines that each of those six species, as well as the Gila trout, yellow-billed cuckoo, and monarch butterfly, occurs or possibly occurs within the project area.  See Miscellaneous Biological Assessment at 4 (AR 005683).

The project area contains a large swath of critical habitat, as well as one PAC, for the Mexican spotted owl:

---

[32]The Miscellaneous Biological Assessment's granularity is notable, e.g., the Forest Service includes a map of the 106 Mexican spotted owl PACs throughout the Gila Wilderness, and identifies specifically which one is located within the project area.  See Miscellaneous Biological Assessment at 9-10 (AR 005688-89).

[33]The Fish and Wildlife Service provides:

When a species is proposed for listing as endangered or threatened under the Endangered Species Act (ESA), we identify specific areas that are essential to its conservation. These are the species' critical habitat.

Critical habitat is a tool that supports the continued conservation of imperiled species by guiding cooperation within the federal government. Designations affect only federal agency actions or federally funded or permitted activities.

U.S. Fish and Wildlife Service, Critical Habitat, available at https://www.fws.gov/project/critical-habitat (last visited October 21, 2024).

Figure 3. Mexican spotted owl PACs and Critical Habitat withing action area.



Miscellaneous Biological Assessment at 10 (AR 005689). In finding that the Aerial Shooting will have no effect on the Mexican spotted owl, a threatened species, the Forest Service notes that any operations taking place during breeding season will not occur within one-quarter mile of the known PAC within the project area, and that no holding facilities will be constructed that "would have any effect on the species or critical habitat." Miscellaneous Biological Assessment at 12 (AR 005691). Moreover, over-grazing threatens the Mexican spotted owl in two ways: (i) by altering "food and cover resources needed by the owl's prey species"; and (ii) altering or eliminating vegetation that may develop into Mexican spotted owl habitat. Miscellaneous

Biological Assessment at 10 (AR 005689).  Accordingly, the Aerial Shooting may help protect the Mexican spotted owl, because "[r]emoval of feral cattle from the action area will allow for improved riparian, aquatic, and upland vegetation conditions."  Miscellaneous Biological Assessment at 12 (AR 005691).

While the Miscellaneous Biological Assessment identifies each Mexican spotted owl PAC individually, see supra at 45 n.29, the Forest Service acknowledges that the Southwestern willow flycatcher, an endangered species, is not catalogued so easily.  See Miscellaneous Biological Assessment at 14 (AR 005693).

> Because riparian vegetation typically occurs in flood plain areas that are prone to periodic natural disturbance, suitable habitats will be ephemeral and their distribution dynamic in nature. Therefore, it is not realistic to assume that any given suitable habitat patch (occupied or unoccupied) will remain continually occupied and/or suitable over the long-term. Unoccupied suitable habitat will therefore play a vital role in the recovery of the SWWF, because it will provide suitable breeding areas for SWWFs to: a) colonize as populations expands (numerically and geographically), and b) move to, following loss or degradation of existing breeding sites.

Miscellaneous Biological Assessment at 14 (AR 005693).  The Forest Service notes, however, that, as of 2019, there were three known Southwestern willow flycatcher sites in the Gila National Forest, none of which is within the Gila Wilderness or the project area:

Figure 4. Southwestern Willow Flycatcher Occupied Sites on the Gila National Forest.



Miscellaneous Biological Assessment at 15 (AR 005694)(identifying Southwestern willow flycatcher sites in red). <u>See also</u> Miscellaneous Biological Assessment at 14 (AR 005693). The Miscellaneous Biological Assessment states that the Gila River Bird Area and the Fort West Ditch sites "have been consistently occupied for over 25 years along the Gila River," and that, in 2007, the Forest Service discovered the WS Dam, located along the San Francisco River. Miscellaneous Biological Assessment at 13-15 (AR 005693-95). Further, the Miscellaneous Biological Assessment notes that the Forest Service excludes "livestock grazing from large portion [sic] of the San Francisco and Gila Rivers to improve riparian function." Miscellaneous Biological Assessment at 16 (AR 005695). Given these conditions, the Forest Service determines that over-grazing is one of several environmental conditions that threaten the Southwestern willow flycatcher's habitat:

> Reasons for the decline and lack of recovery for the SWWF are numerous, complex, interrelated, and are predominantly due to loss and modification of riparian habitat. The loss and modification of riparian habitat occurs due to dams and reservoirs, which alters natural stream flow patterns; groundwater pumping and surface water diversion, which may lower water tables and reduce riparian potential; stream channelization and bank stabilization, which separate the stream from its floodplain; removal of riparian vegetation; improper livestock grazing; recreation; fire; and cultural and urban development.

Miscellaneous Biological Assessment at 19 (AR 005698). It is notable that over-grazing threatens the Southwestern willow flycatcher's habit, because, although the project area does not contain any known Southwestern willow flycatcher sites, the Forest Service identifies a small portion of critical habitat along the Gila River in the project area's Southwest corner:

Figure 7.  Southwestern Willow Flycatcher Critical Habitat within Action Area.



Miscellaneous Biological Assessment at 19 (AR 005698).  Overall, the Forest Service finds that the Aerial Shooting will have no effect on the Southwestern willow flycatcher; the project area has no known sites: "For gathering operations no temporary holding facility for feral cattle will be constructed within critical habitat if construction of that temporary facility would adversely affect the primary constituent elements of critical habitat (i.e. riparian vegetation removal)." Miscellaneous Biological Assessment at 20 (AR 005699).

The Miscellaneous Biological Assessment states that the narrow-headed gartersnake, a threatened species, has been observed in two locations within the Project Area: Little Creek and

Turkey Creek.[34]  Miscellaneous Biological Assessment at 53.  The project area contains some

narrow-headed gartersnake critical habitat along Little Creek:



Figure. Critical Habitat within the action area

Miscellaneous Biological Assessment at 56 (AR 005735).  The Forest Service states that, although

it has not observed the Gila Cows using Little Creek, it has observed the Gila Cows grazing along

Turkey Creek, and "[the Gila Cows] are responsible for riparian and aquatic habitat degradation"

there."  Miscellaneous Biological Assessment at 57 (AR 005736).

 During the warmer parts of the year feral cattle utilize Turkey Creek extensively.
One can find deep holes pawed in the sand by the cattle where they sand bathe to

---

[34]The Forest Service last recorded the narrow-headed gartersnake's presence in Turkey
Creek in 1985, and that area's population status is "not likely viable."  Miscellaneous Biological
Assessment at 53 (AR 005732).  Similarly, the Forest Service last recorded the species' presence
in Little Creek in 2010, and that area's population status is also "not likely viable."  Miscellaneous
Biological Assessment at 53 (AR 005732).

try and reduce insects that they attract. Feral cattle sign (tracks, feces) has been observed in a prehistoric site consisting of a masonary [sic] and rock wall enclosing the opening of a shallow cave, the feral cattle have damaged the wall where they enter and exit the structure.

Miscellaneous Biological Assessment at 57 (AR 005736). The Forest Service also notes that "[h]igh stream-side recreation levels" can contaminate streams, which harms native fish and lowers the narrow-headed gartersnake's prey base. Miscellaneous Biological Assessment at 55 (AR 005734). Although the Miscellaneous Biological Assessment does not make explicit this connection, the Court notes that the Gila Cows' observed activity near Turkey Creek may threaten the narrow-headed gartersnake by contaminating the water and killing the fish that the narrow-headed gartersnake eats. The Commenting Petitioners argue, on the other hand, that a decomposing Gila Cow carcass may contaminate these same waterways and upset the ecological balance. See Cattle Growers Comments at 8 (AR 004991); Shirley Comments at 9 (AR 005324). The Forest Service asserts, however, that "[l]arge animals such as elk, deer, cattle, and horses often succumb to natural causes of death in these same streams," and, accordingly, any Gila Cow carcasses that rot in or near waterways will have "no more of an impact" than another large animal "naturally succumbing in the same place."[35] Miscellaneous Biological Assessment at 57 (AR 005736). Given these dynamics, the Miscellaneous Biological Assessment concludes that the Aerial Shooting will have no effect on the narrow-headed gartersnake. See Miscellaneous Biological Assessment at 57 (AR 005735).

---

[35]The Decision Memo. and the Scoping Letter state that the Forest Service will remove any Gila Cow carcass located in or near a waterway, although Miscellaneous Biological Assessment's section on the narrow-headed gartersnake, loach minnow, or spikedace does not mention this fact . See Decision Memo. at 6, 8 (AR 005904, AR 005906); Scoping Letter at 2 (AR 004289).

The Gila chub, an endangered species, "is known to occur only in perennial[36] portions of Turkey Creek," Miscellaneous Biological Assessment at 28 (AR 005707), in the project area, which also contains designated critical habitat

Figure 9.  Gila Chub Distribution and Critical Habitat within the Action Area.



---

[36]A perennial stream is one that typically has water flowing in it year-round.  See U.S. Environmental Protection Agency, Learn About Streams, (last updated October 10, 2024), available at https://www.epa.gov/cwa-404/learn-about-streams (last visited October 21, 2024).

Miscellaneous Biological Assessment at 29 (AR 005708).  <u>See</u> Miscellaneous Biological Assessment at 30 (AR 005709)("The entire [Turkey Creek segment where the Gila chub occupy] occurs within the action area").  Although the Turkey Creek Gila chub population is "robust and stable," the Forest Service observes:

> Approximately 85-90 percent of the Gila chubs' habitat has been degraded or destroyed, and much of it is unrecoverable.  Today, much of the remaining Gila chub habitat across its range is still extensively grazed, current mining operations still operate in its watersheds, increased recreation use adds to habitat alteration, and the introduction of nonnatives adds to habitat degradation.

Miscellaneous Biological Assessment at 28 (AR 005707).  In evaluating the Aerial Shooting's effect on the Gila chub, the Forest Service suggests that, because the Gila chub occupy a Turkey Creek segment that is "very narrow and consists of bedrock outcrops and large boulders," Gila Cows are not likely to be in the area.[37]  Accordingly, the Miscellaneous Biological Assessment concludes that the Aerial Shooting will have no effect on the Gila chub.  <u>See</u> MBA at 30 (AR 005709).

The loach minnow, an endangered species, occurs in Gila River segments within the project area; "the entire reach of the Gila River within the action area is designated critical habitat":

---

[37]There is a word missing from the Miscellaneous Biological Assessment here:

> Aerial shooting operations may take place within Turkey creek [sic] and gathering may occur in the upper reaches of Turkey Creek where feral cattle use has been observed in the past.  The occupied reach of stream is very narrow and consists of bedrock outcrops and large boulders, making access for both feral cattle and horseback riders.

Miscellaneous Biological Assessment at 30 (AR 005709).  Based on the context, the Court concludes that the Forest Service meant to include the word "difficult" -- or a synonym -- at the end of the second sentence.

**Figure 11.  Loach Minnow Critical Habitat on the Gila National Forest.**



Miscellaneous Biological Assessment at 36-37 (AR 005715-16).  The Miscellaneous Biological

Assessment asserts that activities like "domestic livestock grazing, mining, agriculture, timber

harvest, recreation, development, or impoundments . . . degrade loach minnow habitats by altering

flow regimes, increasing watershed and channel erosion and thus sedimentation, and adding

contaminants to streams and rivers."  Miscellaneous Biological Assessment at 37 (AR 005716).

Although Gila Cows "are present within the reaches of the Gila River" that the loach minnow

occupies, the Miscellaneous Biological Assessment concludes that the Aerial Shooting will have

no effect on the loach minnow, because (i) Gila Cow carcasses decomposing in or near the Gila

River pose no higher contamination risk than naturally decomposing large animals like cattle, elk,

deer, and horse; and (ii) the Forest Service will not construct any holding facilities that impact the

loach minnow's critical habitat.  See Miscellaneous Biological Assessment at 38 (AR 005717).

Like the loach minnow, the spikedace, an endangered species, occurs in Gila River

segments within the project area, and "designated critical habitat is present along the entire reach

of the Gila River within the action area":



Miscellaneous Biological Assessment at 40-41 (AR 005719-20)(showing critical habitat in red). The Miscellaneous Biological Assessment asserts: "Resource activities that affect water quality, such as removal of riparian vegetation, sedimentation, or control of water levels, can affect spikedace habitat quality and should be avoided or corrected." Miscellaneous Biological Assessment at 41 (AR 005720). The Forest Service's no-effect analysis for the spikedace is almost identical to its loach minnow analysis: there is no anticipated effect, because decomposing Gila Cows are no different than other large, decomposing animals, and the Forest Service will not construct any facilities that impact critical habitat. See Miscellaneous Biological Assessment at 42 (AR 005721).

The Miscellaneous Biological Assessment also determines that, although the Gila trout, yellow-billed cuckoo, and monarch butterfly do not have critical habitat in the project area, each of these three species occurs or possibly occurs there. See Miscellaneous Biological Assessment at 4 (AR 005681). The Gila trout, a threatened species, occupies a portion of Little Creek within the project area, and, because the Gila Cows "have not been observed within Little Creek itself," MBA at 34 (AR 005713), the Forest Service determines that the Aerial Shooting will have no effect on the Gila trout in Little Creek, see Miscellaneous Biological Assessment at 32-34 (AR 005711-13). In a 2002 survey, two yellow-billed cuckoos, a threatened species, are detected in the project area. See Miscellaneous Biological Assessment at 23 (AR 005702). The Forest Service notes, however, that the species is not known currently to occupy the project area. See Miscellaneous Biological Assessment at 26 (AR 005705). The Forest Service asserts that, not only will the Aerial Shooting not damage any riparian vegetation within the yellow-billed cuckoos' critical habitat, but also that removing the Gila Cows "will allow for riparian community enhancement and improve any habitat in the action area for the species." Miscellaneous Biological

Assessment at 26 (AR 005705).  The Forest Service also states that no temporary holding facilities will be constructed near either the Gila trout or the yellow-billed cuckoo's habitats.  See Miscellaneous Biological Assessment at 26, 34 (AR 005705; AR 005713).  Although the Forest Service identifies the monarch butterfly as a candidate[38] species, the Miscellaneous Biological Assessment provides no analysis regarding the Aerial Shooting's effects on its ecological viability. See Miscellaneous Biological Assessment at 1-57 (AR 005680-736).

The Forest Service next concludes that the Aerial Shooting's impact on the second identified resource condition-- flood plains,[39] wetlands, or municipal watersheds[40] -- also does not

---

[38]"A species that we find warrants a proposal to list as endangered or threatened, but listing is precluded by higher priority listing activities, is referred to as a candidate species."  U.S. Fish and Wildlife Service, Candidate Conservation, available at https://www.fws.gov/program/candidate-conservation#:~:text=A%20species%20that%20we%20find%20warrants%20a%20proposal,acti vities%2C%20is%20referred%20to%20as%20a%20candidate%20species. (last visited October 23, 2024).  See also Forest Service Manual § 2670.5 (defining candidate species as "plant and animal species that, in the opinion of the [Fish and Wildlife Service], may become endangered or threatened.")

[39]According to the United States Department of the Interior, United States Geological Survey:

> Flood plains are lands bordering rivers and streams that normally are dry but are covered with water during floods. Buildings or other structures placed in flood plains can be damaged by floods. They also can change the pattern of water flow and increase flooding and flood damage on adjacent property by blocking the flow of water and increasing the width, depth, or velocity of flood waters.

U.S. Department of the Interior, Floods and Flood Plains (last modified January 11, 2013), available at https://pubs.usgs.gov/of/1993/ofr93-641/ (last visited October 23. 2024) (emphasis omitted).

[40]"A watershed is an area of land that drains all the streams and rainfall to a common outlet such as the outflow of a reservoir, mouth of a bay, or any point along a stream channel."  U.S. Department of the Interior, Watersheds and Drainage Basis (Dated June 8. 2019), available at https://www.usgs.gov/special-topics/water-science-school/science/watersheds-and-drainage-basins (last visited October 23, 2024).

constitute extraordinary circumstances. <u>See</u> Decision Memo. at 11 (AR 005909). According to the Forest Service, there are no municipal watersheds within or downstream of the project area, and the Aerial Shooting will not disturb flood plains, because the Forest Service would not construct any temporary gathering structures within flood plains. <u>See</u> Decision Memo. at 11 (AR 005909). Regarding the possibility that the Gila Cow carcasses may contaminate water quality and damage the project area's wetlands, the Forest Service references a water resources specialist report, <u>see</u> Carolyn Koury, Gila National Forest, U.S. Forest Service, <u>Watershed & Air Specialist Report</u> at 1-11 (dated January 31, 2023)(AR 005562-72)("Water Specialist Report"), that "concluded the long-term benefits of removing feral cattle from riparian areas and allowing for natural vegetation recovery greatly outweigh any short-term negative impacts a cow carcass may have on water quality," Decision Memo. at 11 (AR 005909). The Decision Memo. states that two factors support the Water Specialist Report's conclusion: (i) over-grazing lasts much longer than rotting carcasses (months/years vs. days/weeks); and (ii) the Forest Service will remove any carcass left in or near a waterway. Decision Memo. at 11 (AR 005909).[41] Crystallizing the water damage that over-grazing causes, the Decision Memo. states that the Gila Wilderness' two primary waterways are in a state of non-attainment because of their water temperature, and that "[r]emoving unauthorized grazing impacts from stream banks along the Gila River and Turkey Creek will contribute to long-term benefits towards achieving water temperature attainment standards." Decision Memo. at 11 (AR 005909).

---

[41]The Forest Service also notes that large animals die in the Gila Wilderness, and, "in most cases, it is likely the carcass, especially wildlife, naturally decompose without any intervention." Decision Memo. at 11 (AR 005909). To extrapolate, large animals that die naturally near Gila Wilderness waterways will often decompose and possibly contaminate the water.

The Water Specialist Report details how over-grazing damages streams, raises water temperatures, and threatens riparian ecosystems. <u>See</u> Water Specialist Report at 7-8 (AR 005568-69). Surveying scientific research regarding over-grazing's physical impact on waterways and the resulting ecological damage, the Water Specialist Report states:

> Researchers estimate that 80 percent of the damage incurred by streams and riparian systems in arid environments is from grazing livestock [Bureau of Land Management, U.S. Department of the Interior, <u>Rangeland Reform: 1994 Draft Environmental Impact Statement</u>]. Stream and riparian damage resulting from livestock grazing includes alterations in watershed hydrology, changes to stream channel morphology, soil compaction and erosion, riparian vegetation destruction, and water quality impairment [A.J. Belsky, A. Matzke, & S. Uselman, <u>Survey of Livestock Influences on Stream and Riparian Ecosystems in the Western United States</u>, 54 <u>J. Soil & Water Conservation</u>; 419 (1999)]. Livestock trampling of stream banks can widen channels, channelize streams, and vertically erode banks. [S. M. Wondzell, <u>The influence of forest health and protection treatments on erosion and stream sedimentation in forested watersheds of eastern Oregon and Washington</u>. 75 <u>Nw. Sci.</u>, 128 (2001)]. This widening and trenching affect both aquatic and terrestrial life forms as trenching subsequently lowers the water table, which reduces water availability to streambank vegetation, and stream shallowing degrades native fish habitats. [Phillip J. Howell, <u>Effects of Disturbance and Management of Forest Health on Fish and Fish Habitat in Eastern Oregon and Washington</u>. 75 <u>Nw. Science</u> 157 (2001); S. M. Wondzell, <u>The Influence of Forest Health and Protection Treatments On Erosion and Stream Sedimentation In Forested Watersheds of Eastern Oregon and Washington</u> 75 <u>Nw. Sci.</u> 128 (2001)]. Widening of the channel also results in an increase of stream surface area which also leads to an increase in temperature.

Water Specialist Report at 7 (AR 005568)(brackets added). The Water Specialist Report provides information on how the Gila Cows, in particular, over-graze and damage the Gila Wilderness' waterways:

> Negative impacts to riparian areas in the project area due to livestock grazing have been documented. The persistence of livestock would result in continued long-term resource damage to riparian resources where they congregate, similar to the 2020 observations by Forest personnel. Bank trampling, trailing, wallowing, and browsing of riparian woody and herbaceous[42] vegetation would

---

[42]"Herbaceous plants are vascular plants that have no persistent woody stems above ground." <u>Herbaceous plant</u>, Wikipedia, available at

continue along the Gila River and its riparian corridor, particularly during hotter and drier months, as this may be their only water source. Loss of deeply rooted riparian species often results in accelerated bank erosion during high flow events. Upland herbaceous vegetation on benches adjacent to the Gila River would continue to <u>see</u> high use from unauthorized livestock.

Water Specialist Report at 7-8 (AR 005568-69). The Water Specialist Report documents the "2020 observations by Forest personnel" with a series of photographs from the field visit:



Photo 1. High use on riparian herbaceous vegetation



Photo 2. Browse on cottonwood seedlings



Photo 3. Dust wallow near Gila River



Photo 4. Upland bench with high use noted by livestock

---

https://en.wikipedia.org/wiki/Herbaceous_plant (last visited November 4, 2024). Vascular plants are plants with specialized tissues that conduct water, minerals, and organic materials throughout the plant. <u>See</u> <u>Vascular plant</u>, Wikipedia, available at https://en.wikipedia.org/wiki/Vascular_plant (last visited November 4, 2024).

The Water Specialist Report also describes the current state of the Gila Wilderness' waterways and how removal of riparian vegetation would exacerbate the situation:

> Water quality in the Gila River and Turkey Creek within the project area is currently temperature impaired. Water temperature is an important physical parameter, which can determine the overall health of aquatic ecosystems. Research has shown that shading of streams by riparian vegetation can reduce stream temperatures by as much as 18°F as well as reducing the daily and seasonal variation in temperature that would occur if the stream were unshaded. This variation is particularly important during low flows in summer, because unshaded streams can become so warm that many invertebrates and fish are badly stressed or killed . . . . In wider rivers, riparian shading is less significant, but water temperatures may be governed by runoff and by warming on exposed floodplains. The most effective known method to reduce surface water temperature is to increase effective shade in areas where trees have been removed . . . .

Water Specialist Report at 8 (AR 00556)(citations omitted and ellipses added).  The Water Specialist Report separately notes that riparian vegetation filters sediment before it enters the water, further protecting water quality.  See Water Specialist Report at 8 (AR 00556).  In sum, the Water Specialist Report details extensively how over-grazing upsets the delicate balance of the Gila Wilderness' riparian systems, because grazing cattle physically damage stream banks and remove shading vegetation, thereby increasing water temperature and threatening aquatic wildlife. See Water Specialist Report at 7-8 (AR 005568-69).

The Water Specialist Report also does not ignore the threat that rotting carcasses pose to the Gila Wilderness' waterways.  See Water Specialist Report at 9 (AR 005570).  These carcasses, if left near waterways, increase nitrogen and phosphorus levels, and decrease dissolved oxygen in the immediate vicinity as bacteria and other microorganism that decompose the carcasses consume extra oxygen.  See Water Specialist Report at 9 (AR 005570).  Additionally, a cow carcass may increase the presence of cryptosporidium -- a parasite that, when consumed, causes diarrhea, vomiting, and nausea -- in the water.  See Water Specialist Report at 9 (AR 005570).  The Water

Specialist Report concludes, however, that these negative impacts would be short-lived while the carcass decomposes and diluted over time and distance in running waterways.  See Water Specialist Report at 9 (AR 005570).  Moreover, removing any carcasses from waterways would mitigate these health and ecological risks.  See Water Specialist Report at 9 (AR 005570).

The Water Specialist Report concludes that the Aerial Shooting "poses a higher benefit over the long-term for riparian resources and water quality versus" not removing the Gila Cows at all.  Water Specialist Report at 10 (AR 005571).  In short, removing the Gila Cows en masse improves the Gila Wilderness' riparian conditions: absent severe over-grazing and hoof trampling, riparian vegetation flourishes, stream channel conditions recover, and floodplains stabilize.  See Water Specialist Report at 8-9 (AR 005669-70).  Vigorous riparian vegetation and well-maintained stream channels and floodplains improve the shading and filtration of the Gila Wilderness' waterways, which lowers water temperature, protects water quality, and, ultimately, benefits the diverse species that inhabit these waterways.  See Water Specialist Report at 8-9 (AR 005669-70).  Accordingly, the Water Specialist Report states that the Aerial Shooting will improve the project area's wetlands, rather than damaging them.  See Water Specialist Report at 9 (AR 00570).  The Water Specialist Report concludes that, given that "there are no anticipated changes to floodplain function," and that "there are no designated municipal watersheds associated with" the project area, "[t]here are no extraordinary circumstances regarding floodplains, wetlands, or municipal watersheds."  Water Specialist Report at 9-10 (AR 00570-71).

Regarding the third identified resource condition -- Congressionally designated areas such as wilderness, wilderness study areas, or national recreation areas -- the Forest Service acknowledges that the scoping comments identify the Aerial Shooting's helicopter use as an extraordinary circumstance.  See Decision Memo. at 12 (AR 005910); Cattle Growers Comments

at 17 (AR 005000)("Congress has already determined that use of motorized or mechanical equipment negatively impact wilderness areas and has prohibited their use.")(citing 16 U.S.C. § 1133(c);[43] Shirley Comments at 18 (AR 005333)(same).    The Decision Memo. implies that, because the Aerial Shooting does not involve a helicopter landing in the Gila Wilderness, the action does not violate the Wilderness Act's provisions barring helicopter use:

> The use of helicopters in wilderness was cited in scoping comments as an extraordinary circumstance.    Section 4(c) of the Wilderness Act[, 16 U.S.C. § 1133(c),] prohibits the landing of aircraft within designated wilderness, whether helicopter or fixed wing.  The proposed action does not include nor does this decision authorize the landing of helicopters in wilderness.

Decision Memo. at 12 (AR 00510).  The Forest Service states that it conducted a minimum requirements analysis,[44] which: (i) analyzes sufficiently the helicopter's impact; and (ii) concludes that the Aerial Shooting is the "minimum tool necessary to protect wilderness character and

---

[43]16 U.S.C. § 1133(c) provides:

Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C. § 1133(c).

[44]An agency may conduct a minimum requirements analysis to "evaluate actions proposed in wilderness involving a use otherwise prohibited by the Wilderness Act, [Section 4(c), 16 U.S.C. § 1133(c)]."    Minimum Requirements Analysis Framework: Gila Wilderness - - Unauthorized Cattle Removal at 1 (dated January 9. 2023), Gila National Forest (AR 005966)("Minimum Requirements Analysis").    A minimum requirements analysis is "designed to examine whether a project truly needs to occur in wilderness, and if so, how to accomplish it with the least impact to the wilderness resource."  Minimum Requirements Analysis at 1 (AR 005934).

address the feral cattle issue." Decision Memo. at 12 (AR 005910). <u>See</u> Minimum Requirements

Analysis Framework: Gila Wilderness -- Unauthorized Cattle Removal at 33 (dated January 9.

2023), Gila National Forest (AR 005966)("Minimum Requirements Analysis"). The Minimum

Requirements Analysis has two sections. <u>See</u> Minimum Requirements Analysis at 1-36

(AR 005934-69). First, the Minimum Requirements Analysis evaluates whether removing the

Gila Cows is necessary. <u>See</u> Minimum Requirements Analysis at 2-8. Here, the Forest Service

concludes that they must remove the Gila Cows to maintain two of the five wilderness

qualities:[45]Natural Quality, and Outstanding Opportunities for Solitude or Primitive and

Unconfined Recreation Quality. Regarding the first quality, the Minimum Requirements Analysis

---

[45]The Forest Service defines the five wilderness character qualities:

(1) The Untrammeled Quality of wilderness character monitors authorized actions that intentionally manipulate or control ecological systems, (2) The Natural Quality of wilderness character encompasses all naturally occurring biological and physical elements of wilderness: plant and animal species and communities, soil, air, and water. This quality also includes the interactions among these elements and the resulting ecological processes or functions that occur in wilderness, (3) The Undeveloped Quality of wilderness character means wilderness retains its primeval character and influence and is essentially without permanent improvement or modern human occupation, such as structures and installations, as well as the use of motor vehicles, motorized equipment, and mechanical transport, (4) The Outstanding Opportunities for Solitude and Primitive and Unconfined Recreation Quality means that visitors are free from encountering other visitors, and free from the sights and sounds of modern civilization, and that visitors require self-reliance, and skills in wilderness travel. It encompasses the sense of discovery, adventure, and mental challenge where one can travel and explore unique and unknown environments on one's own, (5) The Other Features of Value Quality centers on unique and tangible features of a wilderness that are integral to the wilderness character of that place.

Phillip Walrod and Kyle Grambley, <u>Feral Livestock Removal Gila National Forest: Wilderness Resource Report</u> at 3, Gila National Forest, Wilderness Ranger District (AR 005741)("Wilderness Resource Report").

asserts that the Gila Cows' over-grazing and trampling near waterways degrades riparian habitats and damages federally listed species' habitats, including those of the narrow-headed gartersnake, Gila trout, Mexican spotted owl, and Mexican gray wolf. See Minimum Requirements Analysis at 5 (AR 005938). Regarding the second quality, the Minimum Requirements Analysis states: "Feral Cattle presence in wilderness affects visitors [sic] experience by their mere existence. A reminder for modern civilization, feral cattle hinder the visitors sense of discovery. In addition, where cattle are present, they produce trails in and out of riparian zones creating multiple trail braiding along system trails, and piles of manure." Minimum Requirements Analysis at 5 (AR 005938). The Minimum Requirements Analysis also asserts that the Gila Cows must be removed, because the Endangered Species Act requires it, given that the Gila Cows' damage to riparian areas threatens several endangered or threatened species, including the narrow-headed gartersnake, Gila Trout, Gila chub, loach minnow, spikedace, and Southwestern willow flycatcher. See Minimum Requirements Analysis at 7 (AR 005940).

In the second section, the Minimum Requirements Analysis evaluates three[46] ways to remove the Gila Cows: (i) using horse mounted livestock handlers -- after scouting the areas with

---

[46]The Minimum Requirements Analysis also identifies three additional alternatives that are "considered but dismissed," Minimum Requirements Analysis at 31 (AR 005964), and explains why the Forest Service dismissed each option. These three options are: (i) helicopter herding, with horse mounted livestock handlers assisting; (ii) public hunting; and (iii) sterilizing the Gila Cows. See Minimum Requirements Analysis at 31 (AR 005964). The Forest Service's prior attempt at helicopter herding was not successful, because "the horse mounted livestock handlers were unable to keep up with the speed of the helicopter," and "the helicopter spooked the feral cattle[,] causing a stampede." Minimum Requirements Analysis at 31 (AR 005964). The public hunt option "was not analyzed because Forest Service policy dictates that the state agency has jurisdiction over the implementation of public hunts on federal land." Minimum Requirements Analysis at 31 (AR 005964). The sterilization option, which involves injecting female Gila Cows with an immunocontraceptive or "castrating the bulls through banding" is "deemed ineffective," because the Forest Service would have to capture all the Gila Cows of one gender before sterilizing them. Minimum Requirements Analysis at 31 (AR 005964).

a low-flying helicopter -- to wrangle the Gila Cows and euthanize as needed; (ii) shooting the Gila Cows from a low-flying helicopter -- i.e., the Aerial Shooting; and (iii) using a system of corrals to contain and herd the Gila Cows after scouting the areas with a low-flying helicopter.  See Minimum Requirements Analysis at 16-30 (AR 005949-63).  For each option, the Forest Service describes how it intends to perform the action and how the action will impact each of the five wilderness qualities.  See Minimum Requirements Analysis at 16-30 (AR 005949-63).  Regarding the Aerial Shooting's impact, the Minimum Requirements Analysis notes that the helicopter may harm: (i) the Undeveloped Quality if it needs to land in the wilderness "for some unforeseen issue"; (ii) the Natural Quality if it "negatively affect[s] behavior of elk, deer, or other wildlife due to disturbance"; and (iii) the Outstanding Opportunities for Solitude and Primitive and Unconfined Recreation Quality, because the Forest Service would close the project area, and anyone near the project area may hear the "sights and sounds of the low flying helicopters."  Minimum Requirements Analysis at 23-24 (AR 00596-97).  The Minimum Requirements Analysis also asserts, however, that the other two options -- using horse mounted livestock wranglers or building corral systems -- also will require a helicopter to scout the locations.  See Minimum Requirements Analysis at 18-19 (AR 005951-52).  For the first option, the wranglers may also need to install temporary installations to contain the Gila Cows as they are captured, further diminishing the Gila Wilderness' Undeveloped Quality.  See Minimum Requirements Analysis at 18-19; 28-29 (AR 005951-52; AR 005961-62).  For the third option, the corral systems would also further diminish the Gila Wilderness' Undeveloped Quality, because the corrals last many decades and "make it easier for people in the future to impose their will on the environment," and would require "user created path[s] to the stream[s]" so that the captured cattle could access water while they are impounded.  Minimum Requirements Analysis at 29 (AR 005962).

The Minimum Requirements Analysis concludes that the Aerial Shooting is the "minimum action necessary to accomplish the removal of feral cattle," because it is the shortest and most effective option. Minimum Requirements Analysis at 33 (AR 005966). Although the Aerial Shooting's impact on the Undeveloped and Outstanding Opportunities for Solitude and Primitive and Unconfined Recreation Qualities is "severe," Minimum Requirements Analysis at 33 (AR 005966), it is short-lived, see Minimum Requirements Analysis at 33 (AR 005966). While the other two options may take six months, the Aerial Shooting is expected to last only a few weeks, including both reconnaissance and shooting flights. See Minimum Requirements Analysis at 33 (AR 005966). Moreover, the Forest Service expects that the Aerial Shooting will successfully remove enough Gila Cows in one event, whereas the other two options "would have to be repeated year after year for several years until fully successful." Minimum Requirements Analysis at 33 (AR 005966). In sum, the Forest Service considers the project area's wilderness designation as a possible extraordinary circumstance, and, after conducting a Minimum Requirements Analysis, concludes that there are no extraordinary circumstances related to this third resource condition because: (i) removing the Gila Cows improves the project area's wilderness character; and (ii) the Aerial Shooting is the minimal tool to achieve this goal. See Decision Memo. at 12 (AR 005910); Minimum Requirements Analysis at 1-36 (AR 005934-69).

The Decision Memo. moots the fourth resource condition -- inventoried roadless areas or potential wilderness areas -- by noting that no inventoried roadless areas or potential wilderness areas are found within the project area. See Decision Memo. at 12 (AR 005910). The fifth resource condition -- research natural areas -- also does not concern the Forest Service, because only the Turkey Creek Research Natural Area is within the project area. See Decision Memo. at

12 (AR 005910).  The Forest Service asserts that removing the Gila Cows improves rather than degrades the area.  See Decision Memo. at 12 (AR 005910).

Regarding the sixth resource condition -- American Indians and Alaska Native religious or cultural sites, the Decision Memo. states that the Forest Service mailed a government-to-government consultation[47] letter to fourteen tribal governments, and that the responses received indicate that the "proposed action would have no adverse effect on the tribe's cultural heritage resources and/or historic properties."  Decision Memo. at 12 (AR 005910).  The Forest Service mailed nearly identical letters to the Alamo Navajo Chapter, Comanche Nation of Oklahoma, Fort Sill Apache Tribe, Pueblo of Acoma, Pueblo of Isleta, Pueblo of Laguna, Pueblo of Zuni, Ramah Navajo Chapter, San Carlos Apache Tribe, Hopi Tribe, Navajo Nation, White Mountain Apache Tribe, and Ysleta del Sur Pueblo.  See Gila National Forest, U.S. Forest Service, Scoping Mailing List -- Tribal at 1 (dated November 8, 2022)(AR 004268); Letter from Camille Howes to President Robert Aguilar, Mescalero Apache Tribe Re: at 1-4 (dated November 18, 2022)(AR 004298-

---

[47]The Interior Department states:

> A Tribal consultation is a formal, two-way, government-to-government dialogue between official representatives of Tribes and Federal agencies to discuss Federal proposals before the Federal agency makes decisions on those proposals. The Federal agency provides sufficient advance notice to appropriate Tribal leaders of upcoming consultation sessions and, following the consultation sessions, explains to those Tribal leaders how the final agency decision incorporates Tribal input.

What is Tribal Consultation?, U.S. Department of the Interior, Bureau of Indian Affairs, available at https://www.bia.gov/service/tribal-consultations/what-tribal-consultation#:~:text=A%20Tribal%20consultation%20is%20a%20formal%2C%20two-way%2C%20government-to-government,the%20Federal%20agency%20makes%20decisions%20on%20those%20proposals (last visited October 29, 2024).

301)("Mescalero Apache Tribe Consultation Letter").  Much like the Scoping Letter, these letters

outline the Aerial Shooting's motivations and scope, reference the Forest Service's legal authority

to conduct the shoot, and provide a map that defines the project area.  See Mescalero Apache Tribe

Consultation Letter at 1-4 (AR 004298-301).  The letters also contextualize the correspondence by

referencing several regulations, including 36 C.F.R. § 800,[48] Executive Orders 13175[49] and

13007,[50] Forest Service Manual § 1560,[51] and Forest Service Handbook § 1509.13,[52] that compel

the Forest Service to evaluate its actions' cultural resource impacts and engage in formal tribal

consultation.  See Mescalero Apache Tribe Consultation Letter at 1 (AR 004298).  Of the fourteen

consulted tribes, three of them responded.  See Letter from Mark T. Altaha to Camille Howes Re:

---

[48]The regulation provides, in relevant part, that "Indian tribes and Native Hawaiian organizations," 36 C.F.R. § 800.1(c)(2), have "consultive roles," 36 C.F.R. § 800.1(c), when agencies evaluate "the effects of their undertakings on historic properties," 36 C.F.R. § 800.1(a).

[49]The Executive Order details an "accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory polices," where agencies must consult with tribal before promulgating rules that affect tribal resources and sovereignty.  Executive Order No. 13175 § 5, 65 Fed. Reg. 67249 (November 6, 2000).

[50]To "accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and [] avoid adversely affecting the physical integrity of such sacred sites," federal agencies must, inter alia, implement "procedures to ensure reasonable notice is provided of proposed actions or land management policies that may restrict future access to or ceremonial use of, or adversely affect the physical integrity of, sacred sites."  Executive Order No. 13007 §§ 1-2, 61 Fed. Reg. 26771 (May 24, 1996).

[51]The Forest Service Manual says that "determinations as to when a Federal action may have a substantial direct effect on an Indian tribe's interests may be defined by the Indian tribe's perspective," and that a federal agency should consult with potentially affected Indian tribes if there are questions whether the agency's policy will have a substantial direct effect.  Forest Service Manual § 1563.01c.  In this same section, the Forest Service Manual also identifies twelve laws and regulations that govern agency consultation with Indian Tribes.  See Forest Service Manual § 1563.01c.

[52]The Forest Service Handbook outlines consultation protocols, including which Forest Service employees may consult with tribes, when the consultation should occur, and what forms it can take.  See Forest Service Handbook § 1509.13.

Proposed Removal of Feral Cattle on the Gila Wilderness -- Gila National Forest at 1 (dated December 13, 2022)(AR 004575)("White Mountain Apache Tribe Response"); Tribal Consultation Response Letter at 1 (dated November 29, 2022)(signed December 8 and 22, 2022), San Carlos Apache Tribe (AR 004682)("San Carlos Apache Tribe Response") Email from Omar Villanueva to Belinda Mollard Re: Proposal to Conduct Feral Cattle Removal from Gila Wilderness at 1-2 (dated January 5, 2024)(AR 004977-78)("Ysleta del Sur Pueblo Response"). Both the White Mountain Apache Tribe and the San Carlos Apache Tribe say that the Aerial Shooting will have no adverse effect on cultural and historic resources.  See White Mountain Apache Tribe Response at 1 (AR 004575); San Carlos Apache Tribe Response at 1 (AR 004682). Although the Ysleta del Sur Pueblo does not oppose the Aerial Shooting, they say that they are "hopeful that this proposal is handled in the best humanly [sic] way possible," and request that "some of the tribes be able to maybe go collect any hides or parts of the downed cattle."  Ysleta del Sur Pueblo Response at 1 (AR 004977).  The Ysleta del Sur Pueblo also asserts that they "would not like to consult Government-to-Government."  Ysleta del Sur Pueblo at 1 (AR 004977).

Regarding the seventh resource condition -- archaeological sites, or historic properties or areas -- the Decision Memo. states that the Aerial Shooting does not involve any ground-disturbing activities and that any temporary corrals will be located outside designated wildness in consultation with an archaeologist.  See Decision Memo. at 12 (AR 005910).  The Forest Service also asserts that the district archaeologist determined that the Aerial Shooting will have no adverse effect on cultural resources and that the Animal Inspection Service will avoid shooting Gila Cows near known culturally sensitive locations.  See Decision Memo. at 12 (AR 005910).  See also Email from Chris Adams to Jeffrey Shearer, cc'ed Aimee Oliver Re: Archaeological Clearance for the Removal of Livestock From the Gila Wilderness at 1 (dated January 30,

2023)(AR 005560)("District          Archaeologist          Clearance          Email")(Forest          Service

archaeologist)(explaining that there is "no impact to cultural resources when shooting from a fixed

aircraft" and granting archaeological clearance for the Aerial Shooting); Letter from Geoff Cunnar

to Henry Provencio Re: HPD Log 118508, Gila National Forest Proposal to Conduct Feral Cattle

Removal from the Gila Wilderness at 2 (dated December 5, 2022)(AR 004519)("SHPO Comment

Letter")(New Mexico Cultural Affairs Department staff archaeologist)(thanking the Forest Service

for "asking the State Historic Preservation Office (SHPO) to comment" on the Aerial Shooting

proposal and requesting that the Forest Service consult with SHPO "[i]f there is a need for any off-

road staging areas that could possibly result in disturbance to cultural resources").

      To summarize, the Decision Memo. concludes that the Aerial Shooting is excluded

categorically from the NEPA's requirement that the Forest Service produce an EA or an EIS,

because at least one categorical exclusion applies, and there are no extraordinary circumstances.

See Decision Memo. at 8-12 (AR 005906-10). The Forest Service identifies three applicable CEs:

(i) civil and criminal enforcement and investigative activities under 7 C.F.R. § 1b.3(a)(5);

(ii) timber stand and/or wildlife habitat improvement activities under 36 C.F.R. § 220.6(e)(6); and

(iii) short-term resource or public health and safety protection under 36 C.F.R. § 220.6(d)(1). See

Decision Memo. at 8-9 (AR 005906-07). The Forest Service then evaluates the seven requisite

resource conditions to determine that no extraordinary circumstances exist. See Decision Memo.

at 9-12 (AR 005907-10). These resource conditions are: (i) threatened, endangered, or sensitive

species, and/or designated or proposed critical habitats; (ii) flood plains, wetlands, or municipal

watersheds; (iii) Congressionally designated areas such as wilderness, wilderness study areas, or

national recreation areas; (iv) inventoried roadless areas or potential wilderness areas; (v) research

natural areas; (vi) American Indians and Alaska Native religious or cultural sites; and

(vii) archaeological sites, or historic properties or areas.  <u>See</u> Decision Memo. at 9-12 (AR 005907-10).  The Forest Service analyzes each condition and prepares supplemental materials to conclude that the Aerial Shooting does not affect the resource condition enough such that extraordinary circumstances exist.   <u>See</u> Decision Memo. at 9-12 (AR 005907-10); Mexican Gray Wolf Biological Assessment at 1-10 (AR 005548-57); Miscellaneous Biological Assessment at 1-57 (AR 005680-736); Water Specialist Report at 1-11 (AR 005562-72); Minimum Requirements Analysis at 1-36 (AR 005934-69); Mescalero Apache Tribe Consultation Letter at 1-4 (AR 004298-301); White Mountain Apache Tribe Response at 1 (AR 004575); San Carlos Apache Tribe Response at 1 (AR 004682); Ysleta del Sur Pueblo Response at 1-2 (AR 004977-78); District Archaeologist Clearance Email at 1 (AR 005560); SHPO Comment Letter at 1-3 (AR 004518-20).

### iv.        The Scoping Responses.

The Forest Service includes, attached as Appendix B to the Decision Memo., seventeen pages of responses to comments it received during the public scoping for the Aerial Shooting.  <u>See</u> Scoping Responses at 1-17 (AR 005917-33).  First, the Scoping Responses consider and dismiss several alternative operations that commenters proposed.  <u>See</u> Scoping Responses at 1-4 (AR 005917-20).   Next, the Scoping Responses evaluate concerns that the commenters raise regarding the Aerial Shooting.  <u>See</u> Scoping Responses at 4-17 (AR 005920-33).   The Court discusses each set of responses in turn.

#### (1)        The Forest Service Addresses Comments Proposing Alternative Removal Operations.

Responding to many comments asking the Gila Forest to donate "edible portions of cattle that are lethally removed  to a local food bank, charity, or family support services," the Forest Service asserts that: (i) the logistics of removing thousands of pounds of meat from the Gila

Wilderness in a way that adheres to safe food handling standards are "daunting," Scoping

Responses at 1 (AR 005917); and (ii) because it is not feasible to have a licensed meat inspector

on site during the Aerial Shooting, the Gila Cow meat, even if recovered safely and quickly, would

not meet the Federal Meat Inspection Act, 21 U.S.C. §§ 601 -- 695 ("FMIA"), safety standards,

which require federal inspection personnel to be "'present at all times during livestock slaughter

operations,'" Scoping Responses at 2 (AR 005918)(quoting[53] Inspection of Meat Products, U.S

Department of Agriculture, Food Safety and Inspection Service, available at

https://www.fsis.usda.gov/inspection/inspection-programs/inspection-meat-products (last visited

October 31, 2024)), for meat that is "donated to non-profit organizations, such as charitable

institutions, food banks, and government-supported facilities," Scoping Responses at 2

(AR 005918)(citing 21 U.S.C. § 673(a)(5)(A)[54] and 21 U.S.C. § 467b(a)(5)(A)[55]). Some

commenters also request that the Forest Service permit the public to salvage the Gila Cow meat

themselves. See Scoping Responses at 2 (AR 005918). The Forest Service rejects this proposal

because, given that the project area will be closed during the Aerial Shooting, the public would

not be able to recover the carcass meat quickly enough to ensure safe consumption, even on an

individual basis. See Scoping Responses at 2 (AR 005918). Many commenters also propose a

---

[53]Although this quotation in the Scoping Responses is uncited, it is identical to language found on the Agriculture Department website.

[54]21 U.S.C. § 673(a)(5)(A) says that the United States may condemn and donate any meat product derived from cattle sheep, swine, goats, horses, mules, or other equines that violates the FMIA's safety standards, provided that the product: (i) "has been inspected under this chapter and found to be wholesome and not to be adulterated"; and (ii) "is plainly marked 'Not for Sale.'" 21 U.S.C. § 673(a)(5)(A).

[55]21 U.S.C. § 467b(a)(5)(A) has the same inspection requirements as 21 U.S.C. § 673(a)(5)(A), but for donated poultry products. See 21 U.S.C. § 467b(a)(5)(A).

public hunt of the Gila Cows.  See Scoping Responses at 2 (AR 005918).  The Forest Service

dismisses this alternative because the New Mexico Department of Game and Fish -- rather than

the Forest Service -- has the authority to "designate limited seasons and harvest for wildlife

classified as game animals, nongame animals, furbearers, and unprotected wildlife."  Scoping

Responses at 2 (AR 005918).  Moreover, the Forest Service asserts that the Gila Cows do not fall

into any of those categories.  See Scoping Responses at 2 (AR 005918).  Other commenters

propose restocking vacant allotments within and adjacent to the Gila Wilderness so that grazing

permittees can handle the Gila Cow situation.  See Scoping Responses at 2 (AR 005918).  The

Forest Service dismisses this alternative as too challenging and ineffective.  See Scoping

Responses at 2-3 (AR 005918-19).  Most of the Gila Cows inhabit areas that have not been

authorized for grazing since the 1950s, and other vacant allotments within and adjacent to the Gila

Wilderness may not be suitable for grazing.  See Scoping Responses at 3 (AR 005919).  Managing

a grazing allotment requires a permittee to maintain range infrastructure, which floods and fires

can damage.  See Scoping Responses at 3 (AR 005919).  A grazing allotment in the remote areas

where the Gila Cows roam is much more difficult to maintain, and the Forest Service already

dedicates significant resources to repairing range infrastructure that the 2022 Black Fire[56]

damaged.  See Scoping Responses at 3 (AR 005919).  The Forest Service also dismisses a proposal

to construct permanent corrals at the confluence of Sapillo Creek and the Gila River, and at Fall

River Canyon, to use contractors to herd cattle to those corrals, hold the cattle until they acclimate

---

[56]The 2022 Black Fire was a massive wildfire that began in May, 2022, and blackened over 325,000 acres of state, private, and Gila National Forest lands in 2022.  See On the road to Black Fire recovery (dated October 24, 2023), U.S. Forest Service, available at https://www.fs.usda.gov/detail/gila/news-events/?cid=FSEPRD1148051 (last visited October 31, 2024).

to human presence, and then herd the now-trained Gila Cows out of the Gila Wilderness. See Scoping Responses at 3 (AR 005919). The Forest Service says that it considered this alternative in the Minimum Requirements Analysis, and concluded that permanent corrals are more impactful on the area's wilderness character than the Aerial Shooting. See Scoping Responses at 3-4 (AR 005919-20). Although corrals may have been located at these locations many decades ago (prior to the 1970s), their construction as permanent installations would also require an EIS. See Scoping Responses at 4 (AR 005920). The Forest Service also dismisses the less impactful corral construction alternative -- building temporary corrals at the proposed locations and tearing them down at the end of each gather effort. See Scoping Responses at 4 (AR 005920). While this alternative might remove some Gila Cows along the Gila River, it does not address all the Gila Cows in the rest of the project area. See Scoping Responses at 4 (AR 005920). Finally, the Forest Service dismisses a proposal to sterilize the Gila Cows, because this operation would not remove Gila Cows currently in the Gila Wilderness who are actively damaging riparian ecosystems. See Scoping Responses at 4-5 (AR 005920-21).

### (2)    The Forest Service Defends the Aerial Shooting.

In analyzing public concerns about the Aerial Shooting, the Forest Service repeats many of its arguments in the Decision Memo and in other supporting materials, as this Memorandum Opinion already discusses. The Forest Service says it is authorized to shoot and kill the Gila Cows, because: (i) the animals are not "unauthorized livestock," 36 C.F.R. § 262.10, which can be gathered and impounded only in accordance with 36 C.F.R. § 262.10; and (ii) the Forest Service is authorized to manage and remove invasive species. See Scoping Responses at 4-7 (AR 005920-23). The Scoping Responses assert that the Aerial Shooting does not violate the June, 2022, Stipulation, because the Forest Service notified the relevant parties of the Aerial Shooting as early

as November 22, 2022, which was more than seventy-five days before the operation was set to begin.  See Scoping Responses at 7-8 (AR 005923-24).  The Forest Service states that the Aerial Shooting does not violate the NEPA any of the four ways that the commenters allege: (i) not identifying an applicable CE; (ii) not providing information on the Animal Inspection Service's decision-making process; (iii) not providing information on population estimates and resource damage; and (iv) presupposing that the Aerial Shooting will proceed under a CE regardless of public comment.  See Scoping Responses at 8-10 (AR 005924-26).  Regarding the first alleged NEPA violation, the Scoping Responses say that, under 36 C.F.R. § 220.6(f)(2), the Forest Service must identify an applicable CE in its decision memo, not in the scoping letter.  See Scoping Responses at 8 (AR 005924).  The Scoping Letter says that a CE might be used, and the Decision Memo. identifies three CEs.  See Scoping Responses at 8 (AR 005924); Decision Memo. at 8-9 (AR005906-07).  The Forest Service asserts that, accordingly, the Scoping Letter's failure to identify any specific CE does not violate the NEPA.  See Scoping Responses at 8 (AR 005924).  Regarding the second alleged NEPA violation, the Forest Service says that the Animal Inspection Service "will determine the appropriate level of NEPA analysis" based on its own procedures after "all of the required documentation and authorization from the U.S. Forest Service and other Cooperating Agencies has been received."  Scoping Responses at 9 (AR 005925).  The Scoping Responses also include a link to the Animal Inspection Service's NEPA compliance procedures, which are codified under 7 C.F.R. § 372.  See 7 C.F.R. § 372.  Regarding the third alleged NEPA violation, the Forest Service says that the Scoping Letter provides sufficient background information on the Gila Cow situation.  See Scoping Responses at 9 (AR 005924).  The Scoping Responses also provide more information related to the Gila Cows' resource damage -- and reference supporting materials in the project file -- and describe how the Forest Service has

estimated the Gila Cow population by conducting aerial reconnaissance and private gather operations between October, 2021, and December, 2022.   See Scoping Responses at 9 (AR 005924).

Regarding the fourth alleged NEPA violation, the Forest Service asserts that it "was not pre-decisional in its determination that categorical exclusion would likely be used" and that preparing a signed decision memo with supporting documentation was a necessary precondition for any final action related to Gila Cow removal.  Scoping Responses at 10 (AR 005925).  The Scoping Responses also address separately an allegation that the "Forest Service cannot proceed under a CE because extraordinary circumstances exist," Scoping Responses at 12 (AR 005928), based on several resource conditions, including the presence of endangered species, flood plains and wetlands, and Congressionally designated wilderness areas in the project area, see Scoping Responses at 12-13 (AR 005928-29).  Without a cause-effect relationship between a proposed agency action and an effect on the identified resource conditions, the Forest Service may determine that no extraordinary resource circumstances exist.  See Scoping Responses at 13 (AR 005929).  The Scoping Responses assert that the Forest Service analyzed several resource conditions and determined that "the no action alternative (i.e. not removing feral cattle) has a greater impact on water quality and wilderness character than the proposed action and [that] no cause-effect relationship exists."  Scoping Responses at 13 (AR 005928).

The Scoping Responses also address concerns related to the Aerial Shooting's impacts on the Mexican gray wolf -- i.e., the Aerial Shooting may increase wolf-livestock conflict -- and the Gila Wilderness' water quality -- i.e., rotting cattle carcasses may contaminate riparian areas.  See Scoping Responses at 10-12 AR 005926-28).  These sections also mirror many of the Forest Service's arguments made in the Decision Memo. and its supporting materials.  See Scoping

Responses at 10-12 AR 005926-28).   Regarding the Mexican gray wolf issue, the Scoping Responses assert that no relationship between the Aerial Shooting and a change in Mexican gray wolf feeding behavior has been established, the Aerial Shooting's short duration mitigates concerns regarding wolf-livestock conflicts, and the Fish and Wildlife Service -- which the Scoping Responses quote at length -- found that the Aerial Shooting is unlikely to jeopardize the Mexican gray wolf's continued existence.   See Scoping Responses at 10-11 (AR 005926-27). Regarding the water quality issue, the Scoping Responses state that the Water Specialist Report finds that the "the long-term detrimental impacts of feral cattle to the riparian areas of the Gila Wilderness greatly outweighs any short-term potential concerns over carcasses contaminating water quality," Scoping Responses at 11 (AR 005927), and that the Forest Service will remove any cattle carcasses in or near a waterway, see Scoping Responses at 11-12 (AR 005927-28).

The Scoping Responses also address concerns that the Aerial Shooting is otherwise unlawful, because the Forest Service violates: (i) the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), because the Forest Service has not produced documents in response to a FOIA request that the Cattle Growers filed on February 22, 2022; (ii) the Wilderness Act, because the Forest Service may not use helicopters in the Gila Wilderness; and (iii) New Mexico animal cruelty law, N.M.S.A. § 30-18-1 (J), because the Aerial Shooting will cause inhumane deaths and is contrary to commonly accepted agricultural animal husbandry practices.   See Scoping Responses at 10 (AR 005926), id. at 12, (AR 005928), id. at 13-14 (AR 005930).   Regarding the alleged FOIA violation, the Scoping Responses acknowledge that, on February 22, 2022, the Cattle Growers filed a FOIA request with both the Forest Service and the Animal Inspection Service, requesting "all documentation related to the decision memo authorizing the 2022 aerial livestock gunning." Scoping Responses at 10 AR 005926).   The Scoping Responses note, however, that, on April 5,

2022, the Forest Service informed counsel that the "request was in the queue awaiting processing" and that the Cattle Growers responded to the Forest Service's suggestion that the Cattle Growers "reduce the scope of the request to shorten the processing time."  Scoping Responses at 10 AR 005926).  Regarding the alleged Wilderness Act violation, the Scoping Responses point to the Minimum Requirements Analysis, which finds that the Aerial Shooting does not violate the Wilderness Act, because the Forest Service will not land the helicopter in the Gila Wilderness, and the alternative actions -- including no action -- are more invasive than the Aerial Shooting.  See Scoping Responses at 12 (AR 005928).  Regarding the animal cruelty issue, New Mexico law prohibits "negligently mistreating, injuring, killing without lawful justification or tormenting an animal."  N.M.S.A. § 30-18-1(B).  "Lawful justification" means "humanely destroying a sick or injured animal," or "protecting a person or animal from death or injury due to an attack by another animal."  N.M.S.A. § 30-18-1(C).  N.M.S.A. § 30-18-1 does not apply to "the treatment of livestock and other animals used on farms and ranches for the production of food, fiber or other agricultural products, when the treatment is in accordance with commonly accepted agricultural animal husbandry practices," N.M.S.A. § 30-18-1 (I)(4) and, "[i]f there is a dispute as to what constitutes commonly accepted agricultural animal husbandry practices or commonly accepted rodeo practices, the New Mexico livestock board shall hold a hearing to determine if the practice in question is a commonly accepted agricultural animal husbandry practice or commonly accepted rodeo practice," N.M.S.A. § 30-18-1 (J).  The Scoping Responses conclude that the Livestock Board's animal cruelty finding, which "pertains to commonly accepted agricultural animal husbandry practices," is not relevant to the Aerial Shooting, which is "a land management action carried out to address resource impacts" rather than an animal husbandry practice.  Scoping Responses at 13 (AR 005929).  The Scoping Responses also assert that the American Veterinary

Medical Association ("AVMA") "distinguishes between euthanasia, typically conducted on a restrained animal, and methods that are more accurately characterized as humane killing of unrestrained animals under field conditions." Scoping Responses at 14 (AR 005930). The Scoping Responses state that, under AVMA guidelines, personnel tasked with killing wildlife should be proficient, and use proper firearms, ammunition, and traps. See Scoping Responses at 14 (AR 005930). In sum, the Forest Service argues that, although "there may be a distinction between clinical euthanasia and field practices for humane killing, [] field practices are still considered an acceptable form of euthanasia." Scoping Responses at 14 (AR 005930). Accordingly, the Forest Service concludes that, because the Animal Inspection Service's procedures fully comply with AVMA guidelines for field practices, the Aerial Shooting is acceptable. See Scoping Responses at 14 (AR 005930).

Regarding a concern that branded cattle may be shot during the Aerial Shooting, the Scoping Responses state that the Forest Service will notify directly all grazing permittees before conducting the Aerial Shooting, and that, if any branded cattle are killed, their owners may request compensation from the Forest Service or file a claim under the Federal Torts Claims Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411, 2412, 2671-80. See Scoping Responses at 14-15 (AR 005930-31). To assist in processing claims, the Forest Service says that it will document "kill locations so interested parties can inspect the animals." Scoping Responses at 15 (AR 005931). Addressing concerns that cultural resources may be disturbed, the Forest Service indicates that it will consult with the SHPO as needed. See Scoping Responses at 15 (AR 005931).

Finally, the Scoping Responses reject the contention that the Gila Cows are "estray livestock and thus fall under the jurisdiction of the New Mexico Livestock Board." Scoping Responses at 15 (AR 005931). Under New Mexico law, "estray" means

> livestock found running at large upon public or private lands, either fenced or unfenced, whose owner is unknown, or that is branded with a brand that is not on record in the office of the board or is a freshly branded or marked offspring not with its branded or marked mother, unless other proof of ownership is produced.

N.M.S.A. § 77-2-1.1(O).  "Livestock" means "all domestic or domesticated animals that are used or raised on a farm or ranch, including the carcasses thereof, and exotic animals in captivity and includes equines, cattle, sheep, goats, swine, bison, poultry, ostriches, emus, rheas, camelids and farmed cervidae upon any land in New Mexico."  N.M.S.A. § 77-2-1.1(A).  The Livestock Board has jurisdiction over the impoundment of estray livestock.  See N.M.S.A. § 77-13-2.  The Scoping Responses assert that, under New Mexico law, the Gila Cows are not estray livestock, because they are several generations removed from the abandoned Redstone Allotment cattle, the Gila Cows were born in the Gila Wilderness, and were never domesticated or otherwise raised on a farm or ranch.  See Scoping Responses at 16 (AR 005932).  The Scoping Responses argue further that, even if the Gila Cows were estray livestock that are under the Livestock Board's jurisdiction, the Forest Service's power to remove the Gila Cows preempts any State laws "that give the New Mexico Livestock Board authority over these animals -- at least to the extent they require the Forest Service to take or to not take certain actions."  Scoping Responses at 17 (AR 005933).

### e.    The Animal Inspection Service's Categorical Exclusion Record.

On February 16, 2023, the Animal Inspection Service finalizes a document that summarizes the Animal Inspection Service's involvement in the Aerial Shooting.  See Animal Plant Health and Inspection Service, U.S. Agriculture Department, Categorical Exclusion Record Operational Wildlife Damage Management USDA APHIS Wildlife Services at 1-5 (dated February 16, 2023)(AR 005893-97)("Animal Inspection Service CE Record").  The Animal Inspection Service CE Record states that the Forest Service requested the Animal Inspection

Service "to assist with lethally removing feral cattle that are causing habitat damage in designated reads of the Gila National Forest." Animal Inspection Service CE Record at 1 (AR 005893). The Animal Inspection Service CE Record then describes how the Gila Cows, which are "born in the wild and never domesticated," Animal Inspection Service CE Record at 1 (AR 005893), have been damaging the Gila Wilderness and how the Aerial Shooting will be conducted in a way that complies with relevant safety and humaneness standards for euthanizing wild animals. See Animal Inspection Service CE Record at 1-3 (AR 005893-95). The Animal Inspection Service CE Record also summarizes and references relevant parts of the Decision Memo. and the Miscellaneous Biological Assessment, insofar as those materials describe the Gila Cows' environmental threat, and how the Aerial Shooting will not impact adversely threatened and endangered species, historical cultural archaeological, or specially managed natural resources or wilderness areas, or other environmental resources. See Animal Inspection Service CE Record at 2-3 (AR 005894-95).

Regarding the Animal Inspection Service's NEPA compliance procedures, the Animal Inspection Service CE Record asserts that the Aerial Shooting is "categorically excluded from further NEPA analysis and does not require the preparation of an environmental assessment or environmental impact statement." Animal Inspection Service CE Record at 3 (AR 005895). The Animal Inspection Service CE Record supports this conclusion by pointing to how the "analysis above indicates the proposed action will not adversely impact target or nontarget species including threatened and endangered species or critical habitat, or human health and safety," and that, accordingly, "[t]here are no extraordinary circumstances anticipated which might result in a significant effect on the human environment even when considered along with other past, present and reasonably foreseeable future actions." Animal Inspection Service CE Record at 3

(AR 005895).  In addition to concluding that there are no extraordinary circumstances, the Animal Inspection Service CE Record asserts that the Aerial Shooting falls within the Animal Inspection Service's "routine measures" categorical exclusion, which excludes categorically from further NEPA review:

> Routine measures, such as . . . sampling that does not cause physical alteration of the environment, . . . removals, (and) control, and monitoring . . .  (This) may include the (lawful) use . . . of chemicals, pesticides, or other potentially hazardous or harmful substances, materials, and target-specific devices or remedies, provided that such use . . .  (A) . . . is localized or contained in areas where humans are not likely to be exposed, and is limited in terms of quantity . . . B) [sic] . . . will not cause contaminants to enter water bodies, including wetlands; . . .  (C) . . . does not adversely affect any federally protected species or critical habitat; and (D) . . . does not cause bioaccumulation.

Animal Inspection Service CE Record at 3-4 (AR 005895-96)(ellipses, parentheticals, and emphases in original)(brackets added).  Finally, the Animal Inspection Service CE Record asserts its determination regarding NEPA compliance "is based upon current environmental laws, regulations, and policies, and made in consultation with" the Forest Service.  Animal Inspection Service CE Record at 4 (AR 005896).

### 3.    The Petitioners' Alleged Injuries.

Loren Patterson represents that he is the President of the Cattle Growers, and that he is responsible for "oversight over all activities, administration, policy objectives, and strategic initiatives of the association."  Patterson Decl. ¶ 2, at 2.  Patterson also represents that some Cattle Growers members have grazing allotments "in and around the Gila National Forest and Gila Wilderness," and that these grazing permittees' cattle "have entered, and do enter, vacant allotments and graze in the Gila Wilderness" because the fences and gates between active grazing allotments are often left open or knocked down by hikers, hunters, recreational users, wildlife, or the cattle themselves.  Patterson Decl. ¶ 6, at 3.  Patterson concludes that, because these cattle have

entered vacant allotments, some cattle "likely have entered" the project area, and, although they are branded or tagged, such marks are difficult to identify without physical inspection, particularly in the winter months when the cattle grow thicker winter coats. Patterson Decl. ¶ 7, at 3. Patterson asserts that his members will not be able to discover if any of their cattle are killed during the Aerial Shooting, because GPS data on where the shots are taken "will not identify the cattle that are shot and do not die immediately but wander off, bleed out and die." Patterson Decl. ¶ 6, at 3. Patterson also asserts that the Gila Cows being shot "may not be branded," but are still "the progeny of cattle that were and that belonged to NMCGA Members." Patterson Decl. ¶ 11, at 4. Patterson describes a directive that the Cattle Growers developed with the Livestock Board, whereby permittees adjacent to or in proximity to the Wilderness may gather unbranded cattle in the Wilderness, and then purchase those cattle from the Livestock Board following inspection. See Patterson Decl. ¶ 11-12, at 4. Patterson says that some of his members have taken advantage of this directive, and that the Aerial Shooting denies his members the opportunity to continue, or start, using the directive. See Patterson Decl. ¶ 12-13, at 4-5. Patterson thus alleges that his members' lost opportunity "constitute[s] a financial loss to permittees who are NMCGA members." Patterson Decl. ¶ 14, at 6.

Patterson also says that his members "use the Gila National Forest and the Gila Wilderness for aesthetic, recreational, and environmental interests that are ancillary, but related, to their role as ranchers." Patterson Decl. ¶ 15, at 5. Patterson represents that his members "consider themselves to be intimately and regularly connected to the environment, which affects them individually, as well as the cattle they raise and manage." Patterson Decl. ¶ 16, at 5. Patterson describes how his members seek to preserve the environmental integrity of the land adjacent and near to the Gila National Forest and the culture that has arisen around the land, which includes

raising, grazing, and managing cattle.  See Patterson Decl. ¶ 16, at 5.  Patterson thus concludes that any environmental harm to the Gila Wilderness "will necessarily harm the operations of [Cattle Growers] members adjacent to and surrounding the Gila National Forest."  Patterson Decl. ¶ 16, at 5.  Patterson also asserts that his members' other interests in the Gila Wilderness -- including recreation, horseback riding, and camping -- are part of the Cattle Growers' mission of "promoting and preserving the ability of ranchers of ranchers to not only prosper economically, but to enjoy the natural beauty of New Mexico and its forest areas in connection with and alongside their ranching operations." Patterson Decl. ¶ 17, at 6.  Patterson asserts that some Cattle Growers members have made "firm arrangements" to "resume engaging in these outdoor activities in the Gila Wilderness . . . as soon as the Gila Wilderness is reopened after the Aerial Shooting, but no later than the second week of March, 2023, pending weather conditions."  Patterson Decl. ¶ 19, at 6.  Patterson alleges that these members, who have plans to recreate in the Gila Wilderness shortly after the Aerial Shooting, "will be irreparably harmed if they observe and encounter dozens, if not hundreds, of mutilated cattle carcasses throughout the land," and that this harm is "specific given their background as cattle ranchers and the unique relationship they have with cattle and the environment."  Patterson Decl. ¶ 20, at 6-7.  Patterson also says that his members will be harmed irreparably by the "putrid smell and repulsive visual image of cattle carcasses," and he notes that Cattle Growers members "suffered distress from viewing and learning about" the Gila Cows killed during the February, 2022, Shooting.  Patterson Decl. ¶¶ 20-21, at 7.  Patterson also says that carcasses rotting in the Gila River also will harm his members, who use the river as a personal water source while recreating, because they either will lose access to the now contaminated river. or will suffer aesthetic or physical harm if they consume the contaminated water.  See Patterson Decl. ¶¶ 20, 22, at 7.

Nelson Shirley also represents that he is a Cattle Growers member, that his cattle -- both those that he owns individually and through Spur Lake -- have wandered into the project area, and that he has attempted to, and intends to continue to attempt to, take advantage of the Livestock Board directive that allows him to gather and purchase unbranded cattle in the Gila Wilderness. See Shirley Decl. ¶¶ 5, 7, 10, 16, at 2-3, 5.  Accordingly, Shirley alleges that the Aerial Shooting injures both him and Spur Lake, because: (i) he and Spur Lake will not be able to identify any of his cattle that the Animal Inspection Service may kill; and (ii) he[57] will lose an opportunity to purchase unbranded cattle under the Livestock Board initiative.  See Shirley Decl. ¶¶ 12, 15-17, at 3-5.  Shirley also alleges that he intends to recreate in the Gila Wilderness immediately after the Aerial Shooting, "but no later than March 8, 2023, pending weather conditions."  Shirley Decl. ¶ 21, at 6.  Accordingly, Shirley alleges that he[58] will suffer the aesthetic and physical harms that Patterson describes in his declaration -- i.e., observing the mutilated carcasses, experiencing the foul smell, and losing access to, or drinking from, the contaminated Gila River when recreating. See Shirley Decl. ¶¶ 18-24, at 5-7.  Shirley also asserts that he has "personally suffered distress from viewing and learning about the" Gila Cows killed during the February, 2022, Shooting. Shirley Decl. ¶ 23, at 7.

Allen Campbell owns and operates the Gila Hot Springs Campground, which "provides tourists, hikers, campers, and many other people who enjoy nature and the outdoors, with a place

---

[57]Shirley does not allege that Spur Lake will lose this financial opportunity.  See Shirley Decl. ¶¶ 13-17, at 4-5.

[58]Although Shirley asserts that both he and his Spur Lake employees have personal aesthetic and environmental interests in the Gila Wilderness and recreating therein, Shirley does not represent that anyone besides him intends to resume recreating in the Gila Wilderness shortly after the Aerial Shooting.  See Shirley Decl. ¶¶ 18-21, at 5-6.

to sleep, eat, and rest before, during, and after their recreational activities in the Gila Wilderness." Campbell Decl. ¶ 2, at 1. Campbell represents that, in March, 2022, he "had discussions with many hikers and campers visiting the Campground about their experience in the Gila Wilderness in which they expressed their concerns about having observed dead cattle throughout the forest." Campbell Decl. ¶ 6, at 1. Campbell alleges that these individuals told him that they observed dead cattle, "including in or near the Gila River." Campbell Decl. ¶ 6, at 1. Campbell also asserts that one individual sent him a photograph of a dead Gila Cow on the banks of the Gila River that the individual observed while hiking in the Gila Wilderness. See Campbell Decl. ¶ 6, at 1-2. Campbell alleges that "[m]any other hikers" told him "that the forest 'smelled like hell,' describing a putrid and rancid smell caused by the decomposing carcasses of cattle that was present at various points along the trails and the Gila River in the Gila Wilderness." Campbell Decl. ¶ 7, at 2 (internal quotations have no citation). Regarding concerns about the Gila River's water quality, Campbell says that some individuals told him that they "were afraid to drink the water in the Gila River because they believed it was contaminated due to the numerous dead cattle in and around the river," and that one person told him that they believed they got sick after drinking water from the Gila River. Campbell Decl. ¶ 8, at 2. Campbell alleges that the rotting carcasses made him lose campground customers, because, by the end of March, 2022, "it seemed to be common knowledge" that the Gila Wilderness was filled with dead Gila Cows "that would impact their experience." Campbell Decl. ¶ 9, at 3. Campbell insists that the Aerial Shooting's timing exacerbated the problem, because "mid-to-late March[] begins the busiest time of year" for his business. Campbell Decl. ¶ 10, at 3. In sum, Campbell states:

> 12. The Gila Wilderness, and my Campground as a launching point for hikers and campers, were harmed during this timeframe because hikers and campers did not want to experience the sights and smells of decomposing cattle along the trails

and the Gila River in the Gila Wilderness. The Campground experienced a loss of customers and a loss of goodwill caused by the dead cattle in the Gila Wilderness during that timeframe. I am unable to calculate the actual harm to the Campground because I do not know, and cannot know, how many customers would have visited the Campground, but chose not to because of the dead cattle in the Gila Wilderness.

13.    I understand the USFS and APHIS intend to conduct another operation to shoot cattle in the Gila Wilderness from a helicopter beginning February 23, 2023 (the "Aerial Shooting"). If the Aerial Shooting goes forward, the Campground will again suffer a loss of customers and goodwill as it did in Spring 2022. As before, I will be unable to calculate the actual harm to the Campground because I do not know, and cannot know, how many customers would have visited the Campground, but chose not to because of the dead cattle in the Gila Wilderness.

Campbell Decl. ¶¶ 12-13, at 3.

Jay Kinsella is a Grant County resident and Humane Farming member who lives less than two miles from the Gila National Forest. See Declaration of Jean "Jay" Kinsella, Jr. ¶¶ 3, 5, 7, at 1-2 (dated August 31, 2023), filed August 31, 2023 (Doc. 50-4)("Kinsella Decl."). Kinsella represents that he has an aesthetic interest in observing wild animals and in maintaining New Mexico's environmental resources. See Kinsella Decl. ¶¶ 5-6, at 1-2. Kinsella alleges that "[k]nowing that cattle -- and all other wildlife -- within the Gila Wilderness are shot from helicopters, scared by the noise of helicopters and rifles discharging, causes [him] severe emotional disturbance." Kinsella Decl. ¶ 11, at 3. Kinsella also asserts that he "fear[s] the environmental harm caused by" the Aerial Shooting, because there will be more stampedes and rotting carcasses in the river. Kinsella alleges that this environmental harm injures him, because: (i) he fears he will "witness decomposing cattle wounded by gunshot;" (ii) he is distressed "at entering this peaceful area only to anticipate the suffering of animals;" and (iii) the Aerial Shooting "undermines [his] experience of solitude." Kinsella Decl. ¶ 12, at 3. Kinsella is also "concerned about the very principle of shooting cattle from a moving helicopter" because it is his understanding "that, generally, shooting animals from a moving vehicle is prohibited conduct." Kinsella Decl. ¶ 14, at

3.  Kinsella also alleges that he "will not be able to hike or enjoy those areas impacted by the shootings," and that his "interest is not only in experience the wilderness as a refuge for these animals, but in protecting and supporting their humane treatment."  Kinsella Decl. ¶¶ 15, 18, at 4.  Kinsella says that the Forest Service's alleged failure to comply with federal environmental and procedural laws injures him, because: (i) the helicopter use within the Gila Wilderness offends him by disrupting his "intention to listen to the natural sounds, birds, and the lull of the river," Kinsella Decl. ¶ 19, at 5; (ii) helicopter use within the Gila Wilderness will scare wildlife, and "[k]nowledge of the animals' fear and anxiety concerns [him] greatly," Kinsella Decl. ¶ 20, at 5; and (iii) he does not "have the information that [he] need[s] . . . to understand and explain the significant environmental effects of the aerial shooting plan to others," and it is "important to [him] to take an educated position on a policy or action," Kinsella Decl. ¶ 23, at 6.  In sum, Kinsella says that he is "harmed by the Defendants' failure to comply with NEPA and appropriately consider the environmental impact of," Kinsella Decl. ¶ 24, at 7, the Aerial Shooting:

> If Defendants were forced to comply with NEPA and the APA, this may avert the possibility of them overlooking the significant environmental impact of their Aerial Shooting plan.  The cattle would not suffer cruel and inhumane treatment, and I and other members of HFA would not face the increased risk of environmental, emotional, aesthetic, and other risks of harm as detailed here.  An order from the Court demanding compliance with NEPA and the APA would remedy these injuries.

Kinsella Decl. ¶ 25, at 7.

Barbara Thompson is an Albuquerque resident and Humane Farming member who visits the Gila Wilderness with her family "as often as [they] can," Declaration of Barbara Thompson ¶ 6, at 2 (dated August 31, 2023), filed August 31, 2023 (Doc. 50-6)("Thompson Decl.").  See Thompson Decl. ¶¶ 3-4, at 1.  Thompson alleges that her awareness of the Gila Cows' inhumane deaths "causes [her] stress and anxiety."  Thompson Decl. ¶ 10, at 3.  She also asserts

that she is afraid "for the safety of [her] own family, as [they] enjoy hiking and relaxing throughout the Gila National Forest and Gila Wilderness," and she is "emotionally disturbed by the idea of firearms being used in this untouched landscape." Thompson Decl. ¶ 9, at 2. She also is "concerned about having to explain [the Aerial Shooting] to [her] child, as this use of violence against animals goes against our family values." Thompson Decl. ¶ 9, at 3. Thompson says that the Aerial Shooting changes her plans to visit the Gila Wilderness, because she "will not expose [her]self or [her] family to disturbing scenes of wounded, dying animals," Thompson Decl. ¶ 12, at 3, and that she "will no longer be able to easily plan [her family's] recreational activities in the Gila," because the Aerial Shooting "will not be one isolated event," Thompson Decl. ¶ 13, at 4. Thompson asserts that the Forest Service's alleged failure to comply with federal environmental and procedural laws injures her, because: (i) the use of helicopters in the Gila Wilderness "offends [her] sense of the basic nature of this environment, free from human touch and impact," Thompson Decl. ¶ 17, at 5; (ii) the Forest Service "did not meaningfully consider less cruel measures to manage the cattle population," Thompson Decl. ¶ 11, at 3; (iii) the Aerial Shooting's environmental impact, which has not been considered fully, causes her to worry about other animals in the Gila Forest and the Gila Wilderness, see Thompson Decl. ¶ 18, at 5; and (iv) the Forest Service did not give her an opportunity to participate meaningfully in the public comment and review process, which means that, in turn, she lacks sufficient information about the Aerial Shooting to understand its environmental impacts, and explain those impacts to other Humane Farming members and community members, see Thompson Decl. ¶¶ 19-20, at 5-6. In sum, Thompson alleges:

> The harm I suffer from Defendants' failure to comply with NEPA and the APA would be averted upon an order from the Court demanding compliance with NEPA and the APA. The Aerial Shooting plan would be more fully

- 94 -

comprehensive, having considered the significant environmental impact from this activity. Importantly, cattle and other animals would not suffer an inhumane death. I, and other members of HFA would not be at risk of the environmental and emotional risks of harm I have described in this declaration.

Thompson Decl. ¶ 22, at 6.

## PROCEDURAL BACKGROUND

This section outlines the litigation's procedural context. The Court begins by discussing the Petitioner's Complaint and the Court's Memorandum Opinion and Order, filed February 22, 2023 (Doc. 20)("TRO MOO"), denying the Petitioners' Application for Temporary Restraining Order and Preliminary Injunction, filed February 21, 2023 (Doc. 6)("2023 TRO"). Second, the Court describes how the Respondents conducted the Aerial Shooting in February, 2023. Third, the Court describes the arguments in the Motion to Intervene, in the Plaintiffs' Opposition to Motion to Intervene, filed March 13, 2023 (Doc. 31)("Motion to Intervene Opposition"), in the Reply Brief in Support of Motion to Intervene, filed March 21, 2023 (Doc. 34)("Motion to Intervene Reply"), and at the May 22, 2023, hearing. Fourth, the Court describes the arguments in the Petitioners' Merits Brief; in the Respondents' Merits Response; in the Respondent-Intervenor's Response Brief, filed November 2, 2023 (Doc. 59)("Biological Center Merits Response"); in the Petitioners' Reply in Support of Brief on the Merits, filed January 5, 2024 (Doc. 62)("Petitioners' Merits Reply "); and at the February 1, 2024, hearing. Fifth, the Court discusses the parties' arguments related to the Petitioners' Notice of Supplemental Authority and Agency Interpretation, filed January 10, 2025 (Doc. 68)("Supplemental Authority Brief").

### 1.    **The Complaint and the TRO MOO.**

On February 21, 2023, the Petitioners file the Complaint, alleging that: (i) the Aerial Shooting violates the June, 2022, Stipulation, because the Forest Service did not provide the Cattle

Growers, Spur Lake, and the public with enough notice before commencing the Aerial Shooting; (ii) the Forest Service lacks statutory authority to conduct the Aerial Shooting; (iii) the Aerial Shooting is unlawful, because the Forest Service's regulations prohibit such conduct; and (iv) the Forest Service violates both the APA and the NEPA by not preparing an EIS, not identifying an applicable CE, and concluding erroneously that there are no extraordinary circumstances that warrant full NEPA review. See Complaint ¶¶ 1-5, at 2-4. The Petitioners bring four claims: (i) Violation of Court Stipulation, because the Forest Service and the Animal Inspection Service issued that Decision Memo. "only one week before the Aerial Shooting [was] set to begin," Complaint ¶ 78, at 21; (ii) Acting in Excess of Statutory Authority in violation of the APA, because "[t]here is no statute that authorizes the destruction of cattle on wilderness lands," and "the Wilderness Act[] presumptively prohibits the use of 'motorized equipment' and 'mechanical transport,' such as the aircraft intended to be used for shooting cattle here," Complaint ¶ 86, at 22 (quoting 15 U.S.C. 1133(c))(emphasis in Complaint)("Statutory Authority Claim"); (iii) Acting in Violation of Regulation under the APA, because 36 C.F.R. § 262.10 "prescribes a specific process of notice of impoundment, gathering and impoundment, notice of sale, and sale, all of which must be followed before the cattle may be destroyed or otherwise disposed of," Complaint ¶ 93, at 23 (explaining 36 C.F.R. § 262.10)("Impoundment Regulation Claim"); and (iv) Failure to Prepare an EA or EIS in violation of the APA and the NEPA, because the Aerial Shooting is a "major federal action significantly affecting the quality of the human environment under NEPA," Complaint ¶ 100, at 25, none of the CEs that the Forest Service or Animal Inspection Service identifies is applicable, see Complaint ¶ 104-107, at 26-27, and, "[e]ven if one or more categorical exclusions applied, extraordinary circumstances would override them and dictate preparation of an EIS, or at a minimum, an EA," Complaint ¶ 111, at 28 ("NEPA Claim"). See Complaint ¶¶ 76-

113, at 20-29.  The Petitioners request: (i) a declaration, order, and judgment holding that the Aerial Shooting is unlawful; (ii) temporary and injunctive relief enjoining the Forest Service and the Animal Inspection Service from conducting the Aerial Shooting; (iii) an attorneys' fees and cost award; and (iv) all other relief, in law or in equity, to which the Petitioners may be entitled. See Complaint ¶ 114, at 29-30.

On February 22, 2023, the Court denies the Petitioners' 2023 TRO.  See TRO MOO at 2. In the TRO MOO, the Court determines that the Petitioners are not likely to succeed on the merits of any of their claims.  See TRO MOO at 21-24.  For Count I, the Court concludes that the Petitioners are not likely to show that the Respondents violate the June, 2022, Stipulation, because the Scoping Letter provides sufficient notice, and is disseminated on November 22, 2022, which is more than seventy-five days before the Aerial Shooting is set to commence.  See TRO MOO at 22-23.  For Counts II and III, the Court determines that the Gila Cows are not "livestock," as 36 C.F.R. § 222.1 defines that word, and that the 36 C.F.R. § 222.1 definition applies to 36 C.F.R. § 262.10, which prescribes procedures for impounding and disposing of "unauthorized livestock,"  36 C.F.R. § 262.10.    Accordingly,  the  Court  concludes  that,  because 36 C.F.R. § 262.10 does not apply to the Gila Cows, the Petitioners are not likely to show that the Aerial Shooting violates the APA.  See TRO MOO at 23-24.  Regarding Count IV, the Court concludes that the Petitioners are not likely to show that the Respondents violate the NEPA, because the evidence in the record shows that the Respondents "have taken sufficient precautions to avoid liability under NEPA" and "are exempt of the need for an environmental impact statement."  TRO MOO at 24.  The Court also concludes that the Petitioners have not shown that they will suffer irreparable harm for which damages would be an inadequate remedy, because the Petitioners' asserted injuries -- the potential killing of an errant cattle or loss of consumer

goodwill -- are too speculative or insufficient to justify granting injunctive relief.  See TRO MOO at 25.  The Court finally concludes that the balance of equities does not favor the Petitioners, because the Petitioners waited until two days before the Aerial Shooting's planned commencement to file their action, and that granting the 2023 TRO would be adverse to the public interest, because the Court does not see a legal prohibition on the Aerial Shooting, and all parties agree that the Gila Cows need to be removed.  See TRO MOO at 25-26.

### 2.    **The Aerial Shooting**.

On February 24-25 and 27, 2023, the Animal Inspection Service conducts the Aerial Shooting.  See Second Declaration of Camille Howes ¶ 3, at 2, filed March 7, 2023 (Doc. 30-1)("Second Howes Decl.").  During the Aerial Shooting, the Animal Inspection Service kills nineteen Gila Cows, none of whom "ended up close to any waterways or trails."  Second Howes Decl. ¶ 4, at 2.

### 3.    **The Motion to Intervene Briefing and Hearing**.

The motion to intervene briefing is comprised of three briefs.  First is the Biological Center's Motion to Intervene, followed by the Petitioners' Motion to Intervene Opposition, and the Biological Center's Motion to Intervene Reply.  The Court held a hearing on May 22, 2023, where the parties made oral arguments regarding the Motion to Intervene.  See May 22, 2023, Hearing Minutes at 1-2.  The Court discusses each in turn.

### a.    **The Motion to Intervene**.

On February 28, 2023, the Biological Center filed the Motion to Intervene in this lawsuit. See Motion to Intervene at 1-15.  The Biological Center moves, pursuant to rule 24(a) of the Federal Rules of Civil Procedure, to intervene as a matter of right.  See Motion to Intervene at 1. In the alternative, the Biological Center moves, pursuant to rule 24(b) of the Federal Rules of Civil

Procedure, for permissive intervention.  See Motion to Intervene at 1.  In the Motion to Intervene, the Biological Center maintains that it "has a lengthy history of specifically working to address the deleterious environmental impacts from both domesticated and feral cattle on the Gila National Forest and other Southwestern Region National Forests," and "has consistently sought the removal of unauthorized cattle."  Motion to Intervene at 3 (citing Schulke Decl. ¶¶ 9-18, at 3-7).  The Motion to Intervene also notes that the Biological Center submitted comments during the Aerial Shooting's scoping period.  See Motion to Intervene at 4.

The Biological Center argues that it satisfies all rule 24(a) elements for intervention as a matter of right: (i) the Motion to Intervene is timely; (ii) the Biological Center has protectable interests in the lawsuit's subject; (iii) the lawsuit may impair the Biological Center's interests; and (iv) existing parties do not represent adequately the Biological Center's interests.  See Motion to Intervene at 5-13.  Regarding (i), the Biological Center maintains that its Motion to Intervene is timely, because it was filed one week after the Petitioners filed the Complaint.  See Motion to Intervene at 5.  Regarding (ii), the Biological Center insists that it has two protectable interests: protecting riparian areas, and endangered and threatened species, and preserving the protections it has achieved relating to cattle grazing in the Gila National Forest.  See Motion to Intervene at 7-11.  To support its contention that it has a protectable interest in protecting the Gila Wilderness' environmental resources, the Biological Center catalogues its decades-long environmental advocacy in the Gila Wilderness and the Gila National Forest, including petitioning and suing the United States to protect several species -- the spikedace, loach minnow, Mexican spotted owl, Chiricahua leopard frog, narrow-headed gartersnake, and yellow-billed cuckoo -- who either occupy or have critical habitat in the project area.  See Motion to Intervene at 7-9.  To support its contention that it has a protectable interest in preserving the protections it has achieved already,

the Biological Center describes how, nearly three decades ago, the Biological Center sued the Forest Service regarding its mismanagement of 158 grazing allotments across the Southwestern United States.  See Motion to Intervene at 9-10.  That case's settlement agreement obligated the Forest Service to remove cattle from certain riparian habitats and to issue a biological opinion regarding the grazing allotments.  See Motion to Intervene at 10.  Pursuant to those obligations, the Forest Service developed grazing allotment criteria and "has generally committed to exclude cattle from riparian streamside habitat and to regularly monitor riparian areas."  Motion to Intervene at 10.  Between 2017 and 2019, the Biological Center conducted field assessments in the Gila Wilderness and the Gila National Forest to determine if livestock were grazing in areas that the Forest Service excluded.  See Motion to Intervene at 10.  In these assessments, the Biological Center observed widespread overgrazing and riparian damage.  See Motion to Intervene at 10.  Based on those observations, the Biological Center sued the Forest Service in 2020 to "enforce protections for the endangered and threatened species within the upper Gila River watershed in relation to unauthorized cattle grazing."  Motion to Intervene at 10.  The 2020 case also settled, and the resulting settlement agreement ("August 2021 Settlement Agreement") obligates the Forest Service to monitor the excluded riparian areas, including those in the Gila Wilderness, for unauthorized grazing.  See Motion to Intervene at 11.  The August 2021 Settlement Agreement does not address the Gila Cows, but concerns only livestock who have wandered outside of their permitted allotments to graze in excluded areas.  See Motion to Intervene at 11. The Biological Center argues, however, that the Gila Cows' presence undermines the August 2021 Settlement Agreement's goals, because they graze in the excluded areas, which the Biological Center has fought to protect from over-grazing.  See Motion to Intervene at 11.  In sum, the Biological Center asserts that they have protectible interests both in protecting riparian areas in the

Gila Wilderness and in promoting the success of their settlement agreement, which obligates the Forest Service to prevent over-grazing in the Gila Wilderness.  <u>See</u> Motion to Intervene at 7-11. Regarding (iii) -- <u>i.e.</u>, whether the lawsuit impairs the Biological Center's protectable interests -- the Biological Center argues that the "Petitioners' requested relief to allow the Gila feral cow herd to remain within the Gila Wilderness" harms its protected interests, because the Gila Cows' continued presence would damage the riparian areas that the Biological Center seeks to protect. <u>See</u> Motion to Intervene at 11-12.   Regarding (iv) -- <u>i.e.</u>, whether existing parties adequately represent the Biological Center's interests -- the Biological Center argues that, because the Biological Center sues the Forest Service to compel compliance with environmental law, the Biological Center's interests and the Respondents' interests may diverge.  <u>See</u> Motion to Intervene at 12-13.  The Biological Center concludes that, because all four rule 24(a) factors are satisfied, it may intervene as a matter of right.  <u>See</u> Motion to Intervene at 13.  In the alternative, the Biological Center argues that the Court should grant the Biological Center permission to intervene, because the Biological Center "seeks to defend the validity of the agencies' feral cow removal decision," Motion to Intervene at 13, which satisfies rule 24(b)'s requirement that a permissive intervenor's "claim or defense and the main action have a question of law or fact in common," Fed. R. Civ. P. 24(b)(2).

### b.    <u>The Motion to Intervene Opposition</u>.

On March 13, 2023, the Petitioners respond to the Motion to Intervene.  <u>See</u> Motion to Intervene Opposition at 1-14.  The Petitioners argue that the Biological Center may not intervene as a matter of right, because the Respondents adequately represent the Biological Center's interests and the action's outcome will not impair those interests.  <u>See</u> Motion to Intervene Opposition at 7-9.  Regarding adequate representation, the Petitioners emphasize how the Biological Center's

interests and the Forest Service's are identical, as both seek to protect riparian areas and limit over-grazing in the Gila Wilderness. See Motion to Intervene Opposition at 3-6. The Petitioners assert that, because the Respondents and the Biological Center both seek to defend the Aerial Shooting, the Respondents adequately represent the Biological Center's interests. See Motion to Intervene Opposition at 8-9. To support their contention that the Respondents adequately represent the Biological Center, the Petitioners assert that "there is a 'general presumption that "representation is adequate when the objective of the applicant for intervention is identical to that of one of the parties."'" Motion to Intervene Opposition at 9 (quoting San Juan Cnty v. United States, 503 F.3d 1163, 1204 (10th Cir. 2007)(en banc)("San Juan County")(quoting City of Stilwell v. Ozarks Rural Elec. Co-op. Corp., 79 F.3d 1038, 1042 (10th Cir. 1996)). The Petitioners also dispute whether the Biological Center's prior litigation against the Forest Service impacts this analysis, arguing that the fact that the Biological Center had different interests under previous circumstances does not mean that their interests will diverge in this lawsuit. See Motion to Intervene at 9-10. Regarding impairment of the Biological Center's interests, the Petitioners say that the Biological Center's concern -- whether the Gila Cows are removed -- is not the lawsuit's subject. See Motion to Intervene Opposition at 10. Instead, the Petitioners characterize this lawsuit's subject as "the means by which the [Gila Cows][59] must be removed." Motion to Intervene at 10. The Petitioners argue that, accordingly, "the end sought by both the CBD and the USFS -- the removal of these cattle from the Gila Wilderness -- will be accomplished irrespective of the outcome of this case,"

---

[59]The Petitioners use the word, "USFS" here, which is not a synonym for the Gila Cows. See Motion to Intervene Opposition at 10. The Court concludes, however, that, based on the context, this word is a typographical error. It is unlikely that the Petitioners suggest that this lawsuit's subject is the removal of the Forest Service itself, as much as they may disagree with the Forest Service's actions related to the Aerial Shooting.

and thus the Biological Center cannot show that this outcome can impair its interests.  See Motion

to Intervene Opposition at 10.  Regarding permissive intervention, the Petitioners argue that the

Respondents represent adequately the Biological Center's interests, and that intervention will

"'only clutter the action unnecessarily.'"  Motion to Intervene Opposition at 11 (quoting Arney v.

Finney, 967 F.2d 418, 421 (10th Cir. 1992)).  Finally, the Motion to Intervene Opposition asserts

that the Motion to Intervene is procedurally defective, because it is not "'accompanied by a

pleading that sets out the claim or defense for which intervention is sought.'"  Motion to Intervene

Opposition at 11 (quoting Fed. R. Civ. P. 24(c)).

<h4>c.      The Motion to Intervene Reply.</h4>

On March 21, 2023, the Biological Center replies to the Petitioner's Motion to Intervene

Opposition.  See Motion to Intervene Reply at 1-8.  In its Motion to Intervene Reply, the Biological

Center insists that the Respondents do not represent adequately its interests.  See Motion to

Intervene Reply at 1-5.  First, the Biological Center says that the Petitioners mischaracterize San

Juan County:

> First, although San Juan County was an en banc decision denying
> intervention, the Judges' respective bases for that denial was fractured, with only
> three judges joining that portion of the opinion holding that representation was
> adequate. Indeed, Judge Hartz -- the same Judge who wrote the plurality opinion at
> issue in San Juan County -- recognized the non-binding nature of the opinion in a
> decision he authored two years later. WildEarth Guardians v. United States Forest
> Serv., 573 F.3d 992, 997 (10th Cir. 2009)("We are well aware that the lead opinion
> in San Juan County stated that a presumption of adequate representation should
> apply when the government is a party pursuing a single objective. But only three
> members of the en banc court joined this portion of the opinion.")(internal citations
> and quotations omitted); id. at 996 ("We have held . . . that the intervenor's
> 'showing is easily made when the party upon which the intervenor must rely is the
> government, whose obligation is to represent not only the interest of the intervenor
> but the public interest generally, and who may not view that interest as coextensive
> with the intervenor's particular interest.'")(quoting [Utah Ass'n of Ctys. v. Clinton,
> 255 F.3d 1246, 1254 (10th Cir. 2001)]).

Motion to Intervene Reply at 2-3.    Second, the Biological Center insists that adequate representation cannot be presumed solely because both the Respondents and the Biological Center seek to defend the Aerial Shooting.  See Motion to Intervene Reply at 3-4.  The Biological Center asserts that "'the government's representation of the public interest generally cannot be assumed to be identical to the individual parochial interest of a particular member of the public merely because both entities occupy the same position in litigation,'" where "the federal government's objectives 'involve a much broader range of interests' than a private intervenor applicant, 'including competing policy, economic, political, legal, and environmental factors.'"  Motion to Intervene Reply at 3 (quoting Kane Cnty. v. United States, 928 F.3d 877, 894 (10th Cir. 2019)). Applying Kane Cnty. v. United States, the Biological Center states that, because the Forest Service considered these "competing interests" in crafting the Decision Memo., the Respondents cannot represent it adequately.  Motion to Intervene Reply at 3.  The Biological Center also emphasizes how its "long-standing and singular efforts to compel the Forest Service to protect endangered species and riparian habitats" indicate further that, despite their present alignment, the Respondents and the Biological Center do not share "identical" interests.  Motion to Intervene Reply at 4.  In a footnote, the Biological Center also disputes the Petitioners' framing whether the action will impair its interests, arguing that the action concerns not only the means by which the Gila Cows must be removed, but also whether they are removed.  See Motion to Intervene Reply at 5 n.1.  Regarding permissive intervention, the Biological Center makes the same arguments: the Petitioners are incorrect in alleging that the Respondents can represent adequately the Biological Center's interests.  See Motion to Intervene Reply at 5.  Finally, The Biological Center disputes whether it is obligated to lodge a pleading with its Motion to Intervene, which was "filed well before any responsive pleading is due in this case."  Motion to Intervene Reply at 6. The Biological

Center attaches, nonetheless, a response to the Petitioner's Complaint to its Motion to Intervene

Reply.  See Motion to Intervene Reply at 6; Proposed Respondent-Intervenor's Response to

Petitioners' February 21, 2023 "Complaint for Declaratory and Injunctive Relief," filed March 21,

2023 (Doc. 34-1).

    **d.**  **The May 22, 2023, Hearing.**

   On May 22, 2023, the Court holds a hearing on the Motion to Intervene.  See May 22,

2023, Hearing Minutes at 1.  At the hearing, the Biological Center highlights the briefing's core

dispute: whether the Respondents represent adequately the Biological Center's interest.  See Draft

Transcript of May 22, 2023, Hearing at 6:18-7:2 (taken May 22, 2023)(Segee)("May 22, 2023,

Tr.").[60]  Regarding this issue, the Biological Center argues that, given the "long history of pressure

and [the Respondents and the Biological Center] being at loggerheads," the two parties do not

share identical interests.  May 22, 2023, Tr. at 12:4-18 (Segee).  Distinguishing San Juan County

-- where the Tenth Circuit denies intervention -- the Biological Center emphasizes how the

Respondents have "to meet a variety of governing laws and standards that are broader in scope"

than those at issue in San Juan County., which was not an APA action.  May 22, 2023, Tr. at 13:5-

17 (Segee).  Moreover, the Biological Center argues that the Respondents must act on the public's

behalf, and not just on a private group's behalf, even if that private group agrees with the

Respondents' particular position here.  See May 22, 2023, Tr. at 13:18-14:1 (Segee).

   The Petitioners admit that "there is a variety of case law" where courts recognize "that

often the Federal Government's interests cannot adequately represent the interests of a private

---

[60]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

party."  May 22, 2023, Tr. at 16:1-4 (McGuire).  The Petitioners argue, however, that the Respondents and the Biological Center "are directly and unquestionably aligned, both in terms of their position in the lawsuit but also in terms of their motivations," May 22, 2023, Tr. at 17:7-9 (McGuire), regarding the method of cow removal, which -- as opposed to whether the cows are removed -- is the relevant issue in this case, see May 22, 2023, Tr. at 16:24-17:9 (McGuire). Regarding the case law, although the Petitioners do not rebut the Biological Center's San Juan County distinction, they cite Tri-State Generation & Transmission Ass'n, Inc. v. New Mexico Public Regulatory Commission, 787 F.3d 1068 (10th Cir. 2015)("Tri-State") -- where the Tenth Circuit denies intervention -- for the proposition that "those cases finding [] inadequate representation between the Government and the proposed intervenor are inapplicable when the objective of the applicant for intervention in a particular case is identical to that of one of the parties."  May 22, 2023, Tr. at 18:1-5 (McGuire).  In the Petitioners' eyes, the Court must deny the Motion to Intervene, because the Biological Center cannot identify a way their interests differ from the Respondents' interests.  See May 22, 2023, Tr. at 18:22-20:10 (McGuire); id. at 22:14-20 (McGuire).  The Petitioners point to the August, 2021, Settlement Agreement as evidence that the Respondents and the Biological Center have identical interests, because, "by virtue of [the August 2021 Settlement Agreement]," the Forest Service cannot change its position and decide not to remove [the Gila Cows]."  May 22, 2023, Tr. at 21:10-13 (McGuire).  The Petitioners warn the Court: "And if the Court were to hold that[,] simply because it is the Federal Government, that they are incapable of representing CBD's interests adequately in this particular case, that would effectively amount to a position that the Federal Government can never adequately represent the interests of a private party."  May 22, 2023, Tr. at 20:10-17.  Finally, the Petitioners assert that

intervention will delay this action and increase litigation costs.  See May 22, 2023, Tr. at 23:12-24:9 (McGuire).

Before the Biological Center replies to the Petitioners' response, the Court asks for the Respondents' input.  See May 22, 2023, Tr. at 26:12-13 (Court).  Although the Respondents say that they do not oppose or support the Biological Center's intervention, they expect the Biological Center to make arguments that the Respondents do not support.  See May 22, 2023, Tr. at 26:21-27:4 (Smith, Court).  Referencing prior litigation where either the Cattle Growers or the Biological Center sues the United States, and then the non-suing party intervenes, the Respondents assert that they do not believe that the Respondents and the Biological Center have identical interests.  See May 22, 2023, Tr. at 27:4-9 (Smith)("[T]o say that the Center for Biological Diversity and the Federal Government have identical position on anything is, I do not want to say laughable but, it is interesting to say the least."); id. at 27:11-13 (Smith)("[I]n all of these cases, whether it is the Cattle Growers suing or the CBD suing as plaintiff, we are inevitably in the middle").  The Respondents note that, in the case that led to the August, 2021, Settlement Agreement, the Cattle Growers intervened and made the same arguments that the Biological Center makes here.  See May 22, 2023, Tr. at 28:3-10 (Smith).  Regarding which specific interests diverge, the Respondents argue that the Biological Center is not concerned about how Forest Service impoundment regulations work, which is a key issue in this case, or about the safety of the Cattle Growers' permitted livestock that may wander in the project area, which the Forest Service considered in crafting the Decision Memo.  See May 22, 2023, Tr.29:19-30:1 (Smith).  The Respondents argue that the August, 2021, Settlement Agreement does not change this analysis, because that agreement concerns only permitted livestock in riparian areas, which is distinct from the Gila Cow issue.  See May 22, 2023, Tr. at 33:14-24 (Smith).  When the Court asks the Respondents why, if the Court

grants the Biological Center's Motion to Intervene, they favor permissive intervention over intervention as a matter of right, the Respondents say that permissive intervention is easier, because permissive intervention eliminates the complex analysis regarding how connected the Respondents' and the Biological Center's interests are.  See May 22, 2023, Tr. at 30:11-18 (Court, Smith).

Replying to the Petitioners' response, the Biological Center disputes the Petitioners' characterization of this case's core issue.  See May 22, 2023, Tr. at 37:10-38:9.  The Biological Center maintains that it wants the Gila Cows gone and that it supports the Aerial Shooting as a way to remove them.  See May 22, 2023, Tr. at 37:10-38:9.  Stated otherwise, the Biological Center does not seek to defend the Aerial Shooting's specifics, but rather supports the Aerial Shooting, because it removes the Gila Cows.  See May 22, 2023, Tr. at 37:10-38:9.  Thus, in the Biological Center's eyes, the dispute is whether the Gila Cows can be removed, not about how they are removed.  See May 22, 2023, Tr. at 37:10-38:9.  Regarding Tri-State, the Biological Center insists that litigation posture does not determine identical interests.  See May 22, 2023, Tr. at 38:10-21. The Biological Center argues that, instead, whether the parties have the same universe of concerns surrounding their respective positions determines if their interests are identical.  See May 22, 2023, Tr. at 38:22-39:17.  The Biological Center disputes the Petitioners' characterization of the August, 2021, Settlement Agreement and supports the Respondents' framing: the August, 2021, Settlement Agreement addresses how the Forest Service manages permitted livestock and is not relevant to a dispute regarding the Gila Cows' removal.  See May 22, 2023, Tr. at 40:3-22 (Segee).  When the Court asks the Biological Center to identify the key interest that the Biological Center has that is different from Respondents' interests, the Biological Center responds:

> We do probably have a slightly different way of presenting it, just more focused on our, again, singular interests in terms of discussing how that relates to the Endangered Species Act, the riparian habitats, and that the CE, for example, is appropriate in the circumstance like this where the action is going to benefit the environment. And, that it is necessary to stop the degradation.

May 22, 2023, Tr. at 41:18-42:1 (McGuire).

At the hearing, the Court indicates that it is inclined to grant the Motion to Intervene. <u>See</u> May 22, 2023, Tr. at 42:8-43:6 (Court); May 22, 2023 Hearing Minutes at 1-2. In response to the Court's inclination, the Petitioners ask the Court to order the Respondents and the Biological Center to confer on their briefing, and identify areas where they disagree with each other "so as to reduce the duplication of arguments and efforts." May 22, 2023, Tr. at 43:25-44:2 (McGuire). The Court denies this request, reasoning that it should not micromanage the parties and the briefing, and that, even if the Biological Center supports the Respondents' position, the Biological Center ought to be able to explain that position in its own words. <u>See</u> May 22, 2023, Tr. at 44:19-45:5 (Court).

### 4. <u>The Merits Briefing and Hearing</u>.

The merits briefing is comprised of four briefs: the Petitioners' Merits Brief, the Respondents' Merits Response, the Biological Center Merits Response, and the Petitioners' Merits Reply. The Court held a hearing on February 1, 2024, where the parties made oral arguments regarding the merits briefing. <u>See</u> February 1, 2024, Hearing Minutes at 1-2. The Court discusses each brief in turn.

### a. <u>The Petitioners' Merits Brief</u>.

On August 31, 2023, the Petitioners file the Petitioners' Merits Brief, which is fifty-eight-pages long, and attaches seven exhibits, including six sworn declarations and a 185-page Agriculture Department document regarding riparian area management. <u>See</u> Petitioners' Merits

Brief at 1-58; Patterson Decl. ¶¶ 1-24, at 1-10; Shirley Decl. ¶¶ 1-26, at 1-10; Campbell Decl. ¶¶ 1-18, at 1-6; Kinsella Decl. ¶¶ 1-25, at 1-8; Miller Decl. ¶¶ 1-20, at 1-7; Thompson Decl. ¶¶ 1-22, at 1-7; U.S. Department of Agriculture, <u>Proper Functioning Condition Assessment for Lotic Areas</u> at 1-185 (dated 2015), filed August 31, 2023 (Doc. 50-7)("Riparian Technical Reference").  The Petitioners make three primary arguments: (i) the Aerial Shooting violates the Forest Service's impoundment regulations; (ii) the Aerial shooting does not comply with the NEPA; and (iii) the Petitioners have standing.  The Court addresses each in turn.  <u>See</u> Petitioners' Merits Brief at 8-46.

### i. The Petitioners Argue That the Aerial Shooting Violates the Forest Service's Impoundment Regulations.

The Petitioners assert that, because the Forest Service failed to impound the Gila Cows before killing them, the Aerial Shooting violates 36 C.F.R. § 262.10, which prescribes procedures for removing unauthorized livestock from Forest Service lands.  <u>See</u> Petitioners' Merits Brief at 1. The Petitioners insist that 36 C.F.R. § 262.10 applies to the Gila Cows, because they are cattle who are not permitted to be where they are, and thus they are "unauthorized livestock," as 36 C.F.R. § 261.2 defines that phrase:

> Unauthorized livestock means any cattle, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro by § 222.20(b)(13), which is not authorized by permit to be upon the land on which the livestock is located and which is not related to use authorized by a grazing permit.

36 C.F.R. § 261.2.  <u>See</u> Petitioners' Merits Brief at 10-11.  To buttress their preferred definition, the Petitioners catalogue dozens of instances where the Forest Service and other parties[61] refer to

---

[61]While most of the examples that the Petitioners provide are Forest Service documents, two of them are emails from Biological Center President Todd Schulke.  <u>See</u> Petitioners' Merits Brief at 15.

the Gila Cows as unauthorized cattle in fact sheets, internal emails, and meeting notes.  See Petitioners' Merits Brief at 11-16.  The Petitioners also suggest that the Forest Service admits that the Gila Cows are unauthorized livestock in the Decision Memo by "stating that the need to remove the Gila Cattle is intended to '[m]eet the intent of 36 CFR 261.7, which prohibits placing or allowing unauthorized livestock to enter or be in the National Forest System.'"  Petitioners' Merits Brief at 11 (quoting Decision Memo. at 5 (AR 005903))(brackets and emphasis added in Petitioners' Merits Brief).  The Petitioners make a similar argument regarding how the Forest Service notifies grazing permittees about the Aerial Shooting: because the Forest Service issued an "Impound Notice," which "is required pursuant to § 262.10 in connection with the physical impoundment of 'unauthorized livestock,'" the Forest Service "tacitly acknowledged" that the Gila Cows are unauthorized livestock and that 36 C.F.R. § 262.10 applies.  Petitioners' Merits Brief at 16 (internal quotations have no citation).

The Petitioners also reject the Respondents' preferred definition of "unauthorized livestock" as "'animals of any kind kept or raised for use or pleasure.'"  Petitioners' Merits Brief at 17 (quoting 36 C.F.R. § 222.1).  The Petitioners offer three supporting reasons.  See Petitioners' Merits Brief at 17-25.  First, the Petitioners contend that 36 C.F.R. § 261.2's plain language is not limited to "animals of any kind kept for use or pleasure."  36 C.F.R. § 222.1.  See Petitioners' Merits Brief at 17.  Second, the Petitioners contend that the prohibition against unauthorized livestock is in § 261, not § 222.  Petitioners' Merits Brief at 17.  Thus, the § 261 definition, which "'appl[ies] to this part,'" should apply to the § 262.10 impoundment procedure, which is premised on the § 261 prohibition against unauthorized livestock.  Petitioners' Merits Brief at 17 (quoting 36 C.F.R. § 261.2).  The Petitioners argue that the § 222 "has no relationship to the prohibition on 'unauthorized livestock' found in § 261.7," Petitioners' Merits Brief at 18 (internal quotations have

no citation), because: (i) the Forest Service promulgated § 222 more than 10 months after § 261; (ii) § 222 is in a separate part of the Forest Service regulations; (iii) § 222 concerns different subject matter -- grazing policy, rather removal of unauthorized livestock; and (iv) § 222 does not reference § 261, see Petitioners' Merits Brief at 18.  Third, the Petitioners contend that the § 222 definition is a "post hoc rationalization" of the Forest Service's actions, rather than a "good faith attempt" to provide a reasonable definition of the word, because the Forest Service consistently has referred to the Gila Cows as "unauthorized livestock."  Petitioners' Merits Brief at 19.  Finally, the Petitioners maintain that, even if the § 222 definition controls, the Gila Cows are still "kept or raised for use or pleasure," 36 C.F.R. § 222.1, even though a private party does not own them currently, because "livestock" commonly is understood to refer to cattle, regardless of ownership status.  Petitioners' Merits Brief at 19-21.

To close out their argument regarding the Forest Service's violation of its regulations, the Petitioners dispute the Decision Memo.'s assertions that, because the Gila Cows are invasive and are damaging riparian areas, the Forest Service may abandon its impoundment procedures.  See Petitioners' Merits Brief at 21-22.  The Petitioners assert that the Gila Cows are not invasive, because they descend from "traditional cattle used for agricultural purposes."  Petitioners' Merits Brief at 21.  The Petitioners argue, in the alternative, that, even if the Gila Cows are invasive, the Forest Service does not have "carte blanche authority" to shoot the Gila Cows from a helicopter to remove them.  Petitioners' Merits Brief at 21.  Finally, the Petitioners dispute that the Forest Service has sufficient evidence of environmental damage to justify the Aerial Shooting.  See Petitioners' Merits Brief at 22-25.  The Petitioners argue that the Decision Memo.'s photographs of environmental damage are insufficient, because: (i) there are only a few photographs; and (ii) they do not show that the Gila Cows, as opposed to another large grazing animal, caused the

documented damage.  See Petitioners' Merits Brief at 22-25.  The Petitioners allege that, by relying on a sparse set of photographs, the Forest Service "failed to follow the recommendations in the Riparian Technical Reference," because it did not conduct controlled assessments over time to evaluate the Gila Cows' environmental impact.  Petitioners' Merits Brief at 24-25.

ii.   **The Petitioners Argue That the Aerial Shooting Does Not Comply With the NEPA.**

Regarding the Respondents' alleged NEPA violation, the Petitioners argue that the Respondents violate the NEPA, because: (i) the Aerial Shooting is a major federal action that may have significant adverse environmental effects, such that the Forest Service must prepare an EA or an EIS; (ii) the Aerial Shooting does not qualify for a CE, which would absolve the Forest Service from preparing an EA or an EIS; and (iii) even if a CE applies, there are extraordinary circumstances that nonetheless compel the Forest Service to prepare an EA or an EIS.  See Petitioners' Merits Brief at 25-41.  Separately, the Petitioners argue that the Forest Service's scoping process violates the NEPA, because there was no formal public notice-and-comment period after the Forest Service released the Scoping Letter. See Petitioners' Merits Brief at 41-42.  Regarding whether a CE applies, the Petitioners argue that none of the CEs that the Decision Memo. identifies is valid.  See Petitioners' Merits Brief at 35-39.  The Petitioners insist that the first   CE -- civil   and   criminal   enforcement,   and   investigative   activities,   under 7 C.F.R. § 1b.3(a)(5) -- does not apply, because the Aerial Shooting "is a resource management measure aimed at protecting endangered species habitat from degradation, which is not a law enforcement action."  Petitioners' Merits Brief at 37 (citing Decision Memo. at 5-7 (AR 005903-05)).  The Petitioners also allege that the Respondents' position that the Gila Cows are not unauthorized livestock is inconsistent with the Respondents' position that the civil and criminal

enforcement CE applies.  See Petitioners' Merits Brief at 37.  Stated otherwise, if the Gila Cows are not unauthorized livestock, which are prohibited on federal lands, then there is nothing for the Forest Service to enforce civilly or criminally.  See Petitioners' Merits Brief at 37.  The Petitioners assert that the second CE -- timber stand and wildlife habitat improvement activities -- does not apply, because the Aerial Shooting is not an "established vegetation treatment or forestry practice" similar to those practices that 36 C.F.R. § 220.6(e)(6) lists, including burning, thinning and brush control, and girdling trees to create snags.[62]  Petitioners' Merits Brief at 37.  The Petitioners argue that it is unreasonable for the Forest Service to equate the Aerial Shooting, which is "a novel practice," with the § 220.6(e)(6) examples, which are "well-vetted, standard forestry practices for reducing fire risk and/or maintaining forest lands."  Petitioners' Merits Brief at 37.  Finally, the Petitioners argue that the Forest Service's third CE -- short-term resource protection and public safety -- applies only to the impoundment notice and closure order, and not to the Aerial Shooting itself, which is neither an order, nor issued to provide short-term resource protection or protect public safety.  See Petitioners' Merits Brief at 38.  Regarding the Animal Inspection Service's purported CE -- routine, localized measures, including removals, that do not affect adversely wetlands, protected species, or critical habitat -- the Petitioners argue that, because the Aerial Shooting's methods are unique and may result in damage to wetlands, protected species, and critical habitats, it is not a "routine measure," as 7 C.F.R. § 372.5(c)(1)(I) contemplates the phrase. Petitioners' Merits Brief at 38.

---

[62]Girdling refers to a practice where forest managers create snags, or dead trees, by stripping bark from live trees.  See Snags, den trees, and coarse woody debris for wildlife habitat at 7, U.S. Department of Agriculture, available at https://www.nrcs.usda.gov/sites/default/files/2023-02/E666O_WA_020921.pdf (last visited November 18, 2024).

Finally, the Petitioners argue that, even if a CE applied, the Respondents are obligated to prepare an EA or an EIS, because there are extraordinary circumstances. See Petitioners' Merits Brief at 39 (citing 36 C.F.R. § 220.6(b)(1)). The Petitioners maintain that the Aerial Shooting will impact three identified resource conditions: (i) federally protected species or habitat; (ii) flood plains and wetlands; and (iii) designated wilderness. Petitioners' Merits Brief at 40. Regarding (i), the Petitioners insist, without citations, that a low-flying helicopter will deter Mexican spotted owls from using the project area, and that rotting carcasses may pollute waterways and harm aquatic species.[63] See Petitioners' Merits Brief at 40. Regarding (ii), the Petitioners allege that rotting carcasses will pollute waterways, thereby damaging flood plains and wetlands. See Petitioners' Merits Brief at 40 (citing Water Specialist Report at 9 (AR 006041)). Regarding (iii), the Petitioners argue that the Aerial Shooting undermines the Gila Wilderness' wilderness character, because the Aerial Shooting is not the most minimally invasive method of removing the Gila Cows. See Petitioners' Merits Brief at 40-41. The Petitioners note that Congress prohibits helicopter use in wilderness areas "unless 'necessary to meet minimum requirements for the administration of the area for the purposes of [the Wilderness Act].'" Petitioners' Merits Brief at 40-41 (quoting 16 U.S.C. 1133(c))(brackets in Petitioners' Merits Brief, but not in 16 U.S.C. 1133(c)). In short, the Petitioners argue that, by "focusing almost exclusively on the expected benefit" of the Aerial Shooting, the Respondents violate the NEPA, which "requires agencies to consider the positive and negative impacts, as well as the short- and long-term benefits of the proposed action." Petitioners' Merits Brief at 41. Separately, the Petitioners assert that the

---

[63]The Petitioners' Merits Brief does not identify which federally protected aquatic species they allege will be damaged. See Petitioners' Merits Brief at 40.

Respondents violate the NEPA, notwithstanding the alleged failure to prepare an EA or an EIS, because there was no formal notice-and-comment period following the Scoping Letter's release. See Petitioners' Merits Brief at 41. Instead of providing the Court with authority[64] regarding the NEPA's notice-and-comment period requirements, the Petitioners allege that "many people interpreted [the Scoping Letter] as a first step to share information and fully expected that a proposed action, with a public notice and comment period would follow." Petitioners' Merits Brief at 42 (citing Letter from Ty Bays, Chairman of Grant Soil and Water Conservation District, to Camille Howes Re: Request Meeting to Reduce Duplication of Effort and Improve Coordination in Resolving the Feral Cattle Problems at 1 (dated December 1, 2022)(AR 00444)("Grant County Coordination Letter"); Letter from Haydn Forward, Catron County Commissioner, to Camille Howes and Henry Provencio Re: Request for Cooperating Status for Catron County, New Mexico Related to the National Environmental Policy Act Compliance for the Gila National Forest at 1-2 (dated December 14, 2022)(AR 004554-55)("Catron County Coordination Letter")). While both Bays and Forward express their desire to coordinate with the Forest Service regarding the Aerial Shooting, neither says that they expect a formal notice-and-comment period. See Grant County Coordination Letter at 1-3 (AR 004444-46); Catron County Coordination Letter at 1-2 (AR 004554-55).

---

[64]The only regulation to which the Petitioners point is 40 C.F.R. § 1501.9, the relevant language of which is now cabined in 40 C.F.R. 1502.4. Compare 40 C.F.R. 1502.4(a)("Agencies shall use scoping, an early and open process consistent with § 1501.9 of this subchapter, to determine the scope of issues for analysis in an environmental impact statement, including identifying the important issues and eliminating from further study unimportant issues."), with Petitioners' Merits Brief at 41 ("'Generally, [a]gencies shall use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying the significant issues and eliminating from further study non-significant issues.'")(quoting 40 C.F.R. § 1501.9)(brackets in Petitioners' Merits Brief, but not in 40 C.F.R. § 1501.9).

### iii.    The Petitioners Argue That They Have Standing.

Regarding standing, the Petitioners argue that the Cattle Growers and Humane Farming have standing to challenge the Aerial Shooting their members' behalf.  See Petitioners' Merits Brief at 43-44.  The Cattle Growers' members have standing in two ways: (i) their economic interests in the possibility that their cattle may be killed in the Aerial Shooting; and (ii) their "interests in nature, the environment, and the effects dead and decomposing cattle will have on them as they go into the Gila Wilderness."  Petitioners' Merits Brief at 43.  Humane Farming member Kinsella has standing, because he visits the Gila Wilderness "to enjoy open space and wilderness, and to observe animals in their natural habitat," and the Aerial Shooting impairs his "aesthetic enjoyment of the wilderness and his interest in the humane treatment of animals by disrupting the wilderness solitude with helicopter noise and other manifestations of cruelty to animals, including gunfire and rotting carcasses, and by disturbing native wildlife."  Petitioners' Merits Brief at 43-44.  Humane Farming member Thompson has standing, because she "lives close to the wilderness [and has] plans to return this year," and she "support[s] animal protection and campaigns against animal cruelty."  Petitioners' Merits Brief at 43.  The Petitioners also allege that the Respondents' alleged NEPA violation deprived Humane Farming members of an opportunity to comment on the Aerial Shooting and of "the consolation of knowing that any harm to animals was carefully evaluated."  Petitioners' Merits Brief at 44.  The Petitioners allege that these interests are germane both to the Cattle Growers, which seeks "to advance the interests of the New Mexico cattle industry, as well as to encourage sound environmental policies that benefit cattle ranchers and their cattle," and to the Humane Farming, which "is dedicated to the organizational mission of protecting farmed animals, including cattle, which it furthers through legislation, anti-cruelty investigations, legal action, education, and direct care for abused animals."

Petitioners' Merits Brief at 44.  Finally, the Petitioners assert that the requested relief -- preventing the Aerial Shooting -- does not require either organization's members to participate in the lawsuit. See Petitioners' Merits Brief at 44.

The Petitioners' Merits Brief maintains that each individual petitioner -- Spur Lake, Shirley, and Campbell -- has standing.  See Petitioners' Merits Brief at 44-45.  The Petitioners assert that because Spur Lake operates a ranch bordering the Gila Wilderness, its cattle may wander into the project area, and the Forest Service may kill them during the Aerial Shooting.  See Petitioners' Merits Brief at 44-45.  The Petitioners maintain that Shirley, as Spur Lake's owner, has an interest in those wandering cattle, as well as in his own aesthetic and recreational enjoyment of the Gila Wilderness, which the Aerial Shooting will undermine as "dead cattle rot and attract various predators and scavengers."  Petitioners' Merits Brief at 45.  The Petitioners argue that Campbell has standing, because he lost customers after "multiple campers and hikers who use his campground expressly noted the presence of dead cattle in the forest as a reason for dissatisfaction with their experience."  Petitioners' Merits Brief at 45.

**b.**      **The Respondents' Merits Response.**

On October 19, 2023, the Respondents file the Respondents' Merits Response.  See Respondents Brief at 1.  The Respondents argue: (i) the Petitioners do not have standing to pursue the Statutory Authority Claim, the Impoundment Regulation Claim, or the NEPA Claim, see Respondents' Merits Response at 9-17; (ii) 36 C.F.R. § 262.10  does not require the Forest Service to impound the Gila Cows before killing them, see Respondents' Merits Response at 17-37; and (iii) the Respondents comply with the NEPA, because they rely properly on applicable CEs and determine reasonably that no extraordinary circumstances preclude CE use, see Respondents' Merits Response at 37-51.

i.      **The Respondents Argue That the Petitioners Do Not Have Standing.**

Regarding standing for the Statutory Authority Claim and the Impoundment Claim, the Respondents assert that Humane Farming and Campbell lack standing, because they do not "assert any injury to their property interests in cattle as a result of the lethal removal operations." Respondents' Merits Response at 11.  Respondents also assert that the Cattle Growers, Spur Lake, and Shirley lack standing because their allegations of future injury – i.e., that these Petitioners' cattle may be gunned down in the Aerial Shooting – are too conclusory to satisfy Article III's injury-in-fact requirement.  See Respondents' Merits Response at 11-13.

Regarding standing for the NEPA Claim, the Respondents insist that neither the Cattle Growers nor Humane Farming have organizational standing, because neither asserts that environmental protection is their organization's central purpose, and thus the alleged environmental injuries are not germane to their organizations' missions.  See Respondents' Merits Response at 14-15.  Further, the Respondents argue that Humane Farming also does not have standing to pursue the NEPA Claim, because its members do not allege that they intend to spend time in the project area immediately after the Aerial Shooting, such that they are likely to encounter Gila Cow carcasses.  See Respondents' Merits Response at 15-16 (citing Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1396 (9th Cir. 1992); and Sw Env't Ctr. V. Sessions, 355 F. Supp. 3d 1121, 1134 (D.N.M. 2018)(Johnson, C.J.)).  In a footnote, the Respondents assert that Humane Farming's allegation that the Respondents' failure to comply with the NEPA deprived its members of the opportunity to comment on the Aerial Shooting is also not cognizable, because "'deprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing.'" Respondents' Merits Response at 16 n.3 (quoting

Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009))(ellipses in Respondents' Merits Response, but not in Summers v. Earth Island Inst.).   Regarding the individual Petitioners' standing, the Respondents assert that Campbell's injuries are too "hypothetical, conclusory, and vague" to establish standing, because he cannot identify how many customers he lost.   See Respondents' Merits Response at 16.  The Respondents maintain that Shirley also does not have standing, because he has not alleged sufficiently that he is likely to encounter rotting Gila Cow carcasses after the Aerial Shooting, particularly given that he admits that "it would be 'nearly impossible' to locate cattle carcasses across the Project [sic] area."  Respondents' Merits Response at 17 (quoting Shirley Decl. ¶ 12, at 3-4).  In a footnote, the Respondents argue further that Spur Lake does not have standing, because businesses "generally do not have aesthetic or recreational interests, and they cannot support their standing by asserting the aesthetic or recreational interests of their employees or customers."  Respondents' Merits Response at 16 n.4 (quoting Triumvirate, LLC v. Zinke, No. 3:18-cv-0091-HRH, 2018 WL 2027727, at *4 (D. Alaska May 1, 2018)(Holland, J.)).

> **ii.     The Respondents Argue That the Aerial Shooting Does Not Violate the Forest Service's Regulations.**

Regarding the Statutory Authority Claim and the Impoundment Regulation Claim, the Respondents insist that, because the 36 C.F.R. § 222.1 definition, and not the 36 C.F.R. § 261.2 definition, applies to the Gila Cows, 36 C.F.R. § 262.10 does not require the Forest Service to impound the Gila Cows before killing them.  See Respondents' Merits Response at 17-34.  First, the Respondents argue that the § 261.2 definition incorporates implicitly an element of human ownership, because that definition is used only twice in § 261, for prohibitions on: (i) placing unauthorized livestock in the National Forest System; and (ii) ignoring a forest officer's request to

remove unauthorized livestock.  See Respondents' Merits Response at 20-21.  Second, the

Respondents argue that the Forest Service regulations ought to be construed together and "given

harmonious effect" to actualize the regulatory scheme, such that the two definitions are consistent

with one another.  Respondents' Merits Response at 25-31.  In a footnote, the Respondents also

note that the Petitioners' argument that the § 222.1 definition does not apply to § 262.10, because

§ 261.2 says that its definitions "apply to this part," 36 C.F.R. § 261.2, is inapposite because

§ 262.10 is not in § 261.  See Respondents' Merits Response at 26 n.7.  Synthesizing these

positions, the Respondents argue that § 262.10 cannot apply to the Gila Cows, because: (i) the Gila

Cows are not unauthorized livestock; and (ii) § 262.10

> applies to two categories of trespassing livestock: Prior to seizing an animal, the
> Forest Service must give 5-days' written notice to the owner if it "knows the name
> and address of the owner[]," 36 C.F.R. § 262.10(a), or 15-days' notice by
> publication and posting "if the name of the owner is unknown," id. § 262.10(b)

Respondents' Merits Response at 31 (brackets in Respondents' Merits Response).  Stated

otherwise, the Respondents argue that § 262.10 can apply only to animals that humans own,

because the regulation mandates that the Forest Service try to contact the unauthorized livestock's

owner before dealing with it.  See Respondents' Merits Response at 31-32.  In the alternative, the

Respondents assert that, even if § 262.10 applies to the Gila Cows, the Forest Service may still

conduct the Aerial Shooting, because the regulation is "drafted only in the permissive 'may be

impounded,'" which does not prohibit the Forest Service from removing the Gila Cows in some

other way.  Respondents' Merits Response at 33-34 (quoting 36 C.F.R. § 262.10).  Finally, the

Respondents assert separately that the Forest Service has ample evidence that the Gila Cows are

an invasive, exotic species that justifies the Aerial Shooting.  See Respondents' Merits Response

at 34-37.

### iii. The Respondents Argue that the Aerial Shooting Complies With the NEPA.

Regarding the NEPA Claim, the Respondents maintain that the three CEs apply, and that no extraordinary circumstances preclude CE use.  See Respondents' Merits Response at 37-49. The Respondents dispute the Petitioners' characterization of 36 C.F.R. § 220.6(e)(6) as applying only to "established vegetation treatment or forestry practices," Petitioners' Merits Brief at 37, because the CE "plainly applies to both timber stand improvement and/or wildlife habitat improvement activities," Respondents' Merits Response at 38 (emphasis in original).  The Respondents contend that, because nothing in the regulation "suggests that the CE is limited to vegetation treatment," the CE applies properly to the Aerial Shooting, which is designed to improve riparian habitats that the Gila Cows have damaged.  Respondents' Merits Response at 38-39.  The Respondents argue also that 7 C.F.R. § 1b.3(a)(5) -- the law enforcement and investigative activities CE -- applies to the Aerial Shooting, because it is consistent with other authorized civil and criminal law enforcement activities, like removing unauthorized cattle under 36 C.F.R. § 262.10.  See Respondents' Merits Response at 41-42.  The Respondents assert, moreover, that, because the Gila Cows are not unauthorized cattle -- and thus the Forest Service is not conducting a § 262.10 removal -- the Aerial Shooting shares a rationale with 36 C.F.R. § 262.10 and other regulations, like 36 C.F.R. § 261.7, that the law enforcement CE contemplates.  See Respondents' Merits Response at 41-42.  The Respondents' Merits Response mentions briefly the public health and safety CE as applicable only to the public closure order, rather than to the Aerial Shooting writ large.  See Respondents' Merits Response at 41.  Regarding the Animal Inspection Service CE -- routine measures -- the Respondents maintain

> that shooting, including by aircraft, is a routine management tool used by APHIS
> and state game management agencies across the United States to address a variety

of wildlife management issues involving many species, including feral swine and
other hoofed mammals. See [Animal Inspection Service CE Record at 1
(AR 005893); U.S. Department of Agriculture, The Use of Aircraft in Wildlife
Damage Management at 1 (dated September, 2019), (AR 003286)("Wildlife Aerial
Shooting Assessment")]("Aerial shooting . . . is the most common use of aircraft in
the [Wildlife Services] program. From FY11 to FY15, [Wildlife Services] annually
averaged the take of 41,747 animals during 7,066 work tasks associated with aerial
shooting."); [U.S. Department of Agriculture, National Feral Swine Damage
Management Program: Five Year Report FY14-FY18 at 112-114 (undated),
(AR 003020-22)](5-year report indicating that 69 percent of feral swine removals
in New Mexico were conducted through aerial methods, and animals were removed
in Forest Service Wilderness areas).

Respondents' Merits Response at 40 (brackets inside of parentheticals in Respondents' Merits
Response).  The Respondents also dispute the Petitioners' assertion that the Aerial Shooting is
"'highly controversial,' because it is 'likely' to cause cattle carcasses to contaminate water bodies
and wetlands." Respondents' Merits Response at 40 (quoting Petitioners' Merits Brief at 38).  In
response, the Respondents emphasize how the Decision Memo. "specifically addresses this issue"
by prohibiting killing Gila Cows near waterways, and removing carcasses from waterways, if
necessary.  Respondents' Merits Response at 40.

Regarding the Petitioners' challenge to the Forest Service's determination that no
extraordinary circumstances preclude CE use, the Respondents challenge first, as a threshold
matter, the Petitioners' analytical framework.  See Respondents' Merits Response at 43.  The
Respondents assert that the initial question is not whether the Aerial Shooting is a major federal
action that may have significant environmental effects: this inquiry is reserved for assessing
whether an EIS is required after the agency prepares an EA.  See Respondents' Merits Response
at 43.  Instead, the Respondents argue that the agency, after applying a CE, must evaluate seven
resource conditions to check if any rise to the level of extraordinary circumstances that preclude
CE use.  See Respondents' Merits Response at 43.  Regarding the resource condition evaluation,

the Respondents contend that none of the three conditions that the Petitioners identify -- federally protected species or critical habitat; flood plains, wetlands, or municipal watersheds; and Congressionally designated wilderness areas -- constitute extraordinary circumstances. <u>See</u> Respondents' Merits Response at 43-49. Regarding the wildlife impact, the Respondents dispute the Petitioners' characterization of the Forest Service's diligence, and argue that the Miscellaneous Biological Assessment analyzes sufficiently the Aerial Shooting's impact on all protected species and critical habitats. <u>See</u> Respondents' Merits Response at 45-46. Regarding the water quality impact, the Respondents point to the Water Specialist Report as evidence that the Forest Service researched thoroughly whether the Aerial Shooting would damage flood plains, wetlands, or municipal watersheds. <u>See</u> Respondents' Merits Response at 47-48. Finally, regarding the wilderness area impact, the Respondents summarize the Minimum Requirements Analysis as evidence that the Aerial Shooting is the most minimally invasive solution to the Gila Cow problem, and assert that flying a helicopter over the Gila Wilderness does not violate the Wilderness Act, which only prohibits landing aircraft within designated wilderness areas. <u>See</u> Respondents' Merits Response at 48-49. Addressing the Petitioners' arguments regarding the Respondents' allegedly deficient scoping process, the Respondents argue that the Respondents did nothing to mislead the Petitioners into thinking they would have more commenting opportunities beyond the scoping process. <u>See</u> Respondents' Merits Response at 49-50. Specifically, the Respondents note that, because scoping is not reserved for agency actions that require an EIS, the Petitioners were not duped into thinking, as Petitioners argue, , <u>see</u> Petitioners' Merits Brief at 41-42, that that Scoping Letter was the first step in the EIS process, <u>see</u> Respondents' Merits Response at 50 (citing 36 C.F.R. § 220.4(e)("Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or

an EIS.")).  The Respondents argue that, moreover, the Scoping Letter "expressly indicated that the agency was contemplating proceeding under a CE" and that the Petitioners submitted detailed comments that "expressly acknowledge" that the Forest Service intended to proceed under a CE. Respondents' Merits Response at 50.

### c.        The Biological Center's Merits Response.

On November 2, 2023, the Biological Center also responds to the Petitioners' Merits Brief. See Biological Center Merits Response at 1.  The Biological Center Merits Response highlights the Forest Service' extensive ecological research that supports its conclusion that the Gila Cows threaten the Gila Wilderness' riparian systems.  See Biological Center Merits Response at 6-9. The Biological Center also argues that, in addition to complying with the NEPA, the Aerial Shooting complies with other federal law and requirements, including: (i) the Endangered Species Act, which requires the Forest Service to "use 'all methods and procedures which are necessary'" to conserve federally listed species, Biological Center's Merits Brief at 10 (quoting 16 U.S.C. § 1532(3))(emphasis in Biological Center's Merits Brief); (ii) the National Park Service Organic Act, 16 U.S.C. §§ 551-580, which requires the Forest Service to protect national forests against depredation; (iii) and the National Forest Management Act, 16 U.S.C. §§ 1600-1614, which requires the Forest Service to manage national forests in accordance the applicable forest plan, see Biological Center's Merits Brief at 10-13.

### d.        The Petitioners' Merits Reply.

On reply, the Petitioners argue that: (i) they have standing for the Statutory Authority Claim, the Impoundment Regulation Claim, and the NEPA Claim, see Petitioners' Merits Reply at 1-11; (ii) the Respondents' interpretation of "unauthorized livestock" is wrong, Petitioners'

Merits Reply at 11-24; and (iii) the Respondents and the Biological Center fail to rebut the Petitioners' NEPA claim, see Petitioners' Merits Reply at 24-33.

<strong>i.    The Petitioners Argue That They Have Standing.</strong>

The Petitioners' frame the standing issue in reference to the "zone of interests" test for APA standing, where a claimant must show that his or her injury "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint," Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990)(internal quotations have no citation).  See Petitioners' Merits Reply at 1-2.  Regarding standing for the Statutory Authority Claim and for the Impoundment Regulation Claim, the Petitioners insists that the Cattle Growers, Spur Lake, and Shirley have standing, because their injuries -- an inability to retrieve their cattle that may have wandered into the project area -- fall within the impoundment regulation's zone-of-interests, which include an assurance that ranchers will receive notice and opportunity to reclaim cattle that stray into unauthorized areas.  See Petitioners' Merits Reply at 2-6.  The Respondents also maintain that the Cattle Growers, Spur Lake, and Shirley allege aesthetic injuries, but they do not explain how those aesthetic injuries fall within the impoundment regulation's zone-of-interests.  See Petitioners' Merits Reply at 6.  The Petitioners argue that the Campbell Decl. alleges sufficiently a concrete economic injury stemming from the Respondents' alleged violation of the impoundment regulation, because he says that he experienced a decline in business after his customers complained about the smell of rotting carcasses in the Gila Wilderness after the February, 2022, Aerial Shooting.  See Petitioners' Merits Reply at 6-7.  The Petitioners do not identify explicitly how Campbell's economic injury falls within the impoundment regulation's zone-of-interests.  The Petitioners assert that Humane Farming has standing to challenge the impoundment regulation violation, because Humane Farming missed out on an

opportunity to, pursuant to 36 C.F.R. § 262.10's procedures, acquire cattle to place in its animal sanctuary, and that this potential acquisition falls squarely within Humane Farming's core mission of preventing animal cruelty.  See Petitioners' Merits Reply at 7-8.  The Petitioners allege that Humane Farming's purchase of impounded cattle contributes to the impoundment regulation's "purposes of providing cost recovery for impoundment-related expenses."  Petitioners' Merits Reply at 7 (citing 36 C.F.R. § 262.10(e)-(f)).  Regarding standing for the NEPA Claim, the Petitioners assert that each Petitioner alleges sufficiently that they have at least recreational or aesthetic interests in the Gila Wilderness, which fall within the NEPA's zone-of-interests.  See Petitioners' Merits Reply at 8-11.  Regarding whether those interests are germane to each organization's purpose, the Petitioners argue that: (i) the Cattle Growers' "mission is focused on advocating for the interests of cattle growers, which includes supporting environmental policies that protect the environment and the wise use of natural resources"; and (ii) Humane Farming's "organizational mission is focused on protecting animals from cruelty and abuse, which includes protecting the public and the environment from the impact of animal cruelty and abuse." Petitioners' Merits Reply at 11.

> **ii.** **The Petitioners Argue that the Aerial Shooting Violates the Forest Service's Regulations.**

On the merits of the Statutory Authority Claim and the Impoundment Regulation Claim, the Petitioners argue that the Respondents' interpretation of 36 C.F.R. § 262.10 is not entitled to deference under Auer v. Robbins, 519 U.S. 452 (1997), because the impoundment regulation applies clearly and unambiguously to Gila Cow removal.  See Petitioners' Merits Reply at 11-15. The Petitioners also dispute that 36 C.F.R. § 222 -- the Respondents' proposed definition -- and 36 C.F.R. § 261 -- the Petitioners' proposed definition -- should be read together, because those

regulations do not concern the same subject matter.  See Petitioners' Merits Reply at 16.  The

Petitioners also argue that the impoundment regulation does not condition cattle removal on active

ownership, and "[c]ourts have cautioned against accepting interpretations by policymakers that

'imply language that simply does not exist.'"  Petitioners' Merits Reply at 17 (quoting Dir., Office

of Workers' Comp. Programs, United States Dep't of Labor v. Mangifest, 826 F.2d 1318, 1324

(3d Cir. 1987)).  The Petitioners also reiterate their point that the § 222.1 definition applies to the

Gila Cows, because they fall within a category of animals that humans breed "for use or pleasure,"

regardless of their individual ownership status.  Petitioners' Merits Reply at 17.  Finally, the

Petitioners allege that the Respondents' interpretation disrupts the Petitioners' expectations about

the impoundment regulation, because it creates a new, unworkable framework where an animal's

ownership status determines whether it is unauthorized livestock.  See Petitioners' Merits Reply

at 18-20 (distinguishing Utah Native Plant Soc'y v. U.S. Forest Service, 923 F.3d 860 (10th Cir.

2019)).

i.    The Petitioners Argue That the Aerial Shooting Violates the
NEPA.

On the NEPA Claim, the Petitioners repeat their core arguments: the Aerial Shooting does

not fall within a CE, and, even if the Aerial Shooting falls within a CE, extraordinary circumstances

preclude CE use.  See Petitioners' Merits Reply at 24-33.  Regarding CE application, the

Petitioners argue that: (i) the timber stand and/or wildlife habitat improvement CE does not apply,

because the Forest Service has not shown that the Aerial Shooting does not have a significant

environmental effect, see Petitioners' Merits Reply at 30-31; (ii) the law enforcement and

investigative activities CE does not apply, because it is "nonsensical" for the Respondents to argue

that the Gila Cows are not unauthorized cattle, but that they may be removed under a CE that

contemplates enforcement activities directed only at unauthorized cattle, Petitioners' Merits Reply at 32; and (iii) the Animal Inspection Service's routine measures CE does not apply, because, although shooting wild hogs from aircraft is accepted, shooting cattle from aircraft is not, see Petitioners' Merits Reply at 31-32.  Regarding extraordinary circumstances, the Petitioners argue that the Respondents' determination is not supported, because the Respondents do not provide enough information about how they reached their conclusions, and the Decision Memo. is not based on actual data or valid assumptions.  See Petitioners' Merits Reply at 25-28.  Finally, the Petitioners repeat their assertion that the scoping process was inadequate, because it "held out many possibilities, which generated genuine optimism that Respondents would comply with NEPA, unlike in 2022."  Petitioners' Merits Reply at 32-33.  The Petitioners do not identify, however, any law or regulation that the scoping process violates.  See Petitioners' Merits Reply at 32-33.

e.    **The Merits Hearing.**

On February 1, 2024, the Court holds another hearing on the Petitioners' standing and the action's merits.  See February 1, 2024, Hearing Minutes at 1-2.  In addition to reiterating many of the arguments that the parties briefed, the Respondents provide further clarity on their standing arguments. First, the Respondents contend that the possibility that branded cattle may be killed during the Aerial Shooting is not an injury-in-fact and, even if one of the Petitioners' cows are killed, that Petitioner misses only the opportunity to re-purchase the Petitioner's wandering cattle under 36 C.F.R. § 262.10(e), which requires the Petitioner to reimburse the Forest Service for impoundment and unauthorized grazing fees, rendering the re-purchase price higher than market value,    see Transcript of February 1, 2024, Hearing at 102:13-24 (taken February 1, 2024)(McGuire), filed March 11, 2024 (Doc. 66)("February 1, 2024, Tr."); id. at 6:15-9:8

(Hamilton).  Second, the Respondents contend that neither the Livestock Board's directive nor 36 C.F.R. § 262.10 give the public a right to purchase Gila Cows at an auction, and thus the Court could not redress the alleged lost purchasing opportunity.  See February 1, 2024, Tr. at 9:9-11:18 (Hamilton)(citing Baca v. King, 92 F.3d 1031 (10th Cir. 1996)).  Regarding potential mootness issues, the parties agree that some Gila Cows remain in the Gila Wilderness, even after the Aerial Shooting, and that, accordingly, the Forest Service may authorize more aerial operations to remove the remaining Gila Cows.  See February 1, 2024, Tr. at 102:13-24 (McGuire); id. at 119:3-4 (Smith); id. at 122:9-17 (Smith).  Regarding the merits of the Statutory Authority Claim and the Impoundment Regulation Claim, the parties agree that the relevant provisions are unambiguous and thus Auer deference does not apply.  See February 1, 2024, Tr. at 62:24- 63:20 (Court, Smith, McGuire).  Regarding the NEPA Claim's merits, the Petitioners argue the Forest Service's field work does not support its conclusions about the Aerial Shooting's environmental impact, because the Forest Service did not "analyze the issues in a controlled, scientific way."  February 1, 2024, Tr. at 144:22-23 (McGuire).  To support this assertion, the Petitioners point to the Riparian Technical Reference, which, according to the Petitioners, "provides at least some guidance for how to go about assessing riparian damage."  February 1, 2024, Tr. at 144:24-25 (McGuire).  In turn, the Petitioners assert that the Forest Service's field work -- as summarized in the Decision Memo. and its supporting materials -- does not support the Forest Service's conclusions regarding the Aerial Shooting's environmental impact, because the Forest Service failed to follow the Riparian Technical Reference's recommendations for assessing riparian damage.  See February 1, 2024, Tr. at 144:19-145:18 (McGuire).  In response, the Respondents argue that "there is no requirement in the law" that the Forest Service follow the Riparian Technical Reference's recommendations for assessing riparian damage.  February 1, 2024, Tr. at 146:1-2 (Smith).

5.    __The Supplemental Authority Brief__.

On January 10, 2025, the Petitioners file the Supplemental Authority Brief.    See Supplemental Authority Brief at 1.  The Petitioners attach and submit the Gila National Forest, U.S. Forest Service, Land Management Plan: Catron, Grant Hidalgo, and Sierra Counties, New Mexico (dated July 30, 2024), filed January 10, 2025 (Doc. 68-1)("July 30, 2024, Forest Plan"). The Petitioners argue that, because the Forest Service's "Final Forest Plan" refers to the Gila Cows as "feral domestic livestock," the Court "should reject USFS's position in this lawsuit" and "conclude that the Gila Cattle fall within the definition of 'unauthorized livestock' that must be impounded in accordance with 36 C.F.R. § 262.10."  Supplemental Authority Brief at 2-3 (internal quotations have no citations)(citing July 30, 2024, Forest Plan at 140).  The Petitioners highlight a portion of the July 30, 2024, Forest Plan that discusses "Non-Native Invasive Species," July 30, 2024, Forest Plan at 139, and states:

> Feral domestic livestock have been or are a problem in some areas of the forest. These animals are managed by the Forest Service with technical assistance provided by other federal and state partners. While feral hogs are not documented in the forest, there exists the potential for them to arrive and cause issues as they do in other areas of the state. The State of New Mexico considers feral hogs unprotected and is actively trying to eradicate them in several areas. Efforts will be made to eradicate feral hogs if they are documented to occur within the forest. Feral cattle are an ongoing issue arising from legacy non-compliance issues and are more appropriately discussed in the Livestock Grazing section of this plan.

July 30, 2024, Forest Plan at 140.  In addition to arguing that the July 30, 2024, Forest Plan's use of the phrase "feral domestic livestock" in this paragraph should persuade the Court to reject the Forest Service's interpretation of 36 C.F.R. § 262.10 in this case, the Petitioners assert that, because the Forest Service "refers readers to a section of the Forest Plan entitled 'Livestock Grazing'" when "discussing how the Gila Cattle should be addressed or discussed," the July 30, 2024, Forest Plan "underscores the reality that the Gila Cattle are livestock."  Supplemental

Authority Brief at 2 (quoting July 30, 2024, Forest Plan at 140)(emphasis in Supplemental Authority Brief, but not in July 30, 2024, Forest Plan).

On January 17, 2025, the Respondents respond to the Supplemental Authority Brief.  See Federal Respondents' Response to Petitioners' January 10, 2025 "Notice of Supplemental Authority and Agency Interpretation," ECF No. 68 [sic] at 1, filed January 17, 2025 (Doc. 69)("Supplemental Authority Response").  The Respondents make four arguments.  See Supplemental Authority Response at 1-3.  First, the Respondents insist that the Court "'may not consider materials outside of the administrative record'" for the challenged agency decision in reviewing the Petitioners' claims.  Supplemental Authority Response at 1 (quoting Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 58 F. Supp. 3d1191, 1224 (D.N.M. 2014)(Browning, J.)).  The Respondents argue that, because the Forest Service issues the Decision Memo. over a year before the July 30, 2025, Forest Plan, that July 30, 2024, "document [] is not properly before the Court."  Supplemental Authority Response at 2.  Second, the Respondents argue that the "passage the Petitioners quote" neither interprets nor applies the term "livestock" in 36 C.F.R. § 262.10, and, instead, the "passage mostly discusses efforts 'to eradicate feral hogs,' not impound them."  Supplemental Authority Response at 2.  Third, the Respondents argue that the July 30, 2024, Forest Plan is "not a final authoritative statement by the Forest Service," because it is "subject to modification" while it is currently undergoing an "administrative objections process," after which the Forest Supervisor may approve it.  Supplemental Authority Response at 2 (citing Gila National Forest; Revision of the Land Management Plan for the Gila National Forest, 89 Fed. Reg. 61059 (July 30, 2024)("Forest Plan Federal Register Notice").  The Forest Plan Federal Register Notice gives the public sixty days to "file objections for Forest Service review prior to the approval" of the July 30, 2024, Forest Plan.  Forest Plan Federal Register Notice at

61058.  Fourth, the Respondents argue that the phrase "'feral domestic livestock'" means that the Gila Cows are wild animals who are descended from domesticated animals, and, thus, the Gila Cows are not subject to 36 C.F.R. § 262.10.  Supplemental Authority Response at 1-3 (quoting July 30, 2024, Forest Plan at 140).  To support this last argument, the Respondents provide a 2022 dictionary definition of the word "'feral,'" which means "'[h]aving returned to an untamed state from domestication.'"  Supplemental Authority Response at 3 (quoting American Heritage Dictionary (2022))(brackets in Supplemental Authority Brief, but not in the American Heritage Dictionary).

## **LAW REGARDING INTERVENTION**

Rule 24 provides for intervention of right or permissive intervention on timely motion:

(a)    **Intervention of Right.**  On timely motion, the court must permit anyone to intervene who:

    (1)    is given an unconditional right to intervene by a federal statute; or

    (2)    claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

(b)    **Permissive Intervention.**

    (1)    *In General*.  On timely motion, the court may permit anyone to intervene who:

        (A)    is given a conditional right to intervene by a federal statute; or

        (B)    has a claim or defense that shares with the main action a common question of law or fact.

    **(2)**    ***By a Government Officer or Agency***.  On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:

        **(A)**    a statute or executive order administered by the officer or agency; or

        **(B)**    any regulation, order, requirement, or agreement issued or made under the statute or executive order.

    **(3)**    ***Delay or Prejudice***. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24(a)-(b).  "The movant bears the burden of establishing his or her right to intervene."  Ortiz v. New Mexico, 550 F. Supp. 3d 1020, 1070 (D.N.M. 2021)(Browning, J.).

**1.**    **Timeliness.**

Before discussing the differences between the two procedural paths to intervention, the Court addresses one common requirement: timeliness.  Both intervention as a matter of right and permissive intervention require that the motion to intervene be "timely."  Fed. R. Civ. P. 24.  "The timeliness of a motion to intervene is assessed 'in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances.'"  Utah Ass'n of Cntys. v. Clinton, 255 F.3d 1246, 1250 (10th Cir. 2007)(quoting Sanguine, Ltd. v. U.S. Dep't of Interior, 736 F.2d 1416, 1418 (10th Cir. 1984)).

    While rule 24 does not specify what makes a motion to intervene timely, the Tenth Circuit has held that "[t]he timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances."

Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. 236, 245 (D.N.M. 2008)(Browning, J.)(quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1250)(brackets in Am. Ass'n of People with Disabilities v. Herrera, but not in Utah Ass'n of Cntys. v. Clinton).  The United States Court of Appeals for the Tenth Circuit has stated that the timeliness "analysis is contextual" and that courts should not use "absolute measures of timeliness."  Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1250 (quoting Sierra Club v. Espy, 18 F.3d 1202, 1205 (5th Cir. 1994)).  A court properly denies intervention where, for example, a case is near its end stage, and allowing a party to intervene would cause undue prejudice and delay in the proceeding; on the other hand, intervention is proper where, despite the passage of time, there has been limited activity in the case, and the intervention will not prejudice the existing parties.  See Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. at 245-46.

2.      **Intervention of Right.**

In the absence of an unconditional, federal statutory right to intervene, a movant must satisfy the following three criteria to qualify for intervention of right: (i) the movant must have an interest in the litigation's subject matter; (ii) the movant's interest will be impaired or impeded if movant is not allowed to intervene; and (iii) the litigation's existing parties will not represent adequately the movant's interest.  See Fed. R. Civ. P. 24(a)(2).  The Tenth Circuit "has historically taken a 'liberal' approach to intervention and thus favors the granting of motions to intervene."  W. Energy All. v. Zinke, 877 F.3d 1157, 1164 (10th Cir. 2017)(citing Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior, 100 F.3d 837, 841 (10th Cir. 1996)).

The first element --"[t]he interest element" -- "is 'a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.'"  WildEarth Guardians v. Nat'l Park Serv., 604 F.3d 1192, 1198 (10th Cir. 2010)(quoting

San Juan County, 503 F.3d at 1195)(emphasis in WildEarth Guardians v. Nat'l Park Serv). An interest that is direct, substantial, and legally protectable will likely justify intervention. See San Juan County, 503 F.3d 1163, 1194 ("This is not to say that it is error for a court addressing an application for intervention to consider whether the prospective intervenor's interest is direct, substantial, and legally protectable. As we previously stated, an interest that clearly satisfies all these conditions would likely justify intervention.")(citing 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1908, at 272), abrogated on other grounds by Hollingsworth v. Perry, 570 U.S. 693, 697-711 (2013). "The movant's claimed interest is measured in terms of its relationship to the property or transaction that is the subject of the action, not in terms of the particular issue before the district court." WildEarth Guardians v. Nat'l Park Serv., 604 F.3d at 1198 (citing Utah Ass'n of Cntys. v. Clinton, 255 F.3d 1246, 1252 (10th Cir. 2001)).

The second element -- impairment or impediment to the intervenor's interest -- presents "a minimal burden." WildEarth Guardians v. Nat'l Park Serv., 604 F.3d at 1199. "'To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied.'" WildEarth Guardians v. U.S. Forest Serv., 573 F.3d 992, 995 (10th Cir. 2009)(quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1253)(brackets in Utah Ass'n of Cntys. v. Clinton). "If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." WildEarth Guardians v. U.S. Forest Serv., 573 F.3at 995 (quoting San Juan County, 503 F.3d at 1195). "Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation." San Juan County, 503 F.3d at 1203 (quoting United

States v. Union Elec. Co., 64 F.3d 1152, 1162 (8th Cir. 1995)).  If a proposed intervenor's "interest will be prejudiced if it does not participate in the main action, the mere availability of alternative forums is not sufficient to justify denial of a motion to intervene."  Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1254 (quoting Commodity Futures Trading Comm'n v. Heritage Cap. Advisory Servs., Ltd., 736 F.2d 384, 387 (7th Cir. 1984)).  For rule 24(a)(2)'s purposes, "sufficient impairment may result even from the 'stare decisis effect' of a district court's judgment," WildEarth Guardians v. National Park Service, 604 F.3d at 1199 (quoting Utahns for Better Transportation v. United States Department of Transportation, 295 F.3d 1111, 1116 (10th Cir. 2002)), and a court may consider "any significant legal effect in the applicant's interest and [is] not restricted to a rigid res judicata test," Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of Interior, 100 F.3d at 844.

As for the third element, the would-be intervenor also has the "minimal" burden of showing that the existing parties will not represent adequately its interest.  WildEarth Guardians v. Nat'l Park Serv., 604 F.3d at 1200.  "The movant must show only the possibility that representation may be inadequate."  WildEarth Guardians v. Nat'l Park Serv., 604 F.3d at 1200 (citing Utahns for Better Transp. v. U.S. Dep't of Transp., 295 F.3d at 1117).  "The possibility that the interests of the applicant and the parties may diverge need not be great in order to satisfy this minimal burden." WildEarth Guardians v. Nat'l Park Serv., 604 F.3d at 1200 (quoting Utah Ass'n of Cntys. v. Clinton, 255 F.3d at 1254).

3.    **Permissive Intervention.**

"To permissively intervene, a party need not have a direct personal or pecuniary interest in the subject of the litigation."  San Juan County, 503 F.3d at 1207.  The court must consider whether intervention will cause undue delay or prejudice when considering whether to grant permissive

intervention.  See Fed. R. Civ. P. 24(b)(3); DeJulius v. New England Health Care Emps. Pension Fund, 429 F.3d 935, 943 (10th Cir. 2005)(noting that district courts must consider undue prejudice or delay in deciding whether to grant permissive intervention).  The Court interprets rule 24(b) to allow permissive intervention when: "(i) the application to intervene is timely; (ii) the applicant's claim or defense and the main action have a question of law or fact in common; and (iii) intervention will not unduly delay or prejudice the adjudication of the original parties' rights." Wheeler Peak v. L.C.I.2, Inc., No. CIV-07-1117, 2009 WL 521799, at *3 (D.N.M. Oct. 27, 2009)(Browning, J.)(citing Forest Guardians v. U.S. Dep't of Interior, No. CIV-02-1003, 2004 WL 3426413, at *10 (D.N.M. Jan. 12, 2004)(Browning, J.)).  "The grant of permissive intervention lies within the discretion of the district court."  Kane Cnty. v. United States, 597 F.3d 1129, 1135 (10th Cir. 2010)(citing City of Stilwell v. Ozarks Rural Elec. Coop., 79 F.3d at 1043).  The Court has previously concluded that class members may intervene permissively even after the named plaintiffs settle their claims.  See Payne v. Tri-State Careflight, LLC, No. CV 14-1044 JB/KBM, 2016 WL 9738302, at *25-26 (D.N.M. July 12, 2016)(Browning, J.).

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue.  See Summers v. Earth Island Institute, 555 U.S. at 492-93.  The plaintiff bears the burden of establishing standing.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiffs "must 'allege . . . facts essential to show jurisdiction.  If [they] fai[l] to make the necessary allegations, [they have] no standing.'"  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(quoting McNutt v. Gen. Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936))(brackets in FW/PBS v. City of Dallas, but not in McNutt v. Gen. Motors Acceptance Corp. of Indiana).  Moreover, where the defendant challenges standing, a court must presume lack of

jurisdiction "unless 'the contrary appears affirmatively from the record.'"  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986)). "It is a long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings,' but rather 'must affirmatively appear in the record.'"  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231).

   "Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan County, 503 F.3d at 1171.  See U.S. Const. art. III, § 2.  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan County, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) 'an injury in fact that is both concrete and particularized as well as actual or imminent'; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."  Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(quoting Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)).

   "Standing is determined as of the time the action is brought."  Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)(Ebel, J.)).  In Smith v. United States Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejects a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserts allows courts to affirm incorrect decisions without interfering with official, "published" law.  484 F.3d at 1285.  The Tenth Circuit notes that the plaintiff recently has taken his State appeal and, therefore,

was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d at 1285.

By contrast, in Nova Health Systems v. Gandy, the Tenth Circuit concludes that abortion providers have standing to challenge an Oklahoma parental-notification law on the grounds that they are in imminent danger of losing patients because of the new law. See 416 F.3d 1154. Although it concludes that there is standing, the Tenth Circuit is careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faces any imminent likelihood that it would lose some minor patients seeking abortions. Nova Health Sys. v. Gandy, 416 F.3d at 1155. Moreover, while focusing on the time of filing, the Tenth Circuit allows the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faces an imminent threat as of the time of filing. See Nova Health Sys. v. Gandy, 416 F.3d at 1155.

In construing the standing doctrine, the Court has determined that an attorney running for the office of a Court of Appeals of New Mexico judge lacks standing when that attorney alleges that the New Mexico attorney disciplinary counsel harmed his chances of election when the counsel published a summary suspension petition about him. See League of United Latin Am. Citizens v. Ferrera, 792 F. Supp. 2d 1222, 1233-39 (D.N.M. 2011)(Browning, J.). The Court so concludes, because the suspension petition's facts "were already known to voters" through the aggressive campaign tactics of the attorney's election rival, so the harm was not "fairly traceable to the Defendant's action." League of United Latin Am. Citizens v. Ferrera, 792 F. Supp. 2d at 1238-39. The Court has determined, however, that a woman has standing to challenge a New

Mexico criminal statute's constitutionality, even though the State had not yet filed charges against the woman, because the district attorney had not attested that he would not bring charges under the challenged statute.  See Payne v. Wilder, 2017 WL 2257390, at *38 (D.N.M. January 3, 2017)(Browning, J.).  The Court reasons that an injury in fact exists, despite the lack of a charge, because the district attorney's refusal to foreswear a prosecution demonstrates a "credible threat of prosecution."  Payne v. Wilder, 2017 WL 2257390, at *38.  In addition to the cases listed above, the Court has adjudicated standing issues many times.  See, e.g., Friends of the Floridas v. U.S. Bureau of Land Mgmt., No. CIV 20-0924 JB/GBW, 2024 WL 3952037, at *68-70 (D.N.M. Aug. 27, 2024)(concluding that five environmental groups have standing to challenge a mining project that allegedly harms the recreational or aesthetic interests of each group's members); Abraham v. WPX Prod. Prods., LLC, 184 F. Supp. 3d 1150, 1197 (D.N.M. 2016)(Browning, J.)(concluding that oil-well royalty owners have standing to assert a breach of the implied duty to market under New Mexico and Colorado law); N. New Mexicans Protecting Land Water and Rights v. United States, 161 F. Supp. 3d 1020, 1042 (D.N.M. 2016)(Browning, J.)(concluding that an association lacks standing to sue on its members' behalf, because the relief sought is damages); Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d 1123, 1170-75 (D.N.M. 2015)(Browning, J.)(concluding that livestock association whose members had ancestral ties to grazing land in Northern New Mexico has standing to bring a NEPA claim); Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *21, 25 (D.N.M. March 11, 2009)(Browning, J.)(concluding that a developer lacks standing to challenge a city ordinance, because the ordinance would only affect him if he "lost his current permits," which, at the time of the lawsuit, he had not lost).

1. <u>**Organizational and APA Standing**</u>.

Organizational standing can be satisfied in two ways:

> Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert "standing solely as the representative of its members." <u>Warth v. Seldin</u>, 422 U.S. 490, 511, . . . (1975). The latter approach is known as representational or organizational standing. <u>Ibid.</u>; [<u>Summers v. Earth Island Institute</u>], 555 U.S. at 497-498 . . . . To invoke it, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Hunt v. Washington State Apple Advertising Comm'n</u>, 432 U.S. 333, 343 . . . (1977).

<u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.</u>, 600 U.S. 181, 199, (2023)(brackets and ellipses added). "[I]n addition to the Article III standing requirements, [APA] Plaintiffs must also meet the statutory standing requirements of the APA." <u>Utah v. Babbitt</u>, 137 F.3d 1193, 1203 (10th Cir. 1998). To establish APA standing, a plaintiff must: (i) "identify some 'agency action' that affects him in the specific fashion;" and (ii) "show that he has 'suffer[ed] legal wrong' because of the challenged agency action, or is 'adversely affected or aggrieved' by that action 'within the meaning of a relevant statute.'" <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. at 882-883 (quoting 5 U.S.C. § 702).

> [W]e have said that to be "adversely affected or aggrieved . . . within the meaning" of a statute, the plaintiff must establish that the injury he complains of (<u>his</u> aggrievement, or the adverse effect <u>upon him</u>) falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. <u>See</u> <u>Clarke v. Securities Industry Assn.</u>, 479 U.S. 388, 396-397 . . . (1987). Thus, for example, the failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning" of the statute.

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 883.

## LAW REGARDING MOOTNESS

Article III, Section 2 of the Constitution of the United States limits the federal courts' jurisdiction to actual cases and controversies.  See U.S. Const. art. III § 2.  "Federal courts are without authority to decide questions that cannot affect the rights of litigants in the case before them."  Ford v. Sully, 773 F. Supp. 1457, 1464 (D. Kan. 1991)(O'Connor, C.J.)(citing North Carolina v. Rice, 404 U.S. 244, 246 (1971)).  See Johansen v. City of Bartlesville, 862 F.2d 1423, 1426 (10th Cir. 1988); Johnson v. Riveland, 855 F.2d 1477, 1480 (10th Cir. 1988)).  "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  Arizonians for Off. Eng. v. Arizona, 520 U.S. 43, 67 (1997).  See Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1121 (10th Cir. 2010).  Accordingly, if a case is moot, or becomes moot during any stage of the case, the court does not have jurisdiction to hear the case.  A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)(citing Powell v. McCormack, 395 U.S. 486, 496 (1969)).  "Before deciding that there is no jurisdiction, the district court must look at the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and the laws of the United States."  Bell v. Hood, 327 U.S. 678, 682 (1946). Jurisdiction is not dependent on whether the plaintiff will succeed in his cause of action; jurisdiction is determined before the cause of action's details, both in law and fact, are considered. See Bell v. Hood, 327 U.S. at 682.

The Tenth Circuit recognizes a distinction between mootness and standing in Lucero v. Bureau of Collection Recovery, Inc.:

Like Article III standing, mootness is oft-cited as a constitutional limitation on federal court jurisdiction. E.g., Building & Constr. Dep't v. Rockwell Int'l Corp., 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts only decide actual, ongoing cases or controversies."); see Matthew I. Hall, The Partially Prudential Doctrine of Mootness, 77 Geo. Wash. L. Rev. 562, 571 (2009)(citing footnote 3 in Liner v. Jafco, Inc., 375 U.S. 301 . . . (1964), as the first occasion in which the Supreme Court expressly derived its lack of jurisdiction to review moot cases from Article III). But although issues of mootness often bear resemblance to issues of standing, their conceptual boundaries are not coterminous. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189-92 . . . (2000). Indeed, the Supreme Court has historically recognized what are often called "exceptions" to the general rule against consideration of moot cases, as where a plaintiff's status is "capable of repetition yet evading review," S. Pac. Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 515 . . . (1911), or where a defendant has ceased the challenged action but it is likely the defendant will "return to his old ways" - - the latter often referred to as the voluntary cessation exception, United States v. W.T. Grant Co., 345 U.S. 629, 632 . . . (1953); see also, e.g., City of Erie v. Pap's A.M., 529 U.S. 277 . . . (2000). These exceptions do not extend to the standing inquiry, demonstrating the contours of Article III as it distinctly pertains to mootness. Friends of the Earth, Inc., 528 U.S. at 191, 120 . . . .

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d 1239, 1242-43 (10th Cir. 2011). Nevertheless, the doctrines are closely related. As the Supreme Court has recently explained, "[a]t all stages of litigation, a plaintiff must maintain a personal interest in the dispute," and "[t]he doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." Uzuegbunam v. Preczewski, 592 U.S. 279, 282 (2021)(Thomas, J.). See Henry P. Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973)("Mootness is . . . the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).").

A claim may become moot if "(i) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (ii) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis,

440 U.S. at 631.  Establishing mootness is a heavy burden.  <u>See</u> <u>County of Los Angeles v. Davis</u>, 440 U.S. at 631.  Courts may consider the relative likelihood of the events which a party asserts keep the dispute from becoming moot.  <u>See Golden v. Zwickler</u>, 394 U.S. 103, 109 (1969)("We think that under all the circumstances of the case the fact that it was most unlikely that the Congressman would again be a candidate for Congress precluded a finding that there was 'sufficient immediacy and reality' here.").  A case can become moot based on intervening events, such as settling the case, <u>see</u> <u>United States Bancorp Mortgage Co. v. Bonner Mall Partnership</u>, 513 U.S. 18, 25 (1994)("Where mootness results from settlement, the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal . . . ."), or a plaintiff becoming a resident of the State whose residency laws she is challenging, <u>see</u> <u>Sosna v. Iowa</u>, 419 U.S. 393, 399 (1975)("If appellant had sued only on her own behalf, both the fact that she now satisfies the one-year residency requirement and the fact that she has obtained a divorce elsewhere would make this case moot and require dismissal.").

In comparison, while mootness, a statute of limitations, or some other legal doctrine may eventually bar a suit, one cannot lose standing once one has it.  <u>See</u> <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. at 190-92 ("Furthermore, if mootness were simply 'standing set in a time frame,' the exception to mootness that arises when the defendant's allegedly unlawful activity is 'capable of repetition, yet evading review,' could not exist.").  In addition, pursuant to Supreme Court and Tenth Circuit precedent, a case is not moot even if the only relief available to the plaintiff is nominal damages for a past wrong.  <u>See</u> <u>Uzuegbunam v. Preczewski</u>, 141 S. Ct. at 796.  As the Honorable Michael W. McConnell, then-United States Circuit Judge for the Tenth Circuit writes: "It may seem odd that a complaint for nominal damages could satisfy Article III's case or controversy requirements, when a functionally identical claim for declaratory

relief will not.  But this Court has squarely so held." Utah Animal Rts. Coal. v. Salt Lake City

Corp., 371 F.3d 1248, 1257 (10th Cir. 2004)(citing Comm. for First Amend. v. Campbell, 962

F.2d 1517, 1526 (10th Cir. 1992)(Baldock, J.)).  In short, "a claim for nominal damages precludes

dismissal of [a] case on mootness grounds." Utah Animal Rts. Coal. v. Salt Lake City Corp., 371

F.3d at 1262 (McConnell, J., concurring).[65]

---

[65]Judge McConnell concurs in his own majority opinion to express his view that Tenth
Circuit precedent on this issue is incorrect, and to urge "that either an en banc [Tenth Circuit] court
or the Supreme Court should hold that a case that is otherwise nonjusticiable on account of
mootness is not saved by the mere presence of a prayer for nominal damages." Utah Animal Rts.
Coal. v. Salt Lake City Corp., 371 F.3d at 1263.  Judge McConnell acknowledges that his view is
contrary to Tenth Circuit precedent, as well as the "distinguished commentator[s]" Wright and
Miller, but states "that the proposition that a claim for nominal damages automatically precludes
mootness is inconsistent with fundamental principles of justiciability." Utah Animal Rts. Coal. v.
Salt Lake City Corp., 371 F.3d at 1263.  This issue did eventually reach the Supreme Court in the
aforementioned Uzuegbunam v. Preczewski, but an eight-Justice majority in that case held that an
award of nominal damages can, on its own, redress a completed injury and thus a plaintiff's
Constitutional claim for nominal damages precludes dismissal of the case on mootness grounds.
See 141 S. Ct. at 796-97.  Judge McConnell's view has a prominent defender at the Supreme Court,
however; the Honorable John Roberts, Chief Justice of the United States, in his dissent in
Uzuegbunam v. Preczewski, calls Judge McConnell's Utah Animal Rights Coalition v. Salt Lake
City Corp. concurrence "insightful," and agrees with Judge McConnell's position regarding the
incompatibility of the nominal-damages-saves-justiciability rule with Article III of the
Constitution. 141 S. Ct. at 808 (Roberts, J., dissenting).  Chief Justice Roberts expresses his
concern that a rule holding that nominal damages alone can save a case from mootness "turn[s]
judges into advice columnists," because those judges can decide cases in which they cannot grant
the plaintiff any effectual relief -- turning Hamilton's "least dangerous branch" into "the least
expensive source of legal advice." Uzuegbunam v. Preczewski, 41 S. Ct. at 804, 807 (Roberts,
C.J., dissenting).  Chief Justice Roberts also states:

    The best that can be said for the Court's sweeping exception to the case-or-
    controversy requirement is that it may itself admit of a sweeping exception: Where
    a plaintiff asks only for a dollar, the defendant should be able to end the case by
    giving him a dollar, without the court needing to pass on the merits of the plaintiff's
    claims.  Although we recently reserved the question whether a defendant can moot
    a case by depositing the full amount requested by the plaintiff, Campbell-Ewald
    Co. v. Gomez, 577 U.S. 153, 166 . . . (2016), our cases have long suggested that he
    can, see, e.g., California v. San Pablo & Tulare R. Co., 149 U.S. 308, 313-
    314 . . . (1893).  The United States agrees, arguing in its brief in "support" of the
    petitioners that "the defendant should be able to end the litigation without a

resolution of the constitutional merits, simply by accepting the entry of judgment for nominal damages against him." Brief for United States as Amicus Curiae 29. The defendant can even file an offer of judgment for one dollar, rendering the plaintiff liable for any subsequent costs if he receives only nominal damages. See Fed. Rule Civ. Proc. 68(d). This is a welcome caveat, and it may ultimately save federal courts from issuing reams of advisory opinions. But it also highlights the flimsiness of the Court's view of the separation of powers. The scope of our jurisdiction should not depend on whether the defendant decides to fork over a buck.

141 S. Ct. at 808 (Roberts, C.J., dissenting). The Court understands these criticisms, which the Chief Justice powerfully expresses with some punchy turns of phrase. The Court, however, as an inferior court, is bound to apply faithfully Supreme Court and Tenth Circuit precedent, which indicates that nominal damages, on their own, can render a Constitutional claim justiciable even in the absence of other forms of relief. See Uzuegbunam v. Preczewski, 141 S. Ct. at 796-97; Utah Animal Rts. Coal. v. Salt Lake City Corp., 371 F.3d at 1257; Comm. for First Amend. v. Campbell, 962 F.2d at 1526.

Moreover, even writing on a clean slate, the Court would side with the views the eight-Justice majority expresses in Uzuegbunam v. Preczewski. The Court agrees with Justice Thomas' observations in the Uzuegbunam v. Preczewski majority, in which he notes that -- as a historical matter -- common law courts before and after the ratification of the Constitution reasoned that "every legal injury necessarily causes damage." 141 S. Ct. at 798. It follows that nominal damages, "[d]espite being small . . . are certainly concrete," in part because they can "'affec[t] the behavior of the defendant towards the plaintiff.'" 141 S. Ct. at 801 (quoting Hewitt v. Helms, 482 U.S. 755, 761 (1987)). The Court agrees with these observations, which accord with the Court's more general sense that judicial vindication of Constitutional rights -- even when a violation of those rights does not give rise to sizable compensatory damages -- is an important interest that is central to the Constitutional function of the federal judiciary and our system of government. See Carey v. Piphus, 435 U.S. 247, 266 (1978)(Powell, J.)("By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed"). On this note, the Court observes that the Civil Rights Act of 1871, 17 Stat. 13 -- the Act which contains 42 U.S.C. § 1983, the general use civil rights enforcement statute -- contains a jurisdiction-conferring provision, 28 U.S.C. § 1343(3), which contains no amount in controversy requirement. Significantly, at the time, the general federal-question jurisdiction statute contained an amount in controversy requirement. See Erwin Chemerinsky, Federal Jurisdiction § 8.1, at 524-25 (8th ed. 2021)("The absence of any amount in controversy requirement in § 1343(3) made that statute important at a time when the general federal question jurisdiction statute had a minimum amount requirement."). This history indicates that, at the time Congress enacted its first general-purpose civil rights statute, Congress intended that civil rights litigants had a path to the federal courthouse, no matter how small their claim. While this historical evidence is not conclusive on the question of justiciability, it suggests -- albeit indirectly -- that Congress seeks to allow the federal judiciary to adjudicate Constitutional claims without regard to their monetary value.

The Court has concluded that a due process claim is not moot where the plaintiff does not

receive the precise remedy he has requested.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d

1217, 1235-36 (D.N.M. 2011)(Browning, J.).  In Salazar v. City of Albuquerque, a city bus driver

brings a due process claim against the City of Albuquerque after being fired from his job.  See 776

---

As for the question whether a defendant could end a nominal damages suit -- without a
merits resolution -- by accepting an entry of a judgment for nominal damages against it, the
Supreme Court has not ruled explicitly on this issue.  See Campbell-Ewald Co. v. Gomez, 577
U.S. 153, 166 (2016), as revised (Feb. 9, 2016)("We need not, and do not, now decide whether the
result would be different if a defendant deposits the full amount of the plaintiff's individual claim
in an account payable to the plaintiff, and the court then enters judgment for the plaintiff in that
amount.").  In addition, Justice Thomas, in his Campbell-Ewald Co. v. Gomez concurrence, argues
that such a procedure would have been unavailable at the common law.  See 577 U.S. at 171
(Thomas, J., concurring)("At common law, a plaintiff was entitled to 'deny that [the tender was]
sufficient to satisfy his demand' and accordingly 'go on to trial.'" (quoting Raiford v. Governor,
29 Ala. 382, 384 (1856))).  The Court also agrees with the author of a recent Harvard Law Review
note on the topic, which observes that "it is not clear that there is a logical distinction between the
rejection of an offered payment, as occurred in Campbell-Ewald, and the rejection of a tendered
payment, as might occur in the hypothetical the Campbell-Ewald Court reserved."  Leading Case,
Article III -- Standing -- Nominal Damages -- Uzuegbunam v. Preczewski, 135 Harv. L. Rev. 323,
331-32 (2021).

While an interesting -- largely academic -- issue, at the retail, trial court level, there rarely
is any mootness in a common sense use of that term in any case for nominal damages.  Most cases
are litigated vigorously, because the Defendant does not want -- for a host of reasons -- to settle
the claim or have judgment entered against it.  By any definition, such claims are not moot.
Moreover, the Chief Justice and Professor McConnell's proposed rule cannot be applied in a
principled, neutral manner.  If one dollar presents a moot case, it is not clear whether a ten-dollar
case, a hundred-dollar case, or a thousand-dollar case presents a moot case.  As Eubulides of
Miletus famously wondered, how many individual grains of sand make a heap?  In the case of
nominal damages and mootness, the Court is concerned that a finding of mootness may depend on
whether the court likes or dislikes the plaintiff's case.

Finally, the interesting hypothetical of a defendant mooting a plaintiff's case by making an
offer of judgment or sending over a dollar does not happen much, and, in any case, requires
acceptance.  Most defendants -- particularly public officials and entities -- do not want a judgment
entered against them and do not want to be seen as paying any money.  Such actions may be seen
as an admission or concession of guilt.  Moreover, the plaintiff does not have to accept the offer
of judgment or the payment, and if the plaintiff does not, the State official or entity takes a potential
hit without any benefit.  Being cute comes with a risk and a cost.  See Payne v. Tri-State Careflight,
LLC, CV 14-1044, 2016 WL 9738302, at *21-23 (D.N.M. July 12, 2016)(Browning, J.)(discussing
mootness and offers of judgment in the class action context).

F. Supp. 2d at 1223. Although the employee later is reinstated, the Court determines that his due process claim is not moot, because, in addition to reinstatement, he also asks for punitive and back-pay damages. See 776 F. Supp. 2d at 1235-36. The Court has evaluated mootness in several other contexts. See Voter Reference Found., LLC v. Torrez, No. CIV 22-0222 JB/KK, 2024 WL 4008163, at *34 n.33 (D.N.M. Aug. 30, 2024)(Browning, J.)(concluding that, even where the Eleventh Amendment bars nominal damages, a plaintiff's viewpoint discrimination claim is not moot, because the Court had not yet provided the plaintiff with its requested injunctive relief); ETP Rio Rancho Park, LLC v. Grisham, 564 F. Supp. 3d 1023, 1069 (D.N.M. 2021)(Browning, J.)(concluding that trampoline facility operators' due process and equal protection claims against State officials alleging that COVID-19-public-health orders requiring closure of their facilities were not moot, because, even though the plaintiffs' "arguments contain multiple allegations from previous [public health orders], which are no longer in effect," the COVID-19 pandemic "remains ongoing and the State continues to issue" public health orders, which "could create new restrictions that again bring the questioned restrictions back into place"); Nieto v. Univ. of N.M., 727 F. Supp. 2d 1176, 1191 (D.N.M. 2010)(Browning, J.)(determining that a claim is not moot even when a State court previously has dismissed the claim for lack of prosecution and for failure to appear, because there is still time for the plaintiff to seek reconsideration of the decision or an appeal).

### LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION

The APA provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal

authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702. The APA empowers reviewing courts, "[t]o the extent necessary to decision and when presented," to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Such a reviewing court "shall":

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be --

> (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)     contrary to constitutional right, power, privilege, or immunity;

(C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)     without observance of procedure required by law;

(E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706. This statutory provision provides the "default standard" of review under the APA,

which applies unless the agency's enabling act -- or another statute -- provides otherwise.  See

Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995)("[T]he APA provides a default

standard of judicial review -- arbitrary or capricious -- precisely for situations, such as this one,

where a statute does not otherwise provide a standard of judicial review.").  Technically, § 706

provides standards -- not "a standard" -- of review, and different provisions in § 706 are used

according to the subject of the review: for example, the arbitrary-and-capricious standard is used

to review "[i]nformal agency action," and informal (notice and comment) rulemaking, City of

Colorado Springs v. Solis, 589 F.3d 1121, 1131 (10th Cir. 2009), and that standard is "'very

deferential' to the agency's determination," Kobach v. U.S. Election Assistance Commission, 772

F.3d 1183, 1197 (10th Cir. 2014)(quoting Western Watersheds Project v. Bureau of Land

Management., 721 F.3d 1264, 1273 (10th Cir. 2013)).  Section 706's substantial evidence test, on

the other hand, "applies almost exclusively to formal adjudication," Ass'n of Data Processing

Service Organizations, Inc. v. Board of Governors of Federal Reserve System, 745 F.2d 677, 686

n.6 (D.C. Cir. 1984)(Scalia, J.)., because "a case subject to sections 556 and 557 of this title" refers

to the APA's formal adjudication and formal rulemaking provisions, 5 U.S.C. § 706(2)(E).  De

novo review provided in 5 U.S.C. § 706(2)(F), the APA's least deferential standard of review, is

limited to use in two instances: "(1) when the action is adjudicatory in nature and the agency's

fact-finding procedures inadequate; and (2) when issues not previously before the agency are

raised in a proceeding to enforce a nonadjudicatory action."  Franklin Sav. Ass'n v. Dir., Off. of

Thrift Supervision, 934 F.2d 1127, 1142 n.7 (10th Cir. 1991)(emphasis in original)(citing Citizens

to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), abrogated on other grounds by

Califano v. Sanders, 430 U.S. 99 (1977)).[66]  Importantly, § 706 also instructs the reviewing court, "[i]n making the foregoing determinations," to "review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.  See Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1157 (10th Cir. 2004)(rejecting the notion that the reviewing court's analysis "should be limited to those passages expressly relied upon by the [agency]").

In the Tenth Circuit, pursuant to Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1580 (10th Cir. 1994)("Olenhouse"), "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure."  Olenhouse, 42 F.3d at 1580 (emphasis in original).  See Wildearth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d 1314, 1323 (D.N.M. 2009)(Browning, J.).  "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use,

---

[66]In 1947, shortly after the APA's passage, President Truman's Attorney General -- and future Associate Justice of the Supreme Court -- Tom Clark published the Attorney General's Manual on the Administrative Procedure Act, which was prepared as a guide to the then-nascent APA.  See United States Department of Justice, Tom C. Clark, Attorney General, Attorney General's Manual on the Administrative Procedure Act (1947)("AG's Manual on the APA").  Therein, Attorney General Clark remarks -- contrary to the Supreme Court's later interpretation of § 706(2)(F) in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 415 -- that "to the extent that the facts are subject to trial de novo by the reviewing court," § 706(2)(F), "obviously refers only to those existing situations in which judicial review has consisted of a trial de novo."  AG's Manual on the APA at 109.  In essence, AG's Manual on the APA indicates that it was the Attorney General's view -- in 1947 -- that § 706(2)(F) does not establish a standard by which courts could apply the de novo standard of review to situations outside of those which existed at the time of the APA's passage.  While this interpretation is not binding on any court, perhaps owing to its temporal proximity to the APA's passage, even the Supreme Court has acknowledged that "some deference" should be afforded to the AG's Manual on the APA: "[T]he Attorney General's Manual on the Administrative Procedure Act 31, 35 (1947), a contemporaneous interpretation previously given some deference by this Court because of the role played by the Department of Justice in drafting the legislation, further confirms that view."  Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 546 (1978)(footnote removed).

which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant." N. New Mexicans Protecting Land and Water Rights v. United States, 2015 WL 8329509 at *9.

**1.    Reviewing Agency Factual Determinations.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E).   The APA's two linguistic formulations amount to a single substantive standard of review.  See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 683-84 (explaining that, as to factual findings, "there is no substantive difference between what [the arbitrary-or-capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)).  See also Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness.   The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found within the record of closed-record proceedings to which it exclusively applies." (emphasis in original)).

Again, in reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record.  See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order

involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted."). See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, [T]he Supreme Court [of the United States] has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had."). Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action. See N.M. ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 702 n.21 (10th Cir. 2009)(citing rule 201(b) of the Federal Rules of Evidence)("We take judicial notice of this document, which is included in the record before us in [another case]."); New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.22 ("We conclude that the occurrence of Falcon releases is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned, and we take judicial notice thereof."). In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits -- as well as decisions from the United States District Court for the District of Columbia -- have held that taking judicial notice is generally inappropriate in APA review, subject to extraordinary circumstances or inadvertent omission from the administrative record. See Fence Creek Cattle Co. v. U.S. Forest Serv., 602 F.3d 1125, 1131 (9th Cir. 2010); National Min. Ass'n v. Sec'y U.S. Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016); Dist. Hosp. Partners, L.P. v. Sebelius, 971 F. Supp. 2d 15, 32 (D.D.C. 2013)(Huvelle, J.)("The Court, however, notes that taking judicial notice is typically an inadequate mechanism for a court to consider extra-

record evidence when reviewing an agency action."), aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46 (D.C. Cir. 2015). Broadly, the Tenth Circuit has expressed that, "[w]hile judicial review of agency action is normally restricted to the administrative record, we have recognized that consideration of extra-record materials is appropriate in 'extremely limited' circumstances, such as where the agency ignored relevant factors it should have considered or considered factors left out of the formal record." Lee v. U.S. Air Force, 354 F.3d 1229, 1242 (10th Cir. 2004)(quoting Am. Min. Cong. v. Thomas, 772 F.2d 617, 626 (10th Cir. 1985)).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the whole record before it when determining whether an agency's decision survives arbitrary-or-capricious review. Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citing Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971)). The Tenth Circuit explains:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colo. Env't Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999). Arbitrary-or-capricious review requires a district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions," Olenhouse, 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision, see Colorado Environmental Coalition v. Dombeck, 185 F.3d at 1172. The agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal

proceedings.  See SEC v. Chenery Corp., 318 U.S. 80, 94 (1943)("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted by clearly disclosed and adequately sustained.").  While the court may not supply a reasoned basis for the agency's action that the agency does not give itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

   2.   **Reviewing Agency Legal Interpretations.**

   In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution, and Courts reviewing those interpretations apply three different deference standards, depending on the law at issue.  First, as it pertains to federal statutes, between 1984 and 2024, courts had to defer to agency interpretations of ambiguous statutes that the federal agency administered, and this deference was known as Chevron deference -- named after the 1984 case of Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron").  Chevron deference was a two-step process[67] that first asked whether the statutory provision in question is clear and, if it is not clear, then asks whether the agency's interpretation of the unclear statute is reasonable.  Chevron, 467 U.S. at 843.  The Supreme Court, however, overturns this deferential approach during its October 2023 term in Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024)("Loper Bright").

   In Loper Bright, in an opinion that the Honorable John Roberts, Chief Justice of the United States, authors, the Supreme Court reviews the traditional understandings of the judicial function,

---

   [67]There was, additionally, a threshold step -- which Professor Cass Sunstein famously called "step zero" -- which asked whether Chevron deference applies to the agency decision at all.  See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187, 191 (2006).

quoting Alexander Hamilton for the proposition that "[t]he Framers . . . envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts,'" Loper Bright, 603 U.S. at 385 (quoting The Federalist no. 78 (Hamilton)), and the Honorable John Marshall, former Chief Justice of the United States, for the oft-cited principle that "'[i]t is emphatically the province and duty of the judicial department to say what the law is,'" Loper Bright, 603 U.S. at 385 (quoting Marbury v. Madison, 1 Cranch 137, 177 (1803)).  The Supreme Court describes that, although the New Deal "ushered in a 'rapid expansion of the administrative process,'" the Supreme Court continued to "adhere to the traditional understanding that questions of law were for courts to decide, exercising independent judgment."  Loper Bright, 603 U.S. at 387 (quoting United States v. Morton Salt Co., 338 U.S. 632, 644 (1950)).  The Supreme Court then reads and analyzes the plain language of the APA's § 706 -- which states at the outset that, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706 -- and concludes that the APA "codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to Marbury: that courts decide legal questions by applying their own judgment."  Loper Bright, 603 U.S. at 391.

The Supreme Court then explains that "[t]he deference that Chevron requires of courts reviewing agency action cannot be squared with the APA," Loper Bright, 603 U.S. at 396, largely because "[t]he 'law of deference' . . . built on the foundation laid in Chevron [is] '[h]eedless of the original design' of the APA," Loper Bright, 603 U.S. at 398 (quoting Perez v. Mortgage Bankers Ass'n, 575 U.S. 92, 109 (2015)(Scalia, J., concurring in the judgment)).  Moreover, according to the Supreme Court, "agencies have no special competence in resolving statutory ambiguities.

Courts do." Loper Bright, 603 U.S. at 400-01.  In lieu of Chevron's presumption, the Supreme

Court observes that "[t]he better presumption is . . . that Congress expects courts to do their

ordinary job of interpreting statutes, with due respect for the views of the Executive Branch."

Loper Bright, 603 U.S. at 403.  This statement's rule, therefore, is what takes the place of Chevron

deference: ordinary judicial interpretation of statutes, and courts are free to review and reject

statutory interpretations that federal agencies offer.[68]

Second, despite Chevron's demise, when agencies interpret their regulations -- to, for

example, adjudicate whether a regulated party is in compliance with them -- courts accord agencies

what is known as Auer or Seminole Rock deference.  See Auer v. Robbins, 519 U.S. 452

(1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945).  This deference is

applied in the same manner as the erstwhile Chevron deference and is substantively identical.

There would be little reason to have a separate name for this doctrine, except that its logical

_____

[68]The Supreme Court notes, however, that its holding does not forbid Congress from conferring some degree of statutory authority on agencies:

> That is not to say that Congress cannot or does not confer discretionary authority on agencies.  Congress may do so, subject to constitutional limits, and it often has.  But to stay out of discretionary policymaking left to the political branches, judges need only fulfill their obligations under the APA to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA.  By forcing courts to instead pretend that ambiguities are necessarily delegations, Chevron does not prevent judges from making policy.  It prevents them from judging.

Loper Bright, 603 U.S. at 404.  In addition, Loper Bright affirms that deference under Skidmore v. Swift & Co., 323 U.S. 134,139-40 (1944), continues to apply.  See Loper Bright, 603 U.S. at 393-96.  Under this species of deference, "'interpretations and opinions' of the relevant agency, 'made in pursuance of official duty' and 'based upon . . . specialized experience,' 'constitute[d] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance,' even on legal questions."  Loper Bright, 603 U.S. at 388 (quoting Skidmore v. Swift & Co., 323 U.S. at 139-40)(ellipses in Loper Bright and brackets in Loper Bright).

underpinnings are much shakier, and its future is, accordingly, uncertain.  Justice Scalia, after years

of applying the doctrine followed by years of questioning its soundness, finally denounced <u>Auer</u>

deference in 2013 in his dissent in <u>Decker v. Northwest Environmental Defense Center</u>, 568 U.S.

597 (2013).   The Court cannot describe the reasons for Justice Scalia's abandonment of the

doctrine better than the Justice himself:

> For decades, and for no good reason, we have been giving agencies the
> authority to say what their rules mean, under the harmless-sounding banner of
> "defer[ring] to an agency's interpretation of its own regulations." <u>Talk America,
> Inc. v. Michigan Bell Telephone Co.</u>, [564] U.S. [50, 67] . . . (2011) (Scalia, J.,
> concurring).   This is generally called <u>Seminole Rock</u> or <u>Auer</u> deference.   <u>See
> Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 65 S. Ct. 1215, 89 L. Ed.
> 1700 (1945); <u>Auer v. Robbins</u>, 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79
> (1997).
>
> . . . .
>
> The canonical formulation of <u>Auer</u> deference is that we will enforce an
> agency's interpretation of its own rules unless that interpretation is "plainly
> erroneous or inconsistent with the regulation." <u>Seminole Rock</u>, <u>supra</u>, at 414, 65
> S. Ct. 1215, 89 L. Ed. 1700.  But of course whenever the agency's interpretation of
> the regulation is different from the fairest reading, it is in that sense "inconsistent"
> with the regulation.  Obviously, that is not enough, or there would be nothing for
> <u>Auer</u> to do.  In practice, <u>Auer</u> deference is <u>Chevron</u> deference applied to regulations
> rather than statutes.   <u>See Chevron U.S.A. Inc. v. Natural Resources Defense
> Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  The agency's
> interpretation will be accepted if, though not the fairest reading of the regulation, it
> is a plausible reading -- within the scope of the ambiguity that the regulation
> contains.
>
> Our cases have not put forward a persuasive justification for <u>Auer</u>
> deference. The first case to apply it, <u>Seminole Rock</u>, offered no justification
> whatever -- just the <u>ipse dixit</u> that "the administrative interpretation . . . becomes of
> controlling weight unless it is plainly erroneous or inconsistent with the regulation."
> 325 U.S., at 414, 65 S. Ct. 1215, 89 L. Ed. 1700.  Our later cases provide two
> principal explanations, neither of which has much to be said for it.  See generally
> Stephenson & Pogoriler, <u>Seminole Rock</u>'s Domain, 79 Geo. Wash. L. Rev. 1449,
> 1454-1458 (2011).  First, some cases say that the agency, as the drafter of the rule,
> will have some special insight into its intent when enacting it. <u>E.g.</u>, <u>Martin v.
> Occupational Safety and Health Review Comm'n</u>, 499 U.S. 144, 150-153, 111 S.
> Ct. 1171, 113 L. Ed. 2d 117 (1991).  The implied premise of this argument -- that

what we are looking for is the agency's intent in adopting the rule -- is false. There is true of regulations what is true of statutes. As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means." The Theory of Legal Interpretation, 12 Harv. L. Rev. 417, 419 (1899). Whether governing rules are made by the national legislature or an administrative agency, we are bound by what they say, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" See, e.g., Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (1994). That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective. Making regulatory programs effective is the purpose of rulemaking, in which the agency uses its "special expertise" to formulate the best rule. But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is." Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 177, 2 L. Ed. 60 (1803). Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation will be given effect if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors. If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for Auer deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that Congress enacted, as we do per Chevron, it is a fortiori reasonable to defer to them regarding the meaning of regulations that they themselves crafted. To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all. The theory of Chevron (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. See Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 740-741, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996). While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations. For that would violate a

fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands. "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Montesquieu, Spirit of the Laws bk. XI, at 151-152 (O. Piest ed., T. Nugent transl. 1949). Congress cannot enlarge its own power through Chevron -- whatever it leaves vague in the statute will be worked out by someone else. Chevron represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.) So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect. "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power." Thomas Jefferson Univ., supra, at 525, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (Thomas, J., dissenting). Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it." 1 W. Blackstone, Commentaries on the Laws of England 58 (1765). And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation. The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke ed. 1961). Auer deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures." Anthony, The Supreme Court and the APA: Sometimes They Just Don't Get It, 10 Admin. L. J. Am. U. 1, 11-12 (1996). Auer is not a logical corollary to Chevron but a dangerous permission slip for the arrogation of power. See Talk America, 564 U.S., at 68-69, 131 S. Ct. 2254, 180 L. Ed. 2d 96 Scalia J., concurring); Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L. Rev. 612 (1996).

It is true enough that Auer deference has the same beneficial pragmatic effect as Chevron deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court. The agency's view can be relied upon, unless it is, so to speak, beyond the pale. But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute. For as soon as an interpretation uncongenial to the agency is pronounced by a district

court, the agency can begin the process of amending the regulation to make its meaning entirely clear. The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing. See 77 Fed. Reg. 72974 (2012) (to be codified in 40 C.F.R. pt. 122, subpt. B). It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here. And there is another respect in which a lack of <u>Chevron</u>-type deference has less severe pragmatic consequences for rules than for statutes. In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute. That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from <u>Auer</u> deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

<u>Decker v. Nw. Envtl. Def. Ctr.</u>, 568 U.S. 597, 616-21 (Scalia, J., dissenting). Although the Court shares Justice Scalia's concerns about <u>Auer</u> deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.[69]

Moreover, courts afford agencies no deference in interpreting the Constitution. See <u>U.S. West, Inc. v. FCC</u>, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to <u>Chevron</u> deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., <u>Rust v. Sullivan</u>, 500 U.S. 173, 190-91 (1991))). Courts have superior competence in interpreting -- and Constitutionally vested authority and responsibility to interpret -- the Constitution's content. The presence of a Constitutional claim does not take a

---

[69]Clarence Thomas, Associate Justice of the Supreme Court, and Neil Gorsuch, Associate Justice of the Supreme Court, recently have echoed Justice Scalia's concerns with <u>Auer</u> deference, and have called on the Supreme Court to reconsider and overrule <u>Auer</u>. See <u>Garco Construction, Inc. v. Speer</u>, 583 U.S. 1193, 1193-1195 (2018)(dissenting from denial of certiorari).

court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication

of Constitutional issues -- and courts still must respect agency fact-finding and the administrative

record when reviewing agency action for Constitutional infirmities; they just should not defer to

the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land

Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [Constitutional] due process

claim against the [agency] under the framework set forth in the APA.").

Last, the most recent development in Chevron-adjacent jurisprudence is the rise of the

"major questions doctrine."[70]    W. Virginia v. Env't Prot. Agency, 597 U.S. 697, 724

(2022)(Roberts, C.J.)("West Virginia v. EPA").  Concisely put, under this doctrine, a court should

not sustain an agency action that involves regulation of "major questions" -- those of great

---

[70]The novelty -- or, alternatively, the historical basis -- of this doctrine is a source of debate, even among the Justices.  Compare West. Virginia v. EPA, 597 U.S. 697, 766 (2022)(Kagan, J., dissenting)(stating that the majority opinion "announces the arrival of the 'major questions doctrine'" (quoting Majority Op. at 724)), with West Virginia v. EPA, 597 U.S. at 740 (Gorsuch, J., concurring)(stating that "[s]ome version" of the major questions doctrine "can be traced to at least 1897").  See Thomas W. Merrill, The Major Questions Doctrine: Right Diagnosis, Wrong Remedy at 2, Hoover Inst., Legitimacy of Administrative Law Essay Series, available at https://www.hoover.org/sites/default/files/research/docs/ Merrill_WebReadyPDF.pdf (last visited November 16, 2024)(arguing that West Virginia v. EPA crystalized previous expressions of skepticism about "agency assertions of 'broad and unusual authority through an implicit delegation,'" into a distinct "doctrine" (quoting Gonzalez v. Oregon, 546 U.S. 243, 267 (2006)); Kevin O. Leske, Major Questions About the "Major Questions" Doctrine, 5 Mich. J. Env't & Admin. L. 479, 480 (2016)("After over a decade of hibernation, the United States Supreme Court has awoken the 'major questions' doctrine, which has re-emerged in an expanded form." (source of quoted material not cited)).  Nevertheless, the Court is comfortable saying that West Virginia v. EPA marks the "rise" of the major questions doctrine, because that case is the first time that the Supreme Court states that it is applying something called the "major questions doctrine."  West Virginia v. EPA, 597 U.S. at 724.  Justice Kavanaugh, when serving as a Judge on the United States Court of Appeals for the District of Columbia Circuit, once referred to something called the "major rules doctrine" -- which he defined by quoting Justice Scalia's observation that "[w]e expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."  United States Telecom Ass'n v. Fed. Commc'ns Comm'n, 855 F.3d 381, 417 (D.C. Cir. 2017)( Kavanaugh, J., dissenting)(quoting Util. Air Regul. Grp. v. E.P.A., 573 U.S. 302, 324 (2014)).

"'economic and political significance,'" West Virginia v. EPA, 597 U.S. at 721 (quoting Food & Drug Administration v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 147 (2000)(O'Connor, J.)) -- unless the agency can point to clear Congressional authorization for such an action, see West Virginia v. EPA, 597 U.S. at 720-24.   Although the majority opinion in Supreme Court in West Virginia v. EPA never mentions the erstwhile Chevron doctrine, many academic commentators have conceptualized the major questions doctrine as a "exception" or "carve-out" to Chevron analysis.   See Merrill, The Major Questions Doctrine: Right Diagnosis, Wrong Remedy, supra, at 2 ("[T]he major questions doctrine should be seen as a carve-out from the Chevron doctrine, one that all six justices in the conservative majority could agree on as a partial corrective to some of the most frequently cited failings of the Chevron regime."); William N. Eskridge, Jr. et. al., Textualism's Defining Moment, 123 Colum. L. Rev. 1611, 1675 (2023)("Recently, the Major Questions Doctrine (MQD) has become a prominent textualist-favored, policy-based exception to Chevron[.]"); Daniel T. Deacon & Leah M. Litman, The New Major Questions Doctrine, 109 Va. L. Rev. 1009, 1020-21 (2023)("In a set of cases, the [Supreme] Court has suggested either that an issue should not be analyzed using the Chevron framework because Congress did not authorize agencies to resolve the issue due to its majorness, or that the Chevron analysis operates differently because the agency policy is a major one."); Mila Sohoni, The Major Questions Quartet, 136 Harv. L. Rev. 262, 263-64 (2022)(arguing that West Virginia v. EPA and its companion cases "unhitched the major questions exception from Chevron, which has been silently ousted from its position as the starting point for evaluating whether an agency can exert regulatory authority").   While many questions remain about the application of the major questions doctrine, it is clear that -- at least for "major" questions -- an agency will be presumed to have no authority to act unless Congress has "clearly" conferred on that agency the authority to

act, regardless of <u>Chevron</u> deference.  <u>West Virginia v. EPA</u>, 597 U.S. at 716.

       **3.**       **Waiving Sovereign Immunity.**

The APA waives sovereign immunity with respect to non-monetary claims.  <u>See</u> 5 U.S.C.

§ 702.  The statute provides:

> An action in a court of the United States seeking relief other than money damages
> and stating a claim that an agency or an officer or employee thereof acted or failed
> to act in an official capacity or under color of legal authority shall not be dismissed
> nor relief therein be denied on the ground that it is against the United States or that
> the United States is an indispensable party.  The United States may be named as a
> defendant in any such action, and a judgment or decree may be entered against the
> United States:

5 U.S.C. § 702.  Claims for money damages seek monetary relief "to <u>substitute</u> for a suffered loss."

<u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d 1290, 1298 (10th Cir.

2009)(emphasis in original).  Claims that do not seek monetary relief or that seek "specific

remedies that have the effect of compelling monetary relief" are not claims for monetary damages.

<u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d at 1298.  <u>See, e.g.,</u>

<u>Aero Tech, Inc., v. United States Department of the Interior</u>, No. CIV 23-0726 JB/JHR, 2024 WL

4581545 at n. 6 (D.N.M. October 25, 2024)(Browning, J.)(stating that the APA "waives sovereign

immunity for all actions that seek 'relief other than money damages,' 5 U.S.C. § 702, which

includes nonparty subpoenas" (citing <u>Exxon Shipping Co. v. U.S. Dept. of the Interior</u>, 34 F.3d

774, 778-79 n.9 (9th Cir. 1994)).  To determine whether a claim seeks monetary relief, a court

must "look beyond the face of the complaint" and assess the plaintiff's prime object or essential

purpose; "[a] plaintiff's prime objective or essential purpose is monetary unless the non-monetary

relief sought has significant prospective effect or considerable value apart from the claim for

monetary relief."  <u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d at

1296 (quoting <u>Burkins v. United States</u>, 112 F.3d 444, 449 (10th Cir. 1997)).

The APA's sovereign immunity waiver for claims "seeking relief other than money damages" does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act, 28 U.S.C. §§ 1346, 1491, permits district courts to hear some claims against the United States, but it also states that "district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). It follows that the APA does not waive the United States' sovereign immunity as to contract claims even when those claims seek relief other than money damages, such as declaratory or injunctive relief. See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1295. Consequently, two questions determine whether the APA waives the United States' sovereign immunity as to a particular claim: "First, does [the] claim seek 'relief other than money damages,' such that the APA's general waiver of sovereign immunity is even implicated? Second, does the Tucker Act expressly or impliedly forbid the relief that Normandy seeks, such that the APA's waiver does not apply?" Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING THE NEPA

The NEPA requires federal agencies to

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on --

> (i)    the environmental impact of the proposed action,

> (ii)    any adverse environmental effects which cannot be avoided should the proposal be implemented,

> (iii)    alternatives to the proposed action,

> (iv)    the relationship between local short-term uses of man's

environment and the maintenance and enhancement of long-term productivity, and

(v)     any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).   "Although labeled an 'environmental' statute, NEPA is in essence a procedural statute; it does 'not require agencies to elevate environmental concerns over other appropriate considerations.'"  Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric., 817 F.2d 609, 620 (10th Cir. 1987)(emphasis in original)(quoting Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983)).  The NEPA's procedural requirements exist to prevent "precipitous federal decision making at the agency level which may fail to adequately consider the environmental ramifications of agency actions."  Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric., 817 F.2d at 620.  The "NEPA merely prohibits uninformed -- rather than unwise -- agency action."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989)(Stevens, J.). When conducting NEPA review, the Tenth Circuit applies "a 'rule of reason standard' to determine whether claimed NEPA violations 'are merely flyspecks, or are significant enough to defeat the goals of informed decision making and informed public comment.'"  Dine Citizens Against Ruining Our Env't v. Bernhardt, 923 F.3d 831, 852 (10th Cir. 2019)(quoting Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1163 (10th Cir. 2002)).

Regulations provide guidance on the NEPA's implementation.  See 40 C.F.R. §§ 1500-08. Those regulations are entitled to substantial deference.  See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 355-56 (1989); Andrus v. Sierra Club, 442 U.S. 347, 358 (1979).  Council on Environmental Quality ("CEQ") regulations set out three ways that agencies can comply with § 4332(C)'s "detailed statement" requirement for "major Federal actions significantly affecting

the quality of the human environment."  42 U.S.C. § 4332(C).  First, an agency can satisfy that statutory requirement by preparing a detailed statement, called an EIS, that conforms to regulations regarding its format, content, and methodology.  See 40 C.F.R. §§ 1502, 1508.11.

Second, if an agency is unsure whether an EIS is required for a proposed action, i.e., whether the action qualifies as a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), the agency may prepare an EA, see 40 C.F.R. §§ 1503(a), 1501.4(b).  An EA "provide[s] sufficient evidence and analysis for determining whether to prepare" an EIS or, alternatively, "a finding of no significant impact,"  40 C.F.R. § 1508.9(a)(1), which is "a document . . . briefly presenting the reasons why an action . . . will not have a significant effect on the human environment [such that an EIS] therefore will not be prepared," 40 C.F.R. § 1508.13.  See 40 C.F.R. § 1502.2 (stating that, "[a]s in a finding of no significant impact," in an EIS' treatment of "other than significant issues[,] . . . there should be only enough discussion to show why more study is not warranted").  EAs also facilitate the preparation of an EIS when one is necessary, and they help agencies comply with the NEPA when an EIS is not necessary.  See 40 C.F.R. § 1508.9(a)(2)-(3).  An EA needs to include "brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(E), and] of the environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9(b).  Section 4332(E) requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(E).

Third, an agency can determine that an EIS is not required without needing to prepare an EA when the proposed action falls within a CE.  See 40 C.F.R. § 1508.4.  A CE is "a category of actions which do not individually or cumulatively have a significant effect on the human

environment and which have been found to have no such effect in [NEPA] procedures adopted by

a Federal agency." 40 C.F.R. § 1508.4. See Utah Env't Cong. v. Russell, 518 F.3d 817, 821 (10th

Cir. 2008); WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. 2d at 1321-22.

### 1.    Extraordinary Circumstances.

If an agency determines that its action falls within a CE, it still may have to prepare an EA

or an EIS if the agency determines that there are extraordinary circumstances:

> (b)    If an agency determines that a categorical exclusion identified in its agency
> NEPA procedures covers a proposed action, the agency shall evaluate the
> action for extraordinary circumstances in which a normally excluded action
> may have a significant effect.
>
> > (1)    If an extraordinary circumstance exists, the agency
> > nevertheless may apply the categorical exclusion if the
> > agency conducts an analysis and determines that the
> > proposed action does not in fact have the potential to result
> > in significant effects notwithstanding the extraordinary
> > circumstance, or the agency modifies the action to avoid the
> > potential to result in significant effects. In these cases, the
> > agency shall document such determination and should
> > publish it on the agency's website or otherwise make it
> > publicly available.
> >
> > (2)    If the agency cannot categorically exclude the proposed
> > action, the agency shall prepare an environmental
> > assessment or environmental impact statement, as
> > appropriate.

40 C.F.R. § 1501.4(b). To determine "whether extraordinary circumstances related to a proposed

action warrant further analysis and documentation in an EA or an EIS," an agency "should []

consider[]" seven resource conditions:

> (i)    Federally listed threatened or endangered species or designated critical
> habitat, species proposed for Federal listing or proposed critical habitat, or
> Forest Service sensitive species;
>
> (ii)    Flood plains, wetlands, or municipal watersheds;

(iii)    Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;

(iv)    Inventoried roadless area or potential wilderness area;

(iv)    Research natural areas;

(v)     American Indians and Alaska Native religious or cultural sites; and

(vi)    Archaeological sites, or historic properties or areas.

36 C.F.R. § 220.6(b)(1).

The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist.

36 C.F.R. § 220.6(b)(2). "[A]n extraordinary circumstance is found only when there exists a potential for a <u>significant</u> effect on a resource condition." <u>Utah Env't Cong. v. Dale Bosworth</u>, 443 F.3d 732, 743 (10th Cir. 2006)(emphasis in original). An agency does not need to conduct extensive analysis when evaluating resource conditions for extraordinary circumstances:

Reading the regulation to require detailed written analysis from the agency before rejecting each extraordinary circumstance would seem to defeat the purpose of a categorical exclusion -- "a streamlined process allowing minor projects to be quickly implemented" -- and fly in the face of Tenth Circuit precedent that an environmental effect must be "significant" before an agency wishing to rely on a categorical exclusion must "engage in further analysis."

<u>Rocky Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv.</u>, 548 F. Supp. 3d 1042, 1062 (D. Colo. 2021)(Brimmer, C.J.), <u>aff'd</u>, 40 F.4th 1133 (10th Cir. 2022)(quoting <u>Utah Env't Cong. v. Dale Bosworth</u>, 443 F.3d at 735, 742).

**ANALYSIS**

The Court undertakes its analysis in three sections.  First, the Court determines that the Biological Center may intervene as of right or, in the alternative, permissively.  Second, the Court evaluates the Petitioners' standing arguments, and concludes that: (i) only the Cattle Growers and Spur Lake have standing for the Stipulation Claim; (ii) only the Cattle Growers, Spur Lake, Shirley, and Campbell have standing to bring the NEPA Claim; and (iii) all the Petitioners have standing to bring the Statutory Authority Claim and the Impoundment Regulation Claim.  Third, the Court turns to the merits.  The Court dismisses the Stipulation Claim, because the Respondents notified the Petitioners more than seventy-five days before commencing the Aerial Shooting.  The Court also dismisses the NEPA Claim and concludes that the Respondents do not violate the APA, because the Respondents determined reasonably that: (i) at least one CE applies to the Aerial Shooting; and (ii) there are no extraordinary circumstances that preclude CE use.  Finally, the Court dismisses the Statutory Authority Claim and the Impoundment Regulation Claim and concludes that the Respondents do not violate the APA, because: (i) the Respondents are authorized to preserve the Gila Wilderness and remove injurious animals; and (ii) Forest Service regulations do not require the Respondents to impound the Gila Cows, which are not unauthorized livestock, before killing them.

**I.    THE BIOLOGICAL CENTER MAY INTERVENE.**

The Court concludes that the Biological Center may intervene as of right, because the Respondents cannot represent adequately the Biological Center's interests in this lawsuit.  In the alternative, the Court concludes that the Biological Center may intervene permissively, because the Biological Center's intervention will not unduly delay or prejudice the adjudication of the original parties' rights.  The Court addresses each intervention basis in turn.

### A.    THE BIOLOGICAL CENTER MAY INTERVENE AS OF RIGHT.

In addition to filing a timely motion to intervene, see Fed. R. Civ. P. 24, a movant who lacks an unconditional statutory right to intervene must satisfy the following three criteria to qualify for intervention of right: (i) the movant must have an interest in the litigation's subject matter; (ii) the movant's interest will be impaired or impeded if the movant is not allowed to intervene; and (iii) the litigation's existing parties will not represent adequately the movant's interest, see Fed. R. Civ. P. 24(a)(2).   The Court concludes that the Biological Center may intervene as of right, because the Motion to Intervene is timely and the Biological Center satisfies the three rule 24(a)(2) elements.

### 1.    The Motion to Intervene is Timely, and the Biological Center Has Protectible Interests in This Litigation.

Although the Petitioners do not concede any rule 24(a) elements, see Motion to Intervene Response at 7 n.6, the Petitioners do not dispute seriously whether the Biological Center's Motion to Intervene is timely or whether the Biological Center has protectible interests in this litigation's subject matter.  See generally Motion to Intervene at 1-14.  The Biological Center moved to intervene on February 28, 2023, only one week after the Petitioners filed their Complaint.  See Motion to Intervene at 1; Complaint ¶ 1, at 1.  The Biological Center asserted interests in protecting riparian areas and preserving the protections it achieved in the August, 2021, Settlement Agreement satisfy rule 24(a).  See WildEarth Guardians v. Nat'l Park Serv., 604 F.3d at 1198 ("With respect to Rule 24(a)(2), we have declared it 'indisputable' that a prospective intervenor's environmental concern is a legally protectable interest.")(quoting San Juan County, 503 F.3d at 1199); W. Energy All. v. Zinke, 877 F.3d 1157, 1165-67 (10th Cir. 2017)(concluding not only that conservation groups' "interests in reducing the instances and effects of oil and gas drilling on

public lands alone would satisfy" rule 24(a), but also that their interest in "preserving" an agreement with the federal government "that they worked to develop and implement" supports intervention, where the conservation groups "spent years negotiating and litigating" the agreement, and the petitioners' requested relief would undermine the agreement's goals). Accordingly, the Court concludes that the Motion to Intervene is timely, and the Biological Center has protectible interests in this litigation.

## 2.    The Respondents Do Not Represent Adequately the Biological Center's Interests.

Regarding adequate representation, the Court concludes that the Respondents do not represent adequately the Biological Center's interests. "[W]here there is evidence that the government has multiple objectives, [the Tenth Circuit has] declined to find that it could adequately represent intervenors' interests." W. Energy All. v. Zinke, 877 F.3d at 1169. Even where "both the Forest Service and the environmental groups would defend the [challenged agency action], we cannot assume that the environmental groups' interests . . . wholly align with those of the Forest Service." New Mexico Off-Highway Vehicle All. v. U.S. Forest Serv., 540 F. App'x 877, 881 (10th Cir. 2013)(unpublished)("New Mexico Off-Highway Vehicle Alliance")[71]. In New

---

[71]New Mexico Off-Highway Vehicle Alliance v. United States Forest Service, 540 F. App'x 877 (10th Cir. 2013), is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>Mexico Off-Highway Vehicle Alliance</u>, environmental groups move to intervene as of right in an APA case challenging the Forest Service's reduction of roads and trails available for motorized vehicle use.  <u>See</u> <u>New Mexico Off-Highway Vehicle Alliance</u>, 540 F. App'x at 879.  The Tenth Circuit reverses the district court's denial of intervention, reasoning that the Forest Service cannot not represent adequately the environmental groups' interests, because "there is no guarantee that the Forest Service will make all of the environmental groups' arguments in litigation."  <u>New Mexico Off-Highway Vehicle Alliance</u>, 540 F. App'x at 881.  During the challenged action's comment period, the <u>New Mexico Off-Highway Vehicle Alliance</u> proposed intervenors identify specific environmental factors that concern them, and the Tenth Circuit determines that the Forest Service's final agency action "balance[ed] various interests," including, but not limited to, those of the proposed intervenors.  <u>See</u> <u>New Mexico Off-Highway Vehicle Alliance</u>, 540 F. App'x at 881.  Similarly, the Biological Center informed the Forest Service of several ecological concerns that are tailored to its organizational mission as it relates to the Aerial Shooting.  <u>Compare</u> Biological Center Comments at 1-4 (flagging the Gila Cows' impacts on protected wildlife, critical habitat, and water quality), <u>with</u> <u>New Mexico Off-Highway Vehicle Alliance</u>, 540 F. App'x at 881 (summarizing proposed intervenors' recommendations, including, among other things, that the Forest Service "consider the impacts of motorized dispersed camping and motorized big game retrieval, address the fact that the route system is greater than the Forest Service can afford, decrease route density, consider water quality impacts, further consider noise impact, and analyze cumulative impacts").  Also, like the challenged action in <u>New Mexico Off-Highway Vehicle</u>

_____

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>New Mexico Off-Highway Vehicle Alliance v. United States Forest Service</u> has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Alliance, the Aerial Shooting balances divergent interests, including those that the Biological Center and the Cattle Growers do not share. See Decision Memo. at 7-8 (AR 005906-07). For example, the Cattle Growers have an interest in protecting their branded cattle from being killed during the Aerial Shooting. The Biological Center does not share that interest, because the Biological Center has no branded cattle in the Gila National Forest. The Forest Service designed the Aerial Shooting with this unshared interest in mind: the Forest Service provided notice to all grazing permittees to ensure they tracked down any wandering cattle before the Aerial Shooting, and the Forest Service promised to compensate any permittees whose cows are killed during the Aerial Shooting. See Decision Memo. at 7-8 (AR 005906-07). The fact that the Forest Service designed the Aerial Shooting to protect an interest that the Cattle Growers and the Biological Center do not share demonstrates that the Forest Service and the Biological Center do not have the same objectives, because the Forest Service wants to remove the Gila Cows in a way that considers and protects the Cattle Growers' interests, whereas the Biological Center wants to remove Gila Cows, generally, without consideration of the Cattle Growers' interests. Thus, contrary to the Petitioners' position, this situation is not one of "those cases . . . [where] the objective of the applicant for intervention in a particular case is identical to that of one of the parties." May 22, 2023, Tr. at 18:1-5 (McGuire).[72] Accordingly, the Court concludes that the Respondents cannot

---

[72]In that line of cases, "even though a party seeking intervention may have different 'ultimate motivation[s]' from the governmental agency, where its objectives are the same, we presume representation is adequate." Tri-State, 787 F.3d at 1072-73 (quoting City of Stilwell, Okl. v. Ozarks Rural Elec. Co-op. Corp., 79 F.3d at 1042). Tri-State also summarizes how San Juan County does not undermine these cases:

In San Juan County, this court addressed en banc whether several conservation groups were entitled to intervene in a federal quiet-title action brought by San Juan County against the United States. 503 F.3d at 1167. Six judges

represent adequately the Biological Center's interests.  See W. Energy All. v. Zinke, 877 F.3d at

1169.

### 3.    This Litigation May Adversely Affect the Biological Center's Interests.

Regarding interest impairment, the Court concludes that this litigation may adversely affect

the Biological Center's interests.  "Establishing the potential impairment of such an interest

'presents a minimal burden,' and such an impairment may be 'contingent upon the outcome of [ ]

litigation.'"  Kane Cnty. v. United States, 928 F.3d at 891 (first quoting WildEarth Guardians v.

Nat'l Park Serv., 604 F.3d at 1199; and then quoting San Juan County, 503 F.3d at 1203).  As it

relates to interest impairment, the parties disagree about what this case involves.  See Motion to

Intervene Opposition at 10 (Petitioners)(arguing that this case is about how the Gila Cows must be

removed); Motion to Intervene Reply at 5 n.1 (Biological Center)(arguing that this case is about

whether the Gila Cows will be removed).  And, although the Petitioners assert that the Gila Cows

will be removed "irrespective of the outcome of this case," Motion to Intervene Opposition at 10,

that removal will look different if the Petitioners win.  See Complaint ¶ 114), at 29-30 (requesting

injunctive relief to enjoin the Aerial Shooting).  Should the Petitioners prevail on their

Impoundment Regulation Claim, the Forest Service could remove the Gila Cows only after

---

concluded that the conservation groups did not have a sufficient "interest" under
Rule 24(a), id. at 1207 (Kelly, J., concurring), and thus had no occasion to address
whether the conservation groups' interests would be adequately represented by the
United States.  Of the judges to address the adequate representation prong, all
seven -- Judge Hartz writing for three judges and Judge Ebel writing for four -
- agreed that a presumption of adequate representation applied where an applicant
for intervention had objectives "identical" to a party to the suit.  Id. at 1204 (opinion
of Hartz, J.); id. at 1227 & n. 1 (Ebel, J., dissenting).

Tri-State, 787 F.3d at 1072 n.1.

impounding them and putting them up for sale.  Should the Petitioners prevail on their NEPA claim, the Forest Service could remove the Gila Cows only after conducting a more thorough environmental review.  Either way, the Gila Cows remain in the Gila Wilderness for a longer period and continue to damage the Gila Wilderness, which impairs the Biological Center's unique interests in protecting riparian areas.  Cf. WildEarth Guardians v. U.S. Forest Serv., 573 F.3d at 995 (concluding that a suit challenging the Forest Service's approval of mining expansion may impair a mining company's interests, because, "[i]f [the petitioners are] successful in this litigation, operation of the [mining company's mining project] will be impaired, or even halted").  Having determined that the Biological Center satisfies all rule 24(a) elements, the Court concludes that the Biological Center may intervene as of right.

### B.   IN THE ALTERNATIVE, THE BIOLOGICAL CENTER MAY INTERVENE PERMISSIVELY.

In the alternative, the Court concludes that the Biological Center may intervene permissively.  A party may intervene permissively when: "(i) the application to intervene is timely; (ii) the applicant's claim or defense and the main action have a question of law or fact in common; and (iii) intervention will not unduly delay or prejudice the adjudication of the original parties' rights."  Wheeler Peak v. L.C.I.2, Inc., No. CIV-07-1117, 2009 WL 521799, at *3.  See Fed. R. Civ. P. 24(b).  "While [the rule 24(b)] standard is, aptly, 'permissive,' it is also 'a matter within the district court's discretion, and we will not reverse the district court's ruling absent a clear abuse of discretion.'"  City of Stilwell v. Ozarks Rural Elec. Co-op. Corp., 79 F.3d at 1043 (quoting Kiamichi R. Co. v. Nat'l Mediation Bd., 986 F.2d 1341, 1345 (10th Cir. 1993)).  The Petitioners do not argue that the Motion to Intervene is untimely, or that the Biological Center's defenses do not share a common factual or legal question with the main action.  See Motion to Intervene

Opposition at 10-11. Instead, the Petitioners assert that the Biological Center may not intervene permissively, because the Forest Service represents adequately the Biological Center's interests, and intervention "will unnecessarily clutter the action and cause undue delay." Motion to Intervene Opposition at 10. Regarding the Petitioners' first argument, the Court concludes again, for the reasons outlined above, that the Respondents cannot represent the Biological Center adequately. See supra at 173-76. Moreover, lack of adequate representation is not required for permissive intervention, pursuant to rule 24(b). See Fed. R. Civ. P. 24(b). Regarding the Petitioners' second argument, the Petitioners do not identify any way that the Biological Center's intervention delays or clutters the action beyond forcing the Petitioners to respond to whatever potentially duplicative arguments the Biological Center makes. See Motion to Intervene Opposition at 10-11. Neither of the Tenth Circuit cases that the Petitioners cite holds that additional briefing and marginal legal costs preclude, or even weigh against, granting permissive intervention. See City of Stilwell. v. Ozarks Rural Elec. Co-op. Corp., 79 F.3d at 1043 (affirming district court's denial of permissive intervention, where proposed intervenor "attempts to interject additional issues in its proposed answer related to a determination of damages it has, or will, incur"); Arney v. Finney, 967 F.2d 418, 421-22 (10th Cir. 1992)(affirming district court's denial of permissive intervention, where proposed intervenor who "remains a member of the class and is similarly situated with other members of the class," and whose "intervention would not aid the class in its attempt to" litigate its case). Accordingly, the Court concludes that the Biological Center may intervene permissively.

## II.     AT LEAST ONE PETITIONER HAS STANDING TO BRING EACH CLAIM.

First, the Court analyzes which of the Petitioners have standing for: (i) the Stipulation Claim; and (ii) the NEPA Claim; (iii) the Statutory Authority Claim; and (iv) the Impoundment

Regulation Claim.  The Court concludes: (i) only the Cattle Growers and Spur Lake have standing to bring the Stipulation Claim; (ii) only the Cattle Growers, Spur Lake, Shirley, and Campbell have standing to bring the NEPA Claim; (iii) all Petitioners have standing to bring the Statutory Authority Claim and the Impoundment Regulation Claim; and (iv) no claims are moot. Accordingly, at least one Petitioner has standing to bring each claim.

### A.    ONLY THE CATTLE GROWERS AND SPUR LAKE HAVE STANDING TO BRING THE STIPULATION CLAIM.

The Cattle Growers and Spur Lake (together, the "Stipulation Petitioners") are the only Petitioners who are parties to the June, 2022, Stipulation.  <u>See</u> Complaint ¶ 77, at 21.  Only contracting parties and third-party beneficiaries may pursue contract claims.  <u>See</u> Restatement (Second) of Contracts §§ 304, 315 (1981); <u>Colony Ins. Co. v. Burke</u>, 698 F.3d 1222, 1230 (10th Cir. 2012).  To the extent that the June, 2022, Stipulation is a "valid and enforceable agreement," Complaint ¶ 77, at 21, it binds only the contracting parties, because it does not identify any intended third-party beneficiary.  Accordingly, the Court concludes that only the Cattle Growers and Spur Lake have standing to bring the Stipulation Claims.

### B.    ONLY THE CATTLE GROWERS, SPUR LAKE, SHIRLEY, AND CAMPBELL HAVE STANDING TO BRING THE NEPA CLAIM.

Only the Cattle Growers, Spur Lake, Shirley, and Campbell have standing to bring the NEPA Claim, because, although each Petitioner alleges an injury-in-fact within the NEPA's zone-of-interests, Humane Farming's cognizable injury is not germane to its organizational purpose. Accordingly, Humane Farming does not have standing to bring the NEPA Claim.  In addition to the three Constitutional standing requirements -- injury, traceability, and redressability -- the Petitioners also must show that their injuries "fall within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question."  <u>Wyoming v. U.S. Dep't of</u>

Interior, 674 F.3d 1220, 1230-31 (10th Cir. 2012). The Tenth Circuit holds that courts should analyze whether a claim falls within a statute's zone-of-interests only if "Article III standing requirements are met." Wyoming v. U.S. Dep't of Interior, 674 F.3d at 1230-31.[73] Accordingly, the Court first analyzes whether each Petitioner satisfies traditional Article III standing and then analyzes whether each Petitioner's cognizable injuries are within the NEPA's zone-of-interests. Within the traditional Article III standing inquiry, the Court evaluates separately whether the Cattle Growers or Humane Farming have standing either by suffering an injury in its own right, or by asserting organizational standing by demonstrating that: (i) its members would otherwise have standing to sue in their own right; (ii) it seeks to protect interests that are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires

---

[73]In Wyoming v. U.S. Dep't of Interior, the Tenth Circuit categorizes the zone-of-interests inquiry as one of prudential standing. See Wyoming v. U.S. Dep't of Interior, 674 F.3d at 1230-31. Two years later, however, the Supreme Court clarifies that zone-of-interests analysis is not about prudential standing, because zone-of-interests analysis addresses whether Congress has authorized the suit at issue, and not whether Courts should, as a matter of prudence, deny standing to a plaintiff who otherwise satisfies Article III's requirements. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125-28 (2014)("Lexmark"). In Lexmark, the Supreme Court concludes that, although it "admittedly [has] placed that test under the 'prudential' rubric in the past," zone-of-interests analysis "does not belong there," given that "[w]hether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark, 572 U.S. at 127 (citing Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 97, and n. 2, (1998); Clarke v. Sec. Indus. Assn., 479 U.S. 388, 394-395, (1987); Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 288 (1992)(Scalia, J., concurring in judgment))(internal quotations have no citations). The Court interprets Lexmark's clarification to mean that zone-of-interests analysis concerns statutory rather than prudential issues -- even though Lexmark also rejects referring to zone-of-interests analysis as a matter of "statutory standing." Lexmark, 572 U.S. at 128 n.4. Regardless, Lexmark does not hold that the zone-of-interests test belongs to any of the traditional Article III inquiries -- injury, traceability, and redressability -- and the Court will apply the zone-of-interests test only to those claims that already have met those three requirements. See Lexmark, 572 U.S. at 129-132, Wyoming v. U.S. Dep't of Interior, 567F.3d at 1230-31.

participation of the organization's members in the lawsuit.  See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. at 199.

### 1.  Only the Cattle Growers, Spur Lake, Shirley, and Campbell Have Traditional Article III Standing to Bring the NEPA Claim.

Regarding Article III standing, the Court agrees with the Respondents, and focuses only on whether the Petitioners establish an injury-in-fact and whether the Cattle Growers and Humane Farming allege injuries that are germane to their organizational purposes.  See Respondents' Merits Response at 14-17 (declining to address traceability and redressability).  The aesthetic and recreational injuries that the Cattle Growers, Shirley, and Humane Farming allege -- i.e., loss of enjoyment of a serene wilderness that the Aerial Shooting has damaged environmentally, see Patterson Decl. ¶¶ 15-22, at 5-7; Shirley Decl. ¶¶ 18-24, at 5-7; Kinsella Decl. ¶¶ 5-25, at 1-7; Thompson Decl. ¶¶ 9-22, at 2-6 -- are bona fide injuries-in-fact, see Citizens for Constitutional Integrity v. United States, 57 F.4th 750, 760 (10th Cir. 2023), cert. denied, 144 S. Ct. 94 (2023)("The Supreme Court and [the Tenth Circuit] have repeatedly 'held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons ["]for whom the aesthetic and recreational values of the area will be lessened["] by the challenged activity.'")(quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 183 (2000)(quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)))(quotations in brackets added).  The economic injuries that the Cattle Growers, Shirley, Spur Lake, and Campbell allege -- i.e., environmental degradation that damages their businesses, see Patterson Decl. ¶ 16, at 5 ("The operations of NMCGA members are highly intertwined with the outdoors and the environment, and thus harm to the environment, and particularly the Gila Wilderness, will necessarily harm the operations of NMCGA members adjacent to and surrounding the Gila

National Forest."); Shirley Decl. ¶ 19, at 6 (similar); Campbell Decl. ¶ 6-12, at 1-3 (alleging that he lost campground customers after several campers and hikers experienced foul odors and drank potentially contaminated water from the rotting Gila Cow carcasses in March, 2022) -- also are sufficiently concrete. See Ass'n of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 152 (1970)(Douglas, J.)(holding that a data processing service provider alleges injury-in-fact, where the provider asserts that the respondent's ruling allowing national banks to make data processing services available to other banks and bank customers "might entail some future loss of profits"); Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv., 75 F.3d 1429, 1433 (10th Cir. 1996)("Catron County")(concluding that a municipality alleges injury-in-fact under the NEPA, where the municipality asserts that "designation of critical habitat would prevent the diversion and impoundment of water by the [municipality], thereby causing flood damage to county-owned property"); Foremaster v. City of St. George, 882 F.2d 1485, 1487 (10th Cir. 1989)(concluding that the plaintiff alleges injury-in-fact, where the plaintiff asserts that the defendant municipality' electric subsidy for a church causes him to pay higher rates for electricity, where "[t]o the extent that this subsidy diminished total revenues for the City's Utility Department, the Utility Department and the purchasers of municipal electricity are less well off and those purchasers may very well pay higher rates"); The Navajo Nation v. Urb. Outfitters, Inc., No. 12-195 BB/LAM, 2015 WL 11089523, at *3 (D.N.M. Dec. 21, 2015)(Black, J.)("Injury to commercial reputation is sufficient to establish an injury in fact under Article III.")(citing Meese v. Keene, 481 U.S. 465, 473-77 (1987)).  Humane Farming's psychological injuries -- i.e., psychological distress at learning about or possibly viewing the dead Gila Cows, see Kinsella Decl. ¶¶ 11-25, at 2-7; Thompson Decl. ¶¶ 6-22, at 2-6 -- are not sufficiently concrete, however, because there is no indication that any of its members have, or will, observe any Gila Cow

carcasses directly, see Kinsella Decl. ¶ 18, at 4 (alleging that he visits the Gila Wilderness "at least monthly"); Thompson Decl. ¶ 16, at 4 (alleging that she and her family visit the Gila Wilderness "as often as we can").  No Humane Farming member alleges that they intend to visit the project area shortly after the Aerial Shooting, such that they might stumble upon a rotting Gila Cow carcass.  A general interest in returning to an area that exhibits psychologically distressing environmental damage is not enough to show an actual or imminent injury:

> And the affiants' profession of an "inten[t]" to return to the places they had visited before -- where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species -- is simply not enough. Such "some day" intentions -- without any description of concrete plans, or indeed even any specification of when the some day will be -- do not support a finding of the "actual or imminent" injury that our cases require.

Lujan v. Defs. of Wildlife, 504 U.S. 555, 564 (1992)(emphasis in original)(internal quotations have no citation).  See Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 779 (1983)(Brennan, J., concurring)(noting that a plaintiff's psychological injury borne "out of a perception of risk" of a nuclear accident, rather than from a "direct sensory impact of a change in the physical environment," is not cognizable).  Although an organization's injury is concrete if its members observe an inhumane killing directly, see Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1396 (9th Cir. 1992)(concluding that animal protection organization alleged a cognizable psychological injury based on its members' witnessing bison being shot and killed, given that this "injury ar[ose] from a 'direct sensory impact of a change in [their] physical environment'")(quoting Animal Lovers Volunteer Ass'n Inc., (A.L.V.A.) v. Weinberger, 765 F.2d 937, 938 (9th Cir. 1985)(brackets in Fund for Animals, Inc. v. Lujan, but not in Animal Lovers Volunteer Ass'n Inc., (A.L.V.A.) v. Weinberger), Humane Farming does not and cannot allege that they observed directly the Animal Inspecting Service shooting the Gila Cows, because the

Forest Service closed the project area during the Aerial Shooting. See Decision Memo. at 8 (AR 005906). Accordingly, the Court concludes that: (i) the Cattle Growers', Shirley's, and Humane Farming's recreational and aesthetic, non-psychological injuries are cognizable; (ii) the Cattle Growers', Shirley's, Spur Lake's, and Campbell's economic injuries are cognizable; and (iii) Humane Farming's psychological aesthetic injuries are not cognizable.[74] Having also determined that the Petitioners have established traceability and redressability, the Court concludes that the non-organizational Petitioners -- i.e., Shirley, Spur Lake, and Campbell -- have Article III standing to pursue the NEPA claims.

Turning to organizational standing -- which is also an Article III issue, see Students for Fair Admissions, Inc. v. President & Fellows of Harvard College, 600 U.S at 199 -- the Court concludes that the Cattle Growers -- but not Humane Farming -- have organizational standing, because the Cattle Growers' cognizable injuries are germane to their organization's purpose, whereas Humane Farming's cognizable injuries are not. To invoke organizational standing, an organization must demonstrate that: (i) its members have standing to sue in their own right; (ii) the interests that the organization seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires individual members to participate in the lawsuit. See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S at 199. Here, each organization's cognizable injuries are based on injuries to their

---

[74]The Petitioners also allege that Humane Farming members were deprived of an opportunity to comment on the Aerial Shooting. Notwithstanding that nothing stopped Humane Farming members from participating in the scoping process, this alleged procedural harm, without more, does not confer Article III standing. See Summers v. Earth Island Inst., 555 U.S. at 496 (rejecting a party's argument that it has standing based on alleged denial of "the ability to file comments on some Forest Service actions," because "deprivation of a procedural right without some concrete interest that is affected by the deprivation -- a procedural right in vacuo -- is insufficient to create Article III standing").

members.  See supra, at 181-83 (concluding that the Cattle Growers' members allege cognizable recreational, aesthetic, and economic injuries, and Humane Farming members allege cognizable aesthetic injuries).  Thus, the Court concludes that the Cattle Growers' members and Humane Farming' members have standing to sue in their own right.  The Court also agrees with the Respondents that this lawsuit does not require the participation of either organization's members. See Respondents' Merits Response at 14-16.  Accordingly, the Court focuses only on whether the alleged injuries are germane to each organization's purpose.  On this point, the Petitioners argue that: (i) the Cattle Growers' "mission is focused on advocating for the interests of cattle growers, which includes supporting environmental policies that protect the environment and the wise use of natural resources"; and (ii) Humane Farming's "organizational mission is focused on protecting animals from cruelty and abuse, which includes protecting the public and the environment from the impact of animal cruelty and abuse."  Petitioners' Merits Reply at 11.  The Court concludes that the Cattle Growers' cognizable NEPA injuries -- which include recreational, aesthetic, and economic harm which environmental degradation causes -- inhibit its members' ability to make full use of the Gila Wilderness.  Promoting a sustainable, productive, and positive relationship between its members and the Gila Wilderness is within the Cattle Growers' organizational mission. Accordingly, the Cattle Growers' cognizable NEPA injuries are germane to the organization's purpose and the Cattle Growers have organizational standing to bring the NEPA claim.  Humane Farming's cognizable NEPA injuries are limited to its members' inhibited aesthetic enjoyment of the Gila Wilderness that environmental degradation causes.  Those injuries do not fall within Humane Farming's organizational mission, which concerns preventing animal cruelty, and not promoting environmental health and recreation.  Accordingly, the Court concludes that Humane Farming does not have organizational standing to bring the NEPA Claim.

2.      **The Cattle Growers, Spur Lake, Shirley, and Campbell Allege Injuries That Fall Within the NEPA's Zone-of-Interests.**

In addition to having Article III standing, the Cattle Growers, Shirley, Spur Lake, and Campbell (together, the "NEPA Petitioners") satisfy the NEPA's zone-of-interests test. The Cattle Growers and Shirley allege recreational, aesthetic, and economic injuries related to their interests in the Gila Wilderness. See Patterson Decl. ¶¶ 15-22, at 5-7; Shirley Decl. ¶¶ 18-24, at 5-7; Kinsella Decl. ¶¶ 5-25, at 1-7; Thompson Decl. ¶¶ 9-22, at 2-6. These injuries fall within the NEPA's zone-of-interests. See Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 448 (10th Cir. 1996)("[W]e hold that because the [plaintiff] seeks to protect its recreational, aesthetic, and consumptive interests in the land and water surrounding their village, their alleged injuries fall within the 'zone of interests' that the National Environmental Policy Act was designed to protect.")(quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 883). Spur Lake and Campbell also allege economic injuries related to their interests in the Gila Wilderness. See Shirley Decl. ¶ 19, at 6; Campbell Decl. ¶ 8, at 2. Although "[p]urely economic harm does not fall within the NEPA's zone of interests," Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d 1123, 1180 (D.N.M. 2015)(Browning, J.), a plaintiff alleging economic injuries that are "perceptible and environmental, not merely speculative or purely economic," satisfies the zone-of-interests test, Catron County, 75 F.3d at 1433. For example, in Catron County, the Tenth Circuit concludes that a municipality's "threatened injury to its property" from flood damage that may result from a federal agency's decision falls within the NEPA's zone-of-interests, because the threatened injury stems from perceptible future environmental harm. Catron County, 75 F.3d at 1433-34. Similarly, the Cattle Growers, Shirley, Spur Lake, and Campbell allege that the Respondents' NEPA violation may cause perceptible environmental harm -- e.g., contaminating a river from which their

cows or customers drink -- that may damage their property. See Patterson Decl. ¶ 16, at 5; Shirley Decl. ¶ 19, at 6; Campbell Decl. ¶¶ 6-12, at 1-3. Accordingly, the Court concludes that the NEPA Petitioners' injuries fall within the NEPA's zone-of-interests, and, thus, the NEPA Petitioners have standing to bring the NEPA Claim.

### C. ALL PETITIONERS HAVE STANDING TO BRING THE STATUTORY AUTHORITY CLAIM AND THE IMPOUNDMENT REGULATION CLAIM.

While the NEPA Claim alleges that the Aerial Shooting is unlawful, because the Respondents fail to investigate adequately the Aerial Shooting's environmental impacts, the Statutory Authority Claim and the Impoundment Regulation Claim allege that the Aerial Shooting is unlawful, no matter how the Respondents develop it, because the Respondents either lack authority to conduct it or they violate their own regulations in conducting it. See Complaint ¶¶ 83-113, at 21-29. The Statutory Authority Claim and the Impoundment Regulation Claim allege that the fact that the Respondents shot the Gila Cows from a helicopter instead of impounding them, and not the environmental damage that arises from that action, injures the Petitioners. Compare Complaint ¶¶ 83-113, at 21-29, with id. ¶¶ 97-113, at 24-29. Accordingly, the Court analyzes the Statutory Authority Claim and the Impoundment Regulation Claim standing issues in reference to the injuries that are traceable to those the violations that those claims allege -- i.e., whatever injuries stem from the Respondents' decision to shoot the Gila Cows en masse instead of impounding and selling them -- and not in reference to those injuries that stem from environmental degradation that the Aerial Shooting allegedly causes. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 125, (2014)("The plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial

decision.")(quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. at 560).  As in its NEPA Claim standing analysis, the Court first evaluates whether each Petitioner has traditional Article III standing, and then evaluates whether each Petitioner's injuries fall within the relevant statute's zone-of-interests.

**1.      All Petitioners Have Traditional Article III Standing for the Statutory Authority Claim and the Impoundment Regulation Claim.**

Each Petitioner has traditional Article II standing for the Statutory Authority Claim and for the Impoundment Regulation Claim, because they each allege cognizable economic injuries arising from the Aerial Shooting.  The Cattle Growers, Spur Lake, and Shirley allege that: (i) because their cattle have entered vacant allotments in the Gila Wilderness, they likely have entered the project area; and (ii) if their cattle are killed during the Aerial Shooting -- instead of impounded, as 36 C.F.R. § 262.10 requires -- they will not be able to recover their dead cattle's value from the Respondents, because they likely cannot discover the carcasses quickly enough to identify them before they rot in a vast project area that spans over 100,000 acres.  <u>See</u> Patterson Decl. ¶¶ 6-10, at 2-3; Shirley Decl. ¶¶ 8-12, at 2-4.  The Cattle Growers, Spur Lake, and Shirley also allege that the Aerial Shooting denies them the opportunity to take advantage of the Livestock Board directive that allows them to gather and purchase unbranded cattle in the Gila Wilderness. <u>See</u> Patterson Decl. ¶¶ 11-14, at 4-5; Shirley Decl. ¶¶ 13-17, at 4-5.  The Respondents argue that neither of these allegations establish standing.  First, they contend that the possibility that branded cattle may be killed during the Aerial Shooting is not an injury-in-fact, <u>see</u> Respondents' Merits Response at 11-13 (citing <u>Clapper v. Amnesty International USA,</u> 568 U.S. at 409), and, even if one of the Petitioners' cows are killed, that Petitioner misses only the opportunity to re-purchase the Petitioner's wandering cattle under 36 C.F.R. § 262.10(e), which requires the Petitioner to reimburse the Forest Service for impoundment and unauthorized grazing fees, rendering the re-

- 188 -

purchase price higher than market value, <u>see</u> February 1, 2024, Tr. at 102:13-24 (McGuire); <u>id.</u> at 6:15-9:8 (Hamilton).  Second, they contend that neither the Livestock Board's directive nor 36 C.F.R. § 262.10 give the public a right to purchase Gila Cows at an auction, and thus the Court could not redress the alleged lost purchasing opportunity.  <u>See</u> February 1, 2024, Tr. at 9:9-11:18 (Hamilton)(citing <u>Baca v. King</u>, 92 F.3d 1031).

The Court agrees with the Petitioners, and concludes that both standing theories allege cognizable injuries fairly traceable to the Respondents' decision to kill the Gila Cows instead of impounding them, and that the Court can redress those injuries.  Regarding the first standing theory -- <u>i.e.</u>, that the Cattle Growers', Spur Lake's, and Shirley's cattle may be killed during the Aerial Shooting -- the Court concludes that these three Petitioners allege cognizable imminent injuries, because there is a substantial risk that the Forest Service will kill their cows and that they will not be able to redeem them successfully.[75]  <u>See</u> <u>Rocky Mountain Gun Owners v. Polis</u>, 121 F.4th 96, 109 (10th Cir. 2024)("[A] plaintiff need not wait for the harm to occur to satisfy the injury-in-fact requirement."); <u>Kane Cnty. v. United States</u>, 928 F.3d at 888 ("Imminence is 'a somewhat elastic concept,' and '[a]n allegation of future injury may suffice if the threatened injury is "certainly impending," or there is a "substantial risk that the harm will occur."'")(first quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 564; and then quoting <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 158 (2014)(quoting <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. at 414 n.5));

---

[75]The Court acknowledges that no Petitioner alleges that the Forest Service killed any branded cattle during the Aerial Shooting.  Standing, however, "is determined as of the time the action is brought."  <u>Smith v. U.S. Court of Appeals, for the Tenth Circuit</u>, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting <u>Nova Health Sys. v. Gandy</u>, 416 F.3d 1149, 1154 (10th Cir. 2005)(Ebel, J.)).  Accordingly, whether the Forest Service actually killed any of the Cattle Growers', Spur Lake's, or Shirley's cattle does not impact whether those petitioners had standing when they filed the Complaint.

Blum v. Yaretsky, 457 U.S. 991, 1001, (1982)(concluding that nursing home residents alleging that nursing homes do not provide adequate notice before transferring them to lower levels of care have standing, because "the threat of facility-initiated discharges or transfers to lower levels of care is sufficiently substantial"). The Tenth Circuit has found injuries to be sufficiently imminent, even where those injuries depend on a chain of reasonable inferences:

> Under this standard, we conclude that SUWA has established an imminent injury. Kane County and the State of Utah seek to double the width of Swallow Park and North Swag roads, which are both dirt roads, and to more than double the width of Skutumpah Road. Wider roads will likely require realignments or improvements, such as grading or paving. See generally, [Sierra Club v. Hodel, 848 F.2d 1068, 1084-86 (10th Cir. 1988)]; [Kane Cnty. v. United States, No. 2:08-CV-00315, 2013 WL 1180764 (D. Utah Mar. 20, 2013)(Waddoups, J.)]. Such widening and improvement of the roads in a scenic area would almost inevitably increase traffic, diminishing the enjoyment of the nearby natural wilderness. See Hodel, 848 F.2d at 1092 (noting that a project involving "realignments, widening, . . . [and] a significant improvement in the quality of the road surface" would accommodate "large increases in future traffic" on the road); [S. Utah Wilderness All. v. Bureau of Land Mgmt.], 425 F.3d 735, 748 (10th Cir. 2005)](noting that improvements may "change the character of the roadway").

Kane Cnty. v. United States, 928 F.3d at 888. Similarly, the Cattle Growers, Spur Lake, and Shirley describe circumstances from which the Court concludes there is a substantial risk that their branded cows will be killed during the Aerial Shooting. Shirley, who is a Cattle Growers member, alleges that his cattle have wandered into the project area and that, during the winter months, his cattle grow thick coats that cover their brands. See Shirley Decl. ¶ 10, at 3. Shirley and Patterson also observe that the project area spans over 100,000 acres and that it would be "nearly impossible" to discover their killed cattle before they rot in the wilderness. Shirley Decl. ¶ 12, at 3-4.; Patterson Decl. ¶ 9, at 3. Although the Forest Service says it will record location coordinates for each carcass "to allow for follow-up inspection if needed," the Forest Service does not say it will provide those location coordinates to the public or follow up on each carcass to make sure it is

unbranded.  Decision Memo. at 7 (AR 005906).  Accordingly, the Cattle Growers, Spur Lake, and

Shirley's fear that the Animal Inspection Service will kill their cattle, and that the Cattle Growers,

Spur Lake and Shirley will be unable to discover any accidentally killed cows -- so that they may

request compensation from the Forest Service, see Decision Memo at 7 (AR 005905) -- have

support.  The Respondents' citation to Clapper v. Amnesty International USA does not persuade

the Court otherwise.   See Respondents' Merits Response at 11-12.   In Clapper v. Amnesty

International USA, the Supreme Court concludes that the plaintiffs challenging a provision of the

Foreign  Intelligence  Surveillance  Act,  50  U.S.C. §§ 1801-1885c  ("FISA"),  that  allows

surveillance of foreign citizens, do not have standing, because their injuries are too speculative.

See 568 U.S. at 410-14.  The Supreme Court provides five reasons: (i) the challenged provision

cannot be used to surveil the plaintiffs, who are United States persons; (ii) even if the United States

surveils the plaintiffs' foreign contacts, rather than the plaintiffs themselves, the plaintiffs only can

speculate whether the United States will use the challenged provision, instead of some other law,

to surveil; (iii) even if the United States uses the challenged provision to target the plaintiffs'

foreign contacts, the plaintiffs only can speculate whether the FISA Court would authorize the

requested surveillance; (iv) even if the FISA Court approves surveillance of the plaintiffs' foreign

contacts, the plaintiffs only can speculate that the United States will acquire any of those contacts'

communications successfully; and (v) even if the United States were to acquire the plaintiffs'

foreign contacts' communications successfully, the plaintiffs only can speculate whether the

United States will acquire the plaintiffs' communications with those foreign contacts.  See Clapper

v. Amnesty Int'l USA, 568 U.S. at 411-14.  "In sum, respondents' speculative chain of possibilities

does not establish that injury based on potential future surveillance is certainly impending or is

fairly traceable to" the challenged provision.  Clapper v. Amnesty Int'l USA, 568 U.S. at 414.  The

Cattle Growers, Spur Lake, and Shirley's reasonable fear that the Animal Inspection Service --
-- while shooting shaggy cows in the middle of winter from a moving helicopter -- may kill their
cattle accidentally is more compelling than the "speculative chain of possibilities" that the
Supreme Court rejects in Clapper v. Amnesty International USA. 568 U.S. at 414. Accordingly,
the Cattle Growers, Spur Lake, and Shirley allege cognizable injuries under the first standing
theory.

Regarding the second standing theory -- i.e., that the Cattle Growers, Spur Lake, and
Shirley are deprived of the opportunity to exploit the Gila Cows for their own economic benefit --
-- the Court concludes that the Cattle Growers, Spur Lake and Shirley allege cognizable economic
injuries, because each Petitioner alleges, at least, that they intend to gather and purchase the Gila
Cows. See Patterson Decl. ¶ 13, at 4-5 (alleging that some Cattle Growers members have gathered
Gila Cows successfully and subsequently purchased them from the Livestock Board); Shirley
Decl. ¶ 16, at 5 (alleging that, although his initial efforts have been unsuccessful, he "intend[s] to
continue to attempt to gather and purchased unbranded cattle in accordance with" the Livestock
Board directive) "A plaintiff is required only to allege concrete plans; [Lujan v. Defenders of
Wildlife, 504 U.S. at 564], he is not required to successfully execute those plans." Roe No. 2 v.
Ogden, 253 F.3d 1225, 1229 (10th Cir. 2001). See Rocky Mountain Gun Owners v. Polis, 121
F.4th at 109 (concluding that a plaintiff's "stated intention [to purchase a gun before he turns
twenty-one] is sufficient to establish a concrete and particularized future injury" in his challenge
to Colorado's law raising the minimum age to purchase firearms). In Roe No. 2 v. Ogden, the
Tenth Circuit concludes that a plaintiff challenging bar admission questions regarding drug and
alcohol dependency faces imminent injury, because he plans to sit for the bar examination,
invested three years in completing law school, and will likely pass it. See 253 F.3d at 1229-30.

The Tenth Circuit reasons that the bar applicant's injury is "more compelling" than a similarly predicted, yet uncertain, injury that the Supreme Court held to be sufficient for standing purposes in Bryant v. Yellen, 447 U.S. 352 (1980)(White, J.).  Roe No. 2 v. Ogden, 253 F.3d at 1229.  In Bryant v. Yellen, rural community residents seek to intervene and appeal a district court's decision holding that privately owned farmlands were not subject to a federal law that, if applied, would lower the price of the lands.  See 447 U.S. at 367-68.  The residents "could not with certainty establish that they would be able to purchase" the farmlands, because it is uncertain whether the owners would sell, whether the residents have enough money to buy the lands, or whether the residents would be outbid by other potential purchasers.  447 U.S. at 367.  See 447 U.S. at 367 n.17.  The Supreme Court holds, however, that the residents have standing, because it is "likely" that the lands "would become available at less than market prices" if the federal law applies.  447 U.S. at 368.  Similarly, the Cattle Growers, Spur Lake, and Shirley assert that they intend to gather and purchase the Gila Cows, even though it is possible that other purchasers might outbid them at auction or that the sale price would be prohibitively expensive.  See Patterson Decl. ¶ 13, at 4-5; Shirley Decl. ¶ 16, at 5.  Moreover, like the Roe No. 2 v. Ogden plaintiff and the Bryant v. Yellen residents, it is likely that the Cattle Growers, Spur Lake, and Shirley would execute this plan successfully on at least some occasions, given that the Cattle Growers' president attests that some of his organization's members successfully gathered and purchased Gila Cows.  See Patterson Decl. ¶ 13, at 4-5.

The Respondents' Baca v. King citation does not persuade the Court otherwise.   See February 1, 2024, Tr. at 9:9-11:18 (Hamilton).  In Baca v. King, the issue is not whether a plaintiff's allegation that a lost business opportunity is a cognizable injury, but whether the court can redress that injury.  See 92 F.2d at 1036-37.  In Baca v. King, Baca, a cattle rancher, challenges

the BLM's sale of federal land for which he holds a grazing permit.  See 92 F.2d at 1034.  Baca alleges that, if the BLM sells the land, he will lose his grazing rights and thus suffer economic loss.  See 92 F.2d at 1036.  The Tenth Circuit observes that "only the renewal of Mr. Baca's grazing permit or the sale of the land to him would likely redress his claimed injuries."  92 F.2d at 1037.  On this point, the Tenth Circuit holds that: (i) the court cannot compel the BLM to grant Baca another grazing lease, because the relevant statute gives the Interior Secretary discretion over renewing grazing permits and designating public lands for grazing; and (ii) the court cannot compel the BLM to sell the land to Baca, because neither his permit nor the relevant statute grants Baca a first right of purchase.  See 92 F.2d at 1037.  Accordingly, the Tenth Circuit concludes that Baca does not have standing, because the Court does not have the power to grant the relief that would redress his injuries.  See 92 F.2d at 1037.  The Cattle Growers, Spur Lake, and Shirley's economic injuries do not have similar redressability issues.  The Respondents' assertion that "there is no statutory or regulatory authority that would grant the Court jurisdiction to compel [] the Forest Service to provide an opportunity for petitioners or members of the public to purchase cattle" is incorrect.  February 1, 2024, Tr. at 10:14-18 (Hamilton).  The Court may declare the Aerial Shooting unlawful and order the Respondents to comply with 36 C.F.R. § 262.10 if they want to remove the Gila Cows, which would, according to the Petitioners' interpretation, require the Forest Service to impound the Gila Cows, look for any possible owners, and put the Gila Cows up for sale.  See 5 U.S.C. § 706; 36 C.F.R. § 262.10.  If the Forest Service followed those procedures, which, as both parties agree, necessitate a long, arduous process of herding wild animals out of the Gila Wilderness, the Cattle Growers, Spur Lake, and Shirley would have the opportunity simultaneously to gather the Gila Cows themselves and purchase them from the Livestock Board.  Accordingly, the Court concludes that it could redress the Cattle Growers, Spur Lake, and

- 194 -

Shirley's economic injuries if their statutory and regulatory interpretations are correct, and, thus, those three Petitioners have alleged concrete, redressable injuries under the second standing theory.

Both standing theories also establish organizational standing for the Cattle Growers to bring the Statutory Authority Claim and the Impoundment Regulation Claim.  The alleged injuries -- substantial risk that the Animal Inspection Service will kill its members' cattle and lost opportunity to take advantage of the Livestock Board initiative --  are germane to the Cattle Growers' organizational purpose of protecting its members' livestock and promoting its members' ability to gather and purchase livestock.  The Cattle Growers' members would have standing to bring the Statutory Authority Claim and the Impoundment Regulation Claim in their own right, see supra, at 188-93 (concluding that the Cattle Growers has standing based on its members' cognizable injuries), and the lawsuit does not require the participation of either organization's members.  Accordingly, the Cattle Growers have organizational standing.  In sum, the Cattle Growers, Spur Lake, and Shirley establish traditional Article III standing to bring the Statutory Authority Claim and the Impoundment Regulation Claim under both standing theories.

Both remaining Petitioners -- Humane Farming and Campbell -- also have traditional Article III standing to bring the Statutory Authority Claim.  Humane Farming owns Suwanna Ranch, which is "the world's largest animal refuge."  Miller Decl. ¶ 4, at 1.  Humane Farming alleges that the Forest Service's decision to kill the Gila Cows instead of impounding them deprives Humane Farming of the opportunity to purchase the Gila Cows "through public auction for relocation to a farm animal sanctuary such as Suwanna Ranch."  Petitioners' Merits Reply at 7.  Like the Cattle Growers' second standing theory injury -- i.e., that Aerial Shooting deprives the Cattle Growers' members of the opportunity to gather and purchase the Gila Cows -- Humane

Farming's lost opportunity to rescue the Gila Cows is a concrete injury, regardless whether they would have rescued the Gila Cows successfully.  See Miller Decl. ¶ 7, 12; Roe No. 2 v. Ogden, 253 F.3d at 1229-30; Bryant v. Yellen, 447 U.S. at 366-68.  The Court can redress this injury by ordering the Forest Service to impound the Gila Cows instead of killing them, which would give Humane Farming the opportunity to purchase the Gila Cows for refuge.  This standing theory alleges, moreover, that Humane Farming suffers "an injury in its own right," which satisfies organizational standing requirements.  Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S.at 199.  Accordingly, Humane Farming establishes traditional Article III standing to bring the Statutory Authority Claim and the Impoundment Regulation Claim. Campbell also alleges a cognizable injury, insofar as he alleges that the Forest Service's decision to shoot the Gila Cows instead of impounding them produces rotting carcasses in the Gila Wilderness that scares away his customers.  See Campbell Decl. ¶¶ 6-12, at 1-3.  The Court can redress this injury by ordering the Forest Service to impound the Gila Cows instead of killing them, which would prevent large numbers of rotting carcasses from inhibiting the wilderness experience of Campbell's customers.  Accordingly, Campbell has established traditional Article III standing to bring the Statutory Authority Claim and the Impoundment Regulation Claim.

> ### 2.    All Petitioners Allege Injuries That Satisfy the Zone-of-Interests Test for the Statutory Authority Claim and the Impoundment Regulation Claim.

All Petitioners allege injuries based on the Forest Service's decision to shoot the Gila Cows instead of impounding them; these injuries fall within the relevant statutory provision's zone of interests.  To establish APA standing, a plaintiff must: (i) identify a specific agency action that affects him; and (ii) show that his injury "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."  Lujan v. Nat'l

Wildlife Fed'n, 497 U.S. at 882-883 (internal quotations have no citation).  By challenging the

Aerial Shooting's lawfulness, the Petitioners satisfy the first prong of APA standing.  The Court

thus focuses its analysis on whether the Petitioners' satisfy the zone-of-interests test.  The zone-

of-interests test for APA claims is a low bar:

> We have said, in the APA context, that the test is not "'especially demanding,'" Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. [209,  225] . . . (2012).  In that context we have often "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff," and have said that the test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that'" Congress authorized that plaintiff to sue. Id., at [225].  That lenient approach is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review.

Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. at 130-31.  Although the briefing

focuses on the Impoundment Regulation Claim rather than on the Statutory Authority Claim, see

Petitioners' Merits Brief at 8-25; Petitioners' Merits Reply at 11-24, the Complaint identifies one

statutory provision and one regulation that relate to how the Aerial Shooting allegedly exceeds the

Respondents' statutory authority:  (i) 16 U.S.C. § 1133(c);  and  (ii) 36 C.F.R. § 262.10.   See

Complaint ¶¶ 86-87, at 22.  16 U.S.C. § 1133(c) is part of the Wilderness Act.  The Wilderness

Act's policy declaration provides:

> In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness.

16 U.S.C. § 1131(a).  To the extent that the Statutory Authority Claim alleges that the Aerial

Shooting exceeds the Respondents' statutory authority under the Wilderness Act, the Petitioners'

interests fall squarely within that statute's purposes.  The Cattle Growers, Spur Lake, and Shirley's allege that the Aerial Shooting deprives them of "the benefits of an enduring resource of wilderness," because it threatens their cattle or stops them from gathering and purchasing the Gila Cows.  16 U.S.C. § 1131(a).  See Patterson Decl. ¶¶ 6-14, at 2-5; Shirley Decl. ¶¶ 8-17, at 2-5. Humane Farming similarly alleges that the Aerial Shooting deprives it of the benefit of rescuing wild animals, and Campbell alleges that the Aerial Shooting inhibits his ability to run his campground for campers and hikers seeking to enjoy the Gila Wilderness.  See Miller Decl. ¶¶ 7, 12; Campbell Decl. ¶¶ 6-12, at 1-3.  These injuries fall within the Wilderness Act's zone-of-interests, which includes managing wilderness access to promote many public benefits.  See 16 U.S.C. § 1131(a)("[I]t is hereby declared to be the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness."); 16 U.S.C. § 1133(d)(4)("[T]he grazing of livestock, where established prior to September 3, 1964, shall be permitted to continue subject to such reasonable regulations as are deemed necessary by the Secretary of Agriculture."); 16 U.S.C. § 1133(d)(5)("Commercial services may be performed within the wilderness areas designated by this chapter to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas.").

To the extent that the Statutory Authority Claim alleges that the Aerial Shooting exceeds the Respondents' statutory authority under the Forest Service Organic Act, the Petitioners' interests also fall within the Forest Service Organic Act's purposes, 16 U.S.C. §§ 471-583, under which 36 C.F.R. § 262.10 is promulgated.  See Respondents' Merits Response.  The Forest Service Organic Act is designed to manage how the public occupies and uses public and national forests. See 16 U.S.C. § 551.  The Forest Service Organic Act provides that the Agriculture Secretary

"shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests," and that "he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction."  16 U.S.C. § 551.  The Petitioners' Statutory Authority Claim injuries relate to how the Aerial Shooting impacts their ability to occupy and use the Gila National Forest and Gila Wilderness.  Accordingly, the Court concludes that the Petitioners' Statutory Authority Claim injuries fall within the Forest Service Organic Act's zone-of-interests.

The Petitioners' injuries also fall within the zone-of-interests of the regulation that the Impoundment Regulation Claim alleges the Respondents violated -- 36 C.F.R. § 262.10.  See Complaint ¶¶ 93-94, at 23-24.  36 C.F.R. § 262.10 regulates how the Forest Service may remove unauthorized livestock from the National Forest System.  See 36 C.F.R. § 262.10.  The Cattle Growers, Spur Lake, and Shirley's interests in protecting their cattle, and in gathering and purchasing the Gila Cows, are within the scope of this regulation's purposes.  Humane Farming's and Campbell's interests are also at least arguably within this regulation's purposes, because the regulation balances the Forest Service's ability to manage animals on public land with the property interests of those who use that land.  How the Forest Service removes unauthorized livestock impacts: (i) Humane Farming's ability to rescue those animals; and (ii) Campbell's ability to provide a positive recreational experience for his campground customers.  Accordingly, the Court concludes that the Petitioners' Impoundment Regulation Claim injuries fall within 36 C.F.R. § 262.10's zone of interests.  In sum, the Court concludes that all Petitioners have standing to bring the Statutory Authority Claim and the Impoundment Regulation Claim, because all of the Petitioners establish Article III standing for those claims, and the Petitioners' cognizable

injuries are within the Wilderness Act's, Forest Service Organic Act's, or 36 C.F.R. § 262.10's zone-of-interests.

###### D.    THE PETITIONERS' CLAIMS ARE NOT MOOT.

The Court concludes that this case is not moot, because, even though some of the Petitioners' injuries are no longer cognizable, the Aerial Shooting is capable of repetition, yet evading review.  At first glance, because some "'issues presented are no longer 'live,''" the case appears to be moot.  County of Los Angeles v. Davis, 440 U.S. at 631 (quoting Powell v. McCormack, 395 U.S. at 496)(internal quotations have no citation).  For example, the Cattle Growers, Spur Lake, and Shirley's injuries stemming from the possibility that the Respondents may kill their cattle accidentally is no longer cognizable, because the Respondents do not have concrete plans to conduct similar aerial operations this year.  This case falls, however, within the "established exception to mootness for disputes capable of repetition, yet evading review." FEC v. Wis. Right To Life, Inc., 551 U.S. 449, 462 (2007).  This exception "applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" FEC v. Wis. Right To Life, Inc., 551 U.S. at 462 (2007)(quoting Spencer v. Kemna, 523 U.S. 1, 17 (1998)).  The Petitioners satisfy both prongs of this exception.

Regarding the first prong, the Court concludes that the Aerial Shooting is too short to be fully litigated prior to cessation.  The Petitioners cannot challenge the Aerial Shooting -- or any similar operation -- under the APA until the Forest Service makes a "final agency action." 5 U.S.C. § 704.  To be "final," an agency action: (i) "must mark the 'consummation' of the agency's decisionmaking process"; and (ii) "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 178

(1997)(first quoting <u>Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.</u>, 333 U.S. 103, 113 (1948); and then quoting <u>Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic</u>, 400 U.S. 62, 71 (1970)).  The final agency action related to the Aerial Shooting is the Decision Memo., which was released on February 16, 2023 -- less than two weeks before the Aerial Shooting.  <u>See</u> Decision Memo. at 16 (AR 005914); Second Howes Decl. ¶ 3, at 2. Accordingly, the Petitioners could not have filed their APA claim more than two weeks before the Aerial Shooting.  Two weeks is not enough time to adjudicate the Petitioners' claims.  <u>See</u> <u>Kingdomware Techs., Inc. v. United States</u>, 579 U.S. 162, 170 (2016)("We have previously held that a period of two years is too short to complete judicial review of the lawfulness of the procurement.").  Accordingly, the Petitioners' claims satisfy first the first prong of the "capable of repetition, yet evading review" mootness exception.  <u>FEC v. Wisconsin Right To Life, Inc.</u>, 551 U.S. at 462.

Regarding the second prong, the Court concludes that "there is a reasonable expectation" that the Forest Service will conduct similar aerial removal operations again.  <u>FEC v. Wisconsin Right To Life, Inc.</u>, 551 U.S. at 462. The parties agree that some Gila Cows remain in the Gila Wilderness, even after the Aerial Shooting.  <u>See</u> February 1, 2024, Tr. at 102:13-24 (McGuire); <u>id.</u> at 119:3-4 (Smith).  In February, 2024, the Forest Service estimated that between ten and twenty Gila Cows remain.  <u>See</u> February, 1, 2024, Tr. at 119:3-4 (Smith).  Although the Forest Service intends to conduct ground removals for the remaining Gila Cows, the Forest Service also acknowledges that it may authorize more aerial operations if ground removal is not feasible.  <u>See</u> February 1, 2024, Tr. at 122:9-17 (Smith).  The Respondents also admit that, because there may be more aerial operations, this case is not moot.  <u>See</u> February 1, 2024, Tr. at 122:9-11 (Smith).  The Court agrees with the Respondents: because the Forest Service may authorize similar aerial

operations, the Respondents' allegedly unlawful activity is capable of repetition, yet evading review.  See ETP Rio Rancho Park, LLC v. Grisham, 564 F. Supp. 3d at 1069 (concluding that a trampoline facility operators' claims related to COVID-19 public health orders that are no longer in effect are not moot, because the COVID-19 pandemic "remains ongoing and the State continues to issue" public health orders, which "could create new restrictions that again bring the questioned restrictions back into place").  Cf. Audubon of Kan., Inc. v. U.S. Dep't of Interior, 67 F.4th 1093, 1104 (10th Cir. 2023)(concluding that the "capable of repetition but evading review" mootness exception does not apply, where the Fish and Wildlife Service represents that it would not repeat the challenged action).  Accordingly, the Court concludes that the Petitioners' claims are not moot.

**III.    THE RESPONDENTS DO NOT VIOLATE THE JUNE, 2022, STIPULATION.**

The Court concludes that the Respondents do not violate the June, 2022, Stipulation, because the Respondents notified the Cattle Growers, Spur Lake, and Shirley about the Aerial Shooting no later than November 22, 2022, which is more than seventy-five days before the Aerial Shooting began.  The June, 2022, Stipulation states: "[A]ny such aerial lethal removal operations on or before March 1, 2025 would be preceded by at least 75 days' notice to the Petitioners and also to the public."  June, 2022, Stipulation at 1.  The June, 2022, Stipulation does not provide any more detail regarding this notification obligation.  See June, 2022, Stipulation at 1.  For example, the June, 2022, Stipulation does not require the Forest Service to notify the Cattle Growers, Spur Lake, and Shirley in writing, or to publish a decision memorandum regarding aerial removal operations at least seventy-five days before conducting those operations.  See June, 2022, Stipulation at 1.  On November 17, 2022, the Respondents notify the public about their intention to conduct aerial removal operations.  See Scoping Letter at 1 (AR 004288)("This scoping notice and proposal is intended to cover any ongoing live gather and removal efforts, as well as any lethal

- 202 -

removal efforts through either aerial shooting from a helicopter or shooting on the ground."). On

November 22, 2022, the Respondents notify the Cattle Growers, Spur Lake, and Shirley, through

counsel, about their intention to conduct aerial removal operations. See Petitioners Notification

Letter at 1 (AR 004350)(attaching the Scoping Letter). The Notification Letter also references the

June, 2022, Stipulation:

> On June 30, 2022, the U.S. District Court for the District of New Mexico
> approved the stipulation for dismissal for case no. 2:22-cv-00086-JB-CG, New
> Mexico Cattle Growers' Association, et al. v. the United States Department of
> Agriculture, et al. The stipulation for dismissal included the acknowledgment that
> in future proposals by USDA involving the lethal removal of unbranded and
> unauthorized cattle from the Gila Wilderness that "any such removal operations on
> or before March 1, 2025 would be preceded by at least 75 days' notice to the
> Petitioners and also to the public."
>
> . . . .
>
> Plaintiffs in the above referenced lawsuit are being sent the scoping notice along
> with nearby permittees, neighbors, other stakeholders, and members of the general
> public that have expressed interest in receiving such notices. However, to be sure
> that you and your clients receive the notice as outlined in the stipulation for
> dismissal, we include it here and request that you forward it if needed to anyone
> that did not receive it for some reason through the scoping notice process.

Petitioners Notification Letter at 1 (AR 004350). The Court concludes that these two letters serve

as sufficient notice to the Cattle Growers, Spur Lake, and Shirley, and, thus, the Respondents do

not violate the June, 2022, Stipulation.

## IV.    <u>THE RESPONDENTS DO NOT VIOLATE THE NEPA</u>.

The NEPA Petitioners argue that the Respondents violate the NEPA, because the

Respondents did not prepare an EA or an EIS for the Aerial Shooting and the Aerial Shooting is

not excluded categorically under either the Forest Service's or the Animal Inspection Service's

NEPA implementing procedures. See Petitioners' Merits Brief at 25-41. The Court concludes

that the Respondents do not violate the NEPA, because the Aerial Shooting is excluded

categorically from further documentation in an EA or an EIS. Both the Forest Service and the Animal Inspection Service have NEPA-implementing procedures that govern whether the agency must prepare an EA or an EIS before conducting a proposed action. See 36 C.F.R. § 220.6 (describing Forest Service NEPA-implementing procedures); 7 C.F.R. § 372 (describing Animal Inspection Service NEPA-implementing procedures). Both implementing procedures allow the agency the exclude categorically an action from further documentation in an EA or an EIS if: (i) the action falls within one of the agency's CEs; and (ii) there are no extraordinary circumstances. See 36 C.F.R. § 220.6; 7 C.F.R. § 372. The Court first evaluates whether the Forest Service's use of either of its chosen CE's is arbitrary or capricious. Second, the Court evaluates whether the Animal Inspection Service's use of its chosen CE is arbitrary or capricious. Third, the Court evaluates whether either agency's determination that there are no extraordinary circumstances is arbitrary or capricious.

### A.    THE FOREST SERVICE'S APPLICATION OF 36 C.F.R. § 220.6(E)(6) TO THE AERIAL SHOOTING IS NOT ARBITRARY OR CAPRICIOUS.

The Forest Service's NEPA implementing procedures provide:

(a)    General. A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if:

(1)    The proposed action is within one of the categories established by the Secretary at 7 CFR part 1b.3; or

(2)    The proposed action is within a category listed in § 220.6(d) and (e).

36 C.F.R. § 220.6(a). Accordingly, if the Respondents satisfy 36 C.F.R. § 220.6(a)'s conditions -- i.e., if the Aerial Shooting is "within a category listed in § 220.6(d) and (e)," or "within one of the categories established by the Secretary at 7 CFR part 1b.3," and "there are no extraordinary circumstances related to the proposed action" -- the Respondents do not need to

prepare an EA or an EIS under the NEPA. 36 C.F.R. § 220.6(a). The Respondents argue that the Aerial Shooting falls within two Forest Service CEs: 7 C.F.R. § 1b.3(a)(5) ("CE 5") and 36 C.F.R. § 220.6(e)(6) ("CE 6").[76]

First, the Court concludes that the Aerial Shooting does not fall within CE 5, which excludes from further NEPA review "[c]ivil and criminal law enforcement and investigative activities." 7 C.F.R. § 1b.3(a)(5). The Court agrees with the Petitioners' argument that the Respondents' position that the Gila Cows are not unauthorized livestock is inconsistent with the Respondents' position that the civil and criminal enforcement CE applies. See supra, at 113-14; Petitioners' Merits Brief at 37. One of the Respondents' main arguments is that the Gila Cows are not unauthorized livestock. See Respondents' Merits Response at 18-31. If the Respondents are correct in this regard, then removing the Gila Cows is not a civil or criminal enforcement activity, because the Gila Cows' presence in the Gila Wilderness does not constitute a civil or criminal violation. Later in this memorandum opinion, the Court concludes that the Gila Cows are not unauthorized livestock. See infra, at 226-37. Accordingly, CE 5 does not apply to the Gila Cows' removal, and the Forest Service may not rely on it to preclude the Aerial Shooting from further NEPA review.

Next, having concluded that CE 5 does not apply to the Aerial Shooting, the Court moves on to evaluating whether CE 6 applies. CE 6 applies to:

_____

[76]The Respondents also mention a third CE -- 36 C.F.R. § 220.6(d)(1) -- but they admit that the Forest Service does not rely on this CE to preclude the Aerial Shooting from further NEPA analysis. See Respondents' Merits Response at 41. Instead, the Forest Service used this CE to preclude its decision to close the project area during the Aerial Shooting from further NEPA analysis. See Respondents' Merits Response at 41. Because the NEPA Petitioners challenge only the Aerial Shooting, and not the area closure order, the Court does not evaluate whether 36 C.F.R. § 220.6(d)(1) applies to the area closure order.

(6)     Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:

    (i)     Girdling trees to create snags;

    (ii)    Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;

    (iii)   Prescribed burning to control understory hardwoods in stands of southern pine; and

    (iv)    Prescribed burning to reduce natural fuel build-up and improve plant vigor.

The Court concludes that the Aerial Shooting falls within CE 6, and thus the Forest Service's application of CE 6 to the Aerial Shooting is not arbitrary or capricious, because the Aerial Shooting is a wildlife improvement activity that does not use herbicides or involve road-building. The Court considers the parties' competing interpretations of CE 6 and concludes that CE 6 is unambiguous[77] and applies to the Aerial Shooting.  To determine whether this regulation is

---

[77]The Court's conclusion that CE 6 is not ambiguous on this question precludes Auer or Seminole Rock deference to the agency's interpretation of the regulation.  Although neither party in this case discusses whether the Court should apply deference to the Respondents' interpretation of CE 6's scope, the Court concludes that the regulation is not "genuinely ambiguous" whether the Forest Service may conduct targeted shootings to, and thus the regulation "just means what it means -- and the court must give it effect, as the court would any law." Kisor v. Wilkie, 588 U.S. 558, 575 (2019). See id. (noting that "the core theory of Auer deference is that sometimes the law runs out, and policy-laden choice is what is left over," but "if the law gives an answer -- if there is only one reasonable construction of a regulation -- then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense").  This conclusion, however, is of limited consequence here, because the Court reaches the same conclusion on the meaning of the regulation that the Respondents hold. See Respondents' Merits Response at 37-39.  Moreover, the Court is wary of the staying power of Auer deference following Loper Bright, in which the Supreme Court "places a tombstone on Chevron no one can miss." Loper Bright, 603 U.S. at 417 (Gorsuch, J., concurring).  Although the Supreme Court did not overrule or alter Auer deference in Loper Bright, and the Supreme Court declined to overrule Auer just five years ago, see Kisor v. Wilkie, 588 U.S. at 563, the basic principles that purport to underlie Auer and -- formerly -- Chevron deference are conceptually similar in that both involve administrative law's judicial deference to agency interpretations of law and agency regulations,

ambiguous, the Court looks to "the traditional tools of construction, such as the regulatory 'text, structure, history, and purpose.'"  Sierra Club v. U.S. Env't Prot. Agency, 964 F.3d 882, 891 (10th Cir. 2020)(quoting Kisor v. Wilkie, 588 U.S. 558, 559 (2019)(Kagan, J.)).

Regarding the text, CE 6's plain text does not preclude its application to a targeted animal-removal operation.  36 C.F.R. § 220.6(e)(6).  There are only two timber stand or wildlife habitat improvement activities that CE 6 does not apply to: those that use herbicides and those that require over one mile of road construction.    See 36 C.F.R. § 220.6(e)(6).    Accordingly, the Court concludes that CE 6 is not ambiguous, because it means "just means what it means," Kisor v. Wilkie, 588 U.S. at 575, and applies to agency actions that are designed to improve wildlife habitats if those activities do not use herbicides or require over one mile of road construction.  The Administrative Records are replete with evidence that the Forest Service designed the Aerial Shooting to improve wildlife habitats by removing the Gila Cows, whose overgrazing and stream trampling damages delicate riparian systems, and threatens several endangered or protected species.  See supra, at 12-76.  The Court does not need to determine whether the Aerial Shooting will improve wildlife habitats -- although the Court notes that the Forest Service's materials are persuasive on this point -- to conclude that the Forest Service's decision to apply CE 6 to the Aerial Shooting is reasonable.  See WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. at 1329 ("It is not the Court's place to pass judgment on the wisdom or merits of these reports . . . but rather to determine whether the reports evidence consideration of relevant factors and articulate reasoned

---

and thus both are susceptible to constitutional criticisms.  In any event, the Court has made no secret of its skepticism of Auer deference in the past, see Mohon v. Agentra LLC, 400 F. Supp. 3d 1189, 1218-24 (D.N.M. 2019)(Browning, J.), and would welcome a standard more in line with basic separation-of-powers principles.

bases for [the Forest Service's] conclusions [that a categorical exclusion applies to a proposed action.]")(first citing <u>Colo. Env't Coal. v. Dombeck</u>, 185 F.3d at 1172; and then citing <u>Olenhouse</u>, 42 F.3d at 1580).   The Miscellaneous Biological Assessment, Mexican Gray Wolf Biological Assessment, and Water Specialist Report illustrate how the Forest Service considered carefully "relevant factors and articulated reasoned bases" for concluding that the Aerial Shooting will improve wildlife habitats in the Gila Wilderness.   <u>WildEarth Guardians v. U.S. Forest Serv.</u>, 668 F. Supp. at 1329.  <u>See</u> <u>supra</u>, at 35-76.  Accordingly, the Court concludes that the Forest Service's application of CE 6 to the Aerial Shooting is neither arbitrary nor capricious.

The Court also does not find sound the NEPA Petitioners' argument that the Aerial Shooting fails to fit into CE 6, because it is not an "established vegetation treatment or forestry practice," like the four examples that CE 6 provides.  Petitioners' Merits Brief.  Those examples are neither exclusive nor fully illustrative.  <u>See</u> 36 C.F.R. § 220.6(e)(6)("Examples include, but are not limited to").  Importantly, those examples do not limit the plain meaning of CE 6's text, which describes "wildlife improvement activities" that do not involve using herbicides or building roads longer than one mile.  36 C.F.R. § 220.6(e)(6).  The Forest Service designs the Aerial Shooting to improve wildlife habitats in the Gila Wilderness, and the Aerial Shooting does not involve using herbicides or buildings roads.  Accordingly, the Court concludes that CE 6 applies to the Aerial Shooting, and the Forest Service's application of CE 6 to the Aerial Shooting is neither arbitrary or capricious.

### B.    THE ANIMAL INSPECTION SERVICE'S APPLICATION OF 7 C.F.R. § 372.5(C)(1)(I) TO THE AERIAL SHOOTING IS NOT ARBITRARY OR CAPRICIOUS.

Like the Forest Service, the Animal Inspection Service may exclude categorically an action from further NEPA review the action falls within one of the agency's CEs and there are no

extraordinary circumstances.  See 40 C.F.R. § 1501.4(b).    Regarding the Animal Inspection

Service's NEPA compliance, the Respondents argue that the Aerial Shooting falls within

7 C.F.R. § 732.5(c)(1)(i) ("Routine Measures CE").  See Respondents' Merits Response at 39-41.

The Court concludes that the Animal Inspection Service's application of the Routine

Measures CE is not arbitrary or capricious, because the Aerial Shooting satisfies each of the

Routine Measures CE's requirements.  The Routine Measures CE excludes from further NEPA

review:

> Routine measures, such as identifications, inspections, surveys, sampling that does
> not cause physical alteration of the environment, testing, seizures, quarantines,
> removals, sanitizing, inoculations, control, and monitoring employed by agency
> programs to pursue their missions and functions. Such measures may include the
> use -- according to any label instructions or other lawful requirements and
> consistent with standard, published program practices and precautions -- of
> chemicals, pesticides, or other potentially hazardous or harmful substances,
> materials, and target-specific devices or remedies, provided that such use meets all
> of the following criteria (insofar as they may pertain to a particular action):
>
> (A)    The use is localized or contained in areas where humans are not likely to be
>        exposed, and is limited in terms of quantity, i.e., individualized dosages and
>        remedies;
>
> (B)    The use will not cause contaminants to enter water bodies, including
>        wetlands;
>
> (C)    The use does not adversely affect any federally protected species or critical
>        habitat; and
>
> (D)    The use does not cause bioaccumulation.[78]

7 C.F.R. § 372.5(c)(1)(i).  The Routine Measures CE's plain text applies to the Aerial Shooting.

The Administrative Records establish that the Animal Inspection Service routinely conducts aerial

---

[78]"Bioaccumulation is the uptake of substances and contaminants from the environment into the tissues" of an organism.  Sara M. Crayton, Petra B. Wood, Donald J. Brown, Alice R. Millikin, Terence J. McManus, Tyler J. Simpson, Kang-Mo Ku, & Yong-Lake Park, Bioaccumulation of the Pesticide Imidacloprid in Stream Organism and Sublethal Effects on Salamanders, Global Ecology and Conservation at 2, Volume 24 (2020).

shootings to remove wild animals.  See Animal Inspection Service CE Record at 1 (AR 005893);

Wildlife Aerial Shooting Assessment at 1 (AR 003286)(indicating that, between FY11 and FY15,

the Animal Inspection Service killed over 41,000 animals via aerial shootings).  The Court

disagrees with the Petitioners' argument that the Aerial Shooting is not a routine measure, because

the Animal Inspection Service targeted cows, instead of feral swine or another more commonly

targeted wild animal.  See Petitioners' Merits Reply at 31-32.  Nothing in the Routine Measures

CE's text suggests that it is limited to certain species.  See 7 C.F.R. § 372.5(c)(1)(i).  Instead, the

Routine    Measures    CE    is    limited    to    certain    actions,    including    "removals."

7 C.F.R. § 372.5(c)(1)(i).  The Aerial Shooting is a removal, and it is routine, insofar as the Animal

Inspection Service commonly removes wild animals by shooting them from aircraft.

The Aerial Shooting also meets all four criteria in the Routine Measures CE.  Regarding

the first criterion, the Aerial Shooting "is localized or contained in areas where humans are not

likely to be exposed, and is limited in terms of quantity."   7 C.F.R. § 372.5(c)(1)(i)(A).  See

Decision Memo at 7 (AR 005905)(describing how the project area will be closed to the public

during the Aerial Shooting); id. at 2 (AR 005900)(estimating that the Animal Inspection Service

will target no more than fifty to 150 Gila Cows); Second Howes Decl. § 4, at 2 (indicating that the

Animal Inspection Service killed nineteen Gila Cows during the Aerial Shooting).  Regarding the

second criterion, the Animal Inspection Service is not arbitrary or capricious in concluding that

the Aerial Shooting will not "cause contaminants to enter water bodies, including wetlands."

7 C.F.R. § 372.5(c)(1)(i)(B).  The Forest Service designed the Aerial Shooting to protect wetlands,

and, accordingly, Forest Service staff are required to remove any rotting Gila Cow carcasses that

were left in or near waterways.  See Decision Memo at 8 (AR 005906); Animal Inspection Service

CE Record at 3 (AR 005895).  Moreover, the Respondents establish that the Petitioners' fears

about rotting cattle carcasses contaminating wetlands are overblown and that removing the Gila Cows will benefit, rather than damage, the Gila Wilderness' riparian systems.  See Water Specialist Report at 7 (AR 005568).  Regarding the third criterion -- whether the action will "adversely affect any federally protected species or critical habitat," 7 C.F.R. § 372.5(c)(1)(i)(C) -- the Animal Inspection Service relies on the Forest Service's extensive research and conclusions regarding the Aerial Shooting's ecological impact.  See Animal Inspection Service CE Record at 2-4 (AR 005893-95).  Those materials conclude that the Aerial Shooting will have no effect on any threatened or endangered species or habitat in the Gila Wilderness.  See Miscellaneous Biological Assessment at 4 (AR 005683).  "It is not the Court's place to pass judgment on the wisdom or merits of these reports . . . but rather to determine whether the reports evidence consideration of relevant factors and articulate reasoned bases for [the agency's] conclusions [that a categorical exclusion applies to a proposed action.]"  WildEarth Guardians v. U.S. Forest Serv., 668 F. Supp. at 1329 (first citing Colo. Env't Coal. v. Dombeck, 185 F.3d at 1172; and then citing Olenhouse, 42 F.3d at 1580).  Accordingly, the Animal Inspection Services' determination, based on the Forest Service's materials, that the Aerial Shooting will not affect adversely any threatened or endangered species is not arbitrary or capricious.  Regarding the fourth criterion, no party alleges or could allege plausibly that the Aerial Shooting causes bioaccumulation.  Accordingly, the Court concludes that all four criteria are met, and the Aerial Shooting falls within the Routine Measures CE.

### C.    THE RESPONDENTS' DETERMINATION THAT THERE ARE NO EXTRAORDINARY CIRCUMSTANCES RELATED TO THE AERIAL SHOOTING IS NOT ARBITRARY OR CAPRICIOUS.

The Court concludes that the Respondents' determination that there are no extraordinary circumstances related to the Aerial Shooting is not arbitrary or capricious, because the

Respondents analyzed each requisite resource condition and concluded reasonably that there is no potential for "a significant effect" on those resource conditions. Utah Env't Cong. v. Dale Bosworth, 443 F.3d at 743 (emphasis in original). Even if a CE applies to a proposed agency action, the agency may not use that CE to preclude the proposed action from further NEPA review if the agency determines that there are extraordinary circumstances. See 40 C.F.R. § 1501.4(b); Utah Env't Cong. v. Dale Bosworth, 443 F.3d at 742 ("[T]he presence of an extraordinary circumstance precludes the application of a categorical exclusion."). To determine "whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS," an agency "should [] consider[]" seven resource conditions:

> (i)    Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;
>
> (ii)   Flood plains, wetlands, or municipal watersheds;
>
> (iii)  Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;
>
> (iv)   Inventoried roadless area or potential wilderness area;
>
> (v)    Research natural areas;
>
> (vi)   American Indians and Alaska Native religious or cultural sites; and
>
> (vii)  Archaeological sites, or historic properties or areas.

36 C.F.R. § 220.6(b)(1).

> The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist.

36 C.F.R. § 220.6(b)(2). "[A]n extraordinary circumstance is found only when there exists a potential for a significant effect on a resource condition." Utah Env't Cong. v. Dale Bosworth, 443 F.3d at 743. An agency does not need to conduct extensive analysis, moreover, when evaluating resource conditions for extraordinary circumstances:

> Reading the regulation to require detailed written analysis from the agency before rejecting each extraordinary circumstance would seem to defeat the purpose of a categorical exclusion -- "a streamlined process allowing minor projects to be quickly implemented" -- and fly in the face of Tenth Circuit precedent that an environmental effect must be "significant" before an agency wishing to rely on a categorical exclusion must "engage in further analysis."

Rocky Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv., 548 F. Supp. 3d at 1062, aff'd, 40 F.4th 1133 (10th Cir. 2022)(quoting Utah Env't Cong. v. Dale Bosworth, 443 F.3d at 735, 742).

The Court has reviewed and summarized the Forest Service's detailed evaluation of each resource condition. See supra, at 37-76. These evaluations demonstrate that the Respondents consider sufficiently how the Aerial Shooting affects each resource condition and that the Respondents conclude fairly that the Aerial Shooting will not significantly impact each condition. Regarding the first resource condition -- threatened or endangered species or habitats -- the Forest Service compiles sixty-seven pages of biological assessments, which include maps and surveys of each potentially impacted endangered or threatened species and these species' critical habitats. See supra, at 38-61. Incorporating this extensive field work -- which identifies the location of each species and habitat and how an uptick in dead Gila Cows in the project area may impact that species and habitat -- the assessments conclude that the Aerial Shooting either will not affect, or is not likely to jeopardize, each species or critical habitat. See supra, at 38-61. The Tenth Circuit holds that similar field work supports sufficiently the Forest Service's determination that there are

no extraordinary circumstances, where a petitioner alleges that an agency action may significantly affect threatened or endangered species.  See Utah Env't Cong. v. Dale Bosworth, 443 F.3d. at 744 (concluding that "species monitoring performed by the Forest Service, although not consistently conducted on an annual basis, was more than ample to determine whether extraordinary circumstances existed," where the Forest Service conducted several surveys of the two species that the petitioners allege the challenged agency action would affect significantly).

The same logic applies to the Forest Service's determinations regarding the other six resource conditions.  Regarding the second resource condition -- flood plains, wetlands, or municipal watersheds -- the Forest Service provides the Water Specialist Report, which, surveying scientific research and Gila Wilderness field studies, concludes that the water quality benefits of removing the destructive Gila Cows outweigh any negative effects stemming from a short-lived uptick in decomposing carcasses.  See supra, at 62-67.  Regarding the third resource condition -- Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas -- the Forest Service provides the Minimum Requirements Analysis, which evaluates how three different removal techniques likely will impact the Gila Wilderness' five wilderness qualities.  See supra, at 67-72.  Using this analysis, the Forest Service concludes that the Aerial Shooting is the least intrusive method of removing the Gila Cows.  See supra, at 67-72.  Regarding the fourth resource condition -- inventoried roadless area or potential wilderness area -- the Forest Service notes correctly that no inventoried roadless areas or potential wilderness areas are within the project area.  See Decision Memo. at 12 (AR 005910).

Regarding the fifth resource condition -- research natural areas -- the Forest Service concludes that the Aerial Shooting will improve rather than degrade the one research natural area -- the Turkey Creek Research Natural Area -- found within the project area.  See Decision Memo.

at 12 (AR 005910). Although the Decision Memo. does not state explicitly upon which materials this determination relies, the Court concludes that the Forest Service's other research -- which includes the Water Specialist Report, the Miscellaneous Biological Assessment, and the Mexican Gray Wolf Biological Assessment -- supports sufficiently the Forest Service's conclusion that the Aerial Shooting will improve rather than degrade the Turkey Creek Research Natural Area. See supra, at 38-72. Regarding the sixth resource condition -- American Indians and Alaska Native religious or cultural sites -- the Forest Service provides several correspondences between the agency and nearby tribes, none of which identify any cultural sites that the Aerial Shooting will impact. See supra, at 73-75. Finally, regarding the seventh resource condition -- archaeological sites, or historic properties or areas -- the Forest Service provides its consultation with the district archaeologist, who determines that the Aerial Shooting will have no effect on cultural or historic resources. See supra, at 75-76. In sum, the Court concludes that these materials[79] are "more than ample to determine whether extraordinary circumstances exist" and, thus, that the Forest Service is not arbitrary or capricious in determining that there are no extraordinary circumstances related to the Aerial Shooting. Utah Env't Cong. v. Dale Bosworth, 443 F.3d. at 744.

The Court also concludes that the Animal Inspection Service's determination that there are no extraordinary circumstances is not arbitrary or capricious. The Animal Inspection Service relies on and references specifically the Forest Service's Decision Memo. and supporting materials,

---

[79]That the Forest Service does not follow the Riparian Technical Reference's recommendations does not change this conclusion. The Court agrees with the Respondents; there is no law that requires the Forest Service to follow the Riparian Technical Reference's recommendations for assessing riparian damage. See February 1, 2024, Tr. at 146:1-2 (Smith). The Decision Memo. and its supporting materials demonstrate that the Forest Service's conclusions related to riparian damage in the Gila Wilderness are reasonable, notwithstanding that the Forest Service does not follow the Riparian Technical Reference's recommendations.

including the Miscellaneous Biological Assessment and the Minimum Requirements Analysis in

the Animal Inspection Service CE Record.  See Animal Inspection Service CE Record at 2-3

(AR 005894-95); id. at 4 (AR 005896)("This [NEPA compliance] determination is based upon

current environmental laws, regulations, and policies, and made in consultation with [the Forest

Service].").  Accordingly, the Court concludes that the Respondents' determination that there are

no extraordinary circumstances is not arbitrary or capricious, and, thus, the Respondents' decision

categorically to exclude the Aerial Shooting from further NEPA review is not arbitrary or

capricious.[80]

---

[80]The Court also does not find sound the Petitioners' NEPA arguments regarding the Respondents' scoping process.  See Petitioners' Merits Brief at 41-42.  The Petitioners argue that the Respondents "misused the scoping process," which, according to the Petitioners, "is normally the first step in preparation of an EIS."  Petitioners' Merits Brief at 41.  To support this contention, the Petitioners point to 40 C.F.R. § 1501.9, the relevant language of which is now cabined in 40 C.F.R. § 1502.4.  Compare 40 C.F.R. § 1502.4(a)("Agencies shall use scoping, an early and open process consistent with § 1501.9 of this subchapter, to determine the scope of issues for analysis in an environmental impact statement, including identifying the important issues and eliminating from further study unimportant issues."), with Petitioners' Merits Brief at 41 ("Generally, [a]gencies shall use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying the significant issues and eliminating from further study non-significant issues.")(quoting 40 C.F.R. § 1501.9)(brackets in Petitioners' Merits Brief, but not in 40 C.F.R. § 1501.9).  The Petitioners assert that, because the Respondents exclude categorically the Aerial Shooting, and, thus, do not engage in a formal public notice-and-comment period, the Respondents "abandon[] their obligations to conduct an open public process."  Petitioners' Merits Brief at 42.  In response, the Respondents insist that, contrary to the Petitioners' assertions, the scoping process is not reserved for actions that require an EIS and a formal notice-and-comment period.  See Respondents' Merits Response at 50.  To support their contention, the Respondents point to 36 C.F.R. § 220.4, which provides that "[s]coping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or and EIS." 36 C.F.R. § 220.4(e)(1).

The Court agrees with the Respondents.  Nothing in 36 C.F.R. § 220.4 requires a formal notice-and-comment period for actions which are excluded categorically from further NEPA review, or implies that an agency that conducts a scoping process must later produce an EIS.  See 36 C.F.R. § 220.4(e).  Rather, 36 C.F.R. § 220.4 provides that scoping "shall be carried out in accordance with the requirements of 40 C.F.R. 1501.7."  36 C.F.R. § 220.4(e)(1).  The Petitioners do not allege that the Aerial Shooting's scoping process does not comply with 40 C.F.R § 1501.7,

## IV.    THE AERIAL SHOOTING DOES NOT EXCEED THE RESPONDENTS' STATUTORY AUTHORITY.

The Court concludes that the Aerial Shooting does not exceed the Respondents' statutory authority.  Although the briefing focuses on the Impoundment Regulation Claim rather than on the Statutory Authority Claim, see Petitioners' Merits Brief at 8-25; Petitioners' Merits Reply at 11-24, the Complaint identifies one statutory provision and one regulation that relate to how the Aerial Shooting allegedly exceeds the Respondents' statutory authority: (i) 16 U.S.C. § 1133(c), which is part of the Wilderness Act; and (ii) 36 C.F.R. § 262.10, which is promulgated under the Organic Act, see Complaint ¶¶ 86-87, at 22.  Regarding (i), the Petitioners allege that the Aerial Shooting exceeds the Respondents' statutory authority, because "the Wilderness Act[] presumptively prohibits the use of 'motorized equipment' and 'mechanical transport,' such as the aircraft intended to be used for shooting cattle here."    Complaint ¶ 86, at 22 (emphasis in Complaint)(quoting 16 U.S.C. § 1133(c)).  Regarding (ii), the Petitioners allege:

> The absence of statutory authority is further evidenced by the specific regulation to control for and manage unauthorized livestock, 36 C.F.R. § 262.10.  That regulation sets forth the procedures that USFS must follow when removing unauthorized livestock -- including the cattle targeted in the Aerial Shooting -- from the wilderness. This regulation is consistent with the legal principle that unclaimed, unauthorized, and unmanaged cattle are the property of New Mexico. The regulation makes no allowance for the on-site destruction of such cattle. USFS cannot skirt this regulatory limitation on how it removes unauthorized cattle on

---

which outlines how agencies must coordinate with one another if more than one agency is involved in the same action.  See 40 C.F.R § 1501.7.  36 C.F.R. § 220.4 also provides: "Because the nature of complexity of a proposed action determine the scope and intensity of analysis, no single scoping technique is required or prescribed." 36 C.F.R. § 220.4(e)(2).  The Respondents' scoping process -- providing several months of notice to various stakeholders and coordinating agencies, soliciting public comments, and providing detailed responses in an appendix to the Decision Memo., see supra, at 12-24, 76-85-- complies with the Forest Service's scoping obligations pursuant to 36 C.F.R. § 220.4, and the Respondents do not misuse the scoping process by failing to produce an EIS.  Accordingly, the Court concludes that the Respondents' scoping process does not violate the NEPA.

wilderness lands by deputizing another agency (APHIS) to unlawfully remove cattle by Aerial Shooting.

Complaint ¶ 87, at 22-23.  The Court addresses each argument in turn.

Regarding the Petitioners' Wilderness Act argument, the Court concludes that: (i) the Respondents' helicopter use does not violate the 16 U.S.C. § 1133(c); and (ii) even if there is a statutory violation, this violation does not mean that the Respondents exceed their statutory authority.  16 U.S.C. § 1133(c) provides:

> Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C. § 1133(c).    Reading the statute's plain text, the Court concludes that 16 U.S.C. § 1133(c) prohibits only the landing of aircraft in wilderness areas and not the operation of aircraft above wilderness areas.  In making this conclusion, the Court does not find sound the Petitioners' argument that, because 16 U.S.C. § 1133(c) limits the use of "motor vehicles, motorized equipment or motorboats," and "other form[s] of mechanical transport," the Respondents may not fly a helicopter over the Gila Wilderness.  16 U.S.C. § 1133(c).  See Complaint ¶ 86, at 22; Petitioners' Merits Brief at 31-32; Petitioners' Merits Reply at 26-27.  Principles of statutory interpretation affirm the Court's reading.  The Supreme Court first recognizes a presumption against rendering language superfluous Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174 (1803)("It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such a construction is inadmissible, unless the words require it.").

This presumption against superfluity, also known as the "Surplusage Canon," requires that, "if possible, every word and every provision is to be given effect.  None should be ignored.  None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts at 174 (2012)("Scalia & Garner").  Further, "because legal drafters should not include words that have no effect, courts avoid a reading that renders some words altogether redundant."  Scalia & Garner, supra at 176.  Here, under the presumption of superfluity, the Court accords legal significance to every phrase in 16 U.S.C. § 1133(c).  The Petitioners' position that flying a helicopter is a motor vehicle, a piece of motorized equipment, a motorboat, or some other form of mechanical transport within the meaning of 16 U.S.C. § 1133(c), would render the statute's phrase, "landing of aircraft," redundant, because landing an aircraft is a way of using that aircraft.  16 U.S.C. § 1133(c).  See Scalia & Garner, supra at 174.  Stated otherwise, the Court accords meaning to the word "aircraft" by recognizing that an "aircraft" -- e.g., a helicopter -- is not any of the other machines listed in 16 U.S.C. § 1133(c).  Accordingly, the Court, reading the provision's plain text, concludes that 16 U.S.C. § 1133(c) only limits the landing of helicopters in wilderness areas, and not the flying of helicopters over wilderness areas and, thus, the Respondents' helicopter use does not violate the 16 U.S.C. § 1133(c).

Even if a helicopter is a statutory motor vehicle, a piece of motorized equipment, a motorboat, or some other form of mechanical transport under 16 U.S.C. § 1133(c), the Respondents' helicopter use still would not violate 16 U.S.C. § 1133(c), because 16 U.S.C. § 1133(c) allows agencies to use these machines "as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter."  6 U.S.C. § 1133(c).  The Court agrees with the Forest Service's Minimum Requirements Analysis,

which concludes: (i) removing the Gila Cows is necessary to preserve the wilderness character of the Gila Wilderness, see Minimum Requirements Analysis at 2-8; and (ii) the Aerial Shooting is the "minimal action necessary to accomplish the removal of feral cattle," Minimum Requirements Analysis at 33. Accordingly, the Court concludes that the Respondents' helicopter use does not violate 16 U.S.C. § 1133(c), because the helicopter use is "necessary to meet minimum requirements for the administration of the area for the purpose" of the Wilderness Act. 16 U.S.C. § 1133(c).

Although the Court concludes -- for two separate reasons -- that the Respondents' helicopter use does not violate 16 U.S.C. § 1133(c), the Court also concludes that, even if there is a violation, that violation does not mean that the Respondents exceed their statutory authority. The Petitioners do not allege, and could not allege plausibly, that the Forest Service or the Animal Inspection Service derive their statutory authority from the Wilderness Act. One of the statutes that grants the Forest Service authority to conduct the Aerial Shooting is the Organic Act, which provides that the Agriculture Secretary "shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests," and that "he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. One of the statutes that grants the Animal Inspection Service authority to conduct the Aerial Shooting is the Animal Damage Control Act, 7 U.S.C. § 8351-56, which provides that the Agriculture Secretary "may conduct a program of wildlife services with respect to injurious animal species and take any action the Secretary considers necessary in conducting the program." 7 U.S.C. § 8351. The Aerial Shooting falls within these grants of authority, because the Aerial Shooting is designed to preserve the Gila National Forest and the

Gila Wilderness, and to remove the injurious Gila Cows. Thus, potentially violating the Wilderness Act does not exceed either agency's statutory authority. Accordingly, the Court concludes that, even if the Respondents violate 16 U.S.C. § 1133(c), the Respondents do not exceed their statutory authority in conducting the Aerial Shooting.

Regarding (ii) -- i.e., the Petitioners' statutory authority arguments related to the Respondents' alleged 36 C.F.R. § 262.10 violations -- the Court concludes similarly that: (i) the Respondents do not violate 36 C.F.R. § 262.10; and (ii) even if there is a violation, that violation does not mean that the Respondents exceed their statutory authority. The Court analyzes fully whether the Respondents violate 36 C.F.R. § 262.10 in the following section, when it evaluates the Impoundment Regulation Claim's merits. See infra, at 221-37. Based on this analysis, the Court concludes that the Respondents do not violate 36 C.F.R. § 262.10, because the Gila Cows are not unauthorized cattle, as the Forest Service regulations define that term. See infra, at 226-37. The Court also concludes that, even if the Aerial Shooting violates 36 C.F.R. § 262.10, that violation does not mean that the Respondents exceed their statutory authority, because 36 C.F.R. § 262.10 is a regulation that governs the Forest Service's activities, and not a law that grants either the Forest Service or the Animal Inspection Service statutory authority to conduct those activities. The allegation that the Respondents violate 36 C.F.R. § 262.10 is just that: an allegation that the Respondents violate a regulation, and not an allegation that the Respondents exceed their statutory authority. To challenge the Respondents' statutory authority, the Petitioners would have to identify how the Aerial Shooting contravenes one of the laws that grants the Respondents'

Case 1:23-cv-00150-JB-GBW   Document 70   Filed 01/29/25   Page 222 of 241

statutory authority.  Accordingly, the Court concludes that the Aerial Shooting does not exceed

the Respondents' statutory authority.[81]

## V.     THE AERIAL SHOOTING DOES NOT VIOLATE THE FOREST SERVICE'S REGULATIONS.

The Court concludes that the Aerial Shooting does not violate the Forest Service's

regulations, because the Gila Cows are not unauthorized livestock, as the Forest Service

regulations define that term, and, thus, the Forest Service does not need to impound the Gila Cows

before killing them.  The thrust of the Petitioners' argument is that the Aerial Shooting violates

36 C.F.R. § 262.10, which provides: "Unauthorized livestock or livestock in excess of those

authorized by a grazing permit on the National Forest System, which are not removed therefrom

within the periods prescribed by this regulation, may be impounded and disposed of by a forest

officer as provided herein."  36 C.F.R. § 262.10.  36 C.F.R. § 262.10 then prescribes procedures

for removing unauthorized livestock.   See 36 C.F.R. § 262.10(a)-(f).   When a Forest Service

officer discovers unauthorized livestock, the officer "may" impound the animal five days after

notifying the animal's owner, 36 C.F.R. § 262.10(a), or, if the officer does not know who the

owner is, the officer "may" impound the animal fifteen days after providing public notice -- in the

form of publishing in a local newspaper, and posting at the county courthouse and one or more

local post offices -- of the Forest Service's intent to impound the livestock, 36 C.F.R. § 262.10(b).

Either of these impoundment processes "may" be initiated, without further private or public notice,

at any time within twelve months of the initial notice.  36 C.F.R. § 262.10(c).  After the Forest

---

[81]The Petitioners' reference to the Forest Service's 2019 Draft Revised Forest Plan for the
Gila National Forest, see Complaint ¶ 86, at 22, does not change this conclusion.  The 2019 Draft
Revised Forest Plan for the Gila National Forest is not a law that grants either the Forest Service
or the Animal Inspection Service statutory authority.

- 222 -

Service impounds the livestock, "a notice of sale of impounded livestock will be published in a local newspaper and posted at the county courthouse and in one or more local post offices," and that public notice will specify the time, date, and location of the sale, which "shall be at least five days after" the public notice.  36 C.F.R. § 262.10(d).  If the impounded livestock has an owner, the owner "may redeem the livestock any time before" the public sale "by submitting proof of ownership and paying for all expenses incurred" by the Forest Service in impounding the animal. 36 C.F.R. § 262.10(e).  If the impoundment costs exceed the livestock's fair market value, then a "minimum acceptable redemption price at fair market value may be established." 36 C.F.R. § 262.10(e).  If no owner redeems the impounded livestock, the livestock "shall be sold at public sale to the highest bidder, provided this bid is at or above the minimum amount set by the Forest Service."  36 C.F.R. § 262.10(f).  If there is no acceptable bid, the livestock "may be sold at a private sale at or above the minimum amount, reoffered at public sale, condemned and destroyed, or otherwise disposed of."  36 C.F.R. § 262.10(f).

The Petitioners argue that, because the Forest Service did not follow these steps when removing the Gila Cows, the Aerial Shooting violates 36 C.F.R. § 262.10.  See Petitioners' Merits Brief at 8-25; Petitioners' Merits Reply at 11-21.  The Petitioners insist that the Forest Service must follow 36 C.F.R. § 262.10 when removing the Gila Cows, because the Gila Cows are unauthorized livestock, as 36 C.F.R. § 261.2 defines that term:

> Unauthorized livestock means any cattle, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro by § 222.20(b)(13), which is not authorized by permit to be upon the land on which the livestock is located and which is not related to use authorized by a grazing permit; provided, that noncommercial pack and saddle stock used by recreationists, travelers, other Forest visitors for occasional trips, as well as livestock to be trailed over an established driveway when there is no overnight stop on Forest Service administered land do not fall under this definition.

36 C.F.R. § 261.2.  The Respondents argue that 36 C.F.R. § 262.10 does not apply to the Gila Cows, because the Gila Cows are not unauthorized livestock.  See Respondents' Merits Response at 17-37.  In asserting that the Gila Cows are not unauthorized livestock, the Respondents urge the Court not to read 36 C.F.R. § 261.2 in a vacuum and to incorporate other Forest Service regulations to harmonize the regulatory scheme.  See Respondents' Merits Response at 17-31.  Specifically, the Respondents argue that the 36 C.F.R. § 261.2 definition does not apply to the Gila Cows, because the Gila Cows are not "livestock" at all, as 36 C.F.R. § 222.1 defines that term: "Livestock means animals of any kind kept or raised for use or pleasure."  Stated otherwise, the Respondents construe  36 C.F.R. § 261.2,  36 C.F.R. § 262.10,  and  36 C.F.R. § 222.1  together,  so  that "unauthorized livestock," as 36 C.F.R. § 261.2 defines and 36 C.F.R. § 262.10 references, applies only to animals "kept for use or pleasure," and not to the Gila Cows, who do not have owners.  Respondents' Merits Response at 17-31.

The Court undertakes its analysis whether the Aerial Shooting violates Forest Service regulations in two parts.  First, the Court considers and rejects the Respondents' argument that the Forest Service's impoundment procedures are discretionary.   Next, the Court evaluates 36 C.F.R. § 261.2, 36 C.F.R. § 262.10, and 36 C.F.R. § 222.1, and concludes that, based on the regulations' text, history, structure, and purpose, 36 C.F.R. § 262.10 applies only to domesticated animals, and, thus, that the Forest Service does not violate its own regulations by killing the Gila Cows without impounding them first.

### A.    36 C.F.R. § 262.10 IS MANDATORY.

As a threshold issue, the Court does not find sound the Respondents' alternative defense that 36 C.F.R. § 262.10's impoundment procedures are discretionary and not mandatory.  See Respondents' Merits Response at 34 ("The regulation is drafted only in the permissive 'may be

impounded,' preserving the agency's discretion to not take any removal action at all, or to remove the animals using other methods.")(internal quotations have no citation).  This argument is not persuasive.  At a high level, it is unlikely that the Forest Service would promulgate a regulation that the agency can choose to ignore, particularly when that regulation describes specific procedures for the agency to follow.  The text confirms this notion.  36 C.F.R. § 262.10 states that unauthorized livestock or livestock in excess of those authorized by a grazing permit "may be impounded and disposed of by a forest officer as provided herein."  36 C.F.R. § 262.10.  In context, "as provided herein" indicates that the provision's procedures are mandatory if the Forest Service chooses to impound and dispose of any animals to which the regulation applies. 36 C.F.R. § 262.10.  The phrase "may be impounded," 36 C.F.R. § 262.10, means that the Forest Service has discretion whether to impound and dispose of the animals, but does not mean that the Forest Service has discretion "to remove the animals using other methods," Respondents' Merits Response at 34.    36 C.F.R. § 262.10's  sub-sections -- i.e., the impoundment procedures themselves -- reinforce these conclusions.  36 C.F.R. § 262.10(a) provides that livestock "may be impounded any time five days after written notice of intent to impound such livestock is mailed by certified or registered mail or personally delivered to such owners."  36 C.F.R. § 262.10(a). This clause's first part indicates that the decision to impound an animal -- whose owner is known -- is discretionary, see 36 C.F.R. § 262.10(a) ("may be impounded"), and the second part of this clause indicates that, if the Forest Service exercises that discretion, the agency must notify the animal's owner in a specific way, see 36 C.F.R. § 262.10(a) ("any time five days after written notice of intent to impound such livestock is mailed").    The same analysis applies to 36 C.F.R. § 262.10(b), which provides similarly that livestock "may be impounded any time 15 days after the date a notice of intent to impound livestock is first published in a local newspaper

and posted at the county courthouse and in one or more local post offices." 36 C.F.R. § 262.10(b). Importantly, other sub-sections include mandatory language. 36 C.F.R. § 262.10(d) provides: "Following the impoundment of livestock, a notice of sale of impounded livestock will be published in a local newspaper and posted at the county courthouse and in one or more local post offices." 36 C.F.R. § 262.10(d). This sub-section describes a mandatory procedure for publishing the notice of sale if the Forest Service impounds livestock under 36 C.F.R. § 262.10. See Nat. Res. Def. Council, Inc. v. James R. Perry, 940 F.3d 1072, 1078 (9th Cir. 2019)("The word 'will,' like the word 'shall,' is a mandatory term, see Washington v. Harper, 494 U.S. 210, 221 . . . (1990), unless something about the context in which the word is used indicates otherwise.")(ellipses added)(internal quotations have no citation). 36 C.F.R. § 262.10(f) provides that, if livestock are not redeemed on or before the public sale, "they shall be sold at public sale to the highest bidder." 36 C.F.R. § 262.10(f). Again, this language indicates that, if the Forest Service impounds an animal under 36 C.F.R. § 262.10 and no owner claims the animal in time, the Forest Service must put up the animal for public sale. See United States v. Myers, 106 F.3d 936, 941 (10th Cir. 1997)("It is a basic canon of statutory construction that use of the word 'shall' indicates a mandatory intent.")(internal quotation has no citation). Accordingly, the Court concludes that 36 C.F.R. § 262.10 is not a discretionary regulation. If 36 C.F.R. § 262.10 applies to the Gila Cows, the Forest Service must follow 36 C.F.R. § 262.10's procedures if the agency wants to remove the Gila Cows.

**B.    36 C.F.R. § 262.10 IS UNAMBIGUOUS AND APPLIES ONLY TO DOMESTICATED ANIMALS.**

The Court agrees with the parties and concludes that the relevant provisions are

unambiguous and thus <u>Auer</u> deference does not apply.[82]  <u>See</u> February 1, 2024, Tr. at 62:24- 63:20

---

[82]Like the Court's conclusion regarding CE 6's unambiguity in the foregoing NEPA analysis, the Court's conclusion regarding the impoundment regulations is of limited consequence, because the Court reaches the same conclusion on the meaning of these regulations as the Forest Service.  <u>See</u> supra, at 206 n.77; Respondents' Merits Response at 17-31.

The Court's conclusion that the provisions are unambiguous and thus <u>Auer</u> deference does not apply, also takes care of the Petitioner's arguments related to the Forest Service's historic practice of referring to the Gila Cows as unauthorized livestock, which is relevant only to whether an agency's interpretation of an ambiguous regulation is entitled to <u>Auer</u> deference, and not what an unambiguous regulation means.  <u>See</u> <u>Kisor v. Wilkie</u>, 588 U.S. at 579 ("We have [] only rarely given <u>Auer</u> deference to an agency construction 'conflict[ing] with a prior' one.")(quoting <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 515, (1994)(Kennedy, J.)).  Even if there were an <u>Auer</u> issue, the Forest Service's practice of referring to the Gila Cows as unauthorized livestock would not make their present interpretation -- that the Gila Cows are not unauthorized livestock -- unreasonable and not entitled to <u>Auer</u> deference, because the Forest Service's past use of the term is not an official or authoritative position on the term's meaning:

[W]e have laid out some especially important markers for identifying when <u>Auer</u> deference is and is not appropriate.

    To begin with, the regulatory interpretation must be one actually made by the agency.  In other words, it must be the agency's "authoritative" or "official position," rather than any more ad hoc statement not reflecting the agency's views.  [United States v. ]Mead[ Corp.], 533 U.S. [218,] 257-259, and n.6 . . . [(2001)](Scalia, J., dissenting)].  That constraint follows from the logic of <u>Auer</u> deference -- because Congress has delegated rulemaking power, and all that typically goes with it, to the agency alone.  Of course, the requirement of "authoritative" action must recognize a reality of bureaucratic life: Not everything the agency does comes from, or is even in the name of, the Secretary or his chief advisers. So, for example, we have deferred to "official staff memoranda" that were "published in the Federal Register," even though never approved by the agency head.  <u>Ford Motor Credit[ Co. v. Milhollin]</u>, 444 U.S. [555,] 566, n.9, 567, n.10 . . . [(1980)](Brennan, J.)](declining to "draw a radical distinction between" agency heads and staff for <u>Auer</u> deference). But there are limits.  The interpretation must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context.  <u>See, e.g.</u>, <u>Paralyzed Veterans[ of Am. v. D.C. Arena L.P.]</u>, 117 F.3d [579,] 587 [(D.C. Cir. 1997)](refusing to consider a "speech of a mid-level official" as an "authoritative departmental

position"); N. Y. State Dept. of Social Servs. v. Bowen, 835 F.2d 360, 365-366 ([D.C. Cir.] 1987)(rejecting the idea that an "informal memorandum" recounting a telephone conversation between employees could count as an "authoritative pronouncement"); Exelon Generation Co. v. Local 15, Int'l Brotherhood of Elec. Workers, AFL-CIO, 676 F.3d 566, 576-578 ([7th Cir.] 2012)(declining deference when the agency had itself "disclaimed the use of regulatory guides as authoritative"). If the interpretation does not do so, a court may not defer.

Kisor v. Wilkie, 588 U.S. at 576-77 (ellipses and brackets added by this Court). The same logic applies to the Petitioners' argument that, because the Forest Service's proposed forest plan refers to the Gila Cows as "feral domestic livestock," the Court "should reject USFS's position in this lawsuit" and "conclude that the Gila Cattle fall within the definition of 'unauthorized livestock' that must be impounded in accordance with 36 C.F.R. § 262.10." Supplemental Authority Brief at 2-3 (internal quotations have no citations)(citing Gila National Forest, U.S. Forest Service, Land Management Plan: Catron, Grant Hidalgo, and Sierra Counties, New Mexico at 140 (dated July 30, 2024), filed January 10, 2025 (Doc. 68-1)("July 30, 2024, Forest Plan")). In response, the Respondents make four arguments: (i) the July 30, 2024, Forest Plan is not properly before the Court, because the Court "'may not consider materials outside of the administrative record'" for the challenged agency decision, Supplemental Authority Response at 1 (quoting Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 58 F. Supp. 3d at 1224); (ii) the Petitioners' quoted passage neither interprets nor applies the term "livestock" in 36 C.F.R § 262.10 and, instead, the "passage mostly discusses efforts 'to eradicate feral hogs,' not impound them," Supplemental Authority Response at 2; (iii) the July 30, 2024, Forest Plan is "not a final authoritative statement by the Forest Service," because it is "subject to modification" while it is currently undergoing an "administrative objections process," after which the Forest Supervisor may approve it, Supplemental Authority Response at 2 (citing Forest Plan Federal Register Notice at 61059); and (iv) 2022 dictionary definitions suggest that the phrase "'feral domestic livestock'" means that the Gila Cows are wild animals who are descended from domesticated animals, and, thus, the Gila Cows are not subject to 36 C.F.R. § 262.10. Supplemental Authority Response at 1-3 (quoting July 30, 2024, Forest Plan at 140).

As a threshold matter, the Court concludes that the July 30, 2024, Forest Plan is not properly before the Court, because it is not an authoritative regulatory interpretation that may be submitted as supplemental authority pursuant to the Federal Rules of Appellate Procedure. The July 30, 2024, Forest Plan is not a "regulatory interpretation" that reflects the Forest Service's official interpretation of 36 C.F.R. § 262.10. Kisor v. Wilkie, 588 U.S. at 576-77. See Supplemental Authority Response at 2 (asserting that the July 30, 2024, Forest Plan is "is not a final authoritative statement by the Forest Service," because the July 30, 2024, Forest Plan is "subject to modification" while undergoing an "administrative objections process," after which the Forest Supervisor may approve it); Forest Plan Federal Register Notice at 61058 (stating that the public has sixty days to "file objections for Forest Service review prior to the approval" of the July 30, 2024, Forest Plan). The Court thus agrees with the Respondents' second and third arguments, and concludes that the July 30, 2024, Forest Plan is neither an interpretation of the relevant provisions, nor a final, authoritative interpretation by the Forest Service. Rule 28(j) allows a party to submit supplemental authority "[i]f pertinent and significant authorities come to a party's

(Court, Smith, McGuire).   The Court also concludes, however, that the Forest Service's interpretation is correct, and that 36 C.F.R. § 262.10 applies only to domesticated animals.   In concluding that the provisions are unambiguous and that 36 C.F.R. § 262.10 applies only to domesticated animals, the Court looks to "the traditional tools of construction, such as the regulatory 'text, structure, history, and purpose.'"   Sierra Club v. U.S. Env't Prot. Agency, 964 F.3d at 891 (quoting Kisor v. Wilkie, 588 U.S. at 559).   Beginning with the text, the Court concludes that the Forest Service's "unauthorized livestock" definition -- which the Forest Service promulgated on January 14, 1977, see 36 C.F.R. § 261.2 -- does not include wild animals, because relevant 1976 dictionary definitions of the provision's undefined terms indicate that the provision refers only to domestic animals.   See Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012)("When a term goes undefined in a statute, we give the term its ordinary meaning."); Utah v. Evans, 536 U.S. 452, 455 (2002)(Scalia, J.)(using contemporaneous dictionary definitions to

---

attention after the party's brief has been filed." Fed. R. App. P. 28(j).  See Olenhouse, 42 F.3d at 1580 (holding that "the district court should govern itself by referring to the Federal Rules of Appellate Procedure" when reviewing agency action).  Because the July 30, 2024, Forest Plan is not an authoritative regulatory interpretation, the July 30, 2024, Forest Plan is not a "pertinent" or "significant" authority that may be submitted pursuant to rule 28(j).  Fed. R. App. P. 28(j). Accordingly, the Court concludes that the July 30, 2024, Forest Plan is not properly before the Court.

Next, the Court concludes that, even if the July 30, 2024, Forest Plan is an authoritative regulatory interpretation, and thus the July 30, 2024, Forest Plan is properly before the Court, the Court's conclusion that 36 C.F.R. § 262.10 is unambiguous means that the Court does not defer to the Forest Service's interpretation under Auer.  Accordingly, the July 30, 2024, Forest Plan's statements about feral domestic livestock are not relevant to what 36 C.F.R. § 262.10's unambiguous language means. Cf. Kisor v. Wilkie, 588 U.S. at 579.  Finally, even if there is an Auer issue and the July 30, 2024, Forest Plan is an authoritative regulatory interpretation, the Court agrees with the Respondents' fourth argument, and concludes that the term "feral domestic livestock" means that the Gila Cows are wild animals that are descended from animals that were once domesticated, and, accordingly, the Gila Cows are not subject to 36 C.F.R. § 262.10, even using the July 30, 2024, Forest Plan's language.  July 30, 2024, Forest Plan at 140.  Accordingly, the Court determines that the July 30, 2024, Forest Plan does not change the Court's conclusions regarding what 36 C.F.R. § 262.10 means and whether the regulation applies to the Gila Cows.

evaluate Constitutional language); Hibbs v. Winn, 542 U.S. 88, 117 (2004)(Ginsburg, J., dissenting)(using contemporaneous dictionary definitions to evaluate undefined statutory terms); Garland v. Cargill, 602 U.S. 406, 437 (2024)(Sotomayor, J., dissenting)(using contemporaneous dictionary definitions to evaluate undefined statutory terms and observing that contemporaneous dictionary definitions are "some of the best evidence of contemporaneous understanding"); In re Mallo, 774 F.3d 1313, 1321 (10th Cir. 2014)("Dictionary definitions are useful touchstones to determine the 'ordinary meaning' of an undefined statutory term.")(internal quotation has no citation). First, although 36 C.F.R. § 261.2 defines "unauthorized livestock," it does not define "livestock." 36 C.F.R. § 261.2.[83] Accordingly, the Court gives the undefined word "livestock" its ordinary meaning, which, as contemporaneous dictionary definitions indicate, does not include wild animals. See The American Heritage Dictionary of the English Language: New College Edition at 764 (1976)(defining "livestock" as "[d]omestic animals such as cattle, horses, sheep, hogs, or goats, raised for home use or for profit").[84] The Court applies the same logic to each undefined animal listed in the 36 C.F.R. § 262.1 "unauthorized livestock" definition. 36 C.F.R. § 262.1. The 1976 dictionary definitions of each animal, other than equines, indicate

---

[83]Although the Forest Service defines "livestock" in 36 C.F.R. § 222.1, the Forest Service promulgated 36 C.F.R. § 222.1 ten months after it promulgated 36 C.F.R. § 261.2. See 36 C.F.R. § 222.1 (indicating that it was promulgated on October 28, 1977); 36 C.F.R. § 261.2 (indicating that it was promulgated on January 14, 1977). Because 36 C.F.R. § 222.1 did not exist when the Forest Service promulgated 36 C.F.R. § 261.2, the term, "livestock," was undefined in 36 C.F.R. § 261.2 when it was drafted, and the Court uses contemporaneous dictionary definitions to glean that undefined term's ordinary meaning.

[84]The 1976 dictionary's examples of domestic animals are the same animals that the Forest Service lists in its "unauthorized livestock" definition, which further supports the Court's conclusion that 36 C.F.R. § 262.1 refers only to domesticated animals. 36 C.F.R. § 262.1 ("Unauthorized livestock means any cattle, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro . . . .")

that each word "especially" refers to domesticated animals.  The American Heritage Dictionary of the English Language: New College Edition at 213 (defining "cattle" as "[v]arious animals of the genus Bos, especially those of the domesticated species B. taurus, raised in many breeds for meat and dairy products);[85] id. at 1192 (defining "sheep" as "[a]ny of the various usually horned, ruminant mammals of the genus Ovis; especially, the domesticated species O. aries, raised in many breeds for its wool, edible flesh, or skin"); id. at 564 (defining "goat" as "[a]ny of the various horned, bearded ruminant mammals of the genus Capra, originally of mountainous regions of the Old World; especially, one of the domesticated forms of C. hircus"); id. at 627 (defining "hog" as "[a] domesticated pig, especially one weighing over 120 pounds").[86]  The same 1976 dictionary

_____

[85]Interestingly, this entry also includes an obsolete definition that defines "cattle" as simply "[d]omestic animals."  The American Heritage Dictionary of the English Language: New College Edition (1976) at 213.

[86]This entry also includes a definition, which comes before the definition that the Court uses above, that defines "hog" as "[a]ny of the various mammals of the family Suidae, which includes the domesticated pig as well as wild species, such as the boar and the wart hog."  The American Heritage Dictionary of the English Language: New College Edition at 627.  The dictionary editors explain that, where an entry has multiple definitions, the first definition is not any more correct than subsequently listed definitions:

> Numerous English words have a spread of more than three or four distinct meanings or shades of meaning that must be identified and distinguished as separate semantic aspects and presented in a meaningful and useful order. The editors of this Dictionary have taken the position that the most useful order for the general user is neither historical nor by statistical frequency, even if sufficient evidence were available for either of those schemes. The order used here is an effort to arrange a complex word in a psychologically meaningful order, with one subgroup leading into another, so that the word can to some extent be perceived as a structured unit rather than a string of unrelated senses.

Guide to the Dictionary: Order of Definitions, The American Heritage Dictionary of the English Language: New College Edition at xlvi.  Accordingly, the Court concludes that the fact that the Court's definition appears after another definition that includes wild animals does not mean that the Court's definition is less appropriate than the preceding definition.  In any event, the fact that one of the animals listed in the Forest Service's "unauthorized livestock" definition has an

defines "equine" as "[o]f or belonging to the family Equidae, which includes the horses, asses, and zebras." The American Heritage Dictionary of the English Language: New College Edition at 442. That the 1976 dictionary definition of "equine" is the only definition which does not state that the defined word "especially" refers to domesticated animals reinforces the Court's reading of the Forest Service's "unauthorized livestock" definition, which carves out "wild free-roaming horse[s] or burro[s]" from the "equine" category, and not from the other animal categories. 36 C.F.R. § 261.2 ("Unauthorized livestock means any cattle, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro by § 222.20(b)(13), which is not authorized by permit . . . ."). In sum, the ordinary meanings of the provision's undefined terms demonstrate that the Forest Service's 36 C.F.R. § 261.2 "unauthorized livestock" definition is unambiguous and refers only to domesticated animals and not to wild animals. Accordingly, the Court concludes that, based on the Court's reading of 36 C.F.R. § 261.2's plain text, the Forest Service's impoundment procedures -- 36 C.F.R. § 261.10 -- apply only to domesticated animals and not to wild animals, like the Gila Cows. See Decision Memo. at 1 (AR 005899)(noting that the Gila Cows "have not been husbanded, cared for by private owners, or kept or raised on a ranch for several generations, and are thus not domesticated"); Petitioners' Merits Brief at 20 (acknowledging that the Gila Cows are not privately owned);

Principles of statutory interpretation affirm the Court's reading. "Under the in pari materia canon, statutes addressing the same subject matter generally should be read 'as if they were one law.'" Wachovia Bank v. Schmidt, 546 U.S. 303, 316 (2006)(Ginsburg, J.)(quoting Erlenbaugh

---

alternative dictionary definition which includes wild animals does not change the Court's conclusion that the Forest Service's "unauthorized livestock" definition does not refer to wild animals. 36 C.F.R. § 261.2.

v. United States, 409 U.S. 239, 243 (1972))(quoting United States v. Freeman, 44 U.S. 556, 564 (1845)).  See Navajo Health Found.-Sage Mem'l Hosp., Inc v. Burwell, 220 F. Supp. 3d 1190, 1261 (D.N.M. 2016)(Browning J.)(holding that, pursuant to the in pari materia canon, "regulations on the same subject matter are to be construed together if possible")(citing Erlenbaugh v. United States, 409 U.S. at 243-44); Scalia & Garner, supra, at 252 ("Several acts in pari materia, and relating to the same subject, are to be taken together, and compared in the construction of them, because they are considered as having one object in view, and as acting  upon one system.")(quoting 1 James Kent, Commentaries on American Law 433 (1826)).

> The canon is [] based upon a realistic assessment of what the legislature ought to have meant.  It rests on two sound principles: (1) that the body of the law should make sense, and (2) that it is the responsibility of the courts, within the permissible meanings of the texts, to make it so.

Scalia & Garner, supra, at 252.  In applying the in pari materia canon, the "critical questions" are: (i) "[j]ust how affiliated" must the separate statutes or regulations be; and (ii) "what purposes are the same?"  Scalia & Garner, supra, at 253.

The Court concludes that the relevant regulations in this case -- 36 C.F.R. § 261.2, 36 C.F.R. § 262.10,  and  36 C.F.R. § 222.1 -- should be construed in pari materia.  All three regulations are in Chapter II of the Code of Federal Regulations -- titled, "Forest Service, Department of Agriculture" -- and the Forest Service promulgated them in the same year. 36 C.F.R. § 261.2;  36 C.F.R. § 262.10;  and  36 C.F.R. § 222.1.    That the Forest Service promulgated   36 C.F.R. § 222.1   ten   months   after   promulgating   36 C.F.R. § 261.2; 36 C.F.R. § 262.10 does not counsel against construing the three regulations in pari materia.[87]  See

---

[87]Although the Court concludes that 36 C.F.R. § 261.2 and 36 C.F.R. § 262.10 are not ambiguous, the Forest Service's subsequent promulgation of 36 C.F.R. § 222.1 would, if anything, clarify ambiguities in favor of the Forest Service's interpretation.  See Scalia & Garner, supra, at

36 C.F.R. § 222.1 (indicating that it was promulgated on October 28, 1977); 36 C.F.R. § 261.2

(indicating that it was promulgated on January 14, 1977); 36 C.F.R. § 262.10 (indicating that it

was promulgated on January 14, 1977); In re Meyer, 355 B.R. 837, 847 (Bankr. D.N.M.

2006)(Starzynski, B.J.)("[S]tatutes must all be construed in pari materia if possible, regardless of

the differing dates of enactment.")(citing Crawford Fitting Co. v. J. T. Gibbons, Inc., 482 U.S.

437, 444 (1987)(Rehnquist, C.J.)).  All three regulations are promulgated under the same statutory

authority: the Organic Act.  See 36 C.F.R. § 261.2; 36 C.F.R. § 262.10; and 36 C.F.R. § 222.1.

Although the three regulations appear in different parts of the Code of Federal Regulations, each

part contributes to a regulatory framework that governs how the Forest Service may control

activities -- including livestock grazing -- on national forests.  36 C.F.R. § 261.2 -- i.e., the Forest

Service's "unauthorized livestock" definition -- appears in part 261, which is titled "Prohibitions."

36 C.F.R. § 261.2.  36 C.F.R. § 261.1 -- titled "Scope" -- provides that the "prohibitions in this

part apply" when an "act or omission" occurs in the National Forest System or affects, threatens,

or endangers Forest Service property or people using Forest Service lands.  36 C.F.R. § 261.1.

Part 261's subsections describe prohibitions related to, among other things, disorderly conduct,

fire use, timber gathering, livestock management, hunting, motor vehicle use, and recreation in

national forests.  See 36 C.F.R. §§ 261.4-261.8, 261.13, 261.16-17.  36 C.F.R. § 262.10 -- i.e., the

Forest Service's unauthorized livestock impoundment procedures -- appears in part 262, which is

titled "Law Enforcement Support Activities."  Part 262's subsections describe how law

---

252 ("It is a logical consequence of [the principle of in pari materia] that the meaning of an
ambiguous provision may change in light of a subsequent enactment.")(citing United States v.
Stewart, 311 U.S. 60, 64 (1940), and including a parenthetical which states: "construing Revenue
Acts of 1916 and 1928 in pari materia to resolve 'ambiguities and doubts' about meaning of
language of earlier statute").

enforcement may reward individuals who provide information related to unlawful activities on Forest Service land, including stealing property and starting dangerous fires, see 36 C.F.R. §§ 262.2-3, as well as how the Forest Service may impound loose dogs, unauthorized livestock, and other unauthorized property found on Forest Service lands, see 36 C.F.R. §§ 262.10-12.  36 C.F.R. § 222.1 -- i.e., the Forest Service's "livestock" definition -- appears in part 222, which is titled "Range Management."  Part 222's subsections describe how the Forest Service: (i) issues, changes, and otherwise manages grazing and livestock use allotments, permits and permittees, see 36 C.F.R. §§ 222.1-11; (ii) mediates grazing permit disputes, 36 C.F.R. §§ 222.20-26; (iii) charges fees for grazing and livestock use on Forest Service lands, see 36 C.F.R. §§ 222.50-54; and (iv) manages wild free-roaming horses and burros, see 36 C.F.R. §§ 222.60-76.  The Court concludes that parts 261, 262, and 222 concern the same subject matter and contribute to the same purpose, insofar as each part describes how the Forest Service manages a variety of private activities on national forests.  Accordingly, the Court concludes that 36 C.F.R. § 261.2, 36 C.F.R. § 262.10, and 36 C.F.R. § 222.1 should be construed in pari materia.  See United States v. Ressam, 553 U.S. 272, 276-77 (2008)(Steven, J.)(construing together 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 844(h)(2), where the former enhances the criminal penalty for carrying a firearm in connection with a drug trafficking crime, and the latter enhances the penalty for carrying an explosive while committing any felony).

Construing 36 C.F.R. § 261.2, 36 C.F.R. § 262.10, and 36 C.F.R. § 222.1 in pari materia reinforces the Court's reading of 36 C.F.R. § 261.2's plain text and subsequent conclusion that 36 C.F.R. § 262.10 applies only to domesticated animals.  36 C.F.R. § 222.1 defines a term -- "livestock" -- that 36 C.F.R. § 261.2 uses, but does not define.  36 C.F.R. § 222.1.  See 36 C.F.R. § 261.2.  Reading the two provisions in pari materia, the Court interprets the two

provisions so that they are consistent with one another and concludes that 36 C.F.R. § 261.2's "unauthorized livestock" definition refers to "livestock" as 36 C.F.R. § 222.1 defines that term. Because 36 C.F.R. § 222.1 defines livestock as "animals of any kind kept or raised for use or pleasure," the Court's in pari materia reading of the two provisions aligns with 36 C.F.R. § 261.2's plain meaning -- i.e., that "unauthorized livestock" refers only to domesticated animals. Using this consistent definition to interpret 36 C.F.R. § 262.10, the Court concludes that 36 C.F.R. § 262.10 applies only to domesticated animals and not to wild animals, like the Gila Cows.

The presumption against superfluity also reinforces the Court's reading. 36 C.F.R. § 262.10(e) provides that, after the Forest Service impounds unauthorized livestock and provides public notice that the impounded animal will be sold publicly, "[t]he owner may redeem the livestock any time before the date and time set for the sale by submitting proof of ownership and paying for all expenses incurred by the United States in gathering, impounding, and feeding or pasturing the livestock."   36 C.F.R. § 262.10(e).   If 36 C.F.R. § 262.10 applies to non-domesticated animals like the Gila Cows, then 36 C.F.R. § 262.10(e) is meaningless, because these wild animals do not have owners who could redeem them, pursuant to 36 C.F.R. § 262.10(e).  See Scalia & Garner, supra, at 174 ("[I]f possible, every word and every provision is to be given effect. None should be ignored.  None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").  Accordingly, the Court concludes that the presumption against superfluity also supports the Court's interpretation that 36 C.F.R. § 262.10 applies only to domesticated animals.

The structure and purpose of 36 C.F.R. § 261.2, 36 C.F.R. § 262.10, and 36 C.F.R. § 222.1 also affirm the Court's reading.  As discussed, the overall regulatory scheme at issue governs how

the Forest Service manages private actions and property interests on national forests.  See supra,

at 197-200, 217-221.  The Petitioners propose interpreting certain provisions within that scheme

in a way that produces absurd results.  The Petitioners argue that 36 C.F.R. § 262.10 applies to the

Gila Cows, because 36 C.F.R. § 261.2's "unauthorized livestock" definition includes wild animals

that are biologically the same as the animals in 36 C.F.R. § 261.2.  Petitioners' Merits Brief at 8-

21; Petitioners' Merits Reply at 11-24.  Using that interpretation, the Forest Service would have to

post, pursuant to 36 C.F.R. § 262.10(b), a notice of intent to impound a wild animal and wait

fifteen days before impounding that wild animal.  See 36 C.F.R. § 262.10(b).  After waiting for

fifteen days and impounding the wild animal, the Forest Service would then, pursuant to

36 C.F.R. § 262.10(d), post a notice of sale for the impounded wild animal and wait five more

days, during which time "the owner may redeem the [impounded] livestock" before the public sale

occurs.  36 C.F.R. § 262.10(e).  See 36 C.F.R. § 262.10(d).  36 C.F.R. § 262.10 should not be

construed to require the Forest Service to pretend that a wild animal has an owner, wait fifteen

days before impounding it, and then wait another five days to allow an owner -- who does not

exist -- to redeem the impounded animal before the Forest Service sells or kills the animal.  Such

a reading would produce an absurd result, and the fairer reading of the regulatory scheme creates

a more sensible outcome.  See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575

(1982)(Rehnquist, J.)("[I]nterpretations of a statute which would produce absurd results are to be

avoided if alternative interpretations consistent with the legislative purpose are available.").  In

sum, all indicators point in the same direction: 36 C.F.R. § 262.10 does not apply to the Gila Cows,

because the Gila Cows are not domesticated animals.  Accordingly, the Court concludes that the

Aerial Shooting does not violate 36 C.F.R. § 262.10 and, thus, that the Respondents do not violate

the APA.

**IT IS ORDERED** that: (i) proposed-intervenor Center for Biological Diversity's Motion to Intervene, filed February 28, 2023 (Doc. 26) is granted; (ii) the Center for Biological Diversity may intervene; (iii) Petitioners Nelson Shirley, Humane Farming Association, and Allen Campbell are dismissed from the First Cause of Action for Violation of Court Stipulation ("Count I"), <u>see</u> Plaintiffs' Complaint for Declaratory and Injunctive Relief ¶¶ 76-82, at 20-21 filed February 21, 2023 (Doc. 1)("Complaint"); (iv) Petitioners New Mexico Cattle Growers Association and Spur Lake Cattle Company have standing to pursue Count I; (v) Humane Farming Association is dismissed from the Fourth Cause of Action for Failure to Prepare EA or EIS (APA and NEPA Violation)("Count IV"), <u>see</u> Complaint ¶¶ 97-113, at 24-29; (vi) the Cattle Growers, Spur Lake, Nelson, and Campbell have standing to pursue Count IV; (vii) all Petitioners have standing to pursue the Second Cause of Action for Acting in Excess of Statutory Authority (APA Violation)("Count II"), <u>see</u> Complaint ¶¶ 83-88, at 21-23, and the Third Cause of Action for Acting in Violation of Regulation (APA Violation)("Count III"), <u>see</u> Complaint ¶¶ 89-96, at 23-24; (viii) the Respondents United States Forest Service, Animal and Plant Health Inspection Service, Camille Howes, Tom Vilsack, Randy Moore, Michicko Martin, Henry Provencio, Janet Bucknall, and Keith Wehner ("Respondents") do not violate A Stipulation of Dismissal, filed June 30, 2022 (Doc. 39 in No. CIV 22-0086-JB/CG (D.N.M.)); (ix) the Respondents do not violate the Administrative Procedure Act, 5 U.S.C. § 706, in shooting wild cows in the Gila Wilderness from a low-flying helicopter ("Aerial Shooting"); (x) pursuant to 5 U.S.C. § 706(2), the Aerial Shooting is not: (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right; or (c) without observance of procedure required by law; (xi) the Aerial Shooting does not violate the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370; (xii) the Plaintiffs' Complaint for

Declaratory and Injunctive Relief, filed February 21, 2023 (Doc. 1), is dismissed with prejudice; (xiii) the Respondents United States Forest Service's and Animal and Plant Health Inspection Service's compliance with all applicable laws and regulations is affirmed; (xiv) the decision of the administrative appeal is affirmed; and (xv) a separate, Final Judgment will be entered.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Deana M. Bennett
Spencer L. Edelman
Modrall, Sperling, Roehl, Harris & Sisk, PA
Albuquerque, New Mexico

-- and --

Daniel D. McGuire
Pierson Ferdinand LLP
Coppell, Texas

> *Attorneys for Petitioners New Mexico Cattle Growers Association,*
> *Spur Lake Cattle Company, and Nelson Shirley*

Steven S. Scholl
Dixon Scholl Carrillo P.A.
Albuquerque, New Mexico

-- and --

Daniel D. McGuire
Pierson Ferdinand LLP
Coppell, Texas

> *Attorneys for Petitioner Allen Campbell*

Jessica L. Blome
Greenfire Law, PC
Berkeley, California

-- and --

Gretchen Mary Elsner
Elsner Law & Policy, LLC
Santa Fe, New Mexico

-- and --

Daniel D. McGuire
Pierson Ferdinand LLP
Coppell, Texas

     *Attorneys for Petitioner Humane Farming Association*

Sean C. Duffy
  Trial Attorney
United States Department of Justice
Washington, D.C.

--and--

Andrew A. Smith
  Senior Trial Attorney
Emma L. Hamilton
  Trial Attorney
United States Department of Justice
Albuquerque, New Mexico


     *Attorneys for the Respondents*

Marc Fink
Center for Biological Diversity
Duluth, Minnesota

--and--

Brian Segee
Center for Biological Diversity
Ojai, California

--and--

Douglas W. Wolf
Santa Fe, New Mexico

    *Attorneys for Intervenor Center for Biological Diversity*